**AFFIDAVIT OF DAVID HOBSON**

1. I joined General Electric Company ("GE") in 1969 and was employed there until 1996,when I retired. My last position with GE was Manager of Navy Customer Service for GE's Navy and Small Steam Turbine business in Fitchburg, Massachusetts. Since that time I have been involved in several business ventures related to marine steam turbines and the Navy's use thereof. Before joining GE, I received a degree in Marine Engineering from the Massachusetts Maritime Academy and was licensed for many years as a second assistant engineer by the United States Coast Guard. I sailed as an engineering officer on steam ships and worked as an engineer in the shipbuilding industry before my employment with GE. I was involved in marine engineering during my career at GE. I have personal knowledge of the facts contained herein.

2. I submit this Affidavit to attest to the level of supervision and control by the United States Navy and its officers, such as the Inspector of Naval Machinery ("INM"), over the design and manufacture by GE of equipment intended for installation on U.S. Navy vessels, particularly marine steam turbines.

3. During my 27 years of employment with GE, I had frequent and extensive business dealings on behalf of GE with commissioned officers and civilian employees of the United States Navy in connection with the Navy's purchase and use of marine steam turbines from GE. Over the same time period, I also had extensive business dealings on behalf of GE with commercial shipyards and/or ship owners in connection with their purchase and use of marine steam turbines from GE. GE sold its marine steam turbines to the Navy and commercial shipyards and/or ship owners for installation aboard ships.

Exh. C

4. I have studied military and commercial specifications and other documents dating back to World War II concerning marine steam turbines and have conferred on numerous occasions with Naval officers and others involved in Naval and commercial shipbuilding. I have made frequent trips to Naval and commercial shipyards and have been aboard numerous Naval and commercial vessels in all stages of construction, testing and operation.

5. I am personally familiar with the extent of U.S. Navy control over the production of turbines built for U.S. Navy vessels by GE because I participated in the design, manufacturing, testing and sea trials of these turbines and personally interacted with the Navy's machinery inspectors. Based on my education, training and experience, I have thorough knowledge of the historical practices of GE with regard to marine steam turbines that were purchased from GE by the Navy and commercial shipyards and/or ship owners for installation aboard ships.

6. GE manufactured and supplied turbines for U.S. Navy ships under contract between GE and the shipyards and/or United States of America, specifically the Navy Department. That department administered the contract through Navy Sea Systems Command ("NAVSEA"), the Department of the Navy in Washington, D.C., which acted under authority of the Secretary of the Navy. NAVSEA personnel exclusively developed ship designs and plans, as well as comprehensive and detailed guidelines and specifications for all ship equipment. NAVSEA officers supervised, enforced and approved the supplier's compliance with the plans and specifications, which could only be authorized by the Navy through one of its officers.

7. The INM, a Naval officer subordinate to various levels of command within NAVSEA, supervised GE's production of turbines for Navy vessels. The INM, who worked on-

site at GE's Fitchburg and Lynn plants in Massachusetts, exercised direct control over all aspects of GE's production of turbines for Navy vessels. The INM observed the manufacturing process, and enforced compliance with design specifications. All aspects of the design, performance requirements and materials used for construction, including thermal insulation for Navy vessels, were specified by NAVSEA. As manufactured and shipped to the Navy by GE, turbines did not have any thermal insulation materials (whether containing asbestos or otherwise) anywhere on them. GE did not make, sell, or install marine steam turbines with asbestos-containing thermal insulation. Any thermal insulation materials, including thermal insulation blankets, that may have been applied to GE's turbines after they left GE's manufacturing facility would have been supplied and installed by entities other than GE.

8. GE, during all aspects of its turbine work related to U.S. Navy vessels, performed its work under the immediate supervision of the Navy through NAVSEA officers. Supervision and control were exercised through contract documents, design construction drawings, written specifications and personal oversight of GE's work by ship engineers and machinery specialists employed by the U.S. Navy.

9. The chain of U.S. Navy authority between GE and the Secretary of the Navy was multi-tiered and staffed by officers of varying levels of responsibility. Virtually no aspect of the development, manufacture and testing of Naval turbines escaped this close control. An extensive set of General Specifications for ships of the United States Navy as well as U.S. Navy specifications or military specifications known as Mil-Specs were already in place prior to construction of a U.S. Navy vessel. The Mil-Specs comprised tens of thousands of pages and



OCT-17-2003 12:22 PM DAVID HOBON 508 564 5729 P.04

governed all aspects of a vessel's design and construction and specified the materials to be used, including asbestos-containing thermal insulation.

10. The U.S. Navy specifications for GE's marine steam turbines manufactured for the Navy incorporated several lower-level specifications for components or materials used for or with the turbines and governed detailed items like metals, bearings and gaskets. The turbines manufactured and supplied by GE for any U.S. Navy vessel had to meet detailed and precise U.S. Navy specifications. Additionally, each turbine was specifically designed for the vessel or class of vessels in question.

11. In other words, the turbines for a vessel or class were not interchangeable, but instead, were custom built under direction and control of the Navy. NAVSEA developed the initial conceptual design for all classes of Naval vessels. In the design phase of a turbine project, as in all other phases, the U.S. Navy retained ultimate decision authority. By the time an outside design consultant began to participate in the design phase of a new turbine, the U.S. Navy had specified at least the weight, size, power output, speed, and other design parameters.

12. If an engineering disagreement arose between the Navy and the outside design consultant, the Navy controlled the design adopted. All final design drawings and specifications required express U.S. Navy approval and adoption. Following the Navy's acceptance of a quotation for manufacture of the prototype turbine, the prototype supplier would begin tooling and constructing under continuing U.S. Navy supervision and oversight during manufacture of a turbine at sites such as the Lynn and Fitchburg plants.

13. At each of these GE facilities, the INM was on site full time in a separate office called the Defense Contract Management Office. Frequently, GE engineers such as myself dealt

directly with the Navy's Turbine Section in Washington, D.C. A number of U.S. Navy civilian employees, including inspectors and engineers, supported the INM on site. At the Lynn and Fitchburg facilities, for example, INM's staff typically included more than three or four full time civilian U.S. Navy inspectors and several mechanical engineers. All members of the INM staff were Navy employees and had access to all areas of the production facility at all times. During the construction of the prototype turbine, all drawings, approvals and any reports of out-of-tolerance machining were submitted to, and approved by, the INM or by the mechanical engineers working under him.

14. Many steps of the production process required in-process testing. For example, all welds were tested per the Navy design specification. All weld testing reports were reviewed and approved by the INM on site. The INM also approved of the procedures used to test the welds. Similarly, other test results (e.g., balance testing, vibration testing, tolerance measurements, machine variations and the like) were reviewed and approved by the INM. Any reports, which resulted in the replacement of a component part, were also sent to NAVSEA for its review.

15. Before shipment, the turbine typically was tested per contract specification at the site of manufacture. A detailed test agenda for on-site testing was approved by the U.S. Navy. The agenda included tests for power output or speed at various levels of steam pressure, vibration and noise test, bearing temperature test and the like. The test agenda was then conducted on the turbine. The performance of the test agenda was closely monitored by the INM and all test results were submitted to him. The manufacturer then prepared a final report on the

turbine, including all test reports. The final report was then submitted for approval to the on-site INM.

16. Following INM approval, the final report was forwarded to NAVSEA in Washington, D.C., where further approval was required before the manufacturer could ship the turbine. Following the completion of the test agenda, the turbine was fully disassembled and inspected. This was carried on in the personal presence of the on-site INM. One or more of the INM's mechanical engineers would also attend the disassembly inspection. Any contract design or manufacturing abnormalities discovered at this point would lead to rejection of the turbine or to modifications and re-testing. A report of each tear-down was prepared and was then approved and signed by the INM.

17. Paralleling the manufacture of the prototype, the U.S. Navy would prepare a Request for Quotation on the production models of the turbine, subject to any changes developed during the production and testing of the prototype turbine unit. Once received, a quotation would then be subject to a similar review as that described above with respect to prototype unit, including quotation review meeting(s). Approval of a quotation would eventually be given to one or more vendors. Often two vendors were selected to supply production turbines. In many instances, the manufacturer of the prototype unit would secure part or all of the contract work for the production units, but in some instances the manufacturer of the prototype would not be selected for the production contract.

18. The manufacturing process for the production unit then proceeded under the same level and intensity of U.S. Navy scrutiny and supervision as described above for the prototype unit. The INM, assisted by Navy civilian inspectors and mechanical engineers as described

above, would oversee and approve virtually every aspect of manufacturing and testing the turbine. As before, a test agenda for the production unit was approved by the U.S. Navy and all reports from the tests were approved by the on-site INM. Following the completion of the test series, each individual turbine was fully torn down in the presence of mechanical engineers working for the INM. Any abnormalities were noted and resolved. A final report was prepared for each turbine, incorporating the test series reports, and was approved by the on-site INM and by the Department of the Navy in Washington, D.C. Re-assembly of each turbine was then approved by the U.S. Navy civilian inspectors prior to shipment.

19. The first production unit was then shipped to the shipyard that had construction responsibilities for the first vessel (either a Navy shipyard or a civilian yard working under contract with the Navy). The turbine was typically installed by shipyard personnel acting under supervision of engineers from the Navy Supervisor of Shipbuilding, who was subordinate to the Commander of NAVSEA.

20. Once the turbine was installed, it was typically tested by the shipyard at the dock at some load. This testing was reviewed and approved by U.S. Navy personnel at the shipyard. Any deficiencies discovered at this stage were required to be remedied by GE under Navy direction and supervision. Once the ship was launched and outfitted, sea trials followed. The first sea trial was called the "builder's trial" and was conducted by the shipyard using its personnel with senior U.S. Navy personnel on board for observation and approval. Representatives from the major component vendors would also attend. I have attended more than twelve builder's trials as GE's turbine representative on the builder's trials. Prior to GE, I had engine room installation, operation and testing responsibility for more than twelve Navy

ships while employed by a major shipyard. Following successful completion of the builder's trial, the U.S. Navy would conduct an additional sea trial, called an "acceptance trial." Acceptance trials were fully conducted and staffed by U.S. Navy officers, civilian employees and crew, with shipyard and manufacturer's representatives along to observe. As before, any deficiencies discovered with the turbine during acceptance trials would be corrected by GE under direction and control of the Navy. Following the acceptance trial, the vessel was commissioned and would typically embark on a "shake-down cruise." During this cruise, the operation of all components of the vessel were further evaluated and tested by Navy personnel under the widest possible range of operating conditions.

21. During the launching, outfitting and sea trials of the first vessel of a new class, other vessels in the class may be under construction on a trailing schedule. Each and every vessel would go through essentially the same construction, inspection, testing, sea trials and shake-down procedure as described above for the first vessel of the class. All equipment, including the turbines supplied by GE, was built in accordance with U.S. Navy specifications in existence at the time and was approved by the U.S. Navy.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on October 17, 2003.

DAVID HOBSON



OCT-17-2003 12:34 PM DAVID HOBSON 508 564 5729 P.09