# Exhibit B

To Memorandum in Support of Plaintiffs' Motion For Remand
C.A. No. 08-043S

| | | |
|---|---|---|
| **STATE OF RHODE ISLAND** | : | **SUPERIOR COURT** |
| **PROVIDENCE** | : | |
| | : | |
| JACK KORTEKAMP AND | : | |
| GERALDINE KORTEKAMP | : | |
| | : | C.A. NO. |
| | : | |
| | : | |
| VS. | : | |
| | : | June 16, 2006 |
| 3M CO. | : | |
| A.O. SMITH CORPORATION | : | |
| A.W CHESTERTON COMPANY | : | |
| A.Y. MCDONALD MFG. CO | : | |
| ACMAT CORP. | : | |
| ACME BOILER RENTALS, INC. | : | |
| AEROJECT, A GENCORP INC. CO. | : | |
| ALAN MAYLOR CO. | : | |
| ALCO VALVES, A DIVISION OF EMERSON CO. | : | |
| ALFA LAVAL INC. | : | |
| AMCHEM, INC. | : | |
| AMERICAN MARSH PUMPS, INC. | : | |
| AMERICAN STANDARD, INC. (alias), | : | |
| Individually and as successor to AMERICAN | : | |
| RADIATOR & STANDARD SANITORY | : | |
| CORP., TRANE, INC. and KEWANEE | : | |
| ANCHOR INSULATION CO. | : | |
| ANDERSON GREENWOOD LP, f/k/a CROSBY | : | |
| VALVE AND GAGE INC. | : | |
| ANH REFRACTORIES as parent | : | |
| company to A. P. GREEN | : | |
| ASCO VALVES | : | |
| ATLAS BOILER WORKS, INC. | : | |
| ATLAS BOILER RENTALS, INC. | : | |
| ATLAS SYSTEMS GROUP | : | |

ARMSTRONG INTERNATIONAL, INC. :
AURORA PUMP COMPANY :
AVENTIS CROPSCIENCE USA, INC k/n/a :
BAYER CROPSCIENCE, INC. as successor :
To AMCHEM PRODUCTS, INC. :
BELL & GOSSET Co. :
BETHLEHEM APPARATUS CO. :
BIRD, INC. :
BLACKMER PUMPS :
BONDEX INTERNATIONAL INC. :
BORG WARNER MORSE TEC INC. f/k/a BORG :
WARNER CORP. :
BRIGGS & STRATTON CORP. :
BUFFALO PUMPS, INC :
BURNHAM CORP. individually and as successor to :
KEWANEE :
BURNS & ROE :
C. K. SMITH CO., INC. :
CARLIN COMBUSTION TECHNOLOGY :
CARRIER CORPORATION :
CARVER PUMP COMPANY :
CASE IH, LLC :
CASH ACME as a division of THE RELIANCE :
WORLDWIDE CORP. :
CERTAINTEED CORP. :
CHICAGO FIRE BRICK DIVISION of ALLIED :
MINERAL PRODUCTS, INC. :
CLARAGE :
CLARK RELIANCE CO. :
CLAYTON INDUSTRIES :
CLEAVER BROOKS, A DIVISION OF :
AQUA-CHEM :
CLIFTON ASSOCIATES, f/k/a JOHNSON :
ASBESTOS CORP. :
COEN CO., INC. :

COLUMBIA BOILER CO. :
COMPUDYNE as successor to YORK SHIPLEY :
CRANE COMPANY INDIVIDUALLY and as :
Successor in interest to JENKINS BROS and :
WEINMAN PUMP MFG CO. :
CROWN, CORK & SEAL COMPANY, INC. :
CONTROL COMPONENTS, INC. as successor :
to BAILEY CONTROLS, INC. :
COPES-VULCAN
DAIMLER CHRYSLER f/k/a THE
CHRYSLER MOTORS
CORP f/k/a CHRYSLER CORP. :
DAP INC. :
D.B. RILEY f/k/a RILEY STOKER CO. :
DEERE & CO. :
DOW CHEMICAL AS SUCCESSOR TO UNION :
CARBIDE CORP. :
DURABLA MANUFACTURING CO. :
DURO-DYNE CORP. :
EATON CORPORATION AS SUCCESSOR TO :
CUTLER HAMMER, WRIGHT-AUSTIN CO
AND AS PARENT COMPANY TO :
EATON-VICKERS :
ELLIOTT TURBOMACHINERY CO, INC :
EXXON MOBIL :
THE F.C. TAPLIN CO. :
FACTORY MUTUAL INSURANCE CO. :
Operating as FM GLOBAL, as parent co. :
To FACTORY MUTUAL ENGINEERING :
FAIRBANKS MORSE ENGINE :
FISHER CONTROLS INTERNATIONAL, LLC :
FISHER SCIENTIFIC CO, LLC :
FLOTRONICS PUMP CORP. :
FLOWSERVE US, INC :
FLUOR CORP. HEADQUARTERS :

FORD MOTOR CO. :
FORMICA CORP. :
FOSTER WHEELER CORP. :
THE FOXBORO CO. :
FULTON BOILER CO. :
GARDNER DENVER CORP. :
GARLOCK SEALING TECHNOLOGIES, LLS. :
Successor by merger to GARLOCK, INC. :
GENERAL ELECTRIC COMPANY :
G.E. SUPPLY CO. :
GENERAL MOTORS CORPORATION :
GEORGIA PACIFIC CORPORATION :
THE GORMAN RUPP CO as parent to PATTERSON
PUMP CO. :
GOODRICH CORP. f/k/a :
THE B.F. GOODRICH CO. :
THE GOODYEAR TIRE AND RUBBER CO. :
GOULDS PUMPS INC. :
GRAYBAR ELECTRIC CO. :
H.B. SMITH CO. :
H.H. ROBERTSON FLOOR SYSTEMS, :
A CENTRIA CO. :
HAUCK MANUFACTURING :
THE HARTFORD STEAM BOILER INSPECTON :
AND INSURANCE CO. :
HERCULES CHEMICAL CO, INC. :
THE HILLIARD CORP. :
HOMASOTE CO. :
HONEYWELL INTERNATIONAL, INC as successor
In interest to BENDIX CORPORATION :
HURST BOILER & WELDING CO. :
IMO INDUSTRIES, INC. :
INGERSOLL-RAND COMPANY :
INTERNATIONAL PAPER SUPPLY CO. individually
And as successor to the BENDIX CORP. :

ITT INDUSTRIES, INC. :
J.H. FRANCE REFRACTORIES :
JOHNSON CONTROLS, INC. :
JORDAN VALVE, a division of RICHARD INDUS. :
JOY MANUFACTURING CO. :
KADANT JOHNSON USA :
KEELER DOOR-OLIVER BURNER CO. :
KOBOLD INSTRUMENTS, INC :
KOHLER CO. :
LAWLOR MANUFACTURING CO. :
LENNOX INTERNATIONAL :
LESLIE CONTROLS, INC :
LINK-BELT CONSTRUCTION EQUIPTMENT CO.
MCDERMOTT INTERNATIONAL, INC :
MCQUAY INTERNATIONAL :
MELRATH
METROPOLITAN LIFE INSURANCE CO. :
MILTON ROY CO. :
MILWAUKEE VALVE :
NATIONAL AUTOMOTIVE PARTS ASSOC. :
THE NASH ENGINEERING CO. :
NEW ENGLAND INSULATION :
OWENS-ILLINOIS, INC. :
PACKINGS & INSULATION COMPANY :
PATTERSON KELLEY as a division of :
HARSCO CORP. :
PATTERSON PUMP CO. individually and as :
Successor to C.H. WHEELER :
PERINI CORP. :
PETRO OIL BURNING CO. :
PEABODY ENGINEERING CORP. :
P & H MINING EQUIPMENT CO. :
PIC CONTRACTORS :
PNEUMO-ABEX CORP individually and as :
Successor to ABEX CORP. :

PLIBRICO CO. :
RAY BURNER CO. :
ROPER INDUSTRIES, INC. :
R.P.M. INTERNATIONAL, INC. individually and :
As successor to BONDEX :
INTERNATIONAL, INC. :
RUTLAND PRODUCTS :
SENSUS METERING SYSTEMS as successor to :
ROCKWELL INTERNATIONAL :
SID HARVEY INDUSTRIES, INC. :
SKINNER ENGINE CO. :
SPENCE ENGINEERING CO. :
SPIRAX SARCO, INC. :
STERLING FLUID SYSTEMS (USA) LLC for :
PEERLESS PUMP CO. :
STONE & WEBSTER, INC.. :
SUPERIOR BOILER WORKS :
SUSSMAN ELECTRIC BOILERS :
TACO, INC. :
TH AGRICULTURE & NUTRITION CO. :
THIEM CORP. individually and as successor in :
Interest to UNIVERSAL REFRACT. INC :
TIDEWATER SUPPLY CO. :
TODD PACIFIC SHIPARDS CORP. :
TRANE CO. :
TYCO VALVES AND CONTROLS, A :
UNIT OF TYCO FLOW CONTROL :
As successor to YARWAY CORPORATION:
UNION BOILER WORKS INC.
UNION CARBIDE CORPORATION :
U.S. PLYWOOD :
THE UTICA BOILER CO. :
VELAN VALVE CORP. :
VIACOM, INC., as successor in interest by merger :
to CBS CORPORATION f/k/a WESTING- :

HOUSE ELECTRIC CORPORATION :
WARREN PUMPS, INC. :
WEIL MCLAIN, A DIVISION OF THE MARLEY COMPANY :
WESTCO INTERNATIONAL INC :
THE W.M. POWELL CO. :
YEOMAN'S CHICAGO CORP. :
YORK CO. :
ZURN INDUSTRIES :

**COMPLAINT**

1. Plaintiff, Jack Kortekamp, (hereinafter referred to as "plaintiff"), and plaintiff, Geraldine Kortekamp, (hereinafter referred to as "plaintiff spouse") are respectively, husband and wife.

2. Each of the defendants named in the caption above has conducted business in the state of Rhode Island and has produced, manufactured or distributed asbestos and/or asbestos products with the reasonable expectation that such products would be used or consumed in this state, which products were so used or consumed, and has committed the tortuous acts set forth below in this state.

**FIRST COUNT**

Paragraphs 1 and 2 are incorporate herein as if set forth in full.

3. The employer or employers of the plaintiff were engaged in various businesses in which they bought and/or installed asbestos products and materials.

4. The plaintiff was exposed to various asbestos containing products while in the U.S. Navy and as a boiler engineer. Such occupational asbestos exposure during the course of his employment contributed in part or totally to the plaintiff's contraction of asbestos-related mesothelioma and other asbestos-related pathologies.

5. During the period of time set forth above, the plaintiff was exposed to and did inhale and/or ingest asbestos dust, fibers, and particles, which dust, fibers, and particles came from the asbestos products which were contracted for, mined, milled, processed, manufactured, designed, tested, assembled, fashioned, fabricated, packaged, supplied, distributed, delivered, marketed and/or sold by the defendants.

6. Upon information and belief, the defendants, through their agents and employees, mined, processed, manufactured, designed, tested and/or packaged various asbestos-containing products, and supplied, distributed, delivered, marketed and/or sold said asbestos-containing products to the employer(s) of the plaintiff or to others working at the various jobsites where the plaintiff was employed, or to third persons who, in turn, delivered and sold such products and materials to such employers or to others working at such jobsites for use by employees, including the plaintiff.

7. At all relevant times that the plaintiff was working, he was exposed to asbestos materials and products which, as part of his employment, he was forced to

come into contact with and breathe, inhale, and ingest asbestos fibers and particles coming from said asbestos products and materials.

8. At all times pertinent hereto, defendants were engaged in the business of contracting for, mining, milling, processing, manufacturing, designing, testing, assembling, fashioning, fabricating, packaging, supplying, distributing, delivering, marketing, and/or selling asbestos and asbestos products.

9. At all times pertinent hereto, the asbestos products contracted for, mined, milled, processed, manufactured, designed, tested, assembled, fashioned, fabricated, packaged, supplied, distributed, delivered, marketed, and/or sold by the defendants reached the plaintiff without any substantial change in their condition from the time they were sold.

10. The foregoing asbestos products were defective in one or more of the following ways:

(a) In that they were inherently dangerous to those who used, handled, came in contact with and/or inhaled said products and materials;

(b) in that they failed to carry proper, adequate and correct warnings and information concerning the dangers of the said products;

(c) in that they lacked proper safety precautions to be observed by users, handlers and persons, including the plaintiff who would reasonably and foreseeably come into contact with the said products and materials;

(d) in that they were packaged, bagged, boxed and/or supplied to the plaintiffs in packaging, bagging, boxes or other containers that were inadequate and/or improper.

(e) in that the products were delivered to and reached the plaintiff without adequate or proper handling instructions, face masks and/or respirators;

(f) in that any warnings, information and/or safety instructions said products may have carried were improper and inadequate in that they failed to adequately and reasonably apprise users, handlers and persons coming into contact with the said products and materials, including the plaintiff, of the full scope and danger to their health of contact with asbestos products and materials, including the risk of cancer;

(g) in that the said asbestos products and materials were not of merchantable quality;

(h) in that the said asbestos products and materials were not fit and safe for their known and intended purposes and uses.

11. As a result of the above, the plaintiff was caused to sustain severe, painful and permanent injuries such as described in Paragraph 4 caused by his coming into contact with breathing, inhaling and ingesting asbestos fibers. The injuries and diseases from which the plaintiff is suffering will in all probability be fatal and will continue to cause the plaintiff to suffer great pain, suffering, mental anxiety, distress of mind, humiliation, emotional trauma and mental anguish.

12. The disease, diseases or injuries from which the plaintiff suffers were directly and proximately caused by his exposure to asbestos and asbestos products which were mined, milled, manufactured, designed, assembled, fabricated, supplied, constructed, processed, packaged, distributed, delivered, purchased and/or sold by the defendants.

13. As a result thereof, the plaintiff's lifespan has been shortened and his capacity to carry on life's activities has been impaired along with his capacity to enjoy life and family, to engage in any gainful employment, and to participate in civic affairs.

14. As a result of said illness, the plaintiff has been obligated to incur expenses for medical, hospital and surgical treatment, drugs, medicines, x-rays and medical apparatus, and in the future will be obliged to incur further expenses for such purposes.

15. As a further result of said illness, the plaintiff's earning capacity has been impaired and will be impaired in the future and his earning capacity has been permanently impaired.

16. The defendants knew or should have known that the asbestos products and materials were inherently dangerous to those who used, handled or came in contact with said products and materials.

17. The defendants failed to provide proper, adequate and correct warnings and information concerning the dangers of the products and materials to persons using, handling, or coming into contact therewith.

18. The defendants failed to provide proper, adequate and correct warnings and instruction of safety precautions to be observed by users, handlers and persons, including the plaintiff, who would reasonably and foreseeably come into contact with the said products and materials.

19. Any warnings, information and/or instructions of safety precautions were improper and inadequate in that, among other things, they failed to adequately and reasonably apprise users, handlers and persons coming into contact with the said products and materials, including the plaintiff, of the full scope and danger to their health of contact with asbestos products and materials, including the risk of cancer.

20. The defendants have been possessed of medical and scientific data, studies and reports since approximately 1929, which information clearly indicated that asbestos and asbestos-containing products were hazardous to the health and safety of the plaintiff and other human beings.

21. The defendants, during the 1930's, 1940's, 1950's and 1960's became possessed of voluminous medical and scientific data, studies and reports, which information conclusively established that asbestos and asbestos-containing products were hazardous to the health and safety of the plaintiff and all humans exposed to the products.

22. The defendants have since the 1930's had numerous workers' compensation claims filed against them by former asbestos workers/employees.

23. The defendants, since the 1920's, have consistently failed to acknowledge, publish, or in any way advise of studies and reports known throughout the industry, including studies conducted by or on behalf of various defendants in the asbestos industry.

24. Notwithstanding that the defendants possessed the foregoing information, the defendants wrongfully contracted for, mined, milled, processed, manufactured, designed, tested, assembled, fashioned, fabricated, packaged, supplied,

distributed, delivered, marketed, and sold asbestos products and materials to the plaintiff, his employer(s) and/or to others working at the various jobsites and places of employment of the plaintiff and the defendants failed to render proper, adequate and correct warnings, advice, instruction and information and so acted in a grossly negligent, malicious, willful and wanton manner, and failed to use reasonable care under all circumstances, and wrongfully acted in other respects.

25. It was the continuing duty of the defendants to advise and warn purchasers, consumers, and users, and all prior purchasers, consumers, and users, of all dangers, characteristics, potentialities and/or defects discovered subsequent to their initial marketing or sale of said asbestos and asbestos products.

26. The defendants breached these duties by:

(a) failing to warn the plaintiff of the dangers, characteristics, and/or potentialities of the product or products when they knew or should have known that the exposure to the product(s) would cause disease and injury;

(b) failing to warn the plaintiff of the dangers to which he was exposed when they knew or should have known of the dangers;

(c) failing to exercise reasonable care to warn the plaintiff of what would be safe, sufficient, and properly protective clothing, equipment, and appliances when working with, near or during exposure to asbestos and asbestos products;

(d) in that they were packaged, bagged, boxed and/or supplied to the plaintiff in packaging, bagging, boxes or other containers that were inadequate and/or improper;

(e) in that the products were delivered to and reached the plaintiff without adequate or proper handling instructions, face masks and/or respirators;

(f) failing to test the asbestos and asbestos products in order to ascertain the extent of dangers involved upon exposure;

(g) failing to conduct such research that should have been conducted in the exercise of reasonable care in order to ascertain the dangers involved upon exposure;

(h) failing to remove the product or products from the market when the defendant corporations knew or should have known of the hazards of exposure to asbestos and asbestos products;

(i) failing upon discovery of the dangers, hazards, and potentialities of exposure to asbestos to adequately warn and apprise the plaintiff of the dangers, hazards, and potentialities discovered;

(j) generally using unreasonable, careless, and negligent conduct in the contracting for, mining, milling processing, manufacturing, designing, testing, assembling, fashioning, fabricating, packaging, supplying, distributing, delivering, marketing, and/or selling of their asbestos and asbestos products.

WHEREFORE, the plaintiff claims damages.

**SECOND COUNT**

Paragraphs 1 through 26 are incorporated herein as if set forth in full.

27. The plaintiff was a foreseeable user and consumer of the defendants' asbestos and asbestos products.

28. The defendants owed the plaintiff a duty of reasonable care to avoid causing him harm from exposure to their products.

29. The defendants breached their duty in the numerous and various manner set forth above.

30. The defendants' negligence directly and proximately caused the plaintiff's asbestos disease and other lawful damages set forth above.

WHEREFORE, the plaintiff claims damages.

**THIRD COUNT**

Paragraphs 1 through 30 are incorporated herein as if set forth in full.

31. The foregoing acts of the defendants were wrongful as to the plaintiff within the intendment of Restatement, Torts 2d section 402A.

WHEREFORE, the plaintiff claims damages.

**FOURTH COUNT**

Paragraphs 1 through 31 are incorporated herein as if set forth in full.

32. The defendants expressly and/or impliedly warranted that said asbestos materials and products were of merchantable quality, fit and safe for the purposes for which they were contracted for, mined, milled, processed, manufactured, designed, tested, assembled, fashioned, fabricated, packaged, supplied, distributed, delivered, marketed, sold, intended and used, as set out in their sales brochures, manuals and written warranties accompanying or preceding sales and distribution of their products, and in various other manners.

33. The defendants breached said warranties in that said asbestos materials and products were not of merchantable quality, fit and safe for the purposes for which they were contracted for, mined, milled, processed, manufactured, designed, tested,

assembled, fashioned, fabricated, packaged, supplied, distributed, delivered, marketed, sold, intended and used in that, among other things, adequate warning precautions and instructions were not provided to users, handlers, and persons coming into contact with said products and materials.

34. The plaintiff's injuries and resulting damages set forth above were caused by breach of said warranties by the defendants.

35. The plaintiff was employed in capacities which placed him in close proximity with asbestos and asbestos-related materials, manufactured and/or distributed by one or more of the defendants. Plaintiff's presence was known or should have been known to each of the defendants.

WHEREFORE, the plaintiff claims damages.

**FIFTH COUNT**

The plaintiff, Mrs. Geraldine Kortekamp, spouse of the plaintiff hereby realleges and incorporates by reference Paragraphs 1 through 35.

36. As a direct and proximate result of the foregoing acts of the Defendants, the plaintiff's spouse, Mrs. Geraldine Kortekamp, has suffered and will continue to suffer great pain and mental anguish by virtue of her loss of consortium with her husband and the loss of impairment of her husbands services, protection, care and assistance, society,

companionship, affection, love, comfort, support, guidance and kindly offices and advice, and other benefits of the marital relationship.

**SIXTH COUNT**

As against defendant, Metropolitan Life Insurance Company, only.

Plaintiffs repeat and reallege all allegations contained in all paragraphs above as if fully set forth herein.

37. Defendants, individually and as agents of one another and as co-conspirators, aided, abetted, encouraged, counseled, assisted, agreed, and conspired among themselves and with other asbestos manufacturers and distributors to injure plaintiffs.

38. The defendants knew that the others' conduct constituted a breach of duty and gave substantial assistance or encouragement to the other so to conduct itself.

39. The defendants acted in the following fashion:

(a) Defendant Metropolitan Life Insurance Company (hereinafter "Met Life") required a tangible quid pro quo from McGill University in the 1920's in exchange for providing funding for a study of asbestos disease in Canadian miners. The study revealed asbestos miners suffered from asbestosis. The study was never published and agents of Met Life materially misrepresented in the published literature this known fact.

(b) In 1932, Met Life, through its agents Dr. Anthony Lanza, Dr. Fellows, and others, assisted co-conspirator Johns-Manville Corporation with medical examinations of over 1,000 employees of Johns-Manville's factory in Manville, New Jersey. The report of his study showed that a large percentage of the employees suffered from asbestosis including employees not directly involved in the manufacturing process. This 1932 medical survey was not published in the medical literature and therefore was unavailable to scientists studying the issues of asbestos disease. Further collaboration between the conspiring asbestos producers and Met Life officials continued this trend of intentional cover-up.

(c) Beginning in approximately 1934, conspirator Johns-Manville Corporation, through its agents, Vandiver Brown and Attorney J.C. Hobart, and conspirator Raybestos-Manhattan, through its agents, Sumner Simpson and J. Rohrbach, suggested to Dr. Lanza, Associate Medical Director of Met Life (insurer of conspirators Johns-Manville, Raybestos, and others) that Dr. Lanza publish a study on asbestosis in which Dr. Lanza would affirmatively misrepresent a material fact about asbestos exposure; i.e., the seriousness of the disease process, asbestosis. This was accomplished through intentional deletion of Dr. Lanza's description of asbestosis as "fatal" and through other selective editing at the behest of the Defendants and their co-conspirators that

affirmatively misrepresented asbestos as a disease process as being less serious than it actually is and was known to be then. As a result, Dr. Lanza's study was published in the medical literature in this misleading fashion in 1935. Defendant Met Life was motivated, in part, to effectuate this fraudulent misrepresentation and fraudulent nondisclosure by the desire to influence proposed legislation to regulate asbestos exposure and to provide a defense in lawsuits and workers' compensation claims involving Manville, Raybestos, Met Life, and others.

(d) In 1936, conspirators American Brake Block Corporation, Asbestos Manufacturing Company, Gatke Corporation, Johns-Manville Corporation, Keasby & Mattison Company (then an alter-ego to defendant Turner & Newall), Raybestos-Manhattan, Russell Manufacturing, Union Asbestos & Rubber Company, and defendant United States Gypsum Company, entered into an agreement with the Saranac Laboratories. Under this agreement, these companies acquired the power to decide what information Saranac Laboratories could publish about asbestos disease and control what form such publications were to occur. This agreement gave these conspirators power to affirmatively misrepresent the results of the work at Saranac, and also gave these conspirators power to suppress material facts included in any study. On numerous occasions thereafter, the conspirators exercised their power to prevent Saranac scientists

from disclosing material scientific data resulting in numerous misstatements of fact being made at scientific meetings.

(e) On November 11, 1948, representatives of the following conspirators met at the headquarters of Johns-Manville Corporation: American Brake Block Division of American Brake and Shoe foundry, Gatke Corporation, Keasby & Mattison Company (then an alter-ego to defendant Turner & Newall), Raybestos-Manhattan, Inc., Thermoid Company, Union Asbestos and Rubber Company, and defendant U.S. Gypsum Company. U.S. Gypsum did not send a representative to the meeting, but instead authorized Vandiver Brown of Johns-Manville to represent its interest at the meeting and to take action on its behalf.

(f) At this November 11, 1948 meeting, these defendants, co-conspirators and their respective representative decided to exert their influence to materially alter and misrepresent material facts about the substance of research started by Dr. Leroy Gardner at the Saranac Laboratories beginning in 1936. Dr. Gardner's research involved the carcinogenicity of asbestos in mice and also included an evaluation of the health effects of asbestos on humans with a critical review of the then-existing standards of dust exposure for asbestos and asbestos-containing products.

(g) At this meeting, the defendants and their co-conspirators intentionally and affirmatively determined that Dr. Gardner's work should be edited to specifically delete material facts about the cancer-causing propensity of asbestos and the health effects of asbestos on humans and the critique of the dust standards and then published in the medical literature as edited by Dr. Arthur Vorwald. The acts of these conspirators were carried out by co-conspirator defendant Met Life's agent, Dr. Lanza. The defendants and co-conspirators thereby fraudulently misrepresented the risks of asbestos exposure to the public, in general, and the class of persons exposed to asbestos, including plaintiffs.

(h) As a direct result of influence exerted by the above-described conspirators, Dr. Vorwald published Dr. Gardner's edited work in January, 1951, in the Archives of Industrial Hygiene and Occupational Medicine (Vol. 3, No. 1), a journal of the American Medical Association. The published version stressed those portions of Gardner's work that the conspirators wished stressed, but omitted references to cancer, to human asbestosis, and to the inadequacy of the then-established threshold limit values hereinafter "TLVs". Furthermore, that article made a false claim that the published report was the "complete survey" of Dr. Gardner's work. The defendants thereby fraudulently,

affirmatively, and deliberately disseminated this misleading publication to university libraries, government officials, medical doctors, agencies, the public, and others.

(i) Such action constituted a material affirmative misrepresentation of the total context of material facts involved in Dr. Gardner's work and resulted in creating an appearance that inhalation of asbestos was less of a health problem than Dr. Gardner's unedited work indicated.

(j) The following conspirators and others were members of the trade association known as Quebec Asbestos Mining Association (Q.A.M.A.): Johns-Manville Corporation, Carey-Canada (individually and as successor to Quebec Asbestos Corporation), the Celotex Corporation (successor to Quebec Asbestos Corporation), defendant National Gypsum Company (k/k/a Asbestos Claims Management Corporation), and defendant Turner & Newall (individually and successor to Bell asbestos). The members of Q.A.M.A. participated in the above-described misrepresentation of the work of Dr. Gardner published by Dr. Vorwald in the AMA Archives of Industrial Health in 1951. Evidence of the Q.A.M.A.'s involvement in this misrepresentation arises from co-conspirator Johns-Manville's membership in the Q.A.M.A., as well as correspondence from co-conspirators indicating close monitoring of the editing process by Q.A.M.A.'s representative, Ivan Sabourin, acting on behalf of all Q.A.M.A.'s members.

(k) Defendants who were members of the Q.A.M.A., began on or about 1950 to formulate a plan to influence public opinion about the relationship between asbestos and cancer by influencing the medical literature on this subject and then touting and disseminating this literature to the public and to organizations and legislative bodies responsible for regulatory controls of asbestos with the specific intent of misrepresenting the existing scientific information and suppressing contrary scientific data in their possession and control.

(l) This plan of misrepresentation and influence over the medical literature began in or about 1950 when Q.A.M.A. members selected Saranac Laboratories to do an evaluation of whether cancer was related to asbestos. After a preliminary report authored by Dr. Vorwald in 1952 indicated that a cancer/asbestos relationship might exist in experimental animals, the Q.A.M.A. members refused to further fund the study and it was terminated and never publicly discussed.

(m) As a result of the termination of this study, these defendants fraudulently withheld information from the public and affirmatively misrepresented to the public and responsible legislative and regulatory bodies that asbestos did not cause cancer, including affirmative misrepresentations by conspirators' agents Kenneth W. Smith, M.D., Paul Cartier, M.D., Arthur J. Vorwald, M.D., Anthony J. Lanza, M.D., Vandiver Brown,

and Ivan Sabourin, said misrepresentations being directed to, inter alia, U.S. Government officials, Canadian government officials, U.S. National Cancer Institute, other medical organizations, and the general public, including plaintiffs.

(n) Subsequently, the Q.A.M.A. defendant conspirators contracted with the Industrial Hygiene Foundation (I.H.F.) and Dr. Daniel Braun to further study the relationship between asbestos exposure, asbestosis and lung cancer. In 1957, Drs. Braun and Truan reported to the Q.A.M.A. that asbestosis did increase a worker's chances of incurring lung cancer.

(o) The Q.A.M.A. defendants thereafter caused, in 1958, a publication of the work by Braun and Truan in which the findings regarding increased incidence of cancer in persons with asbestosis was edited out by agents of the Q.A.M.A. The published version of this study contained a conclusion that asbestos exposure did not increase the incidence of lung cancer, a conclusion known by the defendant conspirators to be patently false.

(p) By falsifying and causing publication of studies concluding that asbestos exposure did not cause lung cancer and simultaneously omitting a documented finding that asbestosis did increase the risk of lung cancer, the Q.A.M.A. defendants

affirmatively misrepresented to the public and concealed from the public the extent of risks associated with inhalation of asbestos fibers.

(q) In approximately 1958, the Q.A.M.A. defendants publicized the edited works of Drs. Braun and Truan at a symposium in an effort to fraudulently misrepresent to the public and persons exposed to asbestos that the inhalation of asbestos dust would not cause cancer.

(r) The fraudulent misrepresentations beginning in 1946, as elaborated above and continuing with the publication of the 1958 Braun/Truan study, influenced the standards set for the TLVs, and inhibited the lowering of the threshold limit value due to the cancer risk associated with asbestos inhalation.

(s) In 1967, Q.A.M.A. defendants determined at their trade association meeting that they would intentionally mislead consumers about the extent of risks involved in inhalation of asbestos products.

(t) In 1952, a symposium regarding the health effects of asbestos was held at the Saranac Laboratories. The following conspirators were in attendance: Johns-Manville, defendant Turner & Newall, Raybestos-Manhattan, and Q.A.M.A. members by way of their agents, Cartier, Sabourin, and LeChance.

(u) At this meeting, the occurrence of lung cancer and asbestosis in product users was discussed and the carcinogenic properties of all fiber types of asbestos was also discussed. In an affirmative attempt to mislead the public about the extent of health risks associated with asbestos, and in an effort to fraudulently conceal those risk from the public, these defendants conspired to prevent publication of the record of this 1952 Saranac Symposium and it was not published. In addition, the conspirators induced Dr. Vorwald not to announce the results of his and Dr. Gardner's animal studies showing excess cancers in animals that thereby fraudulently misrepresenting existing data, albeit secret, that could not be publicized because of the secrecy provisions contained in the 1936 Saranac Agreement required by the asbestos industry members.

(v) The following conspirators were members of the Magnesia Insulation Manufacturers Association (MIMA): Phillip-Carey Corporation (predecessors to Celotex), Johns-Manville, and others.

(w) In 1955, these conspirators caused to be published the MIMA 85% Magnesia Insulation Manual. This manual falsely and fraudulently misrepresented that asbestos-containing products offered no hazard to workers who used these products.

(x) The following conspirators were members of the trade organization known as the Asbestos Textile Institute (ATI): Raybestos-Manhattan, Johns-Manville,

H.K. Porter, Keasby & Mattison (individually and through its alter-ego defendant Turner & Newall), defendant National Gypsum (n/k/a Asbestos Claims Management Corporation), and others.

(y) In 1947, the members of the ATI received a report from W.C.L. Hemeon regarding asbestosis that suggested re-evaluation of the then-existing TLVs for asbestos exposure. These defendants caused this report not to be published and thereby fraudulently concealed material facts about asbestos exposure from the public and affirmatively misrepresented to the public and class of persons exposed to asbestos that the then-existing TLV was acceptable. Thereafter, these defendant conspirators withheld additional material information on the dust standards from The American Conference of Governmental Industrial Hygienists (ACGIH), thereby further influencing evaluations of TLVs for asbestos exposure.

(z) In 1953, defendant and conspirator National Gypsum (n/k/a Asbestos Claims Management Corporation), through its agents, in response to an inquiry from the Indiana Division of Industrial Hygiene regarding health hazards of asbestos spray products, refused to mail a proposed response to that division indicating that respirators should be worn by applicators of the products. National Gypsum's response distorted and

fraudulently misrepresented the need for applicators of asbestos spray products to wear respirators and fraudulently concealed from such applicators the need for respirators.

(aa) In 1955, conspirator Johns-Manville through its agent Kenneth W. Smith, M.D., caused to be published in the AMA Archives of Industrial Health, an article entitled "Pulmonary Disability in Asbestos Workers". This published study materially altered the results of an earlier study in 1949 concerning the same set of workers. This alteration of Dr. Smith's study constituted a fraudulent and material misrepresentation about the extent of the risk associated with asbestos inhalation.

(bb) In 1955, the National Cancer Institute held a meeting at which conspirators Johns-Manville (individually and as an agent for other alleged co-conspirators) and Dr. Vorwald (as agent of co-conspirators) affirmatively misrepresented that there were no existing animal studies concerning the relationship between asbestos exposure and cancer, when, in fact, the conspirators were in secret possession of several studies that demonstrated that positive evidence did exist.

(cc) In 1957, the members of the ATI jointly rejected a proposed research study on cancer and asbestos and this resulted in fraudulent concealment from the public of material facts regarding asbestos exposure and also constituted an affirmative

misrepresentation of the then-existing knowledge about asbestos exposure and lung cancer.

(dd) In 1964, the members of the ATI met to formulate a plan for rebutting the association between lung cancer and asbestos exposure that had been recently discussed by Dr. Irving J. Selikoff. Thereafter, these members of the ATI embarked upon a campaign to further misrepresent the association between asbestos exposure and lung cancer.

(ee) In 1970, through their agents, co-conspirators Celotex Corporation and Carey-Canada affirmatively misrepresented that they had been in the asbestos business since 1918 and found no reported conditions of asbestosis or lung disease. This constituted a fraudulent misrepresentation about the material facts known to these conspirators.

(ff) All conspirators approved and ratified and furthered the previous conspiratorial acts of conspirators Johns-Manville, Raybestos Manhattan, and Anthony J. Lanza, M.D., acting on behalf of defendant Met Life, and all alleged co-conspirators during the relevant time period and circumstances alleged above, acted as agents and co-conspirators for the other conspirators.

40. All of the aforementioned defendants:

(a) did a tortuous act in concert with the other or pursuant to a common design with them; and/or

(b) knew that each other's conduct constituted a breach of duty and they each gave a substantial assistance or encouragement to the other so to conduct himself; and/or

(c) gave substantial assistance to the other in accomplishing a tortuous result and its own conduct, separately considered, constitutes a breach of duty to the plaintiffs.

41. The acts of the defendants as described above, constitute a fraudulent concealment and/or a fraudulent misrepresentation that proximately caused injury to the plaintiffs in the following manner:

(a) The material published or caused to be published by the defendants was false and incomplete in that the Defendants knowingly and deliberately deleted references to the known health hazards of asbestos and asbestos-containing products.

(b) Defendants individually, as members of a conspiracy, as agents of other co-conspirators, and as aiders and abettors of each other intended that the publication of false and misleading reports and/or the nondisclosure of documented reports of the health hazards of asbestos:

i. maintain a favorable atmosphere for the continued sale and distribution of asbestos and asbestos-related products;

ii. assist in the continued pecuniary gain of the defendants through the sale of their products;

iii. influence in the defendants' favor proposed legislation to regulate asbestos exposure and;

iv. to provide a defense in lawsuits and workers compensation claims brought for injury resulting from asbestos disease.

(c) Plaintiff reasonably relied upon the published medical and scientific data documenting the purported safety of asbestos and asbestos-containing products and the absence of published medical and scientific reports on the extent, nature, and existence of hazards of asbestos and asbestos-containing products to continue exposure to it because of a belief that it was safe.

(d) Defendants individually, as members of a conspiracy, and as agents of each other intended that plaintiff rely upon the published report regarding the safety of asbestos and asbestos-containing products and upon the absence of published medical and scientific data regarding the hazards of asbestos and asbestos-containing products, to continue his exposure to these products.

(e) Defendants individually, as members of a conspiracy, as agents of each other, and as aiders and abettors of each other are and were in a position of superior knowledge regarding the health hazards of asbestos and therefore plaintiff had a right to rely on the published reports commissioned by the defendants regarding the health hazards of asbestos and the absence of published medical and scientific data regarding the hazards of asbestos and asbestos-containing products.

(f) Plaintiff suffered (and will continue to suffer) injury as a direct result and proximate result of the acts alleged herein. As a direct and proximate result of the acts of the defendants, plaintiff suffered serious bodily injury, endured (and will continue to endure) great pain and suffering, incurred (and will continue to incur) medical expenses, suffered (and will continue to suffer) mental anguish, lost earnings and earning capacity, requires medical monitoring, and was otherwise damaged.

42. Plaintiff suffered injury as a direct result and proximate result of the acts alleged herein. As a direct and proximate result of the acts of the defendants, plaintiff suffered serious bodily injury, endured great pain and suffering, incurred medical expenses, suffered mental anguish, lost earnings and earning capacity, requires medical monitoring, and was otherwise damaged.

**WHEREFORE,** plaintiffs demand judgment and damages against the defendants, jointly and severally, plus whatever other further relief this Honorable Court deems right and just, including but not limited to:

(a) $1,000,000. in compensatory damages;

(b) $1,000,000. in punitive damages;

(c) Exemplary damages, including attorneys fees; and

(d) Interest and costs.

The plaintiffs demand trial by jury.

Dated at Providence, Rhode Island, this 16th day of June, 2006.

THE PLAINTIFFS

BY: ______________________

John Deaton, Esq. (RI Bar#6537)
THE DEATON LAW FIRM
One Richmond Square, Suite 134 C
Providence, RI 02906