**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| TODD KORTEKAMP AS EXECUTOR OF THE ESTATE OF JACK KORTEKAMP AND GERALDINE KORTEKAMP AS SURVIVING SPOUSE, | ) | |
| Plaintiffs, | ) | Civil Action No. 08-043S |
| v. | ) | |
| 3M CO., et al., | ) | |
| Defendants. | ) | |

**DEFENDANT GENERAL ELECTRIC'S MEMORANDUM IN SUPPORT OF ITS OPPOSITION TO PLAINTIFFS' MOTION FOR REMAND**

NOW COMES DEFENDANT General Electric ("GE"), by and through its counsel, and hereby files its opposition to the Motion for Remand filed by Plaintiffs Todd Kortekamp and Geraldine Kortekamp ("Plaintiffs"). Plaintiffs contend that this court should remand this case because federal jurisdiction does not exist. However, this action is removable because federal jurisdiction exists on the basis of federal officer/agency removal. This case is properly before the Federal District Court for the District of Rhode Island and Plaintiffs' Motion for Remand should be denied.

## I. INTRODUCTION

Article II, Section 2 of the United States Constitution grants the President power as commander-in-chief of the Navy and Army. Article I, Section 4 grants to the Congress the power to provide and maintain a Navy and Army. The federal government has enormous authority over the sailors and officers of the US Navy including the right of summary execution

and courts martial power to deprive them of life and liberty without the rights and privileges guaranteed to other US citizens. While there have been many disputes over the years between Congress and the President as to how this concurrent power is divided between the two branches, there has been no dispute that maintaining and training a Navy is an area of exclusive federal jurisdiction and one into which unique federal interest preempts state power. The notion that Rhode Island or some other state law would govern the training and communication with U.S. Navy officers and sailors at a federally owned nuclear submarine school in New York strains credulity.

## II. STATEMENT OF RELEVANT FACTS

### A. Pleadings

Plaintiffs brought a personal injury action in the Providence Superior Court of the Rhode Island Trial Court in June 2006 based on Jack Kortekamp's alleged exposure to asbestos-containing products. *See* Complaint (Ex. A). The complaint filed in Rhode Island state court seeks to hold GE responsible for failing to warn Mr. Kortekamp of the potential dangers associated with asbestos. Mr. Kortekamp alleges that he was exposed to asbestos during his service in the United States Navy. In his discovery responses, plaintiff claimed exposure to asbestos while serving on the nuclear submarine the *USS Skate*. However, neither the complaint nor the interrogatory answers alleged that the reactor or the turbine on the *Skate* were supplied by GE. In fact, public records confirm that these were not GE equipment. *See, e.g.,* http://www.globalsecurity.org/ military/systems/ship/ssn-578-specs.htm; http://www.nvr.navy.mil/nvrships/details/SSN578.htm; http://navysite.de/ssn/ssn578.htm. Subsequently, during discovery, a witness testified that Mr. Kortekamp was exposed to asbestos during his naval officer training at Knolls Atomic Power Laboratory, then operated by GE for the

U.S. Navy and the Atomic Energy Commission. GE immediately, and within thirty days of this evidence, removed this case.

Once removed, this case was conditionally transferred to the Asbestos Products Liability Litigation Multidistrict Litigation (No. MDL 875) in the District Court for the Eastern District of Pennsylvania. The MDL was established in 1991 and regularly adjudicates the issues of federal officer removal, the government contractor defense, and federal preemption in the context of asbestos products liability. On February 29, 2008, Plaintiffs requested this Court to stay that conditional transfer. On March 6, this Court denied Plaintiffs' request. Principles of judicial economy—the same principles informing the establishment of the MDL in the first place—weigh in favor of the removal of this case and denial of Plaintiffs' motion to remand.

**B. Knolls Atomic Power Laboratory**

The United States government founded Knolls Atomic Power Laboratory ("KAPL") on federally owned property in 1946 in conjunction with the establishment of the Atomic Energy Commission ("AEC" or "the Commission") and the transfer of the former "Manhattan Project" programs to the Commission. *See* Letter from AEC to the President, August 17, 1951 (Ex. B). GE was contracted to run KAPL. GE was to conduct nuclear research and development and design a power plant that would use nuclear energy, rather than fossil fuels, to generate electricity. *See* Laurence A. Hawkins, *Adventure into the Unknown* 128-33 (1950) (Ex. C). In 1950, the year President Harry S. Truman ordered development of the hydrogen bomb, KAPL's nuclear plant project was converted into a naval nuclear propulsion project in the early days of the Cold War. KAPL then became the joint facility of the AEC and the Navy. Thousands of sailors and officers were trained there on nuclear propulsion. The era of GE's operation of KAPL was also the era of Admiral Hyman G. Rickover, known as the Father of the Nuclear Navy. Admiral Rickover was known for his obsessive fixation on safety and quality control and

for his methods of hurdling the barriers of bureaucracy as well as his iron-fisted control over every detail in the nuclear Navy (e.g., he personally interviewed every potential submarine officer; the stories of these interviews are legendary).

By 1955, KAPL researchers had designed a reactor that could propel a submarine for three years. The first shipboard reactor developed at KAPL was installed on the *USS Seawolf*, commissioned in 1957. The transformation of the United States Navy from a steam-powered force to a modern nuclear-powered one took place at KAPL under the direction and supervision of Admiral Rickover. At KAPL, naval crews trained to operate the *Trident* and other nuclear submarines on working reactors. The United States Navy's mission, "to maintain, train and equip combat-ready Naval forces capable of winning wars, deterring aggression and maintaining freedom of the seas" would not be possible without the work carried out at Knolls Atomic Power Laboratory during those crucial Cold War years. *See* Official Web Site of the United States Navy, http://www.navy.mil/navydata/organization/org-top.asp. For the services GE provided the government, the company was paid the sum of one dollar per year. *See* Contract No. W-31-109-ENG-52 (Ex. D), art. XXXIV, ¶ 1.

Because the activities at KAPL are part and parcel with issues of national security and defense—such as the training of sailors and officers on the United States' most advanced marine weaponry— the vast majority of those activities and documentation of those activities is classified. Moreover, GE no longer operates the facility, as in 1992, Martin Marietta Corp. took over operation of KAPL from GE. KAPL Inc., a division of Lockheed Martin Corp., currently runs the facility.

KAPL is and always has been owned by the federal government. *See* www.kapl.gov. GE's operation of the facility was always by contract with the government. The federal

government recognized that the activities to be performed at KAPL were both potentially dangerous and necessary to the national defense. The contract between GE and the United States explicitly put the risks on the federal government:

> The government deems the work to be performed under this contract to be in the national interest and has requested the Contractor to undertake such work. In view of the fact that the Contractor is undertaking the work for a fixed fee of One Dollar ($1.00) and in view of the unusual and unpredictable hazards involved in carrying out the work under this contract, as well as the abnormal conditions now existing, it is agreed that all work under this contract is to be performed at the expense of the Government, and that the Contractor shall not be liable for, and the Government shall indemnify and hold the Contractor harmless against any delay, failure, loss, expense (including expense of litigation) or damage (including personal injuries and deaths of persons and manage to property) of any kind and for any cause whatsoever, arising out of or connected with the work, and whether or not any employee or employees of the Contractor is or are responsible therefor, unless such delay, failure, loss, expense, or damage should be established by the Government to have been caused directly by bad faith or willful misconduct on the part of some corporate officer or officers (i.e., the Chairman of the Board of Directors, President, Vice President, Secretary, Assistant Secretaries, Treasurer, Assistant Treasurers, Controller and Assistant Controllers) of the Contractor acting within the scope of his or their authority and employment; that the Government shall assume and carry on the defense of all claims, suits, or legal proceedings which may be asserted or instituted against the Contractor on account of acts or omissions in the performance of the work; and that the Government shall pay directly and discharge completely all final judgments entered against the Contractor in such litigation and all claims which may be settled by agreement approved by the Contracting Officer.

Contract No. W-31-109-ENG-52 (Ex. D) art. XXXIV, ¶ 1. The contract set forth detailed safety standards for the contractor to meet. Article XXIV provided:

> In order to protect the life and health of its employees... Contractor will comply with all pertinent provisions of the "Safety Requirements" approved by Chief of Engineers . . . and will take or cause to be taken such additional measures as the Contracting Officer may determine to be reasonably necessary for this purpose... The Contracting Officer will notify the Contractor of any non-compliance with the foregoing provisions and the action to be taken.

*Id.* at art. XXIV, ¶ 1. For two decades, well before the promulgation of OSHA and attendant federal asbestos standards in 1972, KAPL had detailed asbestos handling and training procedures in place. Safety manuals from as early as 1952 specified exposure limits and prescribed what

kind of respirators to use on which kinds of jobs. *See* KAPL Safety Manual Excerpts (Ex. E). A 1962 manual shows that the facility adopted standards issued by the American Standards Association regarding the use of protective equipment. *Id.* KAPL required medical examinations of personnel who would be using certain types of respirators. *Id.* Subcontractors were subject to yet a different set of safety standards. *See* Knolls Atomic Power Lab, Construction Safety and Incident Prevention Rules (Ex. F) (providing that subcontractor activities were governed by General Safety Requirements EM-385-1-1, promulgated by the U.S. Army Corps of Engineers (Ex. G)).

KAPL was exempt from the application of many federal laws. In a letter to President Truman, Acting Chairman of the Atomic Energy Commission Sumner T. Pike recommended that the President, "acting in the exercise of the powers conferred upon [him] by . . . the Atomic Energy Act of 1946 and having determined that such action is essential in the interest of the common defense and security" exempt the contract between the AEC and GE "from the provisions of law relating to contracts." Ex. B, *supra*. President Ronald Regan incorporated the letter into Executive Order 12344, which enabled KAPL to assume many of the functions of the DOE and the Navy, including overseeing safety at nuclear propulsion plants and "prescribing and enforcing standards and regulations . . . as they affect the environment and the safety and health of workers, operators, and the general public." Presidential Executive Order 12344 of Feb. 1, 1982 (codified by P.L. 98-525—October 19, 1984 (42 U.S.C. § 7168)). Notwithstanding these exemptions from *federal* law, KAPL did have extensive safety and health standards. For example, KAPL implemented an "action level" for airborne asbestos fibers one tenth the level mandated by OSHA and required the use of full-face respirators under circumstances where OSHA only required half-face respirators. General Accounting Office, Report: Nuclear Health

and Safety, August 1991 ("GAO Report") (Ex. H) at 25. In response to allegations raised by Jack Shannon[1] (see Ex. G attached to Plaintiff's Motion to Remand), among others, KAPL was subjected to a detailed audit by the General Accounting Office. *See Id.* at 11-14. The GAO found that "the programs and procedures implemented by Naval Reactors at its laboratories and sites are adequate to protect employees and the environment from exposures to radioactive and hazardous materials." *Id.* at 15. Specifically, auditors took multiple air samples at each Naval Reactor site including KAPL and concluded that "none of the 57 samples showed any statistically significant amount of asbestos. *Id.* at 27.

**III. GE TIMELY REMOVED THIS CASE**

Clearly, from the face of the Complaint it could not be ascertained that this case was removable. The allegations in the Complaint do nothing more than state the dates that Mr. Kortekamp served in the Navy and the dates and places of his employment. Plaintiffs submit that GE should have known from the Complaint that this case was removable since it alleges that Mr. Kortekamp was exposed to asbestos in the Navy. Yet it is not GE's burden to guess what ships Mr. Kortekamp served aboard, what he did aboard those ships, where in the ships he was performing his work and to which products he claims exposure. Just because plaintiff served in the Navy does not make his case removable.

GE removed this case to federal court without delay as soon as it was on notice that federal jurisdiction could exist. Plaintiffs argue in their motion to remand that GE should have been on notice that Plaintiff was exposed to GE products because answers to interrogatories revealed that Mr. Kortekamp worked on the *USS Skate* and there were reactors, turbines, and

[1] Mr. Shannon previously litigated these accusations against General Electric in federal court beginning more than 15 years ago. *See Shannon v. General Electric et al.*, 186 F.3d 186 (2d Cir. 1999) (affirming District Court's dismissal of Mr. Shannon's claims for failure to prosecute after Mr. Shannon filed a motion for leave to amend his complaint, but then did not file an amended complaint for two years).

pumps on the Skate. What Plaintiffs fail to note, however, is that those reactors and turbines were not manufactured by GE, but rather by Westinghouse. *See*, *e.g.*, http://www.globalsecurity. org/military/systems/ship/ssn-578-specs.htm; http://www.nvr.navy.mil/nvrships/details/ SSN578.htm; http://navysite.de/ssn/ssn578.htm. The one GE product that Plaintiffs attempt to place on the *USS Skate* is a highly specialized reactor-cooling water pump. *See* Plaintiffs' Exhibits D, E, and F. However, Plaintiffs' Exhibits make no mention of these pumps being on board the *USS Skate*, and in fact demonstrate that the GE units did not meet Navy specifications until January 1958, at least six months after the *USS Skate* was launched. *See* http://navysite.de/ssn/ssn578.htm (*USS Skate* launched on May 16, 1957). In fact, Plaintiff's product identification sheets served August 4, 2006, did *not* list GE pumps as equipment plaintiff was exposed to and his Navy coworker, Joe Haley (deposed November 27, 2007) did not mention GE pumps at all. The very first mention of GE pumps in this case was in Plaintiff's Motion to Remand filed in this Court. Moreover, there is no evidence that Mr. Kortekamp worked on or near this unit (on a ship the size of a skyscraper). Even if it were on the *USS Skate*, that is still not sufficient evidence that would make this case removable. Perhaps most importantly, nowhere do the documents suggest that GE supplied any asbestos with these units.

## IV. GE HAS ESTABLISHED FEDERAL OFFICER JURISDICTION

Removal is appropriate under § 1442(a)(1) whenever: (1) the defendant acted under the direction of a federal officer; (2) the defendant has raised a colorable federal defense to the plaintiff's claims; and (3) a "causal nexus" exists between the plaintiff's claims and the actions taken by the defendant under color of its federal office. *Mesa v. California*, 489 U.S. 121, 124-25 and 134-35 (1989). GE meets each element required to establish federal officer removal jurisdiction in this case, and removal is therefore proper.

**A. GE Acted Under the Direction of a Federal Agency.**

GE satisfies the first element for federal officer removal jurisdiction, that it "acted under" the direction of a federal officer. The "acting under" element of federal officer removal is satisfied where a government contractor provides a service or product under the authority of a federal officer or agency that has direct control over the service or product. *See Green v. A.W. Chesterton Co.*, 366 F. Supp. 2d 149, 153 (D. Me. 2005). This removal requirement is to be "interpreted broadly" and "liberally construed." *Isaacson v. Dow Chemical Co.*, --- F.3d ---; 2008 WL 466111, *4 (2d Cir. 2008) (citation omitted). Indeed, the Supreme Court has held that "if the authority to carry out the project was validly conferred, that is, if what was done within the constitutional power of Congress, there is no liability on the part of the contractor for executing its will." *Boyle v. United Technologies Corp.*, 487 U.S. 500, 506 (1988) (quoting *Yearsley v. W. A. Ross Construction Co.*, 309 U.S. 18 (1940)). Without question, training nuclear submarine officers and sailors is something that could be done *only* under authority from the federal government. *See* In Re *Agent Orange Product Liability Litigation*, --- F.3d ----; 2008 WL 465659 at * 6 ("[T]he exercise of government discretion is inherent to military contracting [as it] 'often involves not merely engineering analysis but judgment as to the balancing of many technical, military, and even social considerations, including specifically the trade-off between greater safety and greater combat effectiveness.'") (quoting *Boyle*, 487 U.S. at 511).

**B. GE Has Demonstrated a Colorable Federal Defense to Plaintiffs' Claims**

**1. GE Need Only Demonstrate That Its Federal Defense Is Plausible and Not Frivolous.**

With regard to *Mesa*'s second prong, a defendant "need not prove" the asserted federal defense, but "merely need colorably to show" the applicability to the plaintiff's claims. *Hilbert v. McDonnell Douglas Corp.*, --- F. Supp. 2d ----, 2008 WL 53266, *9 (D. Mass. 2008). *See also*

*Winters v. Diamond Shamrock Chem. Co.*, 149 F.3d 387, 400 (5th Cir. 1998), *cert. denied*, 526 U.S. 1034 (1999). As explained by the Supreme Court, "one of the most important reasons for removal is to have the validity of the defense . . . tried in a federal court. The officer need not win his case before he can have it removed." *Willingham*, 395 U.S. at 407. Thus, consideration of the actual merits of the invoked defense is inappropriate, as ultimate success on the defense is not the jurisdictional criterion; the only proper inquiry for purposes of § 1442(a)(1) is whether the defendant has asserted a colorable claim to the defense. *See, e.g.*, *Magnin v. Teledyne Continental Motors*, 91 F.3d 1424, 1427 (11th Cir. 1996) (noting that the federal defense "need only be plausible; its ultimate validity is not to be determined at the time of removal"); *Isaacson*, 2008 WL 466111, *6 ("To be 'colorable,' the defense need not be 'clearly sustainable,' as the purpose of the statute is to secure that the validity of the defense will be tried in federal court.") (citing *Willingham*, 395 U.S. at 406-07). In short, *Mesa*'s "colorable defense" requirement must be liberally construed and "should not be read in a narrow or limited manner, nor should the policy underlying it be frustrated by a narrow, grudging interpretation." *Camacho v. Autoridad de Telefonos de Puerto Rico*, 868 F.2d 482, 487 (1st Cir. 1989) (citation omitted).

As GE has alleged sufficient facts necessary to demonstrate that it was acting under the direction of the federal government when it provided services for the U.S. Navy and when it operated KAPL and trained Navy personnel there, it has shown a plausible federal defense at this stage of the action.

**2. GE Has Established At Least a Colorable Government Contractor Defense To Plaintiffs' Claims.**

GE has asserted the government contractor defense—a defense based upon federal common law and first approved by the Supreme Court in *Boyle v. United Techs. Corp.*, 487 U.S. 500 (1988), which "generally immunizes government contractors from civil liability arising out



ME1 7193905v.1

of the performance of federal procurement contracts." *Bailey v. McDonnell Douglas Corp.*, 989 F.2d 794, 797 (5th Cir. 1993). This defense rests upon the fundamental recognitions that the design of military equipment is "assuredly a discretionary function" of the government and that this critical governmental function (which entails a careful balancing of "technical, military, and even social considerations, including specifically the trade-off between greater safety and greater combat effectiveness") must not be subjected to "second-guessing" through state lawsuits against the contractors. *Boyle*, 487 U.S. at 511. Under the government contractor defense, a manufacturer of military equipment cannot be held liable for an alleged "design defect" where: (1) the government developed or approved "reasonably precise specifications" for the equipment; (2) the equipment conformed with these specifications; and (3) "the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States." *Id.* at 512. Lest there be any doubt, the federal interest in controlling its contracts "surely exists as much in procurement contracts as in performance contracts; [there is] no basis for a distinction." *Id.* at 506.

The government developed and promulgated "reasonably precise" standards for the health and safety practices at KAPL and GE conformed to those standards. The Navy took an active role in protecting both military and civilian personnel from occupational hazards. Naval regulations required all medical personnel to be trained to both prevent and treat injury and disease that Naval personnel might encounter in their work. A detailed and strict chain of command governed the safety programs of the Navy. These programs and regulations were characterized by "active assessment, evaluation, and recommendation for control." Affidavit of Dr. Lawrence Betts, dated February 21, 2008 ("Betts Affidavit") ¶¶ 8-10. The information possessed by the U.S. Navy with respect to the specification and use of asbestos insulation and

health hazards associated with the use of asbestos insulation on Navy vessels far exceeded any information concerning the hazards of asbestos insulation onboard a Navy vessel that could have been provided by GE to the U.S. Navy. *See* Betts Affidavit generally, and specifically ¶¶ 27-30 and 33.

Moreover, The Navy would not have permitted variable and inconsistent training depending upon the state in which the training was given. As Dr. Betts states:

> Uniformity and standardization of any communication, and in particular safety information, are crucial to the operation of the Navy. The Navy had a sound, occupational health and safety program based upon its requirements and conducted in accordance with Navy regulations, instructions, and operational necessities. Simply, the Navy could not operate if various personnel were trained differently and received additional, inconsistent information from different manufacturers.

*Id.* ¶ 32.

As discussed above, KAPL had its own detailed and comprehensive safety and training program. *See, e.g.*, GAO Report (Ex. H) at 25 (detailing KAPL's airborne asbestos level limits and requirement that personnel use full-face respirators on certain projects). This extensive program was further subject to Congressional oversight. In 1991, the United States General Accounting Office ("GAO") submitted a report to and testified before the Environment, Energy, and Natural Resources congressional committee regarding the environmental, health, and safety practices at Naval reactor facilities. *See id.*; General Accounting Office, Testimony: Nuclear Health and Safety, April 25, 1991 ("GAO Testimony") (Ex. I). The GAO testified that "federal standards have been established to control asbestos exposures" and that the "controls and procedures implemented at Naval Reactor laboratories and sites" including at KAPL had at all times met those federal standards, with the exception of one exposure incident in 1986 (after Plaintiffs allege exposure). GAO Testimony (Ex. I) at 8-9. *See also* GAO Report (Ex. H) at 24-28. Moreover, GAO stated that Knolls and other Naval Reactor sites are "exempt from most

external oversight." GAO Testimony (Ex. I) at 11. Thus, it is clear that under *Boyle* that the federal government and only the federal government controlled the health and safety practices of GE at KAPL.

Lastly, the federal contractor defense requires a contractor to warn the government of those risks of which the contractor is aware and the government is not. GE has advanced evidence that there were no dangers about the use of asbestos-containing insulation that were known to GE but not to the United States. *See* Betts Affidavit. The Betts Affidavit includes an exhaustive review of the knowledge of the United States and U.S. Navy concerning the hazards of the use of asbestos-containing insulation products. Dr. Betts demonstrates that there were no asbestos-related dangers known to GE that were not also known by the U.S. Navy. Further, not only did the Navy know of the dangers associated with asbestos, but it employed an extensive program of safety measures in order to protect both military and civilian employees from those dangers: The United States Navy knew that inhalation of asbestos could cause pulmonary disease since the 1920s, and implemented an exhaustive program to minimize that hazard. Practices included use of water to control dust, exhaust and ventilation systems, isolation of dust, and use of respirators and other protective gear. *Id.* ¶ 7.

Not only is federal officer removal proper in this case, but a number of courts have adopted a less stringent standard for demonstrating a colorable federal contractor defense in failure to warn cases than the standard stated in *Boyle*. The Sixth Circuit stated that courts should consider the discretion exercised by the government with regard to warnings, rather than the dictation or prohibition of such warnings, in considering whether the federal contractor defense is colorable in a failure to warn case. *Tate v. Boeing Helicopters*, 55 F.3d 1150 (6th Cir. 1995). The *Tate* Court declined to follow cases from other circuits that indicated that the contractor

must show that the Government itself dictated the content of the warnings or that the United States imposed a prohibition against health warnings" *Id*. (citations omitted). The *Tate* court instead declared its own standard: Government *discretion* is required, not dictation or prohibition of warnings. "Where a contractor proposes warnings that the government substantively approves, and satisfies the second and third conditions [of the *Boyle* analysis], the defense displaces state law-even if the government did not 'prohibit' the contractor from proposing more alarming warnings." *Id.* (emphasis in original). *See also McAboy v. IMO*, No. C05-1241L, 2005 WL 2898047 at *4 (W.D. Wash. Oct. 27, 2005) (denying remand and stating that the federal contractor defense was not intended to be granted only when the government exercised absolute control over every aspect of a product's design, citing *Boyle*, 487 U.S. at 512, and that removal pursuant to the federal contractor defense must be construed even more broadly) (citing *Willingham,* 395 U.S. at 406); In re *Agent Orange Product Liability Litigation,* --- F.3d ----; 2008 WL 465659, *11-12 (2d. Cir. 2008) (holding that U.S. government's continued purchase of chemical agent after learning of the agent's potential hazards was sufficient to show that the government had exercised its discretion for purposes of *Boyle*).

Since GE has shown that the federal government approved and oversaw a detailed safety and training program, that GE's performance conformed to those requirements, and that the government exercised its discretion with regard to any instructions to Navy personnel, subject matter jurisdiction over this action is proper and this Court should deny Plaintiffs' Motion for Remand.

### C. The Requisite Causal Nexus Exists Between GE's Acts Under the Direction of the Military and Plaintiffs' Alleged Injury.

The facts above make it clear that there is a causal nexus between the federal direction of GE regarding the operation of KAPL and the conduct for which it has been sued (the alleged

failure to warn of the dangers of asbestos). The Supreme Court has held that "it is plain that the Federal Government's interest in the procurement of equipment is implicated by suits" between government contractors and third parties. *Boyle*, 486 U.S. at 506.

As the Second Circuit recently stated, "[t]he *Boyle* Court was concerned primarily with protecting the government's ability to assume certain kinds of risks without assuming the costs of liability for those risks. It protected this ability by ensuring that where the government accepts such a risk knowingly, a state law that would require finding that same risk unacceptable must be displaced." *Agent Orange*, 2008 WL 465659, *15 (citation omitted). In the case of KAPL, the government explicitly assumed all the risks attendant with the extremely risky proposition of running a nuclear propulsion research and training program except those "caused directly by the bad faith or willful misconduct" of GE officers and directors. *See* Contract No. W-31-109-ENG-52 (Ex. D). The contract, therefore, left no doubt under *Boyle*, that the federal government desired the program to be exempt from the second-guessing of state court juries. Plaintiffs now seek to hold GE liable in state court for the manner in which GE performed a contract with the United States Government. GE's evidence has established that the Navy determined the nature of health and safety precautions at KAPL and the manner and content of communications with Navy personnel.

## V. PLAINTIFFS' CLAIMS ARE COMPLETELY PREEMPTED BY FEDERAL COMMON LAW

Plaintiffs' efforts to employ state law to redress their injuries are completely preempted by federal common law which displaces state law where the unique federal interest in military and defense matters is concerned. *See Boyle v. United Techs. Corp.*, 487 U.S. 500, 504-05 (1988) (establishing the government contractor defense under federal common law). *See also Lontz v. Tharp*, 413 F.3d 435, 440-41 (4th Cir. 2005) ("Complete preemption is a 'jurisdictional



ME1 7193905v.1

doctrine,' while ordinary preemption simply declares the primacy of federal law, regardless of the forum or the claim. . . . [W]hen complete preemption exists, there is 'no such thing' as the state action.") (quoting *Beneficial Nat'l Bank v. Anderson*, 539 U.S. 1, 11 (2003)). The Supreme Court has held that "a few areas, involving 'uniquely federal interests,' are so committed by the Constitution and laws of the United States to federal control that state law is pre-empted and replaced, where necessary, by federal law of a content prescribed (absent explicit statutory directive) by the courts—so-called 'federal common law.'" *Id.* at 504 (internal citation omitted). These areas include such intrinsically federal issues as foreign relations, state boundary and water disputes, the United States' rights and obligations under its contracts, and "the [Government's] interest in getting . . . [its] work done" under defense or national security-related contracts with private parties. *Id.* at 505-06; *Bentzlin v. Hughes Aircraft Co.*, 833 F. Supp. 1486, 1490 (C.D. Cal. 1993) (establishing federal common law immunity from state manufacturing defect suits involving weaponry because "[n]o information concerning the design and capabilities of the [weaponry] can be discovered without interfering with national security"). When an area is of such unique federal interest that the federal courts create federal common law, complete preemption may follow. *See, e.g.*, *Caterpillar Inc. v. Williams*, 482 U.S. 386, 393 n.8 (1987) (describing ruling in *Oneida Indian Nation v. County of Oneida*, 414 U.S. 661, 675 (1974), that state-law complaint was completely preempted by federal common law right of possession to Indian tribal lands); *Republic of the Philippines v. Marcos*, 806 F.2d 344, 354 (2d Cir. 1986) ("Our question then would be whether the federal common law in the area of foreign affairs is so 'powerful,' or important, as to displace a purely state cause of action of constructive trust. We think it probably is.").

**A. Training of Navy Personnel for Defense of the Nation Against Foreign Attack is an "Intrinsically Federal" Interest.**

Defense of the nation against foreign attack is the archetypal interest that is so "intrinsically federal" that state authority is excluded. Plaintiffs' allegation that GE should have provided some ill-described "warnings" over and above those covered by the Navy and its detailed program amounts to nothing more than an accusation against the United States government that its safety standards were not stringent enough. States simply have no role, whether through the legislative, executive, or judicial process, in regulating the federal government's military activities or in the training of its personnel.

Though there is no act of Congress analogous to the Federal Aviation Act, the Locomotive Inspection Act, or the Nuclear Energy Act regulating military training or operations, this cannot reasonably be interpreted to mean that Congress did not intend for the federal government to have exclusive control over these areas. No such act is needed because the United States Constitution itself gives the federal government complete and exclusive control over the military. U.S. Const. art. I, § 4 (granting Congress the power to provide and maintain a Navy and Army); art. II, § 2 (making the President commander in chief of the Navy and Army). Indeed, it is "the purpose of Congress [that] is the ultimate touchstone" of pre-emption analysis. *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 516 (1992).

The functioning of the military requires strict adherence to the chain of command. Such adherence has long extended to the rules ensuring the health and safety of sailors. Evidence of this is found in Naval regulations dating back to at least 1913. In a publication of regulations from that year issued by Secretary of the Navy George von Lengerke Meyer after approval by President Wilson, the Navy mandated that "Every commanding officer of a vessel . . . shall frequently consult with the surgeon in regard to the sanitary condition of his crew, and shall use

all proper means to preserve their health." 1913 Navy Regulations, (Ex. J), art. 20(8). Similarly, Article 2044 of that publication reiterated that it was the duty of the commanding officer to "use all proper means to preserve the health of the crew, and from time to time consult with the medical officer of the ship in regard to sanitary measures to be adopted to that end.

Likewise the updated 1920 and 1930 editions of the regulations included the same rule, making it clear that the Navy's control over its personnel encompassed each sailor's health and hygiene. 1920 Navy Regulations, (Ex. K), art. 20(8); 1930 Navy Regulations (Ex. L), art. 20.

The sheer breadth of the control of the Navy over every aspect of the lives of its sailors is also evident from these regulations. The fact that summary execution is available to the commanding officer of a ship when a sailor disobeys orders makes stark the importance of an uninterrupted channel of communication between officer and sailor. Navy personnel on a nuclear submarine are exposed to a myriad of hazards from hostile fire to heat exhaustion to electrocution to radiation. Balancing these competing risks falls exclusively within the Navy's control. Any state law suggesting that sailors be provided contradictory information to enable them to disobey orders would interfere with this uniquely federal power.

The transition from a conventional to nuclear Navy in the 1950s did not alter this in any manner. KAPL's role in the implementation of the United States government's mandate to defend the nation is explicit. *See, e.g.*, Contract No. AT(45-1)-1350 between the United States of America and GE (Ex. M) ("[I]t has been determined by the [Atomic Energy] Commission that the making of this contract will facilitate the national defense."); War Department Cost Estimate of Contact W-31-109 Eng-52 (Ex. N) (stating that the contract between the government and GE for the operation of KAPL is "negotiated and executed under the First War Powers Act, 1941).

**B. The Navy's Nuclear Research Program is an "Intrinsically Federal" Interest.**

Research for the Navy's nuclear propulsion program is another such interest. Besides wholly occupying the field of nuclear regulation, the Atomic Energy Act of 1946 contains provisions that directly applied to GE's KAPL activities:

> The Commission, as agent of and on behalf of the United States, shall be the exclusive owner of all facilities for the production of fissionable material [with the exception of research facilities without the capacity to produce a nuclear weapon].
>
> The Commission is authorized to make . . . contracts with persons obligating them to produce fissionable material in facilities owned by the Commission. . . . Any contract entered into under this section *shall* contain provisions . . . obligating the contractor to make such reports to the Commission as it may deem appropriate with respect to his activities under the contract, to submit to frequent inspection by employees of the Commission of all such activities and to comply with all safety and security regulations which may be prescribed by the Commission.

Atomic Energy Act of 1946 § 4(c) (emphasis added).

> The President shall direct the transfer to the Commission of all interests owned by the United States or any Government agency in . . . [a]ll facilities, equipment, and materials devoted primarily to atomic energy research and development; and [s]uch other property owned by or in the custody or control of the Manhattan Engineer District or other Government agencies as the President may determine.

*Id.* § 9(a). Indeed, KAPL was established under that act. *See* January 28, 1947 Letter from United States Atomic Energy Commission to General Electric Company, (Ex. O) (confirming that contract for operations of KAPL (W-31-109-Eng-52) would contain certain provisions of the 1946 Act). *See also* May 8, 1952 Letter from United States Atomic Energy Commission to General Electric Company (Ex. P) (expanding GE's authority to conduct irradiations, tests, and other "services for the Commission, for other contactors of the Commission, or for other Government agencies.").

**VI. CONCLUSION**

Plaintiffs' attack on the adequacy of the safety training at the Navy's nuclear propulsion at Knolls Atomic Power Laboratory is either: (1) a challenge to the sufficiency of the federal government's program; or (2) a challenge to the federal government's policing of its own standards. In either case, it is a matter solely within the federal government's purview and not a matter amenable to state law or jurisdiction. As such, Plaintiff's motion for remand is contrary to both the evidence and well established precedent and should thus be denied.

DEFENDANT
GENERAL ELECTRIC COMPANY

/s/______________________________
Jeffrey M. Thomen, Esquire
jthomen@mccarter.com
Federal Bar No. 6738
McCARTER & ENGLISH, LLP
185 Asylum Street, 36th Floor
Hartford, Connecticut 06103
Tel.: (860) 275-6700
Fax.: (860) 724-3397

**CERTIFICATION**

I hereby certify that on March 7, 2008, a copy of the foregoing DEFENDANT GENERAL ELECTRIC COMPANY'S MEMORANDUM IN SUPPORT OF ITS OPPOSITION TO PLAINTIFFS' MOTION FOR REMAND was filed electronically. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system

/s/__________________________
Jeffrey M. Thomen