reviewed, and critiqued. For example, several reports noted blown electrical fuses, personnel's errors, and loose wire connections. Several reports consisted of personnel's procedural mistakes that occurred during training activities.

The following are typical of the reports we reviewed:

- During a routine maintenance period, a worker entered the reactor space to perform required work without his self-reading pocket dosimeter, as required. Even though he was wearing his required primary dosimeter, which did not indicate exposure, an incident report was issued due to the violation of procedures.
- During normal operations, a student shifted electrical power to an incorrect source, prior to a trainer's stopping him. The momentary loss of power led to an automatic shutdown, or "scram," of the reactor. Additional training resulted for the student. There were no safety-related consequences, in that the reactor is designed to accommodate such transients, and the scrams are an anticipated part of the training program.
- During normal operations, a student electrician shifted a power circuit "out of phase," but this did not result in a scram, because there was adequate power going to the necessary systems. The plant continued normal operations, and additional training was prescribed for the electrician.
- During normal operations, a student was required to clean and inspect fuses. The student removed the wrong fuses, resulting in a momentary loss of power and an automatic scram. There were no safety-related consequences, and additional operator training ensued.

One factor contributing to operational safety is that the prototypes are seldom operated at full power during training activities. Naval Reactors has established requirements that limit the power level, and if the limit is exceeded, this is regarded as an incident. This requirement enhances safety because if a problem should occur, it can generally be resolved more easily at low power than at full power. In addition, there would be less of a heat buildup to dissipate at low power.

Another factor that is extremely important to safe reactor operations is the qualifications and training of the personnel that manage and operate the reactors. Contractor personnel are responsible for managing, operating, and maintaining the protoytpe reactors, as well as assisting the Navy in the training program. Contractor prototype managers, supervisors, and operators are subject to the same training program as Navy

officers and crew members. For example, the senior contractor representative stationed at the prototype reactor on a full-time basis is the shift supervisor. The prospective shift supervisor is recruited out of college with a bachelor's degree in a technical field, such as mechanical, electrical, chemical, nuclear, or marine engineering. The training process to become shift supervisor takes 5 or more years as follows:

- Six months of classroom training at Naval Reactors Nuclear Power School in Orlando, Florida, includes topics such as reactor dynamics, core characteristics, and plant operations.
- Six months of training at an operating reactor and classroom training with both oral and written certification examinations follow.
- Fifteen weeks of training to achieve nuclear plant engineering qualifications includes topics such as plant safety and security and personnel safety.
- Over 3-1/2 years are spent obtaining shift supervisor qualifications for the individual's specific reactor plant. This period could be longer if the specific prototype plant is not operating due to maintenance or refueling. Prior to being designated a shift supervisor, the person must pass numerous oral and written examinations concerning plant systems and management. The certifications include all aspects of both normal operations and potential emergency preparedness and response.

In contrast, NRC requires that shift supervisors at commercial nuclear power plants have a high school diploma and 4 years' experience and training at a nuclear power plant. According to an NRC official, the training received is equivalent to a 2-year associate's degree in nuclear technology.

## Asbestos Controls and Procedures at Naval Reactors Laboratories

Asbestos exposures are a serious health hazard and federal standards have been established to control them. The asbestos controls and procedures implemented at Naval Reactors laboratories meet federal standards and in some cases exceed the standards. However, asbestos incidents have been reported, and at the Knolls laboratory a major lapse in asbestos control was experienced in 1986. Also, in anticipation of more stringent federal requirements, Naval Reactors is planning a comprehensive asbestos removal program.

## Naval Reactors Has Implemented Federal Standards

Before 1971, little federal guidance existed to protect personnel from asbestos exposures. Since then, federal guidance has been extensive. In 1971, the Occupational Health and Safety Administration (OSHA) announced pending asbestos standards. The Navy reacted to this pending legislation by implementing the OSHA standards in a February 1971 instruction dealing with the control of asbestos exposure hazards. One month later, although exempt from OSHA, Naval Reactors implemented the Navy instruction initially at the prototype sites, then programwide. The instruction described the minimum health and safety precautions necessary when fabricating, installing, and removing insulation containing asbestos.

Another Navy instruction replaced the 1971 instruction in October 1975. The new instruction established policies on the elimination of asbestos and actions to further reduce asbestos exposures. By the end of 1975, Naval Reactors implemented the 1975 instruction and another Navy instruction that incorporated OSHA safety and health standards and EPA emission standards. This latter instruction also changed in 1979 and again in 1986 in response to changes in OSHA and EPA standards.

We found that the Naval Reactors laboratories and sites meet or exceed the federal standards for asbestos control programs. While the asbestos controls at Bettis and its site were in compliance with OSHA standards, Knolls and its sites exceed OSHA standards in several areas. The Knolls program has reduced the OSHA action level from .1 to .01 fiber per cubic centimeter calculated as an 8-hour time-weighted average. Further, because of the potential danger of asbestos dust, Knolls requires authorization from its industrial hygiene group before removing ceiling panels although this is not required by federal standards. Finally, OSHA and EPA allow the use of half-face respirators in certain situations while the Knolls program only permits the use of full-face respiratory equipment.

## Asbestos Exposures at Knolls in 1986 Exceeded Federal Standards

During our review, we found one serious incident, over the past 20 years, involving asbestos that resulted in exposures exceeding federal limits at Naval Reactors-operated facilities. As a result, Naval Reactors took positive actions to provide programwide improvements in all aspects of asbestos control.

The incident occurred during a 3-month period in 1986, in which Navy personnel were assigned to remove asbestos at Knolls' Kesselring site.

The work was done under the direction of Knolls. During the work, airborne asbestos was discovered that exceeded federal exposure standards. Naval Reactors has established an asbestos monitoring program for personnel who may have been overexposed to asbestos. However, there is no method to measure asbestos inhalation, and most health effects from asbestos exposure would be latent.

A board of five representatives from Naval Reactors was convened to investigate the incident and recommend corrective actions. The board concluded that the incident was caused by fundamental weaknesses in Knolls' methods for planning, performing, and controlling asbestos work. The board made numerous recommendations to correct the weaknesses, including

- establishing an asbestos work control program at Knolls laboratory and its sites based on engineering controls as the primary means to control asbestos exposures;
- revising training programs for asbestos workers as necessary to demonstrate that they are fully qualified; and
- developing a documented system for asbestos work planning, performance, and closeout.

Responding to the recommendations, Knolls laboratory developed asbestos control programs at each of its sites. These programs consisted of procedures, instructions, and training that parallel, to the extent possible, Naval Reactors radiological controls. A Knolls laboratory assessment performed 6 months after the board's report found that its asbestos control programs met OSHA standards and were being effectively administered.

While the board's final report was in process, Naval Reactors field office at Pittsburgh reviewed the asbestos control problems with its contractor at Bettis. Consideration was given to requiring a review of asbestos controls at Bettis and its Idaho site; however, this was not deemed necessary. The Pittsburgh field office determined that in 1986—the year of the board's review—asbestos controls at Bettis and a newly revised program at Idaho had already been reviewed. Both actions addressed the issues found during the Knolls review, and no changes in the asbestos control programs were required.

## Naval Reactors Has Asbestos Removal Program

In anticipation of new, more comprehensive OSHA standards, Naval Reactors has adopted a policy of systematic asbestos removal and replacement. Both laboratories have submitted proposals for asbestos removal to Naval Reactors. Naval Reactors has reviewed and approved both proposals.

The Knolls laboratory plan, estimated to cost $30 million over 10 years, has three objectives. The objectives are to (1) catalogue all asbestos-containing building materials, (2) provide maintenance and surveillance of existing asbestos materials, and (3) remove or stabilize accessible asbestos materials.

Knolls contracted with an asbestos removal vendor, and the cataloging of asbestos-containing materials is underway at two of Knolls' three sites, Kesselring and Knolls. Cataloging is to be completed at all sites by September 1991. Knolls awarded an abatement contract for work at the Knolls Laboratory site in May 1991.

The approved plans at Bettis and its Idaho site were estimated at $10 million over 6 years and $28 million over 10 years, respectively. Both estimates are for planning purposes only and will be updated based on the asbestos catalogue programs in operation at both locations.

## Status of Asbestos Controls at Naval Reactors Facilities

During our review, we physically inspected all laboratories and sites, except the Windsor site, and took 57 air samples to determine the status of asbestos controls at the facilities. This part of the work was performed by our Manager for Health and Safety because of his extensive experience in GAO's ongoing asbestos control and removal programs.

The air samples were taken at various locations that were deemed to potentially have asbestos. These samples (filters) were sent to a commercial laboratory for analysis. None of the 57 samples showed any statistically significant amount of asbestos. All of the samples that did contain traces of asbestos fibers were far below the federal limits for detectable asbestos.

The physical inspections of the facilities noted torn asbestos wrapping on pipes and other instances of exposed asbestos. According to our Manager for Health and Safety, these instances are typical for facilities of the size inspected and appeared to be the result of normal operations. Unless the asbestos is disturbed inadvertently or during operation or maintenance activities, it poses no hazard to employees. However, close

vigilance will help to identify and eliminate these potential hazards until the asbestos removal program is completed at the facilities.

# Current Practices for Hazardous Waste Are Acceptable but Past Activities Posed Problems

Naval Reactors facilities generate two types of hazardous wastes—radioactive and chemical. Currently, these wastes are stored in designated areas until they are shipped off-site for proper disposal. Naval Reactors has implemented procedures to ensure the wastes are handled, stored, and disposed of in a safe manner.

Current handling, storage, and disposal of chemical wastes at Naval Reactors laboratories and sites is inspected by EPA and/or state agencies. In addition, the laboratories and sites are in the process of complying with EPA requirements concerning landfills and disposal areas. EPA and other oversight at Naval Reactors facilities is discussed in chapter 4.

From the early 1950s to about 1970, hazardous waste was disposed of in landfills and other areas at Naval Reactors facilities. These past practices have left problems that must be dealt with under new and more stringent environmental requirements. Consequently, each laboratory and some of their sites have remaining problems that require some sort of continuous action to prevent health hazards.

## Current Waste Handling and Disposal Procedures at Naval Reactors Laboratories

The Naval Reactors laboratories have implemented procedures to protect employees and the public against exposures to radioactive and hazardous waste materials. While Knolls and Bettis laboratories' programs have minor differences, both follow applicable federal, state, and local laws and regulations. In addition, both must follow restrictions set forth by the disposal sites they use. There are basically two types of waste that require special handling and disposal practices—radioactive and chemical waste materials.

### Radioactive Waste Handling and Disposal

Radioactive waste generated at Naval Reactors laboratories and sites includes contaminated equipment, tools, filters, anticontamination clothing, liquids, and other items. The total radioactive waste generated at Naval Reactors laboratories and sites averages over 2,000 cubic meters a year. The quantity of the waste is reduced by decontamination, compacting, and solidifying liquids. No radioactive waste is presently disposed of on-site by the laboratories or sites.

At the point of generation, radioactive waste is collected and temporarily stored in containers that are labeled as to their contents. The waste is then taken to an on-site storage facility, where it is processed

and packaged for disposal. When enough material is collected, arrangements are made to ship the waste to an approved disposal site. To determine if procedures were being followed, we traced the documentation of 17 shipments made by the laboratories and sites. We found that the procedures were followed and at no time in the process—from generation to disposal—was accountability of the radioactive waste lost.

## Chemical Waste Handling and Disposal

The Naval Reactors laboratories procedures for chemical waste handling and disposal are similar to the ones for radioactive waste. However, as chemicals come into the laboratory, information is obtained from the manufacturer concerning the chemical properties and handling and health warnings. As the chemicals are used and declared waste, they are placed in proper containers and the amounts and description of the contents maintained in a log by the generators. The chemicals are then moved to a central storage area and placed in containers for shipment. Each shipping container is weighed, packing slips and a manifest are prepared, and permits (shipper, disposal site) are checked. The shipper and disposal site are then notified, and departure and arrival dates coordinated. During our review, we traced the documentation of 61 waste shipments at the laboratories and sites from generation to removal. The accountability of the waste was maintained throughout the entire process.

In addition, during our review, we physically inspected both areas that generate radioactive and chemical waste and areas for temporary storage, central storage, and processing. We checked records and logs attached to storage containers to verify the implementation of procedures. We found no deviations at the laboratories.

## Status of Past Problems at Knolls Laboratory and Sites

Knolls laboratory has several problems created by past activities. These include

- a plutonium separation research facility used by the Atomic Energy Commission, prior to Naval Reactors involvement with the site, and
- landfills that contain hazardous chemical wastes at Knolls and its Kesselring site.

Knolls determined through interviewing personnel and past records that its Windsor site does not have any environmental problems associated with past activities.

## Early Research Facility Created Major Problem

From 1950 to 1954, the Atomic Energy Commission conducted plutonium separation research work in two buildings located at Knolls laboratory. As a result, the two buildings were contaminated with radioactive material along with several underground tanks used to store radioactive sludge. In addition, an area close to the two buildings and another area at a landfill were used for storing drums filled with radioactive sludge awaiting shipment to a disposal site. These areas were contaminated by leaking drums.

Some areas in the buildings have been decontaminated and are presently used as office space. Other areas are used for storing radioactive material, and some areas have been sealed. The buildings are routinely monitored for radioactivity, and when any maintenance is required, special procedures are implemented to protect workers from radioactive materials.

The underground tanks are encased in concrete, and inspections performed by the Knolls contractor show that the tanks are sound. In addition, a gravel pit has been installed around one of the buildings to collect groundwater, which is treated to remove radioactive material. While the radioactivity in the water collected is below federal and state limits, it is still treated before it is released. The two buildings and the tanks are scheduled for removal sometime in the late 1990s.

The radioactive sludge that leaked from the drums contaminated soil and some small buildings where they were stored. However, 1,074 cubic yards of radioactive contaminated soil was removed from the landfill storage area and several truckloads from the area near the two large buildings. The material was disposed of at an approved disposal site. In addition, one of the small storage buildings has been sealed, and the other one determined to be free of radioactive contamination.

## Landfills Require Monitoring

From the beginning of operations until 1978, Knolls and its Kesselring site disposed of chemical waste in several landfill areas. After inspecting the areas and examining old disposal records, Knolls estimated that about 90 cubic feet of chemical waste was buried per year at a landfill near the laboratory and that Kesselring had buried about 170 cubic feet per year, all prior to 1978. These wastes included acids, chemical reagents, cooling system and lubricating oils, battery acid, paint, solvents, and photographic developing chemicals.

Knolls has 18 groundwater monitoring wells around the laboratory site to detect the presence of the chemical wastes. Samples taken from these wells indicate elevated levels of lead, chromium, vinyl chloride, iron, manganese, and chloride ions. The iron and manganese levels are higher than New York State drinking water standards. According to Knolls' 1988 Environmental Summary Report, the groundwater in the area is not used for drinking water, and in addition, there are no elevated levels of toxic chemicals such as solvents or laboratory chemicals.

The Kesselring site has 53 groundwater monitoring wells to detect chemical wastes. No significant concentration of toxic chemicals has been detected at the site. Pollutants that have been detected are within drinking water standards.

## Status of Problems at Bettis Laboratory and Idaho Site

The Bettis laboratory and its prototype site in Idaho also have environmental problems associated with past activities. Both are currently conducting activities to evaluate historic disposal areas and establish priorities for remedial action in order to comply with EPA requirements.

The Bettis laboratory has identified seven areas or sites that may have been used to dispose of chemicals. Four of the areas are inactive, and three have been remediated for closure. The four inactive sites consist of a waste site used from the late 1950s to about 1964 for the disposal of rubbish and selected chemicals, a shop area used for removing grease from equipment, soil surrounding tanks that leaked but have since been removed, and a landfill area used from 1960 to 1987.

The major problem associated with all of these sites is the presence of a chemical called tetrachloroethylene. At present, there are no federal or state standards for soil or groundwater contamination by tetrachloroethylene. However, drinking water standards do exist, and the levels measured at Bettis exceed these standards. According to Bettis laboratory officials, this poses no immediate health hazard because no groundwater in the area is used for drinking water. EPA will eventually decide whether remedial action is necessary and the extent of the action.

The three sites being closed consist of a target range contaminated with lead bullets, a chemical waste storage pad, and an acid storage tank. All of these have been remediated, and closure plans have been submitted to EPA for its approval.

In addition, Bettis has identified six areas contaminated with radioactive material and has taken actions to address all of them. Soil has been excavated from all of the areas and disposed of at licensed radioactive waste disposal facilities. At this time, Bettis has plans for additional remedial decontamination at only one of the identified areas.

The past contamination on-site at two of the areas has resulted in off-site radiation releases. The waste site, which is contaminated with chemical waste, also contains some radioactivity that moves off-site through precipitation. However, the highest levels identified at the off-site area were less than 2 percent of the federal limits for unrestricted use. In addition to the waste site, liquid releases from the Bettis site have caused some radioactive contamination in an adjacent small stream. However, readings conducted off-site were only slightly above natural background readings.

Bettis' Idaho site has identified 68 potentially hazardous sites or areas. Twelve of these sites are suspected of having both chemical and radioactive waste, and may require some remedial action; 18 sites are suspected of having only chemical waste and are being analyzed to determine if remedial action is necessary; and the remaining 38 sites will not require any action.

Of the 12 sites suspected of having both types of waste, 11 will be sampled during 1991 to determine the type and extent of contamination. However, before remedial action is initiated, an investigation of each site and a feasibility study will be prepared. Naval Reactors officials estimate a final decision on the method for remediation will be made in the late 1990s.

# External and Internal Oversight Is Being Provided at Naval Reactors Laboratories

Despite numerous exemptions,[1] existing oversight of Naval Reactors is extensive. Certain federal and state oversight bodies are authorized access to the laboratories and sites as necessary, while others maintain frequent communications as requested by Naval Reactors. Naval Reactors and its two major contractors have established an extensive internal oversight program at the Naval Reactors laboratories and sites consisting of frequent audits and inspections and close personal attention by its technical staff.

## External Oversight of Naval Reactors Laboratories Provided by Federal and State Agencies

External oversight of Naval Reactors laboratories and sites is basically provided by EPA and state agencies in the respective locations. These inspections are conducted to ensure compliance with a variety of current environmental programs and address compliance with regulations governing past problems arising from land disposal of chemical waste. For example, EPA conducts inspections of the Knolls and Bettis laboratories, including their prototype sites. However, EPA has delegated much of its regulatory authority to the states. Consequently, either the state conducts the inspections, or EPA and the state conduct joint inspections.

### Oversight at Knolls and Its Sites

From January 1988 to June 1990, EPA conducted seven inspections at Knolls and the Kesselring site, either by itself or jointly with New York. Two deficiencies were reported as a result of the inspections.

Knolls' other prototype site in Windsor, Connecticut, was inspected two times by EPA from January 1988 to June 1990. One violation was found. However, since there are no landfills on the Windsor site, the inspections were only for air and water requirements.

New York State provides oversight of Knolls and its Kesselring site through the State Department of Environmental Conservation (DEC) and the Department of Health. These agencies monitor activities and conduct inspections to ensure that environmental and health laws are followed.

The DEC issues permits for water and air emissions, and Knolls routinely submits emission reports to DEC. In addition, DEC conducts surprise site

[1]Presidential Executive Order 12344 of Feb. 1, 1982, which was codified by P.L. 98-525-Oct. 19, 1984 (42 U.S.C. 7158), enables Naval Reactors to assume numerous DOE and Navy functions, including ensuring safe reactor operations by prescribing and enforcing standards and regulations related to the environment and the safety and health of workers, operators, and the general public. Naval Reactors is also exempt from review by independent organizations such as NRC and the Defense Nuclear Facilities Safety Board.

inspections, testing the water coming from the sites and inspecting the air emission points. From January 1988 to June 1990, DEC inspected the Knolls and Kesselring sites 24 times and did not find any reportable items.

DEC also inspects the landfills at the Knolls and Kesselring sites. New York has a program under way to close all of the old landfills in the state, including those at the Knolls and Kesselring sites. Thus, the state did not renew the landfill permits; however, the landfills are operated under the requirement of the expired permit. Knolls laboratory has submitted closure plans for its landfills and is awaiting state action on the plans. In addition to having DEC inspections, Knolls laboratory submits quarterly reports to DEC on the materials that are dumped at the sites and annually on the results of tests from the monitoring wells surrounding the landfills. DEC officials said that neither Knolls nor its Kesselring site has had any serious problems.

The New York State Department of Health does not issue permits, nor does it inspect the Knolls or Kessselring sites. However, it monitors air near the sites for radiation releases and has assisted DEC in testing the nearby Mohawk River for radioactivity.

## Oversight at Bettis and Its Idaho Site

The Bettis laboratory and its prototype site in Idaho have been inspected a total of eight times by the cognizant EPA regional offices and state agencies between January 1988 and August 1990. The Bettis laboratory has been inspected three times by EPA Region III (Philadelphia) and twice by the Pennsylvania Department of Environmental Resources (DER). DER issued a notice of violation in July 1990.

The notice of violation concerned the release of hazardous constituents causing pollution of the groundwater. The notice of violation did not address the current environmental controls at the Bettis site. Rather, of concern was the extent of health risk and/or environmental degradation due to historical disposal practices.

The Idaho site has been inspected three times by regulatory personnel between January 1988 and August 1990. EPA Region X (Seattle) inspected the Idaho National Engineering Laboratory in 1988, 1989, and 1990. In 1990, the inspection was conducted jointly with the state of Idaho Department of Health and Welfare. Bettis' Idaho site was inspected as part of the Idaho National Engineering Laboratory. No

enforcement actions cited by the regulatory bodies were applicable to the Idaho site.

In addition to on-site inspections, the cognizant regulatory bodies are provided environmental monitoring information on a periodic basis. For example, Bettis prepares and distributes annual effluent and environmental monitoring reports to EPA and DER. The Idaho site provides among its reports monthly drinking water sampling results to the state of Idaho.

## Extensive Internal Oversight Is Present at Naval Reactors Laboratories

Audits and inspections conducted by Naval Reactors contractors and field and headquarters personnel have created an extensive oversight of program activities at Naval Reactors laboratories. During our review, we noted that Naval Reactors contractors continuously conduct audits and inspections at almost every level in the organization. In addition, Naval Reactors field office personnel located at the laboratories and sites conduct numerous audits and inspections on a routine basis. Naval Reactors headquarters also conducts biannual inspections of safety, environmental, and radiological conditions.

We reviewed all formal audit reports relating to safety, environment, health, and asbestos from January 1988 to July 1990. Deficiencies were noted in each of the reports, but virtually all of them were of a minor nature, and according to the documentation we reviewed, all were corrected soon after they were brought to the attention of the responsible management unit.

### Contractor Audits and Inspections

The contractors responsible for operations at Bettis and Knolls conduct audits and inspections of all aspects of laboratory activities related to safety, the environment, and health. The audits or inspections are directed toward ensuring compliance with written regulations and procedures used to carry out the activities. The audits and inspections are conducted at all levels of the organization and performed by individuals at different levels. For example, the Bettis laboratory has an organizational unit responsible for safety, the environment, and health. This unit conducts audits and inspections of activities in each area. The organizational subunit responsible for safety, audits all activities related to safety, such as radiological controls. In turn, the radiological controls unit audits its activities pertaining to radiation surveying, etc.

During our review at Bettis' Idaho site, we had a computer listing prepared of all radiological findings for a 1-month period in 1989. There were a total of 199 observed radiological deficiencies, and according to the computer listing, all had been corrected. While this number might indicate major problems, virtually all of them were minor and generally did not require major corrective actions. However, the deficiencies reflect the thoroughness of the audits and emphasize compliance with and awareness of regulations and procedures that are often overlooked. Contractor officials at Knolls and Bettis explained that this oversight approach is deliberate and that emphasis is placed on minor deficiencies in an effort to avoid major ones.

## Naval Reactors Field Offices Audits and Inspections

The Naval Reactors field offices at Bettis and Knolls basically function as audit and inspection groups. For example, from January 1988 to December 1990, Naval Reactors field offices performed 919 formal audits. These audits looked at general and specific operational matters pertaining to activities related to safety, the environment, and health. The findings or deficiencies noted in these audits require a response from the contractor as to the corrective action planned. The action planned must meet the approval of the Naval Reactors field office, which follows up to ensure each action is implemented.

In addition to conducting formal audits and inspections, Naval Reactors field personnel of Knolls conduct daily inspections of activities and require contractors to correct any deficiencies they find. When they record a deficiency, a report is filled out and the manager of the activity has 1 week to respond and identify the actions to correct the deficiency.

Naval Reactors field personnel also perform surveillance of contractors' activities. For example, at Knolls two prototype reactors are visited each week and observed for a 3-hour period. Some of the visits are unannounced and may occur on any of the three daily shifts. Other visits that require a document review are conducted after a one-half day's notice to allow time to assemble the documents. In addition, once each quarter, the prototypes are monitored for 36 continuous hours for either operations, training, chemical/radiological controls, or maintenance.

## Naval Reactors Headquarters Audits and Inspections

Naval Reactors headquarters conducts broad audits of activities associated with safety, the environment, and health. Generally, 4 to 20 headquarters senior level personnel participate in each audit. From January 1988 to November 1990, Naval Reactors headquarters conducted 28 formal audits at Knolls and Bettis. These audits included the following.

- Nine operational reactor safeguards examinations of prototype reactors: Each prototype reactor undergoes this examination every 2 years. Four to six senior individuals conduct the audit, which addresses the areas of safe and reliable prototype operations. For example, they review areas such as operators' knowledge of the plant, conduct drills in areas such as casualty response and radiological controls, and conduct detailed inspections of operating equipment.
- Four prototype reactor site performance evaluations: Nine to 20 individuals conduct these biannual evaluations, which include all activities of the site in support of prototype operations. For example, the evaluations include reviewing training activities, quality assurance programs, environmental protection, emergency preparedness, and physical security.
- Eight radiological controls inspections: Four Naval Reactors representatives conduct a 1-week review of the site radiological control program. The inspections include exposure control and dosimetry, training, radioactive material control, environmental radiological monitoring, and radioactive waste processing and shipment.
- Five criticality and fuel handling audits: Five Naval Reactors inspectors evaluate the adequacy of criticality and fuel handling at the laboratories. The objectives of these audits include evaluating the performance in fuel accountability, criticality alarms, and emergency procedures.

Each review conducted by Naval Reactors was discussed with contractor personnel and actions were planned to address deficiencies. Most actions planned included additional training for individuals and tighter control procedures to ensure safe program operations.

# Conservative Classification Practices at Naval Reactors Result in Overclassification of Some Information

During our work at Naval Reactors, we reviewed thousands of documents that were classified. On the basis of our review of Naval Reactors classification policies and requirements, we found no evidence that Naval Reactors routinely overclassifies information to prevent its release to the public. However, we did note instances in which documents were improperly classified.

## Naval Reactors Classification Policy

Naval Reactors generally uses two designations for classified materials originating from its program. They are "confidential restricted data" and "NOFORN." Information designated as confidential restricted data requires documented accountability and may be released only to individuals with security clearances who need to have access to the information. The information must also be maintained and stored in secured containers or areas. Information designated NOFORN, which means no distribution can be made to foreign governments without Naval Reactors' approval, does not require documented accountability, may be released to individuals approved by Naval Reactors, and can be stored in ordinary locking cabinets. Therefore, both designations prevent release to the general public.

Since the 1950s, the United States has maintained a policy opposed to the transfer of nuclear propulsion technology to foreign nations, due to the military value and concerns over nuclear proliferation. The Congress and the executive branch have reinforced that policy. In 1981, the Congress amended the Atomic Energy Act to provide protection for unclassified nuclear information under DOE's control (41 U.S.C. 2168). Subsequent amendments provided additional protection for unclassified technical information related to nuclear propulsion.

Naval nuclear propulsion information is defined as that information, classified or unclassified, concerning the design arrangement, development, testing, operation, administration, training, maintenance, and repair of the propulsion plants of naval nuclear-powered ships and prototypes, including the associated nuclear support facilities. Where an association with naval nuclear propulsion can be directly identified, the information must be designated as naval nuclear propulsion information. Public release of this information is a violation of several statutes, including the Atomic Energy Act, and agency regulations such as the U.S. Department of Commerce Export Control Regulations and the U.S. Department of State International Traffic in Arms Regulations.

## Naval Reactors Classification Criteria

The Director of Naval Reactors is responsible for establishing classification rules, practices, and procedures to address the security concerns of each agency, so that different DOE and Navy facilities will be held accountable for one set of classification rules. One set of central classification guidelines was developed to ensure uniformity. All facilities that conduct Naval Reactors work, including laboratories and prototype reactor sites, follow these guidelines. No local exceptions are allowed.

According to the Deputy Director of Naval Reactors, this classification program is necessary to protect the information for at least the following reasons.

- Protecting the technological advantage: Nuclear-powered vessels comprise about 40 percent of the Navy's major vessels, including the entire sea-based strategic nuclear deterrent. Protecting the technology is of vital national security interest. Additionally, the transfer of any information that might assist a potential adversary by revealing nuclear-powered warships' capabilities could jeopardize defense capabilities in time of conflict.
- Freedom to operate in foreign waters: Nuclear-powered warships operate in foreign waters and ports of over 50 nations and U.S. dependencies. The acceptance of these vessels into foreign ports is based on the assurance that the same safe procedures and practices followed in U.S. ports will be followed elsewhere.
- Limit proliferation of nuclear-powered ships and nuclear technology: The transfer of any technology that would assist a potential adversary would raise serious national defense concerns.

## Improper Classification of Documents

During our review of Naval Reactors programs and activities, we reviewed thousands of classified documents. While we did not select a random sample, we did review each document for classification. As a result of this process, we identified 11 classified documents that we believed did not require classification. We asked the qualified Naval Reactors classifiers to review the documents. As a result, 6 of the 11 documents were determined not to be classified information, and 2 of the 5 remaining were downgraded from confidential to NOFORN. We noted that the information contained in the documents did not contain adverse environmental, health, or safety information. For example, a classified incident report described an incident in which a large crane mounted on tracks moved 10 feet during high winds at the Idaho site because it had not been properly secured. Another example, which occurred at the Kesselring site, involved an employee's receiving a mild

electrical shock from a vending machine. Again, this information was contained in a classified incident report.

In addition, we found several unclassified documents that contained information concerning adverse environmental effects. For example, unclassified documents contained findings on asbestos problems, chemical spills, and radioactive contamination. We believe that if Naval Reactors was classifying information to hide such problems, many of the above documents would have been classified.

In our opinion, Naval Reactors and its contractors, due to their extreme concern about the potential for disclosure of nuclear technological information to foreign interests that could be detrimental to the United States, err on the conservative side in classifying information. Due to the nature of Naval Reactors' activities, a large amount of information concerning them is classified and not releasable to the public. We believe the inability to make certain information available and discuss activities at the laboratories and sites has contributed to public mistrust and suspicions concerning activities at Naval Reactors facilities, and especially at Knolls Laboratory. During our review, we were provided full access to all information concerning Naval Reactors programs and activities.

# Major Contributors to This Report

## Resources, Community, and Economic Development Division, Washington, D.C.

Judy England-Joseph, Associate Director
Robert E. Allen, Jr., Project Director
W. David Brooks, Project Manager
Duane G. Fitzgerald, Nuclear Engineer

## Office of Security and Safety

Gary R. Mills, Manager, Health and Safety Branch

## Atlanta Regional Office

John M. Gates, Deputy Project Manager

## Philadelphia Regional Office

Darryl L. Whittenberg, Deputy Project Manager
Carolyn B. Alessi, Project Member

## New York Regional Office

Cornelius W. Donovan, Deputy Project Manager
Robert R. Poetta, Project Member

## Ordering Information

The first copy of each GAO report is free. Additional copies are $2 each. Orders should be sent to the following address, accompanied by a check or money order made out to the Superintendent of Documents, when necessary. Orders for 100 or more copies to be mailed to a single address are discounted 25 percent.

U.S. General Accounting Office
P.O. Box 6015
Gaithersburg, MD 20877

Orders may also be placed by calling (202) 275-6241.

United States
General Accounting Office
Washington, D.C. 20548

Official Business
Penalty for Private Use $300

First-Class Mail
Postage & Fees Paid
GAO
Permit No. G100