**POSITIVE AND NEGATIVE FEATURES OF HEARING PROTECTION DEVICES**

| Type | Positive | Negative | Duration |
|---|---|---|---|
| Insert<br>V-1R Triple Flange | After adaptation can be used for long periods. Relatively inexpensive. | Individual fittings by medical personnel required. Frequent fitting causes irritation. | Long-term (3 - 4 hours) |
| Disposable<br>Silaflex, EAR or Deci-Damp | Comfortable. Individual fitting not required. Relatively inexpensive | Molded by hand. Easily Soiled. Difficult to clean. | Infrequent use. Transitory noise exposure. |
| Circumaural Muffs<br>Type I and II<br>372-9 and AN/2 | May be worn over plugs. Most efficient universal device. | Expensive. Heavy. Difficult to carry. Hair or eyeglasses may reduce effective ness. | Long or short term |

One single type of hearing protective device will not meet the needs of all personnel in a hearing conservation program. Activities shall select the appropriate type of hearing protection device based upon a consideration of the factors listed above in addition to the degree of attenuation required in a particular situation. The most convenient method of making this determination is the Noise Reduction Rating (NRR) developed by the Environmental Protection Agency (EPA). The NRR is usually shown on the hearing protector package. The NRR is then related to an individual worker's noise environment in order to assess the adequacy of the attenuation of a given hearing protector.

Since there are a wide variety of noise measuring instruments in use, personnel conducting sound level measurements shall use one of the following methods. In each case, they should take a sufficient number of measurements to achieve a representative noise sample.

a. When using a dosimeter that is capable of C-weighted measurements:

(1) Obtain the C-weighted dose for the entire work shift, and convert to TWA sound level (see dosimeter instruction manual for conversion table).

(2) Subtract the NRR from the C-weighted TWA to obtain the estimated A-weighted TWA under the ear protector.

b. When using a dosimeter that is not capable of C-weighted measurements, the following method may be used:

(1) Convert the A-weighted dose to TWA (see dosimeter instruction manual).

(2) Subtract 7 dB from the NRR value.

(3) Subtract the remainder from the A-weighted TWA to obtain the estimated A-weighted TWA under the ear protector.

c. When using a sound level meter set to the A-weighting network:

(1) Obtain the A-weighted TWA.

(2) Subtract 7 dB from the NRR and subtract the remainder from the A-weighted TWA to obtain the estimated A-weighted TWA under the ear protector.

d. When using a sound level meter set on the C-weighting network:

(1) Obtain a representative sample of the C-weighted sound levels in the environment.

(2) Subtract the NRR from the C-weighted average sound level to obtain the estimated A-weighted TWA under the ear protector.

This manual considers the effectiveness of any combination of insert plugs with circumaural muffs (double protection) to be at least 30 dB. If an activity determines the result of subtracting the estimated reduction value of a particular device or combination of devices from the measured workplace sound level is at or below 84 dB(A), the protection is adequate. However, should the value exceed 84 dB(A) or 140 dB peak, activities shall institute administrative controls to reduce personnel exposure to acceptable levels.

**Appendix 18-B**
**Administrative Control of Noise Exposure**
**with Hearing Protective Devices**
**(Stay Time)**

Limiting time (hr:min per 24 hour day)

| Sound Level (dB(*) | Hearing Protector Noise Reduction (dB) 10 | 20 | 30 | 40 |
|---|---|---|---|---|
| 90 | 16 | -- | -- | -- |
| 94 | 8 | -- | -- | -- |
| 98 | 4 | -- | -- | -- |
| 102 | 2 | 11:18 | -- | -- |
| 106 | 1 | 5:39 | -- | -- |
| 110 | 0:30 | 2:49 | 16 | -- |
| 114 | 0:15 | 1:25 | 8 | -- |
| 118 | __ | 0:42 | 4 | -- |
| 122 | __ | 0:21 | 2 | 11:18 |
| 126 | __ | __ | 1 | 5:39 |
| 130 | __ | __ | 0:30 | 2:49 |
| 134 | __ | __ | 0:15 | 1:25 |
| 138 | __ | __ | __ | 0:42 |

NOTE: Values other than those given above may be calculated using the formula:

$$T = \frac{16}{2^{[\frac{L-80}{4}]}}$$

Where: T = time in hours (decimal)
L = effective sound level in dB(A)

* - Sound levels may be measured in either dB (A) or dB (C). However, as noted in Appendix 18-A, if dB (A) is used, the NRR must be reduced by 7 dB.

Intermediate values may be interpolated by adding or subtracting the decibel difference to the appropriate column.

# CHAPTER 19

# SIGHT CONSERVATION

## 1901. Discussion

All Navy activities with personnel having exposure to eye hazardous operations shall implement a sight conservation program per the guidance established in this chapter and chapter 20. The activity sight conservation program shall include, but not be limited to, the following program elements:

a. Identification and evaluation of eye hazardous areas, processes and occupations

b. Prescription protection eyewear program

c. Provision and maintenance of appropriate personal protective equipment (PPE) at government expense

d. An employee training, promotion and emphasis program

e. Effective program enforcement.

## 1902. Basic Program Requirements

a. Emergency Eyewash Facilities. Activities shall provide emergency eyewash facilities meeting the requirements of reference 19-1 in all areas where the employees' eyes may be exposed to corrosive materials. All such emergency facilities shall be located where they are easily accessible to those in need. Work centers shall activate plumbed eyewash units – weekly for a minimum of 3 minutes to flush the line and verify operation. Quarterly verification, typically by the safety office is recommended. Activation may be required more frequently if the activity's safety and/or occupational health staff determine it is necessary to ensure proper functioning and performance of the eyewash station.

Activities shall service pressurized and non-pressurized self-contained eyewash units quarterly or per the manufacturer's recommendations, whichever is more frequent. Quarterly maintenance shall include cleaning of the unit, replacement of water, and checking for proper operation. Where an additive is used in a self-contained eyewash unit, activities shall use additives specified by the manufacturer, and change fluid at an interval recommended by the manufacturer of the additive. Work centers shall maintain written, dated and signed maintenance records.

Activities shall only use self-contained eyewash units on a temporary basis until permanent emergency eyewash facilities are installed or at remote locations where water is not readily available. Activities shall not use personal eyewash units.

## 1903. Occupational Eye Care Services and Equipment

The activity OSH office shall consult with supply officers and the cognizant medical activity to determine the most suitable procurement procedures when prescription protective eyewear is

required. When Navy medicine provides these services, all medical forms and evaluations must be documented according to the Bureau of Medicine and Surgery Manual of Medical Department, NAVMED P117.

**1904. Temporary Protective Eyewear**

Where protective corrective eyewear is necessary, activities shall provide planos or goggles to visitors, instructors and others who must enter or pass through eye hazardous areas. In addition, they shall be provided to employees awaiting delivery of corrective-protective eyewear.

---

Chapter 19

References

19-1. American National Standards Institute (ANSI) Standard Z358.1-1998, Emergency Eyewash and Shower Equipment, (NOTAL)

# CHAPTER 20

# PERSONAL PROTECTIVE EQUIPMENT

## 2001. Discussion and Policy

a. The best means of protecting personnel from hazard exposure in the workplace is to eliminate the hazard. When this is not possible, engineering controls shall be the method of choice to eliminate or minimize hazard exposure in the workplace. When neither of these methods can be employed, activities shall implement a personal protective equipment (PPE) program to reduce or eliminate personnel exposure to hazards.

b. Navy policy is that activities provide, use and maintain PPE when competent authority determines that its use is necessary and that such use will lessen the likelihood of occupational injuries and/or illnesses. Activities shall provide necessary protective equipment where there is a reasonable probability that the use of the equipment will prevent or reduce the severity of injuries or illnesses. PPE procurement and enforcement of proper use and maintenance is the responsibility of the activity.

c. Activities must recognize that personal protective devices do nothing to reduce or eliminate the hazard itself. They merely establish a last line of defense, and any equipment breakdown, failure or misuse immediately exposes the worker to the hazard. Many protective devices, through misapplication or improper maintenance, can become ineffective without the knowledge of the wearer and can have potentially serious consequences. For this reason, proper equipment selection, maintenance, employee training (including equipment limitations) and mandatory enforcement of equipment use are key elements of an effective PPE program.

## 2002. Basic Program Requirements

Each activity shall ensure that an assessment of all workplaces is conducted to determine if hazards are present that necessitate the use of PPE. If such hazards are present, or likely to be present, activities shall accomplish the following actions:

a. Select, and have each affected employee use, the types of PPE that will protect the affected employee from the hazards identified in the hazard assessment.

b. Communicate selection decisions to each affected employee.

c. Document that the required workplace hazard assessment has taken place with a written certification, identifying the workplace evaluated, the person performing the evaluation and the date(s) of the hazard assessment. Activities shall retain this document as proof of hazard assessment.

**NOTE:**

Reference 20-1 contains an example of procedures that would comply with the requirement for a hazard assessment.

**2003. Equipment Specifications and Requirements**

All personal protective clothing and equipment shall be of safe design and construction for the work to be performed. Federal agencies and standards organizations have developed standards and specifications for the design and use of PPE and devices. Activities shall only use those items that have been recognized and approved. This approval can be met through the use of:

a. Federal specifications

b. American National Standards Institute (ANSI) specifications

c. Recognized approval authority, such as Underwriter's Laboratories (UL), Factory Mutual (FM), or American Society of Testing and Materials (ASTM).

**2004. Eye and Face Protection**

Employees shall wear approved eye and face protection when there is a reasonable probability that wearing such equipment will prevent injury. They shall use eye protection at all times in a designated eye hazard area. Flying particles and chips; splashes from liquids such as acids, caustics and solvents; and operations that generate hot slag or molten metal, welding glare, etc., can cause eye and/or face injury. The activity shall provide the required approved protective equipment and enforce usage. Reference 20-2 provides the requirements for design, construction, testing and use of devices for eye and face protection. Chapter 19 of this manual contains additional information on the Navy Occupational Safety and Health (NAVOSH) sight conservation program.

**2005. Hearing Protection**

See chapter 18 for hearing protection requirements.

**2006. Respiratory Protection**

See chapter 15 for respiratory protection requirements.

**2007. Head Protection**

Helmets and hats for the protection of Navy employees from the impact of falling and flying objects and from limited electric shock and burn shall meet the specifications of reference 20-3. Employees shall wear head protection at all times in a designated hardhat area.

**2008. Foot Protection**

a. Foot Hazardous Operations. Foot and toe hazardous operations are those that have a high incidence of, or potential for, foot or toe injuries. Examples of trades or ratings generally associated with foot or toe hazardous operations are construction, materials handling, maintenance, transportation, ship repair and operation, aircraft overhaul and repair and explosives manufacturing and handling. Employees shall wear foot and toe protection at all times in a designated foot hazard area.

b. Ensure that PPE conforms to NAVOSH standards.

c. Arrange for appropriate medical evaluations to determine worker capability to perform assigned tasks using the prescribed PPE.

d. Train personnel in the selection, use, inspection and care of PPE required for their work situations and maintain records of such training.

e. Ensure protective equipment worn by personnel fits properly.

f. Ensure designated personnel perform periodic equipment inspection, cleaning, disinfection and maintenance.

g. Provide proper equipment storage to protect against environmental conditions that might degrade the effectiveness of the equipment or result in contamination during storage.

h. Ensure compliance with the prescribed use of PPE.

i. Identify non-use, misuse or malfunction of PPE that results, or may result, in injury or occupational illness to Navy personnel.

---

Chapter 20

References

20-1. Title 29 Code of Federal Regulations (CFR) 1910 Subpart I, Appendix B, Non-mandatory Compliance Guidelines for Hazard Assessment and Personal Protective Equipment, latest revision, (NOTAL)

20-2. American National Standards Institute (ANSI) Z87.1-1989 (R-1998), American National Standard Practice for Occupational and Educational Eye and Face Protection, (NOTAL)

20-3. American National Standards Institute (ANSI) Z89.1-1997, American National Standard for Industrial Head Protection, (NOTAL)

20-4. American National Standards Institute (ANSI) Z41-1999, American National Standard for Personal Protection-Protective Footwear, (NOTAL)

b. Foot Protective Devices

(1) Safety shoes, with a built-in protective toe box, primarily provide protection from heavy falling objects. These shoes shall conform to the requirements of reference 20-4, and be appropriately labeled per reference 20-4. Genera- purpose safety shoes (Chukka style) are available through normal supply channels. In cases where standard stock general-purpose safety shoes do not properly fit the employee, the Navy authorizes procurement from commercial sources.

(2) Employees shall wear the following special-purpose safety footwear, furnished for special hazards:

(a) Semi-conductive safety shoes are used to dissipate static electricity. To be effective, employees must use the shoes on conductive surfaces, such as wet concrete, metal decks, carbon-impregnated surfaces, wet terrain, conductive linoleum and conductive tiles. These brown shoes shall conform to Specification CID-A-A-50359 (Shoe, Conductive Series). This shoe was formerly procured under MIL-B-3794.

(b) Molder's "Congress" style safety shoes for protection while handling molten metal. The design prevents hazardous materials from falling inside the shoes and also allows quick removal of the shoes from feet, if necessary, to minimize injury. (MIL-S-82245, Shoe, Molders).

(c) Electrical hazard safety shoes, with a built-in protective toe box, to guard against electrical shock hazards when performing electrical work on live circuits not exceeding 600 volts. Employees should note, however, that these shoes only provide partial protection and should not ignore additional protective measures normally employed in these environments, (i.e., all personnel working on energized circuits shall insulate themselves from the ground (MIL-S-43860 Shoes, Electrical Hazards Protective).

(3) Safety boots are general-purpose footwear items offering the same toe protection as the above safety shoes except in a boot designed for added support. The Navy does not approve these boots for use in areas where hazardous chemicals are used. (MIL-B-87067, Boot, Safety Series).

c. Appropriation and Distribution. The following procedures apply to the issue of protective footwear for military and civilian employees.

(1) Activities shall provide military personnel with standard stock safety shoes when required by their work. When safety shoes exhibit wear, such that safety protection is no longer afforded, the command shall provide standard stock safety shoes as organizational clothing (similar to coveralls or foul weather gear).

(2) The primary method for providing safety shoes to civilians is: issue of standard stock or reimbursement to individuals who buy their own shoes. A secondary method is to issue safety shoes that activities obtain under a local purchasing contract. Activities may select the method best suited to local conditions. Activities must absorb the cost of safety shoes within local operating funds (Defense Capital Working Fund (DCWF), research development, test, and evaluation

(RDT&E), operation and maintenance, Navy (O&M,N). Activities purchasing safety shoes under either local reimbursement or local contracting procedures shall ensure that they are appropriately labeled, and meet the requirements of reference 20-4. Activities shall determine the amount of the reimbursement by taking into consideration the usual cost in the local area for shoes of the type and quality specified in paragraph 2008b. Activities must document cases where medical considerations require specialized safety shoes (orthopedic safety shoes) with a written statement from a physician who treats foot disorders.

(a) Activities shall provide Navy U.S. civilian employees overseas (including foreign nationals) with safety shoes, as required, from standard stocks, unless their cognizant headquarters command grants specific approval for alternate purchasing methods. Foreign national indirect hires, being provided safety shoes under an existing labor agreement, will continue to use the reimbursement procedures contained in the applicable agreement.

(b) Activities shall provide non-appropriated funded civilian employees with safety shoes under provisions of this policy except that the funding and paying sources for required safety shoes will be non-appropriated.

**2009. Hand Protection**

a. Activities shall select, provide and require appropriate hand protection whenever employees' hands are exposed to, or are likely to be exposed to, such hazards as those from skin absorption of harmful substances; severe cuts or lacerations; severe abrasion; punctures; chemical irritants; thermal burns; and harmful temperature extremes.

b. Activities shall base selection of hand protection on an evaluation of the performance characteristics of the hand protection relative to the task(s) to be performed, conditions present, duration of use and the hazards and potential hazards identified.

**2010. Electrical Protective Devices**

Navy activities shall provide appropriate rubber protective equipment for electrical workers who perform work on energized or potentially energized electrical systems. Equipment shall conform to references:

American Society for Testing and Materials (ASTM) D 120-87, Specifications for Rubber Insulating Gloves

ASTM D 178-88, Specification for Rubber Insulating Matting

ASTM D 1048-88, Specification for Rubber Insulating Blankets

ASTM D 1049-88, Specification for Rubber Insulating Covers

ASTM D 1050-90, Specification for Rubber Insulating Line Hose

ASTM D 1051-87, Specification for Rubber Insulating Sleeves.

**2011. Training**

a. Activities shall provide training to each employee who is required to use PPE to include at least the following:

(1) When PPE is necessary.

(2) What PPE is necessary.

(3) How to properly don, doff, adjust and wear PPE.

(4) The limitations of the PPE.

(5) The proper care, maintenance, useful life and disposal of the PPE.

(6) Ability to recognize that defective or damaged PPE shall not be used.

b. Each affected employee shall demonstrate an understanding of the training specified in paragraph 2011a, and the ability to use PPE properly before being allowed to perform work requiring the use of PPE.

c. When a supervisor has reason to believe that any affected employee who has already been trained does not have the understanding and skill required by paragraph 2011b above, the supervisor shall ensure retraining is accomplished for each such employee. Circumstances where retraining is required include, but are not limited to, situations where:

(1) Changes in the workplace render previous training obsolete

(2) Changes in the types of PPE to be used render previous training obsolete

(3) Inadequacies in an affected employee's knowledge or use of assigned PPE indicate that the employee has not retained the requisite understanding or skill.

d. Activities shall maintain documentation verifying that each affected employee has received and understands the required training. Documentation shall be in accordance with paragraph 0605 of chapter 6.

**2012. Responsibilities**

<u>Commanders, Commanding Officers, and Officers in Charge</u> shall include and enforce the following provisions concerning PPE:

a. Ensure the evaluation of workplaces, including applicable hazardous material data and industrial hygiene survey reports, to determine PPE requirements. Qualified safety and occupational health personnel shall perform these evaluations. Commands shall use the results of these evaluations to designate appropriate work conditions and work areas as requiring PPE. The command shall establish effective means of communicating these PPE requirements to employees.

# CHAPTER 21

# LEAD

## 2101. Applicability

a. The provisions of this chapter apply to industrial and construction work and supplement references 21-1 and 21-2.

(1) Construction work covered by reference 21-2, includes any repair or renovation activities or other activities that disturb in place lead-containing materials (LCM) (e.g., steel structure renovation and repair), but does not include routine cleaning and repainting (e.g., minor surface preparation and repainting of rental apartments between tenants or at scheduled intervals) where there is insignificant damage, wear or corrosion of existing lead-containing paint, coatings or substrates.

(2) Employees performing maintenance activities not associated with construction work are covered by the general industry standard for lead, reference 21-1. Maintenance activities covered by the general industry standard are those that involve making or keeping a structure, fixture, or foundation in proper condition in a routine, scheduled or anticipated fashion.

## 2102. <u>Discussion</u>

a. The goal of this chapter is to prevent lead intoxication and related injuries during the use, handling, removal and melting of materials containing lead at Navy activities.

b. Lead, as used in this chapter, means metallic lead, all inorganic lead compounds and organic lead soaps. All other organic lead compounds are excluded. Lead's abundance, low melting point, high molecular weight, high density and malleability make it a useful structural material. When added to resins, grease, or rubber, lead compounds act as antioxidants. Common uses for lead and lead compounds include:

(1) Ballast

(2) Radiation shielding

(3) Paint filler and hardener

(4) Rubber antioxidant

(5) An acoustical insulation component

(6) Solder for electrical components and pipe joints

(7) High voltage cable shielding

(8) Small arms ammunition

(9) Batteries

(10) Roof flashing

(11) Weights

While not an absolute indicator, red, forest green, chrome yellow, "school bus yellow", and "Occupational Safety and Health (OSH) yellow" paints typically contain lead components, such as lead oxides and lead chromate. Lead is also found in polyurethane and water base paints.

c. Significant lead exposures can occur during:

(1) Lead and babbitt melting and casting

(2) Ballast handling

(3) Spraying, sanding, grinding, burning, welding and abrasive blasting of lead containing materials and paint

(4) Soldering with torches

(5) High voltage cable repair

(6) Abrasive blasting with smelting slag

(7) Lead-acid battery reclaiming

(8) Machining lead

(9) Handling of contaminated personnel clothing, etc.

(10) Bullet trap clean-out/general cleaning at firing ranges

d. Lead has long been a recognized health hazard. Lead can damage the nervous system, kidneys and reproductive systems. Chronic lead exposure can initially damage the blood forming organs. Higher levels can result in reproductive dysfunction in both men and women, and it can cause peripheral nerve and central nervous system changes. Lead inhibits heme synthesis and at high levels leads to anemia. Lead can pass through the placenta and lead levels in the mother's blood are comparable to concentrations of lead in the umbilical cord at birth. The fetus and newborn may be at least as susceptible to neurological damage as young children.

e. In recognition of the serious health hazards associated with, and the numerous sources of, potential lead exposure, the Navy has established strict controls to limit both occupational and environmental exposures. Navy activities shall apply standards and controls discussed in this chapter to all personnel ashore. Reference 21-3 discusses the lead control program for forces afloat. Work which falls under the OSHA construction standards, i.e., construction, demolition, renovation, or repair of structures, follow the requirements in reference 21-2.

**2103. Permissible Exposure Limit (PEL) and Action Level Triggering Requirements**

a. PEL. The PEL for an 8-hour time-weighted average (TWA) exposure to airborne lead is 50 micrograms per cubic meter ($\mu g/m^3$) of air. For employee exposure of more than 8 hours in a work day, the PEL shall be determined by the following formula.

$$PEL(\frac{\mu g}{m^3}) = \frac{400}{No.\ Hours\ Worked\ Per\ Day}$$

Activities shall implement engineering and administrative controls to the extent feasible to reduce the exposure to below the PEL when an employee's exposure exceeds the PEL for more than 30 days per year. Wherever the engineering and work practice controls that activities institute are not sufficient to reduce employee exposure to or below the permissible exposure limit, the employer shall nonetheless use engineering controls to reduce exposure to the lowest feasible level and shall supplement them by use of respiratory protection. Where an employee is exposed to lead above the PEL for 30 days or less per year, activities shall use engineering controls to reduce exposures at least to 200 $\mu g/m^3$. Thereafter, use any combination of engineering, work practice, and respiratory protection controls to reduce employee exposure to or below 50 $\mu g/m^3$.

b. Action Level (AL). The AL for an 8-hour TWA exposure to airborne lead is 30 $\mu g/m^3$ (without regard to respirator use). Exposure to airborne lead at or above the AL, for more than 30 days per year, shall trigger biological monitoring and medical surveillance.

**2104. Control of Lead in the Workplace Environment**

Chapter 5 discusses the basic principles for controlling hazards in the occupational environment including substitution with less hazardous materials, engineering controls (closed systems, thermostats), administrative controls (job rotation, work time limits), and use of personal protective equipment (PPE), in that order.

a. General Workplace Control Practices.

(1) The Navy shall not use paints containing more than 0.06 percent lead by dry weight unless the cognizant headquarters command specifically approves higher lead content paint.

(2) Before proceeding with work involving paint, the activity must determine if the paint contains sufficient lead to warrant applying lead controls for the work to be performed. This may be accomplished via testing of the paint using a valid laboratory method, or through established and accurate records which provide the needed information (e.g., paint application records coupled with lead content data from material safety data sheets, product labels, prior testing results, or other valid documentation). The cognizant OSH professional or industrial hygienist (IH) shall determine the lead monitoring and controls required for the work. This determination shall be based on the lead content of the involved paints, the work methods to be employed, and observation, calculations, or previous measurements relevant to the employee exposure potential of the work in question.

(3) When feasible, activities shall minimize the heating of lead and leaded materials through the use of thermostatically controlled heating or the removal of lead containing surface coatings or contaminants prior to heating.

(4) Activities shall establish procedures to maintain work surfaces as free of lead dust as is practical and shall clean up lead dust with high efficiency particulate air (HEPA) filtered vacuum cleaners. They may only use wet sweeping and brushing when vacuuming or other equally effective methods have been tried and found to be ineffective or infeasible. Activities shall not use compressed air to clean work surfaces or work floors.

(5) Activities that have lead containing waste, scrap, debris, containers, equipment, and clothing consigned for disposal shall collect it, seal it in impermeable containers, and label waste per paragraph 2105.

(6) To minimize exposure potential, activities shall isolate hot work on lead and abrasive lead removal operations to the extent feasible, from other operations.

b. Ventilation. Local exhaust ventilation is frequently required to ensure that atmospheric levels of lead particulate do not exceed the PEL. The list below contains general requirements for the design and use of ventilation to reduce exposures. The cognizant industrial hygienist shall provide specific guidance for each lead operation.

(1) The cognizant industrial hygienist shall provide recommendations regarding specific equipment design parameters and system servicing procedures for each operation.

(2) Activities shall design, construct and maintain local exhaust ventilation and dust collection systems per references 21-4 through 21-7.

(3) Activities shall test ventilation systems used to control lead exposures or emissions using qualified engineering or industrial hygiene personnel at least every 3 months and within 5 days of any production, process, or control change which may result in a change in employee exposure. Where devices such as manometers, pitot tubes, etc. are installed to continuously monitor the effectiveness of ventilation systems, activities shall instruct employees who use the system on the meaning and importance of the measurements and to immediately contact their OSH office if the measuring devices indicate a malfunction. Where such devices are in place, industrial hygiene or engineering personnel only need to inspect the ventilation systems annually.

(4) Activities using ventilation systems to control occupational exposures or emissions shall not directly exhaust into any work-space or to the atmosphere. They shall not re-circulate air from operations generating lead. The activity environmental manager shall approve the air pollution control system after consulting with the cognizant air pollution regulatory agency.

(5) The industrial hygienist shall review the ventilation design for ease of maintenance and accessibility, as well as design errors, and shall pay special attention to hoods, duct work, clean out hatches, exhaust fans and air pollution control devices. Activities shall install the exhaust fan, after the air pollution control system, in a protected and restricted room or shed. If a HEPA filter is required and the filter and pre-filter housing is located outdoors, they shall use a bag-in, bag-out style access housing.

c. Personal Protective Clothing and Related Control Facilities

(1) Personnel engaged in operations where the concentration of airborne lead particulates is likely to exceed the PEL or where the possibility of skin or eye irritation exists, shall remove clothing worn to and from work and wear the protective clothing provided by the Navy. Employees shall use waterproof clothing when handling wet lead. Protective clothing includes:

(a) Full body, one-piece coveralls shall be used.

(b) Personnel shall use durable gloves and head covering. Hoods shall extend beyond the collar of the coverall, completely protecting the neck area.

(c) Activities shall provide slip-resistant shoe covers or lightweight rubber boots and may also use disposable shoe covers.

(d) Activities shall provide face shields, vented goggles, or other appropriate protective equipment for use whenever the possibility of eye hazard exists.

**NOTES:**

The proper use of protective clothing requires that employees close all openings and that garments fit snugly about the neck, wrists and ankles. Accordingly, employees shall tape the wrist and ankle junctions, as well as the collar opening on coveralls as necessary, to prevent contamination of skin and underclothing without restricting physical movement.

(2) Activities shall provide clean protective clothing at least weekly. Clean protective clothing shall be provided daily when the 8-hour TWA airborne concentration exceeds 200 $\mu g/m^3$.

(3) Activities shall provide change rooms as close as practical to the lead work area(s) for employees who work where the airborne lead exposure is above the PEL (without regard to the use of respirators). They shall maintain change rooms under positive pressure with respect to adjacent lead work areas. They shall post protective clothing removal procedures in the change room and include vacuuming of clothing (before removal and while still wearing a respirator, if one was required for the task) using a HEPA filter vacuum. Removal of lead particles from clothing by blowing or shaking is prohibited.

(4) Employees exposed to airborne lead concentrations above the PEL (without regard to respirator use) shall shower at the end of the work shift prior to entering the clean change room. Activities shall provide clean change rooms incorporating showers within or adjacent to them for employees who work in areas where their airborne exposure to lead is above the PEL. Change rooms shall have two separate clothing lockers for each employee to prevent contamination of street clothes and to ensure that employees do not leave wearing any clothing or equipment worn during their work shift. Supervisors shall ensure that employees shower at the end of their work shift.

(5) Employees shall not take lead contaminated clothing home to be laundered. Activities shall launder lead- contaminated clothing in a manner to prevent release of lead dust in

excess of the AL. Contracts governing laundering of lead-contaminated clothing shall specifically require that contractors comply with the precautions specified in reference 21-1.

(6) Activities shall transport lead- contaminated clothing in sealed containers to which are affixed the standard "caution label" (see paragraph 2104e). Activities shall notify persons who clean or launder protective clothing or equipment in writing of the potentially harmful effects of exposure to lead.

d. Respiratory Protection

(1) Limits of Respirator Usage

(a) Activities shall use engineering control measures per paragraph 2104 and shall not achieve compliance with PELs solely by the use of respirators except under the following conditions:

1. During the time period necessary to implement engineering control measures

2. In work situations in which the control methods prescribed are not technically feasible or are not sufficient to reduce the airborne concentration of lead particulates below the PEL

3. During emergencies.

(b) Where respirators are required to control exposure to lead, activities shall select respirators per appendix 21-A, and comply with the respirator program per chapter 15 of this manual and reference 21-8.

(c) Activities shall supply a powered air purifying respirator with a HEPA filter in lieu of a half or full-face piece respirator, if the employee chooses to use this respirator and it provides adequate protection.

(d) Activities shall provide a respirator to employees who work with lead, upon request, and shall enter the employee into the respiratory protection program.

e. Warning Signs and Caution Labels

(1) Activities shall provide and display warning signs at each location where airborne lead concentrations may exceed the PEL. Activities shall conspicuously post signs so personnel may read them and take necessary precautions before entering the area. They shall clean and illuminate signs required by this paragraph as necessary so that the legend is readily visible. Signs, in compliance with reference 21-1, may contain a listing of required protective equipment and shall state, as a minimum, the following:

**WARNING**

**LEAD WORK AREA**

**POISON**

**NO SMOKING, EATING OR DRINKING**

(2) Activities shall affix caution labels to containers of contaminated clothing, equipment, raw materials, waste, debris, or other products containing lead if, in any foreseeable way, these products could produce levels of airborne lead which might constitute a threat to health. These caution labels shall state:

**CAUTION**

**CLOTHING CONTAMINATED WITH LEAD**

**DO NOT REMOVE DUST BY BLOWING OR SHAKING**

**DISPOSE OF LEAD-CONTAMINATED**

**WASH WATER IN ACCORDANCE WITH APPLICABLE LOCAL,**

**STATE OR FEDERAL REGULATIONS**

f. Lunch Rooms and Personal Hygiene

(1) Activities shall provide lunchroom facilities for employees who work in areas where their airborne lead exposure is above the PEL (without regard to the use of respirators).

(2) When activities locate lunch facilities adjacent to the lead work area, such facilities shall have a positive pressure, filtered air supply and be readily accessible to employees.

(3) Employees shall remove protective clothing and equipment before entering lunchroom facilities.

(4) Activities shall prohibit eating, drinking, chewing or the use of tobacco products, the application of makeup and storage of food and tobacco products in lead work areas.

(5) Lead workers shall wash their hands and face prior to eating, drinking, using tobacco products or applying cosmetics.

## 2105. Environmental Protection and Waste Disposal Procedures

a. Navy activities must take care to ensure that measures taken to meet local and national environmental standards are compatible with the requirements of this chapter.

b. Activities shall require, prior to disposing of hazardous lead waste, bagging in heavy duty plastic bags or other impermeable containers and labeling with caution labels described in paragraph 2104e(2). Personnel shall label lead waste containers such as bags, trash cans, dumpsters, etc., "LEAD WASTE ONLY" and exercise care to prevent bags and other containers

from rupturing when being moved to a dumpster or other suitable vehicle for transport to a hazardous waste disposal site.

c. Activities shall dispose of lead containing materials per applicable Federal, State and local environmental requirements. The cognizant environmental manager shall determine environmental requirements relating to lead emissions/disposal.

d. Technical assistance for air pollution control is available upon request from the Naval Facilities Engineering Command (COMNAVFACENGCOM) Engineering Field Divisions (EFDs).

## 2106. Training

All Navy personnel who work in areas where the potential exists for lead exposure at or above the action level, or for whom the possibility of skin or eye irritation exists shall receive initial training prior to or at time of assignment and at least annually thereafter. The training, per reference 21-1, shall include, as a minimum, the following:

a. The specific nature of the operations during which exposure is possible

b. The purpose, proper selection, fit testing, use, and limitations of respirators

c. The adverse health effects of lead with particular attention to the reproductive effects upon both males and females

d. The purpose and description of the medical surveillance program, including the use of chelating agents and medical removal protection benefits

e. The engineering controls and work practices to be applied and used in the employee's job, including PPE and personal hygiene measures

f. The contents of the command's compliance plan.

**NOTE:**

All employees in a workplace in which there is a potential for exposure to airborne lead at any level shall be informed of the contents of appendices A and B of reference 21-1, and to any related documents, all of which are available at no charge from the Department of Labor (DOL). In addition, employees shall receive, upon request, any other handout type materials in use or related to the training program.

## 2107. Industrial Hygiene Surveillance

An exposure monitoring plan shall be established for any lead operation with the potential to cause employee exposure at or above the action level. Qualified persons will conduct initial and periodic monitoring. Persons qualified to perform exposure monitoring are specified in chapter 8 of this manual. BUMED IHs will conduct exposure assessments as outlined in chapter 8 of this manual.

**2108. Employee Notification**

Within 5 working days after the receipt of monitoring results, the command shall notify each employee in writing of his/her exposure monitoring results. Whenever the results indicate that the employee was exposed above the PEL, without regard to respirator use, the written statement shall include that fact and a description of the corrective action(s) taken to reduce the individual's exposure.

**2109. Medical Surveillance Program**

a. General. This program consists of three basic elements:

(1) Pre-placement medical evaluation

(2) Semi-annual blood lead monitoring

(3) Follow-up medical evaluations based on the results of blood lead analysis and physician opinion.

Activities shall include personnel in this program when industrial hygiene surveillance indicates that they perform work or are likely to be in the vicinity of an operation which generates airborne lead concentrations at or above the AL for more than 30 days per year. Examinations may include special purpose histories and physical examinations, and laboratory tests designed to detect early signs of lead over-absorption. Refer also to reference 21-9 for medical protocols and guidance. Activities shall base inclusion into this program on airborne concentration measurements without regard to respirator use and, therefore, inclusion does not indicate that an individual is overexposed to lead.

b. Program Elements

(1) Pre-placement Evaluation. All Navy personnel shall receive a pre-placement evaluation as described in reference 21-9 prior to assignment to a position involving potential exposures to lead that equal or exceed the AL.

(2) Blood Lead Levels and Frequency of Monitoring. Navy activities shall make blood lead analysis and zinc protoporphyrin (ZPP) available every 6 months for all personnel who are or may be exposed to lead above the AL for more than 30 days per year. Supporting medical facilities shall perform analysis every 2 months when the blood lead level exceeds 30 μg/100g of whole blood.

(3) Follow-up Medical Surveillance

(a) Individual Reassignment/Medical Removal. An employee shall be reassigned to non-lead work:

1. If an employee's blood lead concentration equals or exceeds 60 μg/100g

2. If the average of his/her last three blood lead measurements equals or exceeds 50 µg/100g; however, Individuals need not be removed if their last blood test indicates a blood lead level at or below 40 µg/100 g.

3. Or, if the employee has signs or symptoms of lead toxicity.

For additional guidance concerning removal procedures, return to former job status, and removal protection requirements, refer to reference 21-1. Activities shall also reassign pregnant women exposed to lead at or above 50 $\mu g/m^3$ or with a blood lead level of 30 µg/100g blood to a job without lead exposure, with medical removal benefits.

(b) Follow-up Blood Lead Monitoring. Activities shall perform follow-up lead monitoring within 2 weeks of the receipt of an initial or routine monitoring result with a blood lead concentration at or above 30 µg/100g of whole blood, and periodically thereafter according to the following criteria.

1. During medical removal (to non-lead work activity), activities shall monitor the employee's blood lead concentration monthly until the employee's last two consecutive test results are at or below 40 µg/100g, at which time the employee may be returned to his/her regular work activity.

2. When an employee's blood lead concentration is between 30 and 40 µg/100g, the activity shall monitor it every 2 months until the last two consecutive blood lead test results are less than 30 µg/100g.

(c) Follow-up Evaluations

1. Medical Follow-up. Activities shall conduct a medical evaluation identical to the pre-placement evaluation, with the exception of chest x-rays, annually for each person found to have a blood lead concentration at or above 30 µg/100g at any time during the prior year.

2. Reassignment Termination of Employment Follow-up. Activities shall conduct a medical evaluation identical to the pre-placement evaluation just prior to the reassignment or termination of an employee from a job requiring medical surveillance.

3. Physicians Written Opinion. Reference 21-1 requires a written opinion and reference 21-9 provides a sample written opinion.

4. Industrial Hygiene Follow-up Investigation. The cognizant industrial hygienist shall be notified of, and perform an investigation to determine the cause of, each blood lead concentration at or above 30 µg/100g which has been verified by follow-up blood lead monitoring.

(d) Other Appropriate Medical Evaluations. The cognizant medical activity shall perform a medical examination, including those elements of the pre-placement examination, which the physician deems necessary:

1. As soon as possible after notification by an employee that he/she has developed signs or symptoms commonly associated with lead intoxication.

2. As soon as possible after notification that the employee desires medical advice concerning the effects of current or past lead exposure on the ability to procreate a healthy child.

3. As soon as possible after being informed that the employee demonstrates difficulty breathing during a respirator fit test or during respirator use.

4. As medically appropriate for personnel who have been removed from exposure to lead due to risk of sustaining material impairment to health, or otherwise limited pending a final medical evaluation.

c. Administrative Procedures

(1) Employee Notification. An activity shall notify the employee of the following, in writing, within 5 working days after receipt of results, when his/her blood lead level is at or above 30 µg/100g whole blood:

(a) His/her blood lead concentration level, as reported

(b) That the regulations require temporary medical removal with Medical Remove Protection benefits when, and if, the employee's blood lead level exceeds the current numerical criterion for medical removal under reference 21-1.

(2) Employee Counseling. The physician shall counsel personnel regarding any abnormalities detected during any screening test. The physician shall make an entry into the employee's medical record that describes the counseling given. The employee shall countersign this entry.

d. Medical Records

(1) Each employee record shall include the following identifying information:

(a) Name

(b) Social security number

(c) Date of birth

(d) Dates of examinations

(e) Job titles, job codes, and/ or primary and secondary Navy Enlisted Classification Code (NEC).

(2) All records of examinations, possible lead-related conditions, related laboratory results, and all forms and correspondence related to the employee's medical history shall become a permanent part of the health record. The cognizant activity shall retain such records for the period of employment plus 20 years, or 40 years, whichever is longer.

(3) Medical facilities shall enter the judgment of the occupational health physician concerning the adequacy of the diagnostic information to support the impression of lead-related

disease in the medical record. Lacking definitive information, the evaluating physician must exercise his/her best medical judgment on each individual case.

(4) Activities shall make available copies of any examinations, laboratory results, or special studies in an employee's health record or compensation folder to a physician of the employee's choice after execution of a proper release of information form.

(5) Should the Navy select the initial physician, the employee may designate a second physician to review any findings and conduct independent examinations and tests as may be deemed necessary. The Navy shall provide to the initial and consulting (second) physician the following:

(a) Copy of reference 21-1 and this chapter

(b) Description of employee's duties

(c) Employee's exposure level

(d) Description of PPE

(e) Blood lead determinations

(f) All prior written medical opinions.

(6) The cognizant medical activity shall maintain these medical records.

(7) Each individual currently or previously employed by Department of the Navy (DON) or any other person he/she may designate shall have access to the records, as paragraph 2109d(2) defines, within 15 days of the request.

**2110. <u>Work Performed by Private Contractors</u>**

a. Use references 21-10 and 21-11 to design lead contract specifications in Navy facilities.

b. Contract administrators shall insure that each contract, for work performed by an independent contractor in the United States or overseas which may involve the release of lead dust, shall incorporate the appropriate references and clauses to ensure that:

(1) The contractor is aware of the potential hazard to his/her employees and Navy personnel.

(2) The contractor complies with references 21-1, 21-2, 21-3, and 21-12 to protect his/her employees, as well as Navy personnel.

(3) The contractor shall control lead dust outside of the work boundary to less than 30 $\mu g/m^3$ at all times, and shall perform sufficient monitoring to confirm that this level of control is maintained. In addition, the controlled work area(s) shall meet this criteria prior to release for unrestricted access. Contractors shall provide copies of their monitoring results to the cognizant industrial hygienist.

**2111. Responsibilities**

a. The Chief, Bureau of Medicine and Surgery (BUMED) shall:

(1) Centrally manage the lead medical surveillance program ashore and afloat.

(2) Provide professional industrial hygiene technical support and training assistance to commands for the purpose of evaluating the potential for lead exposure.

b. Commanders of Echelon Two and other headquarters commands shall:

(1) Provide advice and technical assistance to define appropriate engineering and work practice controls, and to identify acceptable lead free substitute materials.

(2) Ensure program support by budgeting the resources required to meet the regulatory standards for the control of lead as prescribed by this chapter.

(3) Determine the applicability of reference 21-2 to any operations within their respective claimancies and provide policy and guidance to affected commands and activities. This will require procedures to ensure pre-placement medical screening and training are provided to workers based on occupational "task based triggers" specified in reference 21-2.

c. COMNAVFACENGCOM shall:

(1) Provide advice and technical assistance concerning lead paint in Navy buildings, particularly housing, childcare facilities and hospitals.

(2) Ensure that contracting officers and representatives receive the appropriate level of training to adequately plan, design, oversee and review lead construction work.

d. Commanding Officers of shore activities shall:

(1) Apply control measures and monitoring procedures prescribed in this chapter to processes using lead or lead containing materials.

(2) Budget resources in order to meet these lead control requirements.

---

Chapter 21

References

21-1. Title 29 Code of Federal Regulations (CFR) 1910.1025, Lead (as amended) (NOTAL)

21-2. Title 29 CFR 1926.62, Lead in Construction (NOTAL)

21-3. OPNAVINST 5100.19D CH-1 of 30 Aug 01, Navy Occupational Safety and Health Program Manual for Forces Afloat (NOTAL)

21-4. Title 29 CFR 1910.94, Ventilation (NOTAL)

21-5. American Conference of Governmental Industrial Hygienists Pub. No. 2092, Industrial Ventilation: A manual of Recommended Practice, 24th Edition (NOTAL)

21-6. American National Standards Institute (ANSI) Z9.2-2001, American National Standard for Fundamentals Governing the Design and Operation of Local Exhaust Ventilation Systems (NOTAL)

21-7. MIL-HDBK-1003/17C of 29 Feb 96, Industrial Ventilation Systems (NOTAL)

21-8. NEHC Technical Manual, Industrial Hygiene Field Operations Manual, latest revision

21-9. NEHC Technical Manual, Medical Surveillance Procedures Manual and Medical Matrix, latest revision

21-10. UFGS-13282N of Sept 99, Removal and Disposal of Material Containing Lead (NOTAL)

21-11. UFGS-13283N of Sept 00, Removal and Disposal of Lead-Containing Paint (NOTAL)

21-12. Title 29 CFR 1910.134, Respiratory Protection (NOTAL)

## Appendix 21-A

**Required Respirator**

| Airborne Concentration of Lead or Condition of Use | Required Respirator |
|---|---|
| Not in excess of 0.5 mg/m$^3$ | Half mask, air purifying respirator (10xPEL) equipped with high efficiency filters [2,3] |
| Not in excess of 2.5 mg/m$^3$ | Full face piece, air purifying respirator (50xPEL) with high efficiency filters[3] |
| Not in excess of 50 mg/m$^3$ (1000xPEL) | 1. Any powered, air purifying respirator with high efficiency filters[3] or 2. Half mask, supplied air respirator operated in positive pressure mode |
| Not in excess of 100 mg/m$^3$ (2000xPEL) | Supplied-air respirators with full face piece, hood, helmet, or suit operated in positive pressure mode |
| Greater than 100 mg/m$^3$, unknown concentration or fire fighting. | Full face piece, self-contained breathing apparatus operated in positive pressure mode |

[1]Respirators specified for high concentrations can be used at lower concentrations of lead.

[2]Full facepiece is required if lead aerosols cause eye or skin irritation at the use concentrations.

[3]A high efficiency particulate air (HEPA) filter means 99.97 percent efficient against 0.3 micron size particles. Use 42 CFR 84 approved p100 filters to retain consistency with previous NIOSH HEPA filter color-coding.

# CHAPTER 22

## NON-IONIZING RADIATION

### 2201. Discussion

The term non-ionizing refers to forms of radiation, which do not have sufficient energy to cause ionization of atoms or molecules. Typically, examples include the electromagnetic emissions radiated by lasers, radiofrequency (RF), and microwave sources.

### 2202. Policy

The Department of the Navy (DON) policy is to preserve and maintain the health of its personnel by adopting practices that eliminate or control potentially hazardous radiation exposures. This policy encompasses:

a. Limiting personnel exposures to levels that are within permissible exposure guidelines

b. Identifying, attenuating or controlling through engineering design, administrative actions or protective equipment, hazardous exposure levels and other dangers associated with non-ionizing radiation sources

c. Controlling areas in which harmful exposure to unprotected personnel could occur

d. Ensuring personnel are aware of potential exposures in their work places and duty assignments and the control measures imposed to limit their exposures to levels that are within the permissible guidelines

e. Investigating and documenting overexposure incidents.

### 2203. Applicability

All Navy activities employing sources of non-ionizing radiation which may affect the safety and health of personnel shall observe radiation protection requirements, exposure standards and safety guidelines. Provisions of this chapter do not apply to exposures administered to patients undergoing medical diagnostic or therapeutic procedures.

### 2204. Laser Radiation

Lasers are designed to operate at various wavelengths in the ultraviolet, visible and infrared portions of the electromagnetic spectrum, and are used in various military, industrial, medical and scientific applications. While mechanisms for biological damage from lasers are similar to effects produced from absorption of energy from conventional light sources, lasers are of special concern because of their potential to project hazardous levels of energy over great distances. Exposure to lasers can result in permanent and disabling eye injury.

**2205. Laser Radiation Policy**

Chief, Bureau of Medicine and Surgery (BUMED) is the administrative lead agent for laser safety within the DON. Responsibilities for setting forth DON policy and guidance in the identification and control of laser radiation hazards are set forth in reference 22-1.

**2206. Laser Permissible Exposure Limits (PELs)**

a. Laser PELs, also referred to as threshold limit values (TLVs) and maximum permissible exposure (MPE) limits, are published in references 22-2 and 22-3 respectively. For laser exposures that are within the PEL, no adverse biological effects are expected to occur even under repeated or long-term exposure conditions. Only trained and technically qualified personnel shall apply these exposure limits in determining laser safe viewing conditions, since an improperly conducted laser hazard evaluation may pose serious risks to a person's eyes.

b. Laser exposure limits are set to protect tissue from damage and are not the equivalent of comfortable viewing levels. Operators of lasers need to be aware of secondary laser safety concerns. For example, intrabeam viewing of visible wavelength lasers, even at or below the permitted safe level, will still be perceived as an intense light source capable of producing disabling glare or visual after-images. These temporary visual effects can interfere with performing critical tasks such as operating vehicles or aircraft. Similarly, intrabeam viewing of lasers at or below the permitted exposure limits can still damage or "saturate" night vision viewing devices because of the high amplification of incident light levels provided by the devices. Wearing of laser protective eyewear can also lead to other safety concerns, such as the potential for blocking or filtering out the color of some warning or alarm indicator lights.

**2207. Laser Classification, Labeling, Technical Assistance and Exposure Incidents**

a. The Navy has adopted a system for categorizing the hazards of lasers which provides a practical means for determining safety requirements appropriate for different types of lasers. These categories range from a Class I laser that is safe to view under all conditions, to the Class IV laser which can cause eye damage under most viewing conditions. Appendix 22-A provides information on laser classification, types of laser warning signs and labels, technical assistance and exposure incidents.

b. For most lasers used in medical, laboratory, research and industrial applications, use of the classification system precludes the necessity for performing any laser measurements or calculations. Reference 22-4 requires manufacturers to classify and label their laser systems. Laser measurements or laser safety calculations will usually be required only for lasers operating on outdoor ranges or in open areas when it is necessary to define a laser nominal hazard zone (NHZ).

**2208. Military Exempt Lasers**

Lasers or laser systems designated for combat, combat training or classified in the interest of national security may be exempted from compliance with some or all of the provisions of reference 22-4. To obtain military exemption status, the contractor must have written authorization from the military contracting activity, and the laser product must be certified to conform with re-

quirements in reference 22-5 and have been approved by the Navy Laser Safety Review Board (LSRB). Commands shall maintain a current inventory of all military exempt lasers for submission to the administrative lead agent as requested. Commands wishing to dispose of lasers shall obtain approval from BUMED following guidance in references 22-1 and paragraph 2205.

**2209. Laser Safety Review Board (LSRB)**

Military laser systems are reviewed by the LSRB during their development to ensure that adequate safety criteria have been incorporated. LSRB review is required at appropriate stages of development and prior to introduction of prototype or production units into the fleet for testing or initial use. An important function of the Navy Laser Safety Program is a determination of the nominal ocular hazard distance (NOHD) or safe viewing range, for each operational laser system used in the Navy. LSRB review also applies to Class IIIb and Class IV commercial lasers and laser systems that are not intended solely for laboratory or medical use. Reference 22-6 contains general guidance for materials necessary and procedures followed by the LSRB review.

**2210. Laser Safety Hazard Control Program**

Commands operating Class III or IV commercial or military exempt lasers shall establish a laser safety program and designate a laser system safety officer (LSSO) per reference 22-6. The laser safety program shall include an inventory of all commercial Class IIIb, Class IV and all classes of military exempt lasers that are assigned to the command lasers for submission to the administrative lead agent as requested.

**NOTE:**

Some commercially available laser pointers are categorized as Class IIIa lasers with output levels that are not considered safe for all viewing conditions. A formal laser safety program is not required for Class IIIa laser pointers; however, the user needs to recognize that care must be exercised to control its accessibility (kept out of the hands of children or others who are unaware of the hazardous nature of lasers), and to avoid directing the pointer at those in the audience. Class II laser pointers do not pose a hazard during normal viewing, and their use is not restricted.

**2211. Medical Surveillance Procedures**

Enrollment in a laser radiation medical surveillance program is limited to those personnel who are clearly at risk from exposure to laser radiation. The nature of such risks is associated with accidental injuries resulting from excessive exposure to laser levels and not as a result of chronic exposures. The command LSSO determines which personnel should be enrolled in the surveillance program using the following guidance:

a. Laser workers requiring medical surveillance are those individuals who routinely work with Class IIIb or Class IV lasers under conditions where there is a likely potential for accidental exposures to excessive levels. These workers require a pre-placement and termination laser eye examination per reference 22-7.

b. The following personnel generally require medical surveillance:

(1) Research and development (R&D) and laboratory personnel who routinely work with unenclosed Class III and Class IV laser beams

(2) Maintenance personnel who routinely repair or align Class III or Class IV laser systems

(3) Operators (personnel behind the laser) and down-range personnel who routinely work with Class III or Class IV engineering laser transits, geodimeters and alignment laser devices

(4) Operators who routinely work with Class IIIb and Class IV industrial lasers where access to an unenclosed beam path is possible.

c. Other laser workers or personnel where the potential for accidental exposure is deemed very unlikely generally do not require medical surveillance. For example:

(1) Personnel who work with Class I or Class II lasers, or with laser systems containing Class III or Class IV lasers when there is little or no potential for exposure to the open laser beam

(2) Visitors or other personnel involved infrequently in laser testing, demonstrations or training, when the LSSO has ensured such personnel will be protected from exposure to levels of laser radiation greater than the PEL

(3) Supervisory, clerical and custodial personnel working in laser areas where laser safety procedures preclude their exposure to levels of laser radiation above the PEL

(4) Operators of fielded military laser systems when operations are conducted on established laser ranges, or as part of training operations where prescribed laser safety procedures are enforced

(5) Personnel involved in "force on force" laser training exercises where appropriate protection is established, either in the form of administrative controls or procedures, or where laser protective eyewear is provided.

**2212. Laser Safety Training**

a. Commands shall provide LSSO laser safety training through the completion of a Laser System Safety Officer Course at the Naval Occupational Safety and Health and Environmental Training Center (NAVOSHENVTRACEN). BUMED may approve equivalent training. There are four categories of LSSOs, administrative laser safety officer (ALSO), technical laser safety officer (TLSO), laser safety specialist (LSS), and range laser safety specialist (RLSS). Re-testing at the LSSO's highest certification level is required to maintain certification for all categories of LSSO every 4 years. If the LSSO fails the re-certification examination, the LSSO will have to be re-certified by attending the appropriate course. Commanding officers should determine which category of LSSO is appropriate for their command considering their mission, types of la-

sers being used, and size of the laser safety program. Laser safety-training requirements at medical treatment facilities for the medical LSSO and designated medical personnel are contained in reference 22-8.

(1) An ALSO is qualified to:

(a) Establish and manage a unit level laser safety program.

(b) Approve, disapprove, or submit for safety approval to higher authority all local laser uses, both portable and fixed.

(c) Instruct employees and supervisors on the safe use of lasers.

(d) Supervise laser operations and maintenance.

(e) Manage laser incident investigations as appropriate. Technical assistance of a LSS or a RLSS is required.

(f) Maintain a laser medical surveillance program.

(g) Maintain an inventory of military-exempt and class IIIb and class IV lasers.

(h) Post laser warning signs and devices.

(i) Ensure that laser operators have the appropriate knowledge to safely operate their specific lasers (supervisor safety briefs, factory training school, instructional materials, etc.)

(j) Provide safety briefs/pre-mission briefs to laser range users.

(k) Prior to use of a laser range, ensure/confirm that warning signs have been posted, the area is clear of specular reflectors, personnel have required LEP, and all other safety conditions for range laser use outlined in the range regulations or range standard operating procedures (SOPs) are met.

(l) Perform laser eye protection inspections.

(2) A TLSO is qualified to:

(a) Understand the calculations and measurements of laser safety parameters such as Nominal Ocular hazard Distances (NOHDs) and required optical densities for laser eyewear.

(b) Train ALSOs using the administrative lead agent (ALA) approved course curriculum (Qualifications of TLSOs as instructions requires ALA/lead Navy technical laboratory (LNTL) approval.

(c) Understand classification of lasers and laser systems.

(d) Perform the duties of a laboratory, installation, base, research facility, or RLSO that includes establishing and managing a base or installation laser range safety program; approving/disapproving the use of laser systems and laser operations on their range that fall within the guidelines of the range certification; and performing annual range safety compliance inspections; and ensuring laser ranges under their cognizance are certified/re-certified by RLSS at least every 3 years or when changes to the range fall outside the current certification.

(e) Ensure range regulations/SOPs are provided to commands requesting unsafe of the laser range.

(f) Review training plan (to include laser type(s) and proposed employment tactics) of each command requesting access to the laser range certification.

(g) Perform the same duties as an ALSO.

(3) A LSS is qualified to:

(a) Perform the calculations and measurements of laser safety parameters such as NOHDs and required optical densities for laser eyewear.

(b) Train ALSOs, TLSOs, RLSOs, and LSSs using the ALA-approved course curriculum. (Qualification of instructors requires ALA/LNTL approval).

(c) Classify lasers and laser systems.

(d) Conduct technical aspects of laser incident investigations.

(e) Perform the same tasks as a TLSO.

(4) A RLSS is qualified to:

(a) Conduct laser radiation hazard surveys and evaluations for commanding officer certification.

(b) Perform the calculations and measurements required to certify a laser range.

(c) Train ALSOs and RLSSs using the ALA-approved course curriculum. (Qualification of instructors requires ALA/LNTL approval.)

(d) Conduct technical aspects of laser range incident investigations.

(e) Perform the same tasks as a TLSO.

b. Laser range safety officers, laser maintenance personnel and industrial laser supervisors shall complete a formal command laser safety training course as outlined in reference 22-6.

c. Commands shall provide formal classroom training on the potential hazards associated with accidental exposure to laser radiation to all personnel in areas operating Class IIIb (and Class IIIa with danger logo) or Class IV lasers. In particular, the vulnerability of the eyes to being damaged by lasers shall be emphasized. Commands shall conduct annual refresher training per reference 22-6.

d. For employee training, the following laser safety training videotapes are available from the Norfolk Regional Electronic Media Center: *Laser Hazards and Control*, 804245DN, *Hazards and Control of Military Lasers*, 804246DN, and *Laser Safety in Medical Treatment Facilities,* 803198DN. (See section 0604b). Additional information is available in reference 22-9 on laser operations, hazard distances for Navy laser systems and use of laser protective eyewear.

**2213. <u>Other Optical Sources</u>**

Broadband optical sources such as germicidal lamps, phototherapy, sun lamps, blacklights, arc lights, projector lamps, high intensity discharge lamps and infrared arrays are also used in many medical and industrial applications. These types of light sources may require controls to prevent possible acute effects such as skin burns, photokeratitis, cataracts or retinal burns. Exposure guidance can be found in reference 22-2. Obtain assistance in the evaluation of broadband optical sources, where personnel are considered to be at ocular risk, from an industrial hygienist or radiation health officer.

**2214. <u>Radiofrequency (RF) Electromagnetic Fields (EMF)</u>**

RF exposure is primarily associated with operation of various radars and communication systems at Navy shore facilities and aboard ships. In addition to personnel concerns, RF fields may generate induced currents or voltages that could cause premature activation of electro-explosive devices in ordnance, equipment interference or sparks and arcs that may ignite flammable materials and fuels.

**2215. <u>Radiofrequency Ashore and Afloat</u>**

Naval Sea Systems Command (COMNAVSEASYSCOM) is the lead agency for coordinating electromagnetic safety programs for naval ships. Space and Naval Warfare Systems Command (COMSPAWARSYSCOM) is the lead agency for coordinating electromagnetic safety programs for shore facilities. Reference 22-10 contains RF hazard (RADHAZ) guidance regarding hazards of RF exposure to personnel, fuels and ordnance.

**2216. <u>RF Permissible Exposure Limits (PELs)</u>**

a. Reference 22-10 will be amended to reflect the current RF PELs listed in reference 22-11 for the frequency range of 3 kilohertz to 300 Gigahertz. Limited information on the RF PELs is provided in the tables in appendix 22-B. Those persons conducting RF hazard analysis and evaluations should consult the more extensive technical guidance contained in references 22-11, 22-12, and 22-13.

b. Exposure limits are specified for locations that are defined as either controlled or uncontrolled environments. Controlled environments are areas where exposure may be incurred by personnel who are aware of the potential for RF exposure as a result of employment or du-

ties, by individuals who knowingly enter areas where higher RF levels can reasonably be anticipated to exist and by exposure incidental to transient passage through such areas. Uncontrolled environments generally include public areas, living quarters and work places where there is no expectation that higher RF levels should be encountered.

c. The RF exposure limits for controlled environments represent scientifically derived values to limit absorption of RF energy in the body, and to restrict the magnitude of RF currents induced in the body. This means that the amount of energy absorbed is insufficient to produce or cause any adverse effects on health, even under repeated or long-term exposure conditions. The controlled environmental limits are the equivalent of personnel exposure standards for all individuals. In uncontrolled environments where access is not restricted or controlled, lower permissible exposure levels have been adopted as a consensus to maintain lower exposure levels outside of well-defined areas. The limits for uncontrolled environments should not be interpreted as being imposed to lesson any known adverse health effect, and should not be interpreted as being the limit on personnel exposure for non technical employees or for members of the public that enter a controlled environment.

d. For shipboard situations, consider the weather decks, enclosed and open masts and electronic work spaces as controlled environments. For shore stations, consider accessible areas beyond a station's perimeter fence line as uncontrolled environments. Within a station's boundaries, differentiation between controlled and uncontrolled environments will require individual determinations. For both ship and shore situations, incorporate existing physical structures or areas, such as decks, fences, rooftops, etc., in defining the location of boundaries for controlled environments.

e. No special RF exposure limits or additional exposure restrictions are imposed in the case of pregnancy.

**2217. RF Measurement and Evaluation**

a. Facilities shall determine RF levels for all areas in which personnel could receive exposures in excess of the exposure limits. In addition, shore facilities must determine RF field levels where locations of RF emitting antennas may be expected to raise concerns among personnel or generate public inquiries regarding levels of RF emissions beyond the base perimeter. Facilities must use proper RF measurement techniques and application of the RF exposure limits to avoid imposing unnecessary restrictions on operations or establishing overly restrictive protective boundaries. Facilities may obtain assistance in measuring RF emission levels from the activities listed in appendix 22-C.

b. A comprehensive RF hazard evaluation for major platforms, such as warships or communication stations, where multiple RF emitters exist in close proximity to each other, requires considerable technical familiarity with electromagnetic fields. Such surveys may involve determination of boundary locations for protective fences or enclosures, or specifying operational conditions or restrictions necessary for protection of personnel. The activities listed in appendix 22-C may perform these evaluations, which are primarily an engineering type survey.

c. In addition to appendix 22-C, safety or health professionals may make RF measurements or calculations for situations that primarily consist of determining RF exposure levels for a particular area occupied by personnel.

**2218. Safety Certification**

a. Activities identified in paragraph 2218(c) shall obtain a survey certification from the technical activities listed in appendix 22-C to ensure all RF sources have been evaluated, safe separation distances have been determined, warning signs posted and any other safety measures, such as protective fences, have been defined.

b. To maintain certification, the site shall forward information on new RF sources that are installed to the technical activity listed in appendix 22-C to obtain a theoretical or calculated safety evaluation. The activity with the original site certification shall maintain this provisional certification.

c. All shore facilities having RF emitters must obtain baseline certification. For most facilities, certifications/re-certifications will require an instrumented site survey or desktop analysis. Some activities with only a few low power RF systems may require neither. The certifying agency will determine certification survey/re-certification requirements of the facility. Re-certifications will be scheduled as follows:

(1) Three-Year Resurvey Re-certification. Major COMNAVCOMTELCOM transmitter facilities are included within this group.

(2) Five-Year Resurvey Re-certification. Sites with large numbers or frequent additions/changes of RF emitters or a site located in populated areas where public exposure to RF emissions may be an environmental concern.

(3) Ten-Year Resurvey Re-certification. Sites having a moderate and stable number of RF microwave emitters.

**2219. Warning Signs, Labels and Devices**

a. The RF hazard warning signs, labels, devices, exposure incident procedures and technical assistance are shown in appendix 22-C. Appropriate warning statements are added in the lower triangular portion of the sign. Variations are authorized, such as subdued signs for camouflage or to improve visibility under certain lighting conditions, provided the general wording and layout of the sign remain the same.

b. Activities shall post RF hazard warning signs at all access points to areas in which levels exceed the exposure limits for controlled environments.

c. Activities should post RF hazard warning signs in appropriate areas in which the RF levels exceed the exposure limits for uncontrolled environments as determined by cognizant engineering or safety or health professionals.

d. In areas where access to levels greater than 10 times the exposure limits for controlled environments may exist, warning signs alone do not provide sufficient protection. Activities shall provide other warning devices and controls, such as flashing lights, audible signals, barriers or interlocks, as determined by the certification authority, depending upon the potential for exposure.