e. See appendix 22-C for reporting of RF incidents.

**2220. Research, Development and Acquisition**

a. Activities performing research, development, testing and evaluation (RDT&E) and acquisition of RF systems, including non-developmental items and commercial off-the-shelf items, shall identify RF control requirements by incorporating adequate protection measures or identifying appropriate operational restrictions to maintain personnel exposures within the exposure limit. System safety studies under reference 22-13 shall use the exposure limits given in reference 22-11 to define restrictions necessary to limit personnel exposures.

b. Activities shall include safety information, operational restrictions, and safe exposure distances for systems being fielded in appropriate fielding documents and technical manuals to limit RF exposure of personnel engaged in operation, maintenance and repair of the system.

**2221. RF Safety Training**

Activities shall provide RF safety training to personnel who routinely work directly with RF equipment or whose work environments contain RF equipment that routinely emits RF levels in excess of the exposure limits for controlled environments. Activities shall conduct training before assignment to such work areas, and shall focus on awareness of the potential hazards of RF fields, established procedures and restrictions to control RF exposures, and personnel responsibility to limit their own exposures. Activities may incorporate RF safety training in periodic safety training programs to satisfy command-training objectives.

**2222. Protective Clothing**

The Navy does not authorize RF-shielded protective clothing for routine use as a means of protecting personnel. This does not preclude use of other protective equipment, such as electrically insulated gloves and shoes for protection against electrical shock or RF burn, or for insulation from the ground plane.

**2223. Low Frequency and Static Electric and Magnetic Fields**

a. Electric and magnetic fields exist around power lines, electrical devices and appliances. The intensity of these fields decreases rapidly with distance. While questions have been raised about the possibility of health effects from exposure to electric and magnetic fields at levels that are commonly encountered in homes and most work places, findings issued by various scientific review panels have not confirmed that such fields pose any risk to health.

b. Since the body is a conductor, electric fields induce a charge on the surface of the body that results in current flow inside the body. Time varying magnetic fields, or body movement in a static magnetic field, induce electric fields and current flow inside the body. For commonly encountered fields near high voltage transmission lines, power distribution systems, office equipment, and household appliances, the magnitude of these induced currents will typically be below levels which are perceptible. Existing guidelines given in references 22-2, 22-11, and 22-12 have been established to limit induced current densities in body tissues. This ration-

ale has been used to set a biological endpoint since no other definable risk criterion has been identified for establishing a health standard for electric and magnetic fields.

**2224. Video Display Terminals**

a. Video display terminals (VDTs) are electronic devices that typically involve individuals remaining in close proximity to them for long periods of time. Various forms of electromagnetic energy are associated with VDTs, including static electric fields near the screen, 60 Hz electric and magnetic fields, higher frequency fields around 10 kHz from the beam sweep circuits and low intensity X-rays near some internal components.

b. Some computer manufacturers have chosen to advertise VDTs with low magnetic field emissions for marketing reasons. Other manufacturers have produced various products that are advertised as reducing electromagnetic emissions from VDTs. Extensive measurements have shown that the fields emitted from VDTs are already well below exposure guidelines. There is no requirement or need to periodically measure emissions from VDTs, or to procure add-on screens for shielding electromagnetic emissions from VDTs.

c. VDTs are sensitive to electrical interference, and the displays have been reported to be affected by 60 Hz magnetic fields as low as 10 to 15 milligauss. Such interference poses no health concerns other than annoyance. Correction usually involves relocation of the VDT away from the source of interference or in some cases, adding shielding to nearby power distribution components.

**2225. Responsibilities**

a. Commander, Naval Sea Systems Command (COMNAVSEASYSCOM) shall:

(1) Serve as the lead agent for RF radiation safety and hazard analysis for the Navy's Electromagnetic Environmental Effects (E3) Program, and as the technical lead agency for laser safety and laser safety hazard analysis in the Navy.

(2) Ensure a capability exists to conduct laser hazard surveys of military laser systems, laser installations and firing ranges.

(3) Sponsor reference 22-10 in providing operating procedures and guidance for electromagnetic hazards to personnel, ordnance and fuel and for RF hazard certification for ships and craft.

b. Commander, Space and Naval Warfare Systems Command (COMSPAWARSYSCOM) shall:

(1) Serve as the technical lead agency for RF radiation safety and hazard analysis as a component of the Navy's Electromagnetic Environmental Effects (E3) Program for shore facilities.

(2) Provide information to COMNAVSEASYSCOM for updating information on the hazards of electromagnetic radiation to personnel and fuels in reference 22-10.

c. Chief, Bureau of Medicine and Surgery (BUMED) shall:

(1) Serve as administrative lead agency for laser safety and laser safety hazard analysis in the Navy.

(2) Will maintain a list of all DON laser systems that have been exempted from Title 21 Code of Federal Regulations and their status.

(3) Provide the secretariat to the LSRB and ensure laser safety design standards, safety documentation and training and laser protective devices are developed for military laser systems.

(4) Ensure laser safety design standards, safety documentation, training standards, and laser eye protection are developed for military laser systems.

(5) Serve as the lead agency for guidance on personnel exposure limits for lasers, RF and other electromagnetic sources.

(6) Provide technical assistance to Navy commands addressing electromagnetic exposures or human health effects issues with local governments or state agencies.

(7) Maintain the Navy repository of laser and RF investigative reports involving personnel injuries from lasers and RF overexposures.

(8) Provide assistance through the Navy Environmental Health Center for laser and RF hazard evaluations at industrial and medical activities.

(9) Sponsor appropriate biological research for addressing the effects of electromagnetic energy on humans.

d. Other Echelon Two and headquarters commands shall ensure:

(1) Safety requirements are included in procurement activities for the design, operation, maintenance, repair, technical orders, handbooks, manuals and other publications related to lasers and RF systems per references 22-6 and 22-11.

(2) Laser and RF hazard surveys and certifications are obtained for new equipment, installations, laser training ranges or modifications of existing equipment, installations or ranges when required to define laser or RF exposure levels or determine personnel access restrictions.

e. Commanders, commanding officers, and officers in charge shall:

(1) Establish a laser safety program per reference 22-6 to protect personnel.

(2) Ensure personnel are trained to be familiar with potential laser or RF exposure hazards and appropriate protective measures.

(3) Allow laser operation only at installations and ranges that have been certified and approved by an appropriate LSSO as safe for each specific laser and tactic to be used.

(4) Obtain safety certification for non-ionizing radiation sources. Update these certifications when new items are added. Also obtain provisional certification whenever new lasers or RF systems are installed, existing RF radiating antennas are modified or relocated or new construction occurs in the vicinity of an RF radiating antenna, when such changes may affect restrictions or boundaries imposed for limiting personnel exposures to RF fields.

(5) Ensure laser or RF surveys are conducted by technically competent personnel. Technical activities are listed in appendix 22-A for laser and 22-C for RF safety.

(6) Investigate, document and report results of laser or RF exposure incidents per chapter 14 of this document. Refer also to appendix 22-A for laser incidence, 22-C for RF incidence, and reference 22-7.

(7) Ensure that the use and disposal of military exempt lasers are per reference 22-1.

(8) Prepare an annual inventory of all Class IIIb, Class IV, and all classes of military exempt lasers per references 22-1 and 22-6.

---

## Chapter 22

## References

22-1. SECNAVINST 5100.14C of 5 May 99, Military Exempt Lasers

22-2. American Council of Government Industrial Hygienists, Threshold Limit Values and Biological Exposure Indices (NOTAL)

22-3. American National Standards Institute (ANSI) Z136.1-2000, American National Standard for the Safe Use of Lasers, (NOTAL)

22-4. 21 CFR 1040 (as amended)

22-5. MIL-STD 1425A, Safety Design Requirements for Military Lasers and Assorted Support Equipment

22-6. OPNAVINST 5100.27/MCO 5104.1A, Navy Laser Hazards Control Program (NOTAL)

22-7. BUMEDINST 6470.23 of 18 Aug 99, Medical Management of Non-Ionizing Radiation Casualties

22-8. BUMEDINST 6470.19 of 24 Aug 90, Laser Safety for Medical Facilities

22-9. E0410-BA-GYD-010, Technical Manual, Laser Safety

22-10. NAVSEA OP 3565/NAVAIR 16-1-529/NAVELEX 0967-LP-624-6010, Volume I, Technical Manual, Electromagnetic Radiation Hazards (Hazards to Personnel, Fuel and Other Flam-

mable Material and Volume II, Technical Manual, Electromagnetic Radiation Hazards (Hazards to Ordnance)

22-11. DOD Instruction 6055.11 of 21 Feb 95, Protection of DOD Personnel from Exposure to Radiofrequency Radiation and Military Exempt Lasers

22-12.Institute of Electrical and Electronics Engineers, IEEE Std.C95.1, 1999 Edition (Incorporating IEEE Std C95.1-1991 and IEEE Std C95.1a-1998, IEEE Standard for Safety Levels with Respect to Human Exposure to Radiofrequency Electromagnetic Fields 3kHz to 3GHz, (NOTAL)

22-13. Institute of Electrical and Electronics Engineers, IEEE Standard Recommended Practice for Measurement of Potentially Hazardous Electromagnetic Fields, RF and Microwave, IEEE C95.3-1991 (NOTAL)

22-14. International Radiation Protection Association, International Non-Ionizing Radiation Committee, Interim Guidelines on limits of Exposure to 50/60 Hz Electric and Magnetic Fields, May 1989

22-15. International Radiation Protection Association, International Non-Ionizing Radiation Committee, Guidelines on Limits of Exposure to Static Magnetic Fields, May 1993

**Appendix 22-A**

**Laser Classification, Labeling, Warning Signs, Technical Assistance, and Exposure Incidents**

CLASS I LASERS
Lasers which by inherent design normally cannot emit radiation levels in excess of the permissible exposure limits. Not hazardous under almost all operational or viewing condition. No controls required.

CLASS II LASERS
Low-powered lasers and laser systems that emit less than 1mW visible continuous wave (CW) radiation. Not considered hazardous for momentary exposure. These lasers carry a CAUTION label.

CLASS III LASERS
Lasers which do not present a diffuse reflection hazard.

Class IIIa
Low-powered laser systems that emit 1 to 5 mW visible CW radiation. Lasers or laser systems of less than 2.5 $mW/cm^2$ are not considered to be hazardous for momentary (0.25 seconds) unintentional exposures unless the beam is viewed with magnifying optics. These lasers carry a CAUTION label. Lasers that exceed 2.5 $mW/cm^2$ carry a DANGER label and should not be directly viewed even momentarily.

Class IIIb
Medium-powered lasers or laser systems considered to be hazardous when the direct or specularly reflected beam is viewed without protection. Special care is required to prevent intrabeam viewing and to control specular reflections from mirror-like surfaces. These lasers carry a DANGER label and require the use of protective eyewear.

CLASS IV LASERS
High-powered lasers or laser systems that can be hazardous to the eye from intrabeam viewing, specular reflections or diffuse reflections. They may also be hazardous to the skin or ignite flammable materials. These lasers carry a DANGER label. Strict controls are required, including use of protective eyewear and door interlocks.

Example of a Class II Laser Warning Label




Example of label for Class II and Class IIIa LASER

Example of a Class IV Laser Warning Label




Example of label for Class IIIb and Class IV
LASER DEVICES.

Laser safety warning signs for posting at laser facilities and at laser ranges are stocked at the Naval Inventory Control Point, Naval Publication and Forms Branch, 700 Robbins Ave., Philadelphia, PA 19111-5098. For Information concerning these forms contact: commercial (215)(697-2626), or DSN (442-2626). Order on MILSTRIP via Defense Automated Addressing Systems. The following signs are available:

| | |
|---|---|
| Sign Contents: | "DANGER, LASER, KNOCK BEFORE ENTERING" |
| Type: | Laminated 10 inches high by 14 inches wide |
| Form No.: | 0118-LF-114-8900 |

| | |
|---|---|
| Sign Contents: | "DANGER, LASER RANGE IN USE, DO NOT ENTER" |
| Type: | Laminated 18 inches high by 24 inches wide |
| Form No.: | 0118-LF-020-1100 |

## Laser Exposure Incidents

a. If eye damage from laser exposure is suspected or observed, and in all cases of exposure to levels in excess of five times the laser exposure limits of this chapter, the cognizant activity shall ensure the individual receives a medical examination by an ophthalmologist or optometrist as soon as possible. While laser injuries associated with military operations have been

rare, limited experience indicates that the extent of eye damage from an accidental laser exposure may not be readily or initially apparent to either the individual or to local medical personnel. Since early medical intervention may lessen the severity of the damage or subsequent retinal scarring from the laser injury, efforts should be made to have the individual promptly seen by an ophthalmologist or at the ophthalmology department of a hospital **on a walk-in emergency basis.**

b. Commands shall investigate and document all suspected laser incidents or mishaps involving personnel exposure to excessive laser energy in accordance with chapter 14 of this manual. The command exercising operational control of the laser has the primary lead for conducting the laser exposure investigation and for ensuring the appropriate report is filed.

c. Commands are required to report exposure incidents (as outlined in subparagraph g) and investigate exposure levels for the following situations:

(1) Personnel injury has been sustained or physical symptoms are experienced by the individual(s) which are believed to be associated with laser exposure.

(2) Inadvertent exposure occurred to members of the general public or to other non-involved personnel as a result of naval operations which have exceeded the PEL.

(3) Exposure circumstances or the severity of the incident or mishap are such that inquires from news media are anticipated, or are deemed to be of interest to the chain-of-command.

d. Commands shall refer personnel reporting physical symptoms or suspected of having been exposed to levels in excess of the PEL for a medical evaluation or follow-up.

e. Commands shall make initial notification for the occurrence of a laser incident by telephone, fax, message or e-mail to the appropriate technical assistance point listed in this appendix with copy to the Bureau of Medicine and Surgery (MED 212). Discussions following this initial notification can determine whether a more extensive investigation will be necessary and whether a site visit should be scheduled to assist in making laser measurements or an exposure evaluation. Central to the command's investigation will be a determination of the degree of laser exposure incurred since such incidents often involve emotional concerns or health worries which cannot be easily addressed when measurement data is not available. Performing laser measurement assessments are often beyond the technical capabilities of the local command or the nearby medical facility.

f. In cases where it is necessary to reconstruct events or reestablish equipment configuration for conducting a laser exposure assessment, the accuracy of the recreation is crucial to the validity of the subsequent measurements. The command's investigating officer should apply particular attention to obtaining written statements from those involved giving detailed descriptions of the sequence of events, exposure times and equipment set-ups, as well as obtaining appropriate charts, diagrams or photographs indicating the locations of exposed personnel.

g. The command shall submit a final report on the laser incident to the Commander, Naval Safety Center, and to the Bureau of Medicine and Surgery (MED 212), with copies to appro-

priate headquarters and systems commands within 30 days of the incident. The command shall also include in the report to BUMED pertinent medical records, retinal photographs and identification data for personnel who were exposed.

## Laser Technical Assistance

Interested parties may obtain technical assistance and advice regarding laser safety as follows:

a. For laser operations at medical activities, contact the Navy Environmental Health Center, (NEHC), 620 John Paul Jones Circle, Suite1100, Portsmouth, VA 23708-2103, DSN 864-5500, commercial (757) 363-5500, fax (757) 444-3672.

b. For all laser operations, other than medical, military exemption of lasers, and certification surveys of laser firing ranges, contact the following activities: (Funding for services shall be provided by the requesting command).

Laser System Evaluation and Range Surveys:

Naval Surface Warfare Center Dahlgren Division,17320 Dahlgren RD Dahlgren, VA 22448, DSN 249-1060/1149, commercial (540) 653-1060/1149, fax (540) 653-8453 http://www.nswc.navy.mil/safety/laser

Laser Range Surveys:

Naval Surface Warfare Center Corona Division (Code SE41), Corona, CA 91718-5000, DSN 933- 4139, commercial (714) 273-4139.

c. For laser bio-effects and medical research issues, or assistance in evaluating laser-induced injuries, contact the Naval Health Research Center-Detachment Brooks AFB 8301 Navy Road, Brooks AFB, TX 78235-5365, DSN 240-4699/6552, commercial (210) 536-4699/6552, fax (210) 536-6439/6528.

d. For guidance on laser exposure limits and health issues, contact the Non-Ionizing Radiation Health Branch, Bureau of Medicine and Surgery (MED 212), 2300 E Street NW, Washington DC 20372-5300, DSN 762-3444, commercial (202) 762-3444, fax (202) 762-0931.

## Appendix 22-B

**Table 1**
**RF Permissible Exposure Limits For Controlled Environments**

**A. Radiofrequency Fields**

| Frequency Range ($f$) (MHz) | Electric Field (E) (V/m) | Magnetic Field (H) (A/m) | Power Density (S) (mW/cm$^2$) (E, H Fields) | Averaging Time($T_{avg}$) (minutes) $E^2$, $H^2$, S |
|---|---|---|---|---|
| .003 - 0.1 | 614 | 163 | ($10^2$, $10^6$) | 6 |
| .1 - 3.0 | 614 | 16.3/$f$ | ($10^2$, $10^4/f^2$) | 6 |
| 3 - 30 | 1842/$f$ | 16.3/$f$ | ($900/f^2$, $10^4/f^2$) | 6 |
| 30 - 100 | 61.4 | 16.3/$f$ | (1.0, $10^4/f^2$) | 6 |
| 100 - 300 | 61.4 | 0.163 | 1.0 | 6 |
| 300 - 3000 | | | $f$/300 | 6 |
| 3000 - 15000 | | | 10 | 6 |
| 15000 - 300000 | | | 10 | $616000/f^{1.2}$ |

**B. Induced and Contact Current Restrictions**

| Frequency Range ($f$) (MHz) | Maximum Current Through Both Feet (mA) | Maximum Current Through Each Foot (mA) | Contact Current (mA) |
|---|---|---|---|
| 0.003 - 0.1 | 2000$f$ | 1000$f$ | 1000$f$ |
| 0.1 - 100 | 200 | 100 | 100 |

**C. Pulsed Radiofrequency Fields**

| Frequency Range ($f$) (MHz) | Peak Electric Field (E) (kV/m) | Peak Power Density/Pulse for Pulse Duration < 100 msec (mW/cm$^2$) |
|---|---|---|
| 0.1-300000 | 100 | (PEL)($T_{avg}$)/(5)(pulse width) |

**D. Partial- Body Exposures**

| Frequency Range ($f$) (MHz) | Peak Value of Mean Squared Field ($V^2/m^2$ or $A^2/m^2$) | Equivalent Power Density (mW/cm$^2$) |
|---|---|---|
| 0.1 - 300 | <20 $E^2$ or 20 $H^2$ | - |
| 300 - 6000 | - | <20 |
| 6000-96000 | - | $<20(f/6000)^{0.25}$ |
| 96000 - 300000 | - | 40 |

**Table 2**

**RF Permissible Exposure Limits For Uncontrolled Environments**

**A. Radiofrequency Fields**

| Frequency Range (*f*) (MHz) | Electric Field (E) (V/m) | Magnetic Field (H) (A/m) | Power Density (S) ($mW/cm^2$) (E, H Fields) | Averaging Time($T_{avg}$) (minutes) $E^2$, S or | $H^2$ |
|---|---|---|---|---|---|
| .003 - 0.1 | 614 | 163 | $(10^2, 10^6)$ | 6 | 6 |
| .1 - 1.34 | 614 | 16.3/*f* | $(10^2, 10^4/f^2)$ | 6 | 6 |
| 1.34 - 3.0 | 823.8/*f* | 16.3/*f* | $(180/f^2, 10^4/f^2)$ | $f^2/0.3$ | 6 |
| 3 - 30 | 823.8/*f* | 16.3/*f* | $(180/f^2, 10^4/f^2)$ | 30 | 6 |
| 30 - 100 | 27.5 | $158.3/f^{1.668}$ | $(.2, 9.4x10^5/f^{3.336})$ | 30 | $.0636f^{1.337}$ |
| 100 - 300 | 27.5 | 0.0729 | 0.2 | 30 | 30 |
| 300 - 3000 | | | *f*/1500 | 30 | - |
| 3000 - 15000 | | | *f*/1500 | 900000/*f* | - |
| 15000 - 300000 | | | 10 | $616000/f^{1.2}$ | - |

**B. Induced and Contact Current Restrictions**

| Frequency Range (f) (MHz) | Maximum Current Through Both Feet (mA) | Maximum Current Through Each Foot (mA) | Contact Current (mA) |
|---|---|---|---|
| 0.003 - 0.1 | 900*f* | 450*f* | 450*f* |
| 0.1 - 100 | 90 | 45 | 45 |

**C. Pulsed Radiofrequency Fields**

| Frequency Range (f) (MHz) | Peak Electric Field (E) (kV/m) | Peak Power Density/Pulse for Pulse Duration < 100 msec ($mW/cm^2$) |
|---|---|---|
| 0.1-300000 | 100 | (PEL)($T_{avg}$)/(5)(pulse width) |

**D. Partial- Body Exposures**

| Frequency Range (*f*) (MHz) | Peak Value of Mean Squared Field ($V^2/m^2$ or $A^2/m^2$) | Equivalent Power Density ($mW/cm^2$) |
|---|---|---|
| 0.1 - 300 | <20 $E^2$ or 20 $H^2$ | |
| 300 - 6000 | | 4 |
| 6000-30000 | | *f*/1500 |
| 30000 - 300000 | | 20 |

## Application and Measurement Notes

Guidance on measuring procedures and techniques for evaluating hazards from RF sources are in the following Institute of Electrical and Electronics Engineers (IEEE) standards that are available for purchase from Customer Service, 445 Hoes Lane, Piscataway, NJ 08854-1331, telephone (800) 678-IEEE:

IEEE C95.1,1999 Edition - Safety Levels With Respect to Human Exposure to Radiofrequency Electromagnetic Fields, 3 kHz to 300 GHz (order number SH-14878).

IEEE C95.3-1991 Recommended Practice for the Measurement of Potentially Hazardous Electromagnetic Fields - RF and Microwave (order number SH-14886).

**Sections 1A and 2A**

- The PELs refer to time-averaged exposure values obtained by spatial averaging RF measurements over an area equivalent to the vertical cross-section of the human body.

- At frequencies less than 100 MHz, the applicable exposure limit is given in terms of rms E or H values. Exposure limits can be expressed in terms of plane-wave-equivalent power density values as shown by the S values in parentheses for the E and H fields.

- In nonuniform fields, spatial peak values can exceed the exposure limits even though the spatially averaged value does not exceed the exposure limit. Spatial peak values are limited by the partial-body exposure limits given in section 1D and 2D.

- For exposure duration less than the averaging period, the maximum exposure limit, in any time interval equal to the averaging period is, exposure limit = exposure limit $[T_{avg}/T_{exp}]$, where $T_{exp}$ is the exposure duration in that interval expressed in the same time units as $T_{avg}$, and the exposure limit is expressed in terms of power density.

- Measurements to determine adherence to the exposure limit should be made at distances of at least 5centimeters (cm) or greater from any re-radiating objects or reflective surfaces.

- Low-power RF devices, such as hand-held, mobile and marine transmitters, are excluded from compliance with the exposure limits in sections 1A and 2A under the following conditions in which the radiating antenna or structure is not maintained within 2.5 cm of the body:

  Controlled environment low-power device exclusion pertains to devices that emit RF energy under the control of an aware use: at frequencies between 100 kHz and 450 MHz if the radiated power is 7 watts, or less; at frequencies between 450 and 1500 MHz, if the radiated power is (7)(450/f) watts, or less, where f is in MHz.

  Uncontrolled environment low-power device exclusion pertains to devices that emit RF energy without control or knowledge of the user: at frequencies between 100 kHz and 450MHz, if the radiated power is 1.4 watts, or less; at frequencies between 450 and 1500 MHz, if the radiated power is (1.4)(450/f) watts or less, where f is in MHz.

- Additional RF exposure limits or exposure restrictions are not imposed in case of pregnancy.

**Sections 1B and 2B**

- Guidance is provided for limiting the RF induced currents in the human body for free-standing conditions (no skin contact with metallic objects); and under conditions of grasping contact with metallic bodies to limit the maximum RF current through an impedance equivalent to that of the human body. Special measuring equipment is required, and revised rules have been adopted for time averaging at frequencies greater than 100kHz. Obtain assistance from the technical centers listed in this appendix.

**Sections 1C and 2C**

- Peak power exposure limitations are provided for pulsed conditions where each pulse is less than 100 milliseconds (msec) and there are no more than 5 pulses in the time averaging period. Those limits are given to prevent unintentionally high exposure from decreasingly short averaging times.

**Sections 1D and 2D**

- In the case of partial-body exposure conditions from highly directional sources or from substantially nonuniform fields over an area equivalent to the body, relaxation of the whole-body PELs of Sections 1A and 2A is allowed for exposures limited to a portion of the body. Partial-body limits do not apply in the case of direct exposure to the eyes.

## Appendix 22-C

**RFR Hazard Warning Sign, Labels, Exposure Incidents and Technical Assistance**

Sign Title: Radiofrequency Hazard Warning - Keep Moving
Form No.: 101/5
Type: 5-inch Label
NSN: 7690-01-377-5893
Superseded NSN: 0967-LF-183-8010

Sign Title: Radiofrequency Hazard Warning - Keep Moving
Form No.: 101/12
Type: 12-inch Label
NSN: 7690-01-377-5894
Superseded NSN: 0967-LP-183-8010

Sign Title: Radiofrequency Hazard Warning - Beyond This Point
Form No.: 102/5
Type: 5-inch Label
NSN: 7690-01-377-5895
Superseded NSN: 0967-LP-153-8010

Sign Title: Radiofrequency Hazard Warning - Beyond This Point
Form No.: 102/12
Type: 12-inch Label
NSN: 7690-01-377-5082
Superseded NSN: 0967-LP-153-8010

Sign Title: Radiofrequency Hazard Warning - Burn Hazard
Form No.: 103/5
Type: 5-inch Label
NSN: 7690-01-377-5896
Superseded NSN: 0967-LP-315-2010

Sign Title: Radiofrequency Hazard Warning - Burn Hazard
Form No.: 103/12
Type: 12-inch Label
NSN: 7690-01-377-5898
Superseded NSN: 0967-LP-315-2010

Sign Title: Radiofrequency Hazard Warning - Fuel Operations
Form No.: 104/5
Type: 5-inch Label
NSN: 7690-01-377-5899
Superseded NSN: 0967-LP-315-1010

Sign Title: Radiofrequency Hazard Warning - Fuel Operations
Form No.: 104/12

Type: 12-inch Label
NSN: 7690-01-377-5900
Superseded NSN: 0967-LP-315-1010

Sign Title: Radiofrequency Hazard Warning - Blank
Form No.: 105/5
Type: 5-inch Label
NSN: 7690-01-377-5374
Superseded NSN: 0967-LP-350-1010 and 0967-LP-096-3010

## Reporting of RF Exposure Incidents

a. Commands shall investigate and document all suspected RF incidents or mishaps involving personnel exposure to excessive RF levels, in accordance with Chapter 14 of this manual. The command exercising operational control of the RF source has the primary lead for conducting the RF exposure investigation and for ensuring the appropriate report is filed.

b. Commands are required to report exposure incidents and investigate exposure levels for the following situations:

(1) Personnel injury has been sustained or physical symptoms are experienced by the individual(s) that are believed to be associated with RF exposure.

(2) Personnel exposure has been determined to have exceeded the appropriate PEL in terms of power density by a factor of five or more. (For exposure determinations, provisions for time averaging and spatial averaging can be used in conjunction with transmitter duty factors and antenna rotation or scanning rates to establish maximum likely exposure levels.)

(3) Inadvertent exposure occurred to members of the general public or to other non-involved personnel as a result of naval operations that have exceeded the appropriate PEL.

(4) Exposure circumstances or the severity of the incident or mishap are such that inquires from news media are anticipated, or are deemed to be of interest to the chain of command.

c. Commands shall refer personnel reporting physical symptoms or suspected of having been exposed to levels in excess of five times the PEL for a medical evaluation or follow-up. Since medical evaluations following RF exposure have been infrequently required and physical signs of injury are usually not manifested, medical personnel should be advised to refer to reference 22-7 for information on RF biological effects.

d. Commands shall make initial notification for the occurrence of an RF incident by telephone, fax, message or e-mail to the appropriate technical assistance point listed in this appendix with copy to the Bureau of Medicine and Surgery (MED 212). Discussions following this initial notification can determine whether a more extensive investigation will be necessary and whether a site visit should be scheduled to assist in making RF measurements or an exposure evaluation. Central to the command's investigation will be a determination of the degree of RF exposure incurred since such incidents often involve emotional or health concerns which cannot be easily addressed when measurement data is not available. Performing RF measurement

assessments are often beyond the technical capabilities of the local command or the nearby medical facility.

e. In cases where it is necessary to reconstruct events or reestablish equipment configuration for conducting an RF exposure assessment, the accuracy of the recreation is crucial to the validity of the subsequent RF measurements. The command's investigating officer should apply particular attention to obtaining written statements from those involved giving detailed descriptions of the sequence of events, exposure times and equipment set-ups, as well as obtaining appropriate charts, diagrams or photographs indicating the locations of exposed personnel.

f. The command shall submit a final report on the RF incident to the Commander, Naval Safety Center and to the Bureau of Medicine and Surgery (MED 212), with copies to appropriate headquarters and systems commands. The command will also include in the report to BUMED pertinent medical records and identification data for personnel who were exposed. BUMED is tasked with maintaining a permanent repository for RF exposure incidents.

## Technical Assistance

Commands may obtain site certification, technical assistance and advice as follows:

a. For RF health hazards, personnel exposures and exposure incidents from industrial and medical RF emitting sources, contact the Navy Environmental Health Center (NEHC), 620 John Paul Jones Circle, Suite 1100, Portsmouth, VA 23708-2103, DSN 864-5500, commercial (757) 363-5500, fax (757) 444-3672.

b. For measurement surveys for shipboard RF emitting systems, contact Systems Electromagnetic Effects Branch (Code J-52), Naval Surface Warfare Center Dahlgren Division, 17320 Dahlgren Road, Dahlgren, VA 22448-5100,. DSN 249-8594, commercial (540) 653-8594, fax (540) 653-7494.

c. For site certification and measurement surveys for shore-based RF emitting systems, contact Space and Naval Warfare Systems Center (SPAWARSYSCEN) Charleston (Attn: Code 323), P.O. Box 190022, North Charleston, SC 29419-9022, DSN 588-5372, or commercial (843) 974-5372. For shore facilities within PACNAVFACENGCOM geographical region, contact Space and Naval Warfare Systems Activity Pacific (SPAWARSYSACT PAC) (Attn: Code - D915), 675 Lehua Avenue, Pearl City, HI 96782-3356, DSN 315-474-7330, commercial (808) 474-7330 or bkutara@spawar.navy.mil.

d. For RF bio-effects and medical research issues, or assistance in evaluating personnel overexposure incidents, contact the Naval Health Research Center-Detachment Brooks AFB, 8301 Navy Road, Brooks AFB, TX 78235-5365, DSN 240-4699, commercial (210) 536-4699, fax (210) 536-6439.

e. For guidance on RF exposure limits and health issues, contact the Non-Ionizing Radiation Health Branch, Bureau of Medicine and Surgery (MED 212), 2300 E Street NW, Washington DC 20372-5300, DSN 762-3444, commercial (202) 762-3444, fax (202) 762-0931.

# CHAPTER 23

# ERGONOMICS PROGRAM

## 2301. Background and Discussion

a. Ergonomics is the field of study that involves the application of knowledge about physiological, psychological and biomechanical capacities and limitations of the human body. This knowledge is applied in the planning, design, and evaluation of work environments, jobs, tools and equipment to enhance worker performance, safety and health. Ergonomics is essentially fitting the workplace to the worker.

b. This program seeks to prevent injuries and illnesses by applying ergonomic principles to identify, evaluate and control ergonomic risk factors for work-related musculoskeletal disorders (WMSDs). WMSDs are defined as a class of disorders involving damage to muscles, tendons, tendon sheaths, and related bones, muscles, and nerves. They may also be known more specifically as repetitive strain injuries (RSI); Cumulative Trauma Disorders (CTDs) and Overuse Syndrome. WMSDs result from the cumulative effect of repeated traumas associated with specific workplace risk factors. Ergonomic risk factors include but are not limited to:

(1) Physical or biomechanical stress induced by excessive movement such as prolonged typing, assembling components, and repeated hand tool usage.

(2) Sustained positions such as standing or holding a body part away from the body for long periods.

(3) Awkward or unsupported postures such as working with the back bent forward, kneeling, or stooping.

(4) Excessive vibration from powered hand tools, vehicles, or other equipment.

(5) Exertions associated with force caused by frequent or heavy lifting, pushing, grasping, pulling, or carrying of heavy or cumbersome objects.

(6) Compression or contact stress caused by resting against the edge of a work surface or grasping sharp edges like hand tools.

(7) Physiological stress induced by heat, cold, use of personal protective equipment, shift work, extended work schedules; or excessive physical activity without adequate work breaks.

When present for sufficient duration, frequency, or magnitude, these risk factors may contribute to WMSDs. In addition, personal risk factors, such as, physical conditioning, existing health problems, gender, age, work technique, hobbies and organizational factors (e.g. job autonomy, quotas, deadlines) contribute to the development of WMSDs.

## 2302. Management Commitment

a. A successful ergonomic program cannot be implemented without commitment by the commanding officer, or officer in charge, to resource and support worker and staff efforts to control ergonomic risk factors and reduce associated injury. Aggressive, visible, and coordinated management actions are necessary to prevent WMSDs, control costs related to these injuries, and improve mission readiness.

**2303. Employee Involvement**

a. Employee involvement and feedback are essential to identify ergonomic hazards and develop an effective means for their abatement. A command ergonomic program shall include worker involvement to assist in ergonomic hazard identification.

(1) If the command has a safety and health committee, the committee shall review and analyze ergonomic problem areas and recommend corrective actions.

(2) The command may form worker-based teams to identify ergonomic problems, analyze risk factors, and develop solutions. Civilian best business practices reports and military studies have proven worker-based teams to be extremely effective in controlling ergonomic risk factors and reducing injury.

**2304. Process Review and Measurement**

a. Each activity shall include a self-assessment of its ergonomic program as part of the Process Review and Measurement System (PR&MS).

b. Each activity shall conduct a periodic analysis of WMSD reportable and recordable injury and illness data from OPNAV 5102/6 or an equivalent database or log. Refer to paragraph 1409 of this instruction for guidance on completing this form.

c. WMSD analyses should include specific departments, codes, or operations experiencing WMSDs to determine where there is greater risk for injury. An accurate trend analysis for WMSDs should also include, but is not limited to, the following:

(1) Body part involved

(2) Specific type of injury/illness (e.g.: BLS code, medical diagnosis)

(3) Number of known WMSD injuries and illnesses or determine rate of WMSD within a defined population

(4) Number of lost workdays due to WMSD injury and illness or determine rate within a defined population

(5) Description of job(s) to include ergonomic risk factors

(6) Cost of treatment (if known)

d. An activity should consider observations made during safety inspections and other factors, such as absenteeism, high personnel turnovers, fitness and age of workers in the identifi-

cation of ergonomic risk factors. The command may also elect to survey personnel in occupations known or suspected to have high risks to determine if they have experienced unreported warning signs or injuries.

e. Additional measures and metrics to assess and monitor the ergonomic program may be developed by each activity as necessary to adequately conduct more detailed analyses.

**2305. Job Task Analysis**

a. Activities shall identify ergonomic risk factors as part of, or in conjunction with, workplace inspections required by chapter 9 and industrial hygiene surveys required by chapter 8. Risk factors to consider include awkward posture, sustained positions, excessive force, excessive repetition, contact stress, segmental or whole body vibration, unsafe bending, twisting, over-reaching, overhead work, excessive pinch gripping and overexertion.

b. Activities shall use appendix 23-A for the following situations:

(1). Analysis of a task or operation attributable to a WMSD.

(2.) Analysis of a task or operation identified as causing muscular pain or joint pain.

(3.) Analysis of a task or operation identified as causing numbness or tingling of any body part.

(4.) Analysis of a task or operation identified as causing extreme discomfort or muscular fatigue.

(5.) Analysis of repetitive motion tasks and operations considered significant by the activity.

(6.) As the initial analysis conducted by a worker-based team.

(7.) New analysis of jobs, tasks, operations, or workstations modified due to ergonomic concerns.

c. The activity shall review the identified risk factors in appendix 23-A and determine what action is required to eliminate the risk factor. There may be situations where action may not be deemed necessary after thorough analysis. If no action is taken, the risk factor analysis and decision rationale shall be documented in writing and kept on file for at least 5 years.

**NOTE:**

The Job Requirements and Physical Demands survey (JRPD) is an additional ergonomic tool that may be used by trained safety and occupational health personnel to identify jobs with ergonomic risk factors, employee discomfort, and assess ergonomic stressors. The JRPD may be used as a follow-up tool to Appendix 23-A or independently to quantify ergonomic risks and prioritize projects. JRPD information may be provided through the resource list in appendix 23-B.

d. Ergonomic assessments shall be assigned Risk Assessment Codes (RAC) consistent with chapters 9 and 12.

**2306. Command Assistance**

a. The principles and application of ergonomics is a multidisciplinary applied science encompassing medical, engineering, industrial hygiene, and safety fields. It is recognized that activity personnel may not have the experience necessary to identify, analyze and resolve all ergonomic situations. When the safety manager or other internally available staff identifies ergonomic issues beyond the scope of their capabilities, commands should seek assistance from the resource list in appendix 23-B.

**2307. Hazard Prevention and Control**

a. The preferred priorities for corrective actions of ergonomic risk factors include: ergonomic risk elimination, engineering controls, substitution of materials/tools/ equipment, improved work practices and administrative controls. Examples of administrative controls are: lifting restrictions, adjustment of work-rest cycles, slowing work pace, and job rotation.

b. Activities shall not use back support belts or wrist splints as safety protective equipment. These devices are considered medical appliances, and must be prescribed by a credentialed health care provider who shall assume responsibility for proper fit of the device, treatment, monitoring and supervision of the wearer.

c. Engineering Controls. Engineering controls are the preferred mechanism for controlling ergonomic risk factors. These controls may entail redesign of workstations, work methods, and tools to reduce or eliminate the risk factors. References 23-1 through 23-7 contain detailed guidance on principles and techniques for implementing engineering controls.

d. Workstation Design. Workstations should be easily adjustable to accommodate the person/persons performing a specific task or job, not just the average worker. Generally, design limits are based upon a range from the 5th percentile female to the 95th percentile male values for critical body dimensions. The work-space should be large enough to allow the full range of required movements. Anthropometric data and design recommendations for military equipment and facilities can be found in reference 23-2.

e. Illumination. This reference also includes design criteria for task illumination, vibration levels, noise levels and ventilation. Adequate illumination for highly visual tasks may be one of the primary concerns for some workstations. Both the quantity and the quality of light are important. Glare, contrast, and shadows influence lighting quality and can seriously diminish performance. Illumination design guidance may be found in reference 23-2. Existing illumination problems should be corrected using guidance from references 23-3 and 23-4 or other professional references that meet or exceed the references of this chapter.

f. Design of Work Methods. Analyses of work processes, that requires consideration of worker posture and repetition rate, should be supplemented by addressing the force or exertion required of workers. Redesign of work methods should also consider any changes in the time required to perform tasks. WMSD reduction benefits may not be realized if ergonomic related steps are added to the process, but sufficient time is not allowed to perform such tasks.

g. Tool Design and Handles. Properly designed tools and handles increase worker productivity by extending and amplifying manipulative abilities and protecting the workers against concentrated forces. Activities shall pay proper attention to the selection and design of tools and workstation layouts to minimize WMSD risks and back injuries. Activities shall select or design tools and handles to minimize or eliminate the following risk factors for both male and female workers:

(1.) High contact forces and static loading

(2.) Extreme or awkward joint positions

(3.) Repetitive action of the fingers, wrist and arm

(4.) Tool vibration (see reference 23-10)

(5) Excessive force or grip strength requirements.

**NOTE:**

Activities can accomplish many workstation and job procedure designs using an approach to ergonomics based on an understanding of human anatomy and physiology without resorting to time- consuming and expensive measurements. For example, activities should select hand tools to distribute the applied forces over a wide area of the hand regardless of the job being performed. Sometimes it is possible, on a small scale, to obtain sample tools from manufacturers for trial periods to allow employees and management decide which tool is the best based upon comfort, usability, utility, durability, price and productivity. This process will increase product acceptance and take advantage of worker experience and knowledge.

h. Administrative Controls. Activities shall only consider administrative controls after engineering controls or process redesign are not feasible. Administrative controls include:

(1.) Rotating employees to jobs with dissimilar physical requirements.

(2.) Establishing adequate work/ rest schedules.

(3.) Where heavy objects must be handled, activities may calculate a recommended weight limit using the methods contained in references 23-2 and 23-7 to specify the maximum lift an unassisted individual should attempt for one or two handed lifts. The maximum lift an unassisted individual should attempt is 51 pounds under ideal lifting conditions.

(4.) In situations where heavy lifts cannot be avoided, establish a policy to include the assistance of other personnel in the lift.

(5.) Label the actual weight of any object that a worker needs to lift or carry.

(6.) Ensure that material in storage is stacked off the floor and placed at no less than knuckle height.

i. Planned Facility Modifications and Equipment Purchases. When activities develop plans for new or modified facilities, processes, jobs, tasks, materials and equipment, they shall analyze such plans for opportunities to eliminate or reduce ergonomic hazards. For example, when purchasing office furniture to equip new facilities or replace existing equipment, activities should consider selecting equipment that allows easy adjustment of chair height, keyboard position and video display screen position. Reference 23-2 provides further information on this topic.

j. Some projects developed to address ergonomic hazards that exceed the funding capability of local organizations may qualify for centrally-managed Navy occupational safety and health (NAVOSH) funds. Applications for these funds should be submitted per the procedures of chapter 12, Hazard Abatement Program.

**2308. Ergonomic Training**

a. A key to maintaining an effective ergonomics program is the proper training of managers, supervisors, professional staff, ergonomic teams and employees. General ergonomics training shall be provided to all employees as applicable to the employee's role in the workplace. Periodic refresher training should be provided at command discretion. Recommended training topics for various personnel are provided in appendix 23-C.

b. OSH professional staff responsible for conducting the ergonomics program shall receive formal training on the recognition and control of ergonomic risk factors in Navy work places. The Naval Occupational Safety and Health and Environmental Training Center (NAVOSH-ENVTRACEN) provides the Navy Ergonomics Program course (A-493-0085) to train OSH professional staff and other personnel involved in ergonomic assessments, control of ergonomic hazards, and program management.

**2309. Medical Program**

a. Cognizant medical commands shall support line activity initiatives to reduce WMSDs by providing occupational medicine services as described in section 0807. Occupational medicine professionals shall collaborate with commands, for the purpose of conducting work place visits to obtain knowledge of operations, work practices and transitional-duty jobs to provide ergonomics assessments, and facilitate recovery of individuals with WMSDs.

b. Physical Standards Pre-placement and Periodic Examinations. For positions that involve significant risk for WMSDs, the command, human relations office and cognizant medical command shall review the presence and adequacy of existing physical requirements of the job and make recommendations for improvement to the command.

**NOTE:**

As warranted, consistent with the provisions of 5CFR339.301 "an agency may require an individual who has applied for or occupies a position which has medical standards or physical requirements or which is part of an established medical evaluation program, to report for a medical examination:

(1) Prior to appointment or selection (including reemployment on the basis of full or partial recovery from a medical condition);

(2) On a regularly recurring, periodic basis after appointment; or

(3) Whenever there is a direct question about an employee's continued capacity to meet the physical or medical requirements of a position.

(4) An agency may require an employee who has applied for or is receiving continuation of pay or compensation as a result of an on-the-job injury or disease to report for an examination to determine medical limitations that may affect placement decisions."

c. Health Education for Ergonomic Hazards. Each cognizant medical command shall collaborate with and assist the employing command in providing health education and lifestyle modification information to individuals with WMSD symptoms and for all identified workers at high risk for WMSDs.

d. Recovery of Injured Employees. The Navy encourages cognizant medical commands to offer medical advice, counseling and physical therapy services to rehabilitate employees with WMSDs. Where such services are not available from the cognizant medical command, activities may contract for physical therapy services, provided the cognizant medical command has an opportunity to review the procurement specification prior to solicitation and provide professional medical oversight of the contract.

e. Monitoring for Trends. Health care professionals shall periodically, e.g., monthly, review occupationally related acute care visits to monitor WMSD trends.

**2310. Responsibilities**

a. Echelon Two Commands shall:

(1) Provide guidance and assistance as necessary to subordinate commands on program development and implementation.

(2) Coordinate program implementation among similar activity types; disseminate information on process improvements to eliminate duplication of effort.

b. Commander, Naval Supply Systems Command (COMNAVSUPSYSCOM) shall take appropriate actions to increase the availability of ergonomically-designed furnishings, equipment and tools through the supply system. Conversely, commands shall take efforts to purge the supply system of ergonomically incorrect equipment such as back belts.

c. Commander, Naval Facilities Engineering Command (COMNAVFACENGCOM) shall:

(1) Perform comprehensive ergonomic risk analysis of WMSD factors as part of the facility design process.

(2) Review plans for new or modified facilities, processes, jobs, tasks, tools, materials and equipment to ensure that changes will reduce or eliminate ergonomic risk factors for WMSDs.

(3) Develop and implement a Navy-wide program to minimize ergonomic stress through facility design, equipment selection and maintenance of facilities, equipment and tools.

d. Chief of Naval Education and Training (CNET) shall provide OSH ergonomics training consistent with requirements of this chapter.

e. Chief, Bureau of Medicine and Surgery (BUMED) shall:

(1) Develop technical and administrative guidance for the medical aspects of the ergonomics program.

(2) Provide medical support by developing therapy and treatment programs, including provision of physical therapists who perform in-house physical therapy to injured employees, serve as part of the education team providing training to prevent injuries and ergonomically evaluate return-to-work capabilities.

f. Commander, Naval Safety Center shall conduct a mishap analysis program, reviewing available data for a 5-year period, to identify WMSDs by activity and command, including number or rate of WMSD, injury/illness type, and body part.

g. Commanding Officers of Medical Commands, Activities, and Treatment Facilities shall:

(1) Monitor WMSD trends using appropriate records.

(2) Verify low risk of transitional duty assignments.

(3) Provide health education for personnel with a past history or current symptoms of WMSD and education on preventive measures for high-risk individuals.

(4) Assist line activities in the medical recovery of WMSD individuals and the implementation of transitional duty programs.

(5) Assist commands in the development of physical requirements for positions.

h. Commanders, Commanding Officers and Officers in Charge shall:

(1) Annually, analyze injury and illness records and other pertinent information to determine the need for ergonomic improvements and corrective actions within the activity.

(2) Identify and budget resources to administer an effective ergonomics program consistent with the guidance in this chapter.

(3) Consider shift-work related stressors when determining scheduling policies. Appendix 23-D provides guidance for shift work that does not involve military watch standing or military operational environments.

(4) Where rehabilitative services are not available from the cognizant medical command, activities may contract for such services, provided the cognizant medical command has an opportunity to review the procurement specification prior to solicitation and provide professional medical oversight of the contract.

Chapter 23

References

23-1. Department of Defense, Military Standard, Human Engineering Design Criteria for Military Systems, Equipment and Facilities, MIL-STD-1472F, 23 August 1999, (NOTAL)

23-2. Anthropometry of US Military Personnel, DOD-HDBK 743A, 13 Feb 1991.

23-3. Illuminating Engineering Society, IES Lighting Handbook, 9th ed., New York, 2000 (NOTAL)

23-4. American National Standards Institute/Illuminating Engineering Society of North America (ANSI/IES) RP-7-1991, American National Standard Practice for Industrial Lighting (NOTAL)

23-5. American National Standards/ Human Factors Society (ANSI/HFS) 100-1998 American National Standard for Human Factors Engineering of Visual Display Terminal Workstations (NOTAL).

23-6. NIOSH Publication No. 97-117 of March 97, Elements of Ergonomics Programs – A Primer Based on Workplace Evaluations of Musculoskeletal Disorders (NOTAL)

23-7. National Institute for Occupational Safety and Health, A Work Practices Guide for Manual Lifting. Tech. Report No. 94-110 (1994), U.S. Department of Health and Human Services, Cincinnati, OH. (NOTAL)

## Appendix 23-A

## Ergonomic Survey Tool

This checklist is an ergonomic screening tool for typical work activities. Typical work activities are a regular and foreseeable part of the job, occur more than 1 day per week and more frequently than 1 week per year. This checklist determines if a typical work activity has noteworthy ergonomic stressors present for sufficient duration. A 'caution zone' job is defined as having one or more boxes are checked in the checklist below.

A job found to be in the "caution zone" should be evaluated further by the command or through outside assistance. If possible, further analysis with the Job Requirements and Physical Demand (JRPD) survey is recommended. JRPD information may be obtained through the sources listed in appendix 23-B. Jobs not determined to be 'caution zone' should be periodically reevaluated since changes in the work environment may create new ergonomic stressors.

Checklist source: Washington State Department of Labor and Industries

| Job Position Evaluated: | Date: | No. of employees in these jobs? | Employee Name | Reviewer Name |
|---|---|---|---|---|

| **Caution Zone Checklist**<br>Use one sheet for each position evaluated. | | | |
|---|---|---|---|
| Movements or postures that are a regular and foreseeable part of the job, occurring more than one day per week, and more frequently than one week per year. | | If done in this job position ✓ the box | |
| **Awkward Posture** | | | **Comments/Observations** |
|  | **1.** Working with the hand(s) above the head, or the elbow(s) above the shoulders more than 2 hours total per day. | ☐ | |
|  | **2.** Working with the neck or back bent more than 30 degrees (without support and without the ability to vary posture) more than 2 hours total per day. | ☐ | |

| | | | |
|---|---|---|---|
|  | **3.** Squatting more than 2 hours total per day. | ☐ | |
|  | **4.** Kneeling more than 2 hours total per day. | ☐ | |
| **High Hand Force** | | | **Comments/Observations** |
|  | **5.** Pinching an unsupported object(s) weighing 2 or more pounds per hand, or pinching with a force of 4 or more pounds per hand, more than 2 hours per day (comparable to pinching half a ream of paper). | ☐ | |
|  | **6.** Gripping an unsupported objects(s) weighing 10 or more pounds per hand, or gripping with a force of 10 or more pounds per hand, more than 2 hours total per day (compara-ble to clamping light duty auto-motive jumper cables onto a battery). | ☐ | |
| **Highly Repetitive Motion** | | | **Comments/Observations** |
|  | **7.** Repeating the same motion with the neck, shoulders, el-bows, wrists, or hands (exclud-ing keying activities) with little or no variation every few sec-onds, more than 2 hours total per day. | ☐ | |
|  | **8.** Performing intensive keying more than 4 hours total per day. | ☐ | |

OPNAVINST 5100.23F
15 July 2002

| Repeated Impact | | | Comments/Observations |
|---|---|---|---|
|  | **9.** Using the hand (heel/base of palm) or knee as a hammer more than 10 times per hour, more than 2 hours total per day. | ☐ | |
| **Heavy, Frequent or Awkward Lifting (A simple scale can be used to determine the weight of materials)** | | | **Comments/Observations** |
|  | **10.** Lifting object weighing more than 75 pounds once per day or more than 55 pounds more than 10 times per day. | ☐ | |
|  | **11.** Lifting objects weighing more than 10 pounds if done more than twice per minute, more than 2 hours total per day. | ☐ | |
|  | **12.** Lifting objects weighing more than 25 pounds above the shoulders, below the knees or at arms length more than 25 times per day. | ☐ | |
| | | | |
| **Moderate to High Hand-Arm Vibration (Closely estimate or obtain the vibration value of the tool in use)** | **Comments/Observations** | | |
|  | **13.** Using impact wrenches, carpet strippers, chain saws, percussive tools (jack hammers, scalers, riveting or chipping hammers) or other tools that typically have high vibration levels, more than 30 minutes total per day. | ☐ | |
|  | **14.** Using grinders, sanders, jigsaws or other hand tools that typically have moderate vibration levels more than 2 hours total per day. | ☐ | |

For each "caution zone job" identified, find any physical risk factors that apply using the Follow-up checklist. Reading across the page, determine if all of the conditions are present in the work activities. If they are, a WMSD hazard exists and must be reduced below the hazard level or to the degree technologically and economically feasible

## Follow-up Physical Risk Factor Check List

### Awkward Posture

| Body Part | Physical Risk Factor | Duration | Visual Aid | (✓) here if this is a WMSD hazard |
|---|---|---|---|---|
| Shoulders | Working with the hand(s) above the head or the elbow(s) above the shoulder(s) | More than 4 hours total per day |  | ☐ |
| | Repetitively raising the hand(s) above the head or the elbow(s) above the shoulder(s) more than once per minute | More than 4 hours total per day |  | ☐ |
| Neck | Working with the neck bent more than 45° (without support or the ability to vary posture) | More than 4 hours total per day |   | ☐ |
| Back | Working with the back bent forward more than 30° (without support, or the ability to vary posture) | More than 4 hours total per day |   | ☐ |
| | Working with the back bent forward more than 45° (without support or the ability to vary posture) | More than 2 hours total per day |   | ☐ |

| Awkward Posture (continued) | | | | Check (✓) here if this is a WMSD hazard |
|---|---|---|---|---|
| **Body Part** | **Physical Risk Factor** | **Duration** | **Visual Aid** | |
| Knees | Squatting | More than 4 hours total per day |  | ❑ |
| | Kneeling | More than 4 hours total per day |  | ❑ ❑ |

| High Hand Force | | | | | Check (✓) here if this is a WMSD hazard |
|---|---|---|---|---|---|
| **Body Part** | **Physical Risk Factor** | **Combined with** | **Duration** | **Visual Aid** | |
| Arms, wrists, hands | Pinching an unsupported object(s) weighing 2 or more pounds per hand, or pinching with a force of 4 or more pounds per hand (comparable to pinching half a ream of paper) | Highly repetitive motion | More than 3 hours total per day | | ❑ |
| | | Wrists bent in flexion 30° or more, or in extension 45° or more, or in ulnar deviation 30° or more | More than 3 hours total per day |  Ulnar deviation | ❑ |
| | | No other risk factors | More than 4 hours total per day |  | ❑ |

| High Hand Forces | | | | | |
|---|---|---|---|---|---|
| **Body Part** | **Physical Risk Factor** | **Combined with** | **Duration** | **Visual Aid** | Check (✓) here if this is a WMSD hazard |
| Arms, wrists, hands | Gripping an unsupported object(s) weighing 10 or more pounds per hand, or gripping with a force of 10 pounds or more per hand (comparable to clamping light duty automotive jumper cables onto a battery) | Highly repetitive motion | More than 3 hours total per day | | ☐ |
| | | Wrists bent in flexion 30° or more, or in extension 45° or more, or in ulnar deviation 30° or more | More than 3 hours total per day |  | ☐ |
| | | No other risk factors | More than 4 hours total per day |  | ☐ |

**Highly Repetitive Motion**

| Body Part | Physical Risk Factor | Combined with | Duration | Check (✓) here if this is a WMSD hazard |
|---|---|---|---|---|
| Neck, shoulders, elbows, wrists, hands | Using the same motion with little or no variation every few seconds (excluding keying activities) | No other risk factors | More than 6 hours total per day | ☐ |
| | Using the same motion with little or no variation every few seconds (excluding keying activities) | Wrists bent in flexion 30° or more, or in extension 45° or more, or in ulnar deviation 30° or more **AND** High, forceful exertions with the hand(s) | More than 2 hours total per day | ☐ |
| | Intensive keying | Awkward posture, including wrists bent in flexion 30° or more, or in extension 45° or more, or in ulnar deviation 30° or more | More than 4 hours total per day | ☐ |
| | | No other risk factors | More than 7 hours total per day | ☐ |

**Repeated Impact**

| Body Part | Physical Risk Factor | Duration | Visual Aid | Check (✓) here if this is a WMSD hazard |
|---|---|---|---|---|
| Hands | Using the hand (heel/base of palm) as a hammer more than once per minute | More than 2 hours total per day |  | ☐ |

| | | | |
|---|---|---|---|
| Knees | Using the knee as a hammer more than once per minute | More than 2 hours total per day |  |

❑

OPNAVINST 5100.23F
15 July 2002

**Heavy, Frequent or Awkward Lifting**

This analysis only pertains if you have "caution zone jobs" where employees lift 10 lbs. or more

**Step 1** **Find out the actual weight of objects that the employee lifts. Actual Weight = ________ lbs.**

**Step 2** **Determine the Unadjusted Weight Limit.** Where are the employee's hands when they begin to lift or lower the object? Mark that spot on the diagram below. The number in that box is the Unadjusted Weight Limit in pounds.




**Unadjusted Weight Limit: ________ lbs.**

**Step 3** **Find the Limit Reduction Modifier.** Find out how many times the employee lifts per minute and the total number of hours per day spent lifting. Use this information to look up the Limit Reduction Modifier in the table below.

| **How many lifts per minute?** | **For how many hours per day?** 1 hr or less | 1 hr to 2 hrs | 2 hrs or more |
|---|---|---|---|
| 1 lift every 2-5 mins. | 1.0 | 0.95 | 0.85 |
| 1 lift every min | 0.95 | 0.9 | 0.75 |
| 2-3 lifts every min | 0.9 | 0.85 | 0.65 |
| 4-5 lifts every min | 0.85 | 0.7 | 0.45 |
| 6-7 lifts every min | 0.75 | 0.5 | 0.25 |
| 8-9 lifts every min | 0.6 | 0.35 | 0.15 |
| 10+ lifts every min | 0.3 | 0.2 | 0.0 |

Note: For lifting done less than once every five minutes, use 1.0

**Limit Reduction Modifier: ____.______**

**Step 4** **Calculate the Weight Limit.** Start by copying the Unadjusted Weight Limit from Step 2.

**Unadjusted Weight Limit: = ______ lbs.**

If the employee twists more than 45 degrees while lifting, reduce the Unadjusted Weight Limit by multiplying by 0.85. Otherwise, use the Unadjusted Weight Limit

**Twisting Adjustment: = _____._____**

**Adjusted Weight Limit: = ______ lbs.**

Multiply the Adjusted Weight Limit by the Limit Reduction Modifier from Step 3 to get the Weight Limit. **X**

**Limit Reduction Modifier: _____.___**

**Weight Limit: = _____ lbs.**

**Step 5** **Is this a hazard?** Compare the Weight Limit calculated in Step 4 with the Actual Weight lifted from Step 1. If the Actual Weight lifted is greater than the Weight Limit calculated, then the lifting is a WMSD hazard and must be reduced below the hazard level or to the degree technologically and economically feasible.

Note: If the job involves lifts of objects with a number of different weights and/or from a number of different locations, use Steps 1 through 5 above to:

1. Analyze the two worst case lifts -- the heaviest object lifted and the lift done in the most awkward posture.
2. Analyze the most commonly performed lift. In Step 3, use the frequency and duration for <u>all</u> of the lifting done in a typical workday.

## Hand-Arm Vibration

**Use the instructions below to determine if a hand-arm vibration hazard exists.**

Step 1. Find the vibration value for the tool. (Get it from the manufacturer, look it up at this web site: http://umetech.niwl.se/vibration/HAVHome.html, or you may measure the vibration yourself). The vibration value will be in units of meters per second squared ($m/s^2$). On the graph below find the point on the left side that is equal to the vibration value.

Step 2. Find out how many total hours per day the employee is using the tool and find that point on the bottom of the graph.

Step 3. Trace a line in from each of these two points until they cross.

Step 4. If that point lies in the crosshatched "Hazard" area above the upper curve, then the vibration hazard must be reduced below the hazard level or to the degree technologically and economically feasible. If the point lies between the two curves in the "Caution" area, then the job remains as a "Caution Zone Job." If it falls in the "OK" area below the bottom curve, then no further steps are required.




**Example:**
An impact wrench with a **vibration value of 12 $m/s^2$** is used for **2½ hours** total per day. The exposure level is in the Hazard area. The vibration must be reduced below the hazard level or to the degree technologically and economically feasible.

Note: The caution limit curve (bottom) is based on an 8-hour energy-equivalent frequency- weighted acceleration value of 2.5 $m/s^2$. The hazard limit curve (top) is based on an 8-hour energy-equivalent frequency- weighted acceleration value of 5 $m/s^2$.

## Appendix 23-B
## Ergonomics Resources

**Naval Facilities Engineering Command ergonomic support**

Ergonomic Program Manager
SOUTHWESTNAVFACENGCOM
1220 Pacific Hwy
San Diego, CA 92132-5190
Ph: 619-532-2536, DSN: 522-2536
Fax: 619-532-1195

**Bureau of Medicine and Surgery (BUMED) ergonomic support**

Navy Environmental Health Center
620 John Paul Jones Circle
Suite 1100
Portsmouth, VA 23708-2103
Phone: (757) 462-5500
After Hours: (757) 621-1967
DSN: 253-5500

Contact: Industrial Hygiene or Occupational Medicine directorates

**Chief of Naval Operations (N45) ergonomic resource**

http://www.navosh.net/ergonomics

This web site contains ergonomic best practice examples, public domain documents, government documents, technical information, and links to other ergonomic sites. This site will also have information for the Job Requirements and Physical Demands Survey (JRPD) which is an ergonomic tool to enable Safety and Occupational Health professionals identify ergonomic risk factors and prioritize problem areas.

**Appendix 23-C**

**Recommended Ergonomic Training**

**General orientation training for new employees**

(1) Ergonomic risk factors related to the employee's job.

(2) Back injury prevention

(3) Early symptoms and warning signs of WMSD. Reporting of signs and symptoms. The basic structures of the body, how they function together and how they are affected by WMSDs

(4) Correct use of ordinary hand tools to include proper body position. Selection and use of ergonomically designed tools available in the workplace.

(5) Workstation design and adjustment.

**Personnel with back injury risk factors.** Activities should provide initial back injury prevention training for personnel with jobs having identified risk factors for back injury. As a minimum, this training should include:

(1) Basic anatomy and physiology of the spine and neck.

(2) Warning signs of back injury.

(3) Biomechanics of lifting and proper lifting techniques

(4) Back injury risk factors on and off the job

**Manager**. Managers should receive sufficient training on ergonomic issues to effectively carry out their responsibilities for the health and safety of their employees.

(1) Proper maintenance of facilities, equipment and tools as a technique to minimize ergonomic stress

(2) The elements of an effective case management process

(3) Safe and unsafe ergonomic behaviors of employees

(4) Forming worker based teams and the benefits of a team approach to ergonomics.

(5) Ergonomic policy of the Navy, Department of Defense, and the Occupational Safety and Health Administration (OSHA).

**Supervisors**. Supervisors with employees subject to identified ergonomic risk factors should receive the following training:

1. Recognition of WMSD signs and symptoms.

2. WMSD reporting.

3. Ergonomic risk factors, such as, awkward postures, static positions, external forces, repetitive motion and lifting hazards.

4. Methods to reduce or eliminate ergonomic risk factors.

5. How to obtain ergonomic assistance.

**Collateral duty personnel**. Activities without full time professional OSH managers may assign collateral duty personnel to administer an ergonomics program. At a minimum their training should include:

1. How to manage an ergonomics program

2. How to identify ergonomic hazards.

3. Measures to reduce or eliminate ergonomic hazards.

4. How to evaluate the effectiveness of ergonomics programs and controls.

**Facility Engineers, Architects, and Designers**. Engineering staffs responsible for planning, designing, or writing specifications for equipment, tools, jobs, tasks and processes should receive formal training on methods of eliminating or reducing ergonomic risk factors.

**Appendix 23-D**

## Ergonomic Considerations for Shift Workers

### A. Background

Shift work is a risk factor for several medical disorders, poor performance, and decreased vigilance in the job. It presents these problems because of its conflict with normal human biological rhythms, particularly the sleep/wake rhythm and the temperature rhythm, which direct the body to sleep at night.

The problem with night work and transmeridian jet travel is that normal time cues are shifted faster than the human circadian rhythm can adjust. For example, it takes at least 2 days for the sleep/wake cycle to adjust to a 6-hour transmeridian flight. More time is required for body temperature and performance rhythms to adjust. Two to 3 weeks are required for complete adjustment of the temperature rhythm to a complete day-night reversal (a 12-hour time shift). Because different biological rhythms adjust at different rates, not only does the person become desynchronized with respect to external time cues, but individual rhythms no longer have a normal phase relationship.

The most frequent problem for night workers, experienced by at least 60 percent of these workers, is chronic sleep deprivation due to not only fewer total hours of sleep, but disrupted sleep as well. Such sleep deprivation in night workers can be severe. Night work has also been shown to be disruptive with respect to family and social interactions. Shift-workers are at higher risk for psychosocial problems as well as family problems, including divorce.

Personnel with a history of rigid sleep requirements, strong "morning types," and older workers (over 45) are more apt to have difficulty adjusting to night work. Five to 20 percent of night workers will suffer from shift maladaptation syndrome, which can only be treated by removal from the night shift.

### B. Shift Workers Scheduling Guidelines

Supervisors who prepare schedules for night shifts must consider the potential for scheduling practices to affect the ability of individuals to perform assigned tasks safely.

Unless prescribed by current labor contracts, schedules must be rotated in the forward (clockwise) direction. This direction is best because the human clock runs slow with respect to the 24- hour solar day and, therefore, adjusts faster to a phase delay than to a phase advance. The following additional guidelines regarding scheduling of night workers, including workers on rotating schedules that include night work, are recommended for consideration when preparing schedules.

(1) At least 48 hours off should follow the night shift rotation.

(2) Overtime should be avoided for personnel adjusting to time shifts.

**C. Medical Surveillance for Shift Workers**

Being assigned night shift work, by itself, does not obligate an employee to undergo a medical evaluation. Where medical evaluations are required, due to positions covered by medical standards, the requirement to work night shifts should be indicated by the appointing officer on the SF-78 by circling item B-28, "Protracted or irregular hours of work," to alert the examining physician to evaluate fitness to work night shifts or recommend appropriate restrictions.

Supervisors may request medical qualification information from workers who demonstrate persistent performance problems or increased absenteeism after beginning night work. Even workers who have been able to tolerate night work for years may begin to show signs and symptoms of shift work intolerance with increasing age.

Pre-employment evaluation of workers who will be involved in night work and surveillance of shift work employees require attention to the following medical conditions that may impair an individual's ability to perform assigned tasks safely or be aggravated by shift work schedules:

1. Diabetes mellitus, epilepsy, cardiovascular disease, asthma, peptic ulcer, irritable bowel syndrome, or use of medication with circadian variation in effectiveness. The examining physician must determine when such medical conditions are severe enough to warrant medical disqualification for night work.

2. Supervisors are cautioned to consult Federal Personnel Manual (FPM) chapter 339 governing medical qualification determinations.

**D. Additional References**.

1. LaDou J., Occupational and Environmental Medicine, 2nd ed., pp 592-3, Appleton and Lange, 1997.

2. Rom W.N., Environmental and Occupational Medicine, 3rd ed., pp 1173-7, Lippincott Williams and Wilkins, 1998.

3. Scott A.J., "Shift Work and Health", Primary Care, 1 Dec 2000, 1057-79.

# CHAPTER 24

## ENERGY CONTROL PROGRAM (LOCKOUT/TAGOUT)

### 2401. Discussion

a. Purpose. This chapter establishes Navy policy and minimum procedures for locking out or tagging the sources of energy to equipment or systems under the requirements of reference 24-1 and the minimum performance standards of reference 24-2.

b. Scope and Application. The requirements of this chapter apply to the control of energy during servicing and maintenance of machinery and equipment ashore. These requirements apply only when the unexpected energizing or movement of machinery/equipment or the release of energy during the maintaining or servicing of such equipment/machinery could cause injury to personnel and/or property damage.

(1) This policy does not cover routine production operations unless:

(a) Operations require workers to remove or bypass a guard or other safety device.

(b) Operations require workers to place any part of their bodies into an area of the machine or equipment where work is actually performed upon the material being processed (point of operation) or where an associated danger zone exists during the machine operating cycle.

**NOTE:**

This chapter does not cover minor tool changes and adjustments and other minor servicing activities, which take place during normal production operations if they are routine, repetitive, and integral to the use of the equipment for production, provided that the work is performed using alternate measures which provide effective protection.

(2) The requirements of this chapter do not apply to the following:

(a) Shipboard operations that are covered under references 24-3 and 24-4

(b) Equipment under the exclusive control of electrical utilization installations for the purpose of power generation, transmission and distribution, including related equipment for communication or metering, which are covered under references 24-5 and 24-6

(c) Exposure to electrical hazards from work on, near or with conductors or equipment in electrical utilization installations, which are covered under references 24-5 and 24-6

(d) Work on cord and plug-connected electrical equipment where exposure to the hazards of unexpected start-up of the equipment is controlled by unplugging the equipment, and the plug is under the exclusive control of the worker performing the servicing or maintenance

(e) Hot tap operations involving transmission and distribution systems for substances such as gas, steam, water or petroleum products performed on pressurized pipelines if:

(1) Continuity of service is essential.

(2) Shutdown of the system is impractical.

(3) Documented procedures are followed and special equipment utilized to protect personnel.

(f) Training evolutions ashore on shipboard tagout per references 24-3 and 24-4. However, the installation of equipment for such training is covered by this instruction.

**2402. General Policy**

All shore activities shall comply with the lockout/tagout requirements of reference 24-1, except as noted in paragraph 2401.

a. Commands shall discipline any person(s), other than the original person(s) who installed the lockout/tagout device(s) or that person's supervisor, who removes a lockout/tagout device.

b. When similar machines and/or equipment are covered with a single generic written procedure, the procedure shall list the types of equipment to which the operating procedure applies.

c. Lockout, not tagout is the preferred method of energy control and commands shall use it ashore where feasible. Activities shall not use combination locks for lockout. No two lockout devices (locks) shall have the same key. No more than two keys shall exist for any lock. The worker shall maintain one key and the supervisor shall maintain the other in a location readily accessible in the event of an emergency.

d. Both lockout and tagout devices shall indicate the identity of the employee applying the device(s). Tagout devices shall indicate the cognizant shop or code, the telephone number where the employee can be reached during working hours, his/her supervisor, date applied, and the machine, equipment or system component that is de-energized.

e. Commands shall ensure that all training complies with reference 24-1, is specific to the activity, but need not include instruction on energy sources or means of isolation that are not applicable to the activity.

**2403. Requirements for Contractors or Other Outside Agencies**

Activities shall ensure contracts require the contractor or agency to:

a. Submit a copy of instructions explaining the contractor's or agency's lockout/tagout program. In addition, the activity shall provide the contractor or agency with a copy of the lockout/tagout program instruction of the activity where the work is to be performed.

b. Contractors must comply with the requirements of reference 24-7.

**2404. Responsibilities**

a. Commanders of Echelon Two and Other Headquarters Commands shall:

(1) Ensure development and implementation of lockout/tagout programs are per the guidance in this chapter for all systems and operations under their cognizance.

(2) As necessary, provide amplifying guidance to subordinate activities on command implementation of the lockout/ tagout program to ensure program consistency and effectiveness.

b. Chief of Naval Education and Training (CNET) shall:

(1) Incorporate lockout/tagout requirements into the NAVOSH & Hazardous Material Control and Management Navy Training Systems Plan.

(2) Develop a lockout/tagout training syllabus and related performance qualification standards to include the provisions of lockout/tagout.

(3) Provide specialized lockout/ tagout training where necessary.

(4) Integrate lockout/tagout principles and procedures into the curriculum of the Navy Supply Corps School (Athens, GA) and the Naval School Civil Engineer Corps Officers (Port Hueneme, CA).

(5) Serve as the central source for delivery and dissemination of information on Navy lockout/tagout training.

(6) Incorporate lockout/tagout information into the curriculum of all appropriate training courses.

c. Commander, Naval Supply Systems Command (COMNAVSUPSYSCOM) shall provide standard stock OSHA-compliant tags and locks for use by activities per the requirements of this chapter.

d. Commanders, Commanding Officers, and Officers in Charge shall:

(1) Develop and implement written plans and procedures for a lockout/tagout program that meet the policy of this chapter and the direction of reference 24-1.

(2) Initiate actions to identify and resolve deficiencies in the lockout/tagout budget and allocation of resources to bring about effective local program implementation.

(3) Ensure a current roster of trained and qualified employees who are authorized to work on hazardous energy systems and equipment is maintained.

e. Activity OSH Offices shall:

(1) Approve the equipment or applications where tagout may be used in place of lockout (and maintain a list of approvals) unless this responsibility is delegated to someone else by the commanding officer.

(2) Annually review compliance with the provisions of this chapter and any specific procedures developed as a result.

(3) Where lockout is not feasible, tagout may be used. Activities shall maintain a list of the type of equipment and applications. The official authorizing tagout will ensure compliance with the requirements of this chapter for use of tagouts to achieve equivalent protection to lockout systems.

---

Chapter 24

## References

24-1. Title 29 Code of Federal Regulations (CFR) 1910.147 of 13 Feb 96, The Control of Hazardous Energy (lockout/tagout), latest revision, and Title 29 CFR 1910.332 of 6 Aug 90, Electrical-Safety-Related Work Practices, latest revision (NOTAL)

24-2. American National Standards Institute (ANSI) Standard Z244.1-1982, American National Standard for Personal Protection Lockout/Tagout of Energy Sources-Minimum Safety Requirements (NOTAL)

24-3. OPNAVINST 5100.19D CH-1 of 30 Aug 01, Navy Occupational Safety and Health (NAVOSH) Program Manual for Forces Afloat (NOTAL)

24-4. OPNAVINST 3120.32C of 11 Apr 94, Standard Organization and Regulations of the U.S. Navy

24-5. OPNAV P-45-117-6-98 of Jun 98, Electrical Safety Field Guide

24-6. MIL-HDBK 1025/12 of November 1998, Military Handbook for Safety of Electrical Transmission and Distribution Systems

24-7. EM385-1-1 of Oct 92, U.S. Army Corps of Engineers Safety and health Requirements Manual (NOTAL)

# CHAPTER 25

## POLYCHLORINATED BIPHENYLS (PCBs)

**2501. Policy**

a. Navy policy is to minimize the potential for polychlorinated biphenyl (PCB) exposure by substitution with non-PCB containing materials, using engineering and administrative controls and using appropriate personal protective equipment (PPE).

b. Occupational exposures to PCBs may arise from processes such as retrofilling PCB-containing electrical transformers, removing PCB-impregnated felts or gaskets or working with synthetic rubber, plasticizers or other materials that contain PCBs.

**2502. Discussion**

a. The Occupational Safety and Health Administration (OSHA) regulates workplace PCBs as air contaminants per reference 25-1. The Environmental Protection Agency (EPA) regulates environmental contamination involving PCBs under reference 25-2. The only human health hazard that has been definitively associated with prolonged exposure to liquid PCBs is a type of skin lesion characterized as chloracne. Eye irritation, chloracne and subclinical liver enzyme abnormalities have been recorded with high inhalation exposures. Note that no adverse human effects have ever been described for exposures to PCB surface contamination alone (references 25-3 and 25-4). For additional information regarding toxicological evaluation, guidance on occupational and environmental issues and other technical information, refer to reference 25-5.

b. The low vapor pressure associated with PCBs suggests that air concentrations on the order of 0.5 milligram per cubic meter ($mg/m^3$) of air are difficult to achieve under normal workplace conditions. High concentrations of liquid PCBs, optimal temperature and pressure conditions and/or subjection to mechanical dispersion processes would be required to achieve such airborne levels. Air sampling, which has been conducted at a variety of occupational worksites for industrial processes involving PCBs, confirms that airborne concentrations of PCBs are rarely detectable.

c. Under certain conditions such as industrial transformer fires, polychlorinated dibenzo-dioxins (PCDDs) and polychlorinated dibenzo-furans (PCDFs) can be generated from PCBs or PCB solvents (chlorophenols). It must be noted that the health effects of these toxic by-products do not apply to unpyrolized PCB compounds, as is sometimes falsely assumed.

d. The National Institute for Occupational Safety and Health (NIOSH) and the International Agency for Research on Cancer have concluded that there is sufficient toxicological evidence to characterize PCBs as "suspected carcinogens." Neither OSHA nor the American Conference of Governmental Industrial Hygienists (ACGIH) characterize PCBs as suspected human carcinogens.

**2503. Permissible Exposure Limits, Skin Designation**

a. Permissible Exposure Limits (PELs). PCB PELs relate to allowable airborne exposure concentrations for an 8-hour day in a 40-hour workweek. There are two PELs for PCBs depending on the approximate percentage by weight of chlorine in the compound:

(1) Chlorodiphenyl (42 percent chlorine) - 1.0 $mg/m^3$

(2) Chlorodiphenyl (54 percent chlorine) - 0.5 $mg/m^3$

b. Skin Designation. Skin designation denotes that PCBs can be absorbed through the skin. Activities shall prevent or reduce skin exposure to PCBs to the extent necessary through the use of substitution, engineering controls, work practices or PPE, such as gloves, coveralls, goggles or other appropriate PPE.

**2504. Control of PCB Exposure in the Workplace Environment**

a. General Workplace Control Practices. For situations not exceeding the PELs and not involving unprotected PCB skin contact, activities shall employ routine work and personal hygiene measures appropriate for any occupational setting.

(1) When working with PCB-impregnated materials, such as insulating felts, or with articles that contain liquid PCB solutions, personnel shall strictly observe good housekeeping procedures to avoid the possibility of secondary surface contamination.

(2) Employees involved in PCB- related work activities shall not eat, drink, smoke, chew tobacco or gum or apply cosmetics in the work area.

(3) Activities shall collect and dispose of PCB-containing waste, scrap and debris, and PCB-contaminated clothing (consigned for disposal) in sealed impermeable bags or other impermeable containers labeled per applicable Federal, State or local environmental regulations. For guidance consult reference 25-2.

(4) Personnel shall not perform hot work in the immediate area when work is performed with PCB material.

b. Personal Protective Equipment

(1) Personnel engaged in handling PCB-contaminated or PCB-impregnated material (such as "rip out" or "stripping" operations), during which skin contact with PCBs is considered probable, shall wear the following PPE:

(a) Full-body, one-piece disposable coveralls constructed of Tyvek® material or comparable substitute material

(b) Nitrile or Viton® gloves

(c) Nitrile or neoprene foot coverings if the work involves the probability of foot contamination by any means

(d) Face shields and vented goggles or other appropriate eye protective equipment wherever the possibility of eye contact exists.

(2) If work situations exist where it is likely that workers' clothing will become saturated with PCB-containing liquids, personnel shall use protective clothing materials having "greater than 24 hours" breakthrough times against PCBs, as listed in reference 25-6. The following PPE is recommended if saturation is anticipated:

(a) Saranex®-coated Tyvek® coveralls for whole body protection

(b) Viton® rubber for gloves and foot coverings

(c) Face shields and chemical goggles for eye protection.

c. Respiratory Protection

(1) Under most conditions, activity OSH offices shall use air-sampling data to determine the necessity for wearing respiratory protection. The cognizant industrial hygienist shall determine the need to perform air sampling for PCBs.

(2) If air sampling results indicate that the PELs for PCBs have been exceeded, personnel shall use a supplied air respirator that has a full facepiece and is operated in the pressure-demand or other positive-pressure mode.

(3) Use of respirators shall comply with the requirements of chapter 15.

(4) When selecting respiratory protection for PCB decontamination, the cognizant industrial hygienist should give consideration to the solvent being used, the potential airborne concentration of the solvent and the possible presence of chlorinated dioxins and furans.

## 2505. Medical Surveillance Program

Activities shall include personnel who meet the exposure criteria outlined in reference 25-7, and as determined by an industrial hygienist, in the appropriate medical surveillance program.

## 2506. Environmental Contamination

PCBs are recognized environmental contaminants. The threat they pose to the environment is largely due to their chemical stability, lipid solubility and resistance to biodegradation.

Reference 25-8 provides Navy requirements that address Federal environmental regulations. Also, see references 25-9 and 25-10 for guidance. Refer to reference 25-2 for spill cleanup requirements.

---

## Chapter 25

## References

25-1. Title 29 Code of Federal Regulations (CFR) 1910.1000 Subpart Z, Table Z-1-A, of 1 Jul 96, Limits for Air Contaminants (NOTAL)

25-2. Title 40 CFR 761 of 1 Jul 96, Polychlorinated Biphenyls (PCBs) Manufacturing, Processing, Distribution in Commerce, and Use Prohibitions (NOTAL)

25-3. DHHS, National Institute for Occupational Safety and Health (NIOSH) Publication No. 77-225 of Sep 77, "Criteria for a recommended standard, Occupational Exposure to Polychlorinated Biphenyls" (NOTAL)

25-4. U.S. Department of Health and Human Services, Agency for Toxic Substances and Disease Registry (ATSDR) Publication No. TP-92/16 of 1993, Toxicological Profile for Selected PCBs (Arochlor-1260, 1254, 1248, 1242, 1232, 1221, and 1016) (NOTAL)

25-5. NEHC Technical Manual, Industrial Hygiene Field Operations Manual, "Poly-chlorinated Biphenyls (PCBs), Polychlorinated Dibenzofurans (PCDFs), and Polychlorinated Dioxins (PCDDs), latest edition (NOTAL)

25-6. ACGIH (American Conference of Governmental Industrial Hygienists) 3rd Edition, Guidelines for Selection of Chemical Protective Clothing (NOTAL)

25-7. NEHC Technical Manual, Industrial Hygiene Field Operations Manual, "Medical Surveillance Procedures Manual and Medical Matrix," latest edition (NOTAL)

25-8. OPNAVINST 5090.1B of 1 Nov 94, Environmental and Natural Resources Program Manual, Chapter 11, "PCB Management Ashore" (NOTAL)

25-9. NAVSEA S9593-A1-MAN-010, Shipboard Management Guide to PCBs, latest edition (NOTAL)

25-10. Naval Energy and Environmental Support Activity (NEESA) 20.2-028C, PCB Program Management Guide, latest edition (NOTAL)

# CHAPTER 26

# MAN-MADE VITREOUS FIBERS

## 2601. Discussion

a. This chapter provides guidance for controlling and minimizing the exposure of Navy personnel to man-made vitreous fibers (MMVF) during use, removal and disposal of materials.

b. Man-made vitreous fibers, also referred to as man-made mineral fibers (MMMF) or synthetic vitreous fibers (SVF), are a group of fibrous inorganic materials, generally aluminum or calcium silicates, that are derived from rock, clay, slag and glass. The Navy uses MMVF for thermal and acoustical insulation and as reinforcement materials. The MMVF products have replaced asbestos as the primary source of insulation and lagging material.

c. There are three categories of MMVF:

(1) Glass fibers, including glass wool, filamentous glass and special application superfine glass

(2) Mineral wools, more correctly separated into rock wool and slag wool

(3) Refractory ceramic fibers (RCF).

For a complete discussion of MMVF, refer to reference 26-1.

d. In contrast to asbestos fibers, MMVF are amorphous; that is, they are glassy and lack a crystalline matrix. Consequently, the man-made fibers do not split longitudinally into thinner fibers, but break transversely into shorter fibers.

## 2602. Applicability

The provisions in this chapter apply to all facilities using man-made vitreous fiber products.

## 2603. Exposure Limits

a. The exposure limits for MMVFs are listed in appendix 26-A.

(1) These exposure limits are based on "pure" product exposures. If the manufacturer's material safety data sheet (MSDS) lists other regulated chemicals (i.e., in the lubricating oils or sizings), then activities must consider the applicable exposure limits for these chemicals.

(2) If the MSDS lists more stringent exposure values, consult the cognizant industrial hygienist or the Navy Environmental Health Center to assess the suggested exposure limit based on its scientific validity.

b. For a literature review of occupational exposures to MMVF, see reference 26-1.

**2604. Control of MMVF in the Workplace**

a. General Workplace Control Practices. When performing work on MMVF, activities shall:

(1) Use wet methods whenever possible.

(2) Provide containments during removal procedures, including glove bags where applicable, if necessary to keep exposures below the exposure limits.

(3) Minimize airborne dusts and fibers through strict adherence to good housekeeping procedures. At a minimum, activities shall vacuum work areas at the end of the work-shift using a high efficiency particulate air (HEPA) vacuum. Pick up any MMVF scraps that fall to the ground or floor as soon as possible to reduce possible airborne fiber generation as a result of material disturbance.

(4) Ensure personnel involved in MMVF operations do not eat, drink, smoke, chew tobacco or gum, or apply cosmetics in the work area.

b. Ventilation

(1) Certain operations may require the use of local exhaust ventilation (LEV) to ensure that airborne levels of MMVF do not exceed the exposure limits. All such ventilation shall be high efficiency particulate air HEPA-filtered. Activities shall design, construct, install and maintain LEV and dust collection systems per references 26-2, 26-3 and 26-4.

(2) Work centers using power tools for machining MMVF products (i.e., saws, drills and grinders) shall equip them with HEPA-filtered local exhaust to collect dust at the source.

c. Personal Protective Clothing and Related Facilities

(1) All personnel working with MMVF materials shall wear goggles or safety glasses with side shields and long sleeved clothing and should wear leather or other impenetrable gloves and disposable (i.e., Tyvek® or equivalent) coveralls. If personnel use non-disposable coveralls, they shall thoroughly clean them with a HEPA-filtered vacuum before leaving the work area. Activities shall launder them (separately from other clothing) before being worn again.

(2) In addition to the personal protective equipment (PPE) listed above, personnel experiencing skin irritation shall wash or shower to remove the irritant substances, and upon return to work shall ensure that their long sleeved clothing is closed at the neck and wrists. They should also wear a head covering.

(3) Personnel shall use respiratory protection when the exposure limit is or is reasonably expected to be exceeded. The minimum respiratory protection shall be half-mask with P100 filter. Activities shall ensure that respiratory protection complies with the requirements of chapter 15 of this instruction.

(4) Personnel handling MMVF materials shall wash thoroughly with soap and water before breaks and at the end of the work shift. Personnel should shower at the end of the work shift.

(5) Where the potential for exposure is effectively eliminated through the use of glove bags, the use of the PPE described above is not required.

**2605. Disposal Procedures**

Personnel shall adequately wet MMVF waste before placing it in heavy duty plastic bags or other suitable impermeable containers for disposal in an approved sanitary landfill.

**2606. Training**

a. Navy personnel who work with or handle MMVF, or who may be occupationally exposed to MMVF, shall receive the following training prior to initial assignment:

(1) The health effects/hazards of MMVF

(2) Uses of MMVF products that could result in exposure

(3) Engineering controls and work practices

(4) Purpose, proper use and limitations of personal protective equipment and the required protective equipment when working with MMVF.

b. Training records shall be per chapter 6.

**2607. Industrial Hygiene Surveillance**

a. The cognizant Bureau of Medicine and Surgery industrial hygienist shall establish exposure monitoring plans to characterize exposures for employees occupationally exposed to MMVF above the exposure limit. Within a class or category of similar operations, they shall sample at such frequency and pattern as to accurately and reproducibly represent airborne levels produced by a typical operation within the class or category.

b. If the initial sampling or the periodic monitoring results statistically indicate that personnel exposures are below the exposure limit, routine monitoring of personnel may be discontinued.

c. Whenever changes in production, engineering controls, or work practices occur that may effect personnel exposure, exposure monitoring shall be conducted to ensure that personnel exposures are below the exposure limit.

**2608. Man-made Vitreous Fiber Medical Surveillance Program**

Activities shall conduct medical surveillance, based on industrial hygiene assessment per reference 26-5.

Chapter 26

References

26-1. Navy Environmental Health Center Technical Manual 6290.91-1 Rev A of Oct 97, Man-made Vitreous Fibers (NOTAL)

26-2. American Conference of Governmental Industrial Hygienists Pub. No. 2092, Industrial Ventilation: A Manual of Recommended Practice, 23rd Edition (NOTAL)

26-3. American National Standards Institute (ANSI) Z9.2-2001, American National Standard for Fundamentals Governing the Design and Operation of Local Exhaust Ventilation Systems (NOTAL)

26-4. MIL-HDBK-1003/17C of 29 Feb 96, Industrial Ventilation Systems (NOTAL)

26-5. Navy Environmental Health Center Technical Manual, Medical Surveillance Procedures Manual and Medical Matrix, Latest Edition (NOTAL)

## Appendix 26-A

## Exposure limits for MMVFs

The exposure limits for MMVFs are derived in part from the ACGIH 1998 TLVs:

| | | |
|---|---|---|
| 1. Continuous filament glass fibers | 1 f/cc | (a) |
| 2. Continuous filament glass fibers | 5mg/m$^3$ | (b) |
| 3. Glass wool fibers | 1 f/cc | (a) |
| 4. Rock wool fibers | 1 f/cc | (a) |
| 5. Slag wool fibers | 1 f/cc | (a) |
| 6. Special purpose glass fibers | 1 f/cc | (a) |
| 7. Refractory ceramic fibers | 1 f/cc | (a) |
| 8. Refractory ceramic fibers (high temperature) | .05 mg/m$^3$ | (c) |

(a) Fibers longer than 5 μm; diameter less than 3 μm; aspect ratio greater than 5:1 as determined by the membrane filter method at 400-450X magnification (4-mm objective) phase contrast illumination.

(b) Inhalable fraction. The concentration of inhalable particulate for the application of this exposure limit is to be determined from the fraction passing a size-selector with the characteristics of SI (d)=50% x (1 + $e^{-0.06d}$) for 0< d $\leq$100μm where: SI (d) = the collection efficiency for particles with aerodynamic diameter d in μm.

(c) High temperature means- use temperature of > 850 °C. Operations involving the removal of "high temperature" refractory ceramic fiber (RCF) materials shall adhere to an exposure limit of 0.05 mg/m$^3$ respirable crystalline silica dust. The reason for this variation is that, at high temperatures, RCF will convert to cristobalite, a form of crystalline silica dust. The concentration of respirable particulate for the application of this exposure limit is to be determined from the fraction passing a size-selector with the characteristics of SR(d)= SI(d) [1-F(x)] with $\Gamma$=4.25 μm and $\Sigma$=1.5 and where F(x)= the cumulative probability function of a standardized normal variable,x. The variable x can be found by using the following formula:

$$x = \frac{\ln (d/\Gamma)}{\ln (\Sigma)}$$

# CHAPTER 27

## CONFINED SPACE ENTRY (CSE) PROGRAM (NON-MARITIME)

### 2701. Discussion

Confined spaces are enclosures that have limited means of entry and exit, and although they are large enough to get into, they are not designed for continuous employee occupancy. Examples include storage tanks, pits, vaults, vats, water towers, chemical reactors, process vessels, and manholes. Each year, over a million and a half workers enter confined spaces. Many are seriously injured or killed as a result of asphyxiation, electric shock, heat stress or engulfment by liquids or finely divided solids such as wood dust. Many incidents are exacerbated by ill-fated rescue attempts made by well meaning, but untrained, rescuers.

The Occupational Safety and Health Administration (OSHA) estimates that 85 percent of confined space-related incidents could have been prevented if proper precautions had been followed. Moreover, the overwhelming majority of all confined space fatalities could have been prevented if spaces had simply been tested for atmospheric hazards or ventilated prior to entry. For this reason, Navy policy is to consider all confined spaces to contain the most unfavorable and unsafe conditions. Entry into, or work in or on, such spaces is prohibited until qualified personnel have performed the tests, evaluations and prescribed procedures of this chapter to ensure that safe conditions exist and are maintained. Each installation shall develop a written, program that explains the processes, means and methods used for recognizing, evaluating and controlling potential confined space hazards, and for communicating information concerning those hazards to employees.

This instruction explains the minimum requirements for an acceptable written, site-specific confined space program. It incorporates the requirements of those standards, codes, rules and regulations outlined in Appendix B. In situations where a conflict exists, the most restrictive requirement prevails.

### 2702. Applicability

a. The provisions of this chapter apply to all Navy shore non-maritime commands.

b. Naval maritime facilities such as naval shipyards, Ship Repair Facilities (SRFs), Intermediate Maintenance Facilities (IMFs), Shore Intermediate Maintenance Activities (SIMAs), Trident Refit Facilities (TRFs), and other Navy commands whose primary mission is shipbuilding, ship repair, or ship breaking are governed by reference 27-1.

c. Navy shore non-maritime commands (e.g., PWC or FISC) performing facilities-related confined space work ashore within a facility identified in subparagraph 2702.b shall comply with this chapter, except that a certified NFPA Marine Chemist or Board certified Navy GFE shall be used as required by reference 27-1. For those situations where non-maritime commands perform confined space work at naval maritime facilities and occupy the same confined space with naval maritime facility employees, entry procedures shall be developed and managed by the cognizant Navy GFE.

d. Navy shore non-maritime commands performing ship repair operations shall comply with reference 27-1, except that the Confined Space Program Manager (CSPM) may provide man-

agement of the applicable reference 27-1 requirements, and perform or designate other personnel to perform duties limited to those of a Navy Competent Person (formerly known as Gas Free Technician). Personnel performing Navy Competent Person duties must have completed the training and OJT specified in reference 27-1, except that the amount of experience in a maritime facility and the amount of OJT may be limited to the appropriate types of confined space operations performed by the activity as determined by the CSPM. A certified NFPA Marine Chemist or Board Certified Navy GFE shall still be used as required by reference 27-1.

**2703. Program Management**

a. Regional commanders, commanding officers, or officers in charge are ultimately responsible for all safety and health issues at their installations. In cooperation with other members of their management team, they shall provide continuing support, both motivational and financial; to ensure that an installation's confined space entry program remains effective. They shall appoint, in writing, a qualified CSPM.

b. The CSPM, in cooperation with line managers, supervisors, and employees, shall manage all facets of the installations confined space entry program, and has full authority to make necessary decisions to ensure the program's continued success. The CSPM is the only person authorized to amend an installation's confined space program

c. The CSPM shall successfully complete course number A-493-0030, Confined Space Safety, (formally OSH 245E Gas Free Engineering for Non-Maritime Operations) conducted by the Naval Occupational Safety and Health and Environmental Training Center (NAVOSHENVTRACEN), or equivalent. The cognizant headquarters command OSH manager must approve equivalent training. The command OSH office shall keep verification of such training on file along with the written appointment to the position. In addition to formal classroom training, the command shall establish a proficiency program to ensure that CSPMs possess the understanding, knowledge, and skill necessary for the safe performance of their duties. This can be accomplished by having the program audited by a CSPM from another activity.

d. The CSPM shall use additional personnel to perform duties in support of the confined space program. The CSPM has the authority to designate other qualified persons to assist in the day-to-day management and implementation of the confined space program as follows:

(1) Assistant Confined Space Manager (ACSPM). The ACSPM may be authorized to perform duties equivalent to those of the CSPM and shall meet the same qualifying criteria. The CSPM must designate the ACSPM in writing.

(2) Qualified Person (QP). QP duties are limited to performing atmospheric testing in confined spaces and inspecting for physical hazards. If the space does not contain, or have the potential to contain, any atmospheric or serious physical hazard, the QP may reclassify the space as "non-permit required". If the space contains hazards that cannot be eliminated, its classification will remain "permit required" and the QP shall contact the CSPM or ACSPM to inspect and provide an entry permit. If authorized, the QP may also conduct follow-up inspections and atmospheric testing on permit required spaces after initial permits were issued by the CSPM/ASCPM. CSPM or ACSPM shall conduct/coordinate the formal classroom/ proficiency training for personnel assigned duties as a QP and appoint the QP in writing. Training shall include the proper use, maintenance, calibration, and operational check of equipment being used. In addition, training shall include requirements and provision of this chapter as it relates to the