# Exhibit B

To Plaintiffs' Reply to General Electric Company's Opposition to Plaintiffs' Motion to Remand
C.A. No. 08-043S

# REPORT OF BOARD OF INVESTIGATION ON THE POSSIBLE EXPOSURE TO ASBESTOS OF PERSONNEL AT THE KESSELRING SITE

PERIOD OF OCCURRENCE

JULY 1986 - SEPTEMBER 1986

Date of Report

19 November 1986

TABLE OF CONTENTS


I. INTRODUCTION

II. SCOPE OF INVESTIGATION

III. REGULATORY AUTHORITY

IV. SUMMARY

V. FACTS

A. Background

1. Kesselring Site
2. Organization
3. S3G Prototype
4. Responsibilities
5. Navy Crew Assignment to Asbestos Work
6. Kesselring Site Asbestos Analysis Capability

B. Training

C. Performance of Asbestos Work

D. Respiratory Protection Program

E. Monitoring

E. Audits/Inspections

G. Qualification/Training - Safety Office

H. Personnel Exposure

VI. ANALYSIS

VII. CONCLUSION

VII. JUDGEMENT OF NEEDS

## APPENDICES

1. Appointment of Board of Investigation
2. Personnel Interviewed
3. OPNAVINST 6260.1B, "Control of Asbestos Exposure to Naval Personnel and Environs"
4. Kesselring Site Safety Office Roster
5. S3G Selected Restricted Availability Management Structure
6. Asbestos Work Permit
7. Kesselring Site Safety and Health Instruction No. 7.0 - Removal, Handling, and Control of Asbestos Insulating Material
8. Kesselring Site Respiratory Permit

## I. INTRODUCTION

This is a report of the Board of Investigation appointed by the Manager, Schenectady Naval Reactors Office (SNR), U.S. Department of Energy (USDOE) to investigate and report on the possible exposure of personnel to asbestos during the period July - September 1986 at the Kesselring Site of the Knolls Atomic Power Laboratory (KAPL) at West Milton, New York.

## II. SCOPE OF INVESTIGATION

On 10 October 1986 an SNR Board of Investigation was appointed in accordance with DOE Order 5484.1. (Appendix 1 )

The Board was to determine if personnel at the Kesselring Site, particularly Navy personnel assigned to the S3G Prototype had been exposed to asbestos beyond the established Permissible Exposure Limits (PEL's)*

The Board was also to evaluate the control of asbestos work at the Site by KAPL, and if deemed necessary, to identify any corrective actions which need to be taken to ensure adequate protection for asbestos workers.

In conducting its investigation the Board interviewed responsible managers and personnel of the General Electric Company, U.S. Navy staff crew members of the S3G and D1G Prototypes, shipyard personnel responsible for work on the S3G prototype, cognizant Naval personnel, and a KAPL craft lagger. The Board inspected asbestos work areas inside the S3G Prototype; examined equipment used to monitor and control asbestos exposure during the conduct of work; and observed the available physical evidence (asbestos samples) that had been preserved. The Board reviewed all available records of the work: work permits, analytical data, personnel exposure data and environmental sampling data.

* Permissible Exposure Limits

1. "Time-Weighted Average (TWA)" - The 8-hour TWA airborne concentration of asbestos fibers to which personnel may be exposed shall not exceed two fibers per cubic centimeter of air (2 f/cc).

2. "Ceiling Limit" - Personnel shall not be exposed at any time to airborne concentrations of asbestos in excess of ten fibers per cubic centimeter of air (10 f/cc).

The list of individuals interviewed by the Board has been included in Appendix 2 to this report. The identity of persons associated with specific exposure data has been protected by the use of alphabetic designators in this report. Individuals are identified by A, B, C, etc. Specific personnel identification is available from the Chairman of the Board to persons authorized access to such data pursuant to the limitations of the Privacy Act.

## III. REGULATORY AUTHORITY

Under the provisions of DOE Order 5480.1A, the Deputy Assistant Secretary for Naval Reactors is responsible for establishing safety and health standards for the Kesselring Site. Under this authority, Naval Reactors issued letter R#43 dated June 16, 1983 which prescribed OPNAV Instruction 6260.1B as the applicable standard for asbestos work at the Kesselring Site (Appendix 3). The instruction also, by reference, required compliance with the American National Standards Institute (ANSI) Standard Z88.2.1980, Titled "American National Standard Practices for Respiratory Protection."

This investigation was conducted utilizing the above requirements as the basis for evaluating the control and performance of asbestos work at the Kesselring Site.

## IV. SUMMARY

From 8 July 1986 through 27 September 1986, U.S. Navy personnel assigned to the S3G and D1G Prototypes at the Kesselring Site performed asbestos removal work as directed by KAPL. The work was not performed in accordance with existing safety directives and requirements of the U.S. Department of Energy and Naval Reactors. This resulted in some U.S. Navy personnel possibly being exposed to asbestos in excess of Permissible Exposure Limits (PEL's).

In preparation for this work KAPL conducted a four hour training lecture to qualify Navy personnel (prototype crew members) to perform asbestos work. The training was inadequate. It did not provide adequate guidance to ensure that Navy personnel members could perform the work safely, nor properly monitor their own exposure to asbestos while performing the work. No engineered procedures were prepared by KAPL to limit release of and potential exposure to asbestos by the workers. During performance of the work, Navy personnel were on their own to obtain appropriate permits, mobilize equipment, select and obtain respirators, design and erect containments, perform the work, conduct monitoring of their person and the work environment, and package asbestos waste. The Navy personnel were also expected to complete their work within stringent schedule requirements. They received little technical guidance and no supervision.

Area and individual asbestos monitors were not analyzed during performance of the work. No confirmation on asbestos levels in the work area was available until up to two months after completion of the work. Analysis of personnel and environmental samples found that in several cases monitoring data was invalid. KAPL has not yet been able to establish the exposure to asbestos received by some individual crew members.

The fundamental causes of this occurrence are: Navy personnel were inadequately trained for asbestos work by KAPL; work procedures utilizing engineered work controls were not used; and KAPL did not control, nor supervise the asbestos work performed by these personnel.

The Board concludes that there is credible possibility that some personnel who worked on asbestos removal in S3G and D1G from July - September 1986 may have been exposed to asbestos in excess of the Permissible Exposure Limit. The Board is unable to determine the specific individual exposure from the information available.

## V. FACTS

### A. BACKGROUND

#### 1. Kesselring Site

The K. A. Kesselring Site in West Milton, New York is one of three geographic locations of the Knolls Atomic Power Laboratory (KAPL). KAPL is operated by the General Electric Company (GE), for the United States Department of Energy (USDOE) under Prime Contract DE-AC12-76SN00052. As the Prime Contractor, GE is responsible for all aspects of the operation of the Site.

General Electric (referred to hereafter as KAPL) is responsible for plant operations and management of prototype maintenance. U.S. Navy personnel are assigned to the Site to assist in operation and maintenance of the reactor plants and to train other Navy personnel to be reactor operators.

#### 2. Organization

Safety

Kesselring Site Safety activities are under the direction of the Subsection Manager, Safety, Environment/Special Projects. This Subsection includes the Site Safety Office which is staffed with a Manager, Safety and Health, two Safety Professionals, Safety Specialist, two Industrial Hygienists, and an Incident Prevention component which includes a Supervisor and fifteen Incident Prevention (IP) personnel (Appendix 4 ).

3. S3G Prototype

During the period under investigation (July - September 1986), the S3G Prototype had been shut down for a Selected Restricted Availability (SRA) to perform maintenance work. One of the work items included the removal of asbestos lagging in several areas of the engine room and the reactor compartment of the prototype in preparation for other work.

The Kesselring Site organization for S3G during the Selected Restricted Availability (SRA) is indicated in Appendix 5.

At the time of the investigation the SRA was still in progress but all asbestos work had been stopped at the direction of the KAPL General Manager. Some asbestos work remains to be completed in-hull.

4. Responsibilities

A. Safety and Asbestos Controls

The Manager Safety, Environment/Special Projects (SE/SP) is responsible for the Safety program at the Kesselring Site. He has assigned responsibility for the asbestos controls program, including training of asbestos workers, to the Lead Industrial Hygienist who is under the direction of the Manager, Safety and Health.

The KAPL Manager SE/SP was primarily responsible to assure that asbestos workers at Kesselring Site, including Navy personnel, were properly trained.

B. S3G Prototype

The Plant Manager is the KAPL manager who has overall responsiblity for safe and proper supervision, operation and maintenance of the prototype plant.

The Operations Manager is the KAPL manager responsible for safe and proper operation of the prototype. He reports to the Plant Manager and is responsible for the performance of the Shift Supervisors and their sections.

The Materials Manager is the KAPL manager responsible for the maintenance of the prototype's power plants systems and equipment, and the organization and training of personnel assigned under him for effective maintenance of the power plant. He provides assistance for the training of personnel in the Navy training program in maintenance practices and techniques. He and his staff are responsible for preparation of the prototype work packages including technical requirements for asbestos removal. He reports to the Plant Manager.

The Maintenance Officer is a staff commissioned Naval Officer responsible for maintenance of prototype systems and equipment operated by Navy personnel. The Maintenance Officer is responsible for planning and coordinating all preventive and corrective maintenance on equipment under his cognizance. He assists prototype management and section supervision on the scheduling and timely conduct of maintenance. He reports to the Materials Manager.

For prototype operations, S3G crew members are under the line management responsibility of the Shift Supervisor who reports to the Operations Manager. The Operations Manager acknowledged his responsibility for the crew and their training.

For the S3G/SRA asbestos work, however, crew members were performing maintenance on a prototype system. Because maintenance work is the responsibility of the Materials Manager, this asbestos work was the responsibility of the Materials Manager. The Materials Manager indicated to the Board that he was responsible for the maintenance work of the crew and if they had a problem it would be reported to him (Materials Manager). The Maintenance Officer, who reports to the Materials Officer, also acknowledged that he considered himself responsible for performance of the S3G asbestos work.

The Materials Manager had line management responsibility for performance of the maintenance asbestos work by S3G crew members.

5. Navy Crew Assignment to Asbestos Work

The majority of the asbestos work assigned to the S3G crew was in support of maintenance projects to be completed at a later time by the Navy Maintenance Training Group (MTG). MTG is an on-site organization staffed by U.S. Navy personnel. The group is responsible for maintenance/repair of in-hull prototype systems and equipment. The remaining asbestos work assigned to the crew was in support of a subcontractor doing instrumentation and control work.

It is not unusual for Navy crew members to be assigned to perform small scale asbestos removal tasks to support emergent work. Because of the S3G/SRA there was a larger than normal number of maintenance tasks. It is not customary to use Navy crew members to perform asbestos removal tasks to support a subcontractor.

KAPL decided to use S3G crew members for the asbestos work after contract negotiations with a subcontractor failed to reach agreement for asbestos removal work. The lagging removal, as estimated by KAPL (S3G Materials Manager), involved about 1500 manhours of work.

To support S3G asbestos work, KAPL arranged with Puget Sound Naval Shipyard (PSNS) for an experienced shipyard lagging supervisor to be made available for the period 28 July 1986 through 15 August 1986. KAPL considered it desirable to have a production "expert" on hand to oversee this operation, to make assessments of this lagging operation and to ensure newly exposed lagging ends were properly capped.

Navy personnel were undergoing a heavy workload of operations and training during the time in which the asbestos work took place.

6. <u>Asbestos Analysis Capability</u>

Kesselring Site has an asbestos counting laboratory on site which is staffed by personnel who have been trained and certified by NIOSH as proficient in asbestos counting. This laboratory is used primarily for analysis of asbestos samples to determine if an area, in which asbestos work has been completed, is acceptable for normal use (Clearance Samples).

KAPL chose to have personnel and environmental samples, obtained during the course of asbestos work, analyzed under subcontract by Galson Technical Services of Syracuse, New York. Galson is certified by NIOSH to perform asbestos counting and analysis.

B. <u>TRAINING</u>

The training for the S3G crew members selected to be asbestos workers consisted of a four-hour classroom lecture given by the Kesselring Site Lead Industrial Hygienist. Classes were given about two months (April - May 1986) prior to the Navy personnel being assigned to asbestos work. The primary emphasis in the training was on the health effects of asbestos, the Permissible Exposure Limits to asbestos, and methods for the sampling for the presence of asbestos. The Board found serious deficiencies in the KAPL training of crew members.

1. The majority of the selected Navy personnel did not have any prior training or experience in removal of asbestos. The Kesselring Site training did not teach or show workers techniques for removing asbestos. The Industrial Hygienist stated to the Board that he considered practical training to be "not of much use - they can pick it up on the job."

2. Both the Navy asbestos workers who were trained and the Kesselring Site Lead Industrial Hygienist stated that the Kesselring Site training was intended to qualify the workers for small asbestos removal tasks or response to asbestos casualties. The Kesselring Site Manager, Safety and Health stated that the Industrial Hygienist had informed him that the Navy asbestos workers were only trained to do small asbestos jobs, not the type of work being done on S3G. The actual operations completed included several such small tasks but also some major lagging

removal tasks (i.e., removal of more than 20 lineal feet of lagging from large diameter pipe). The S3G Materials Officer stated that he considered the asbestos work to be a major "ripout" effort.

3. The training session was conducted 2-3 months before the Navy asbestos workers were assigned to remove asbestos. Several of the workers stated that due to the passage of time they remembered very little of the training they had received.

4. The Industrial Hygienist stated that he relied on prior Radiological Controls training of the crew members to qualify them in practical aspects of cleaning/removal of protective clothing, erection of containments, and monitoring. Several of the Navy asbestos workers were assigned to collect core samples of installed lagging for determination of asbestos content by a KAPL laboratory. The Kesselring Site training did not teach the Navy personnel how to perform this work task.

5. The Asbestos Work Permits (Appendix 6), KAPL forms requiring completion and approval for each asbestos job, required the workers to erect containments or tents during their asbestos removal activities. The Kesselring Site training did not teach the Navy personnel how to erect containments or tents.

6. The Asbestos Work Permits required the Navy asbestos workers to wear and remove respirators and protective clothing. The Kesselring Site training did not teach the workers how to wear and remove respirators and protective clothing.

7. The Kesselring Site asbestos control instruction (Appendix 7) requires that asbestos workers be qualified by completing "an asbestos ripout operation under instruction". The training records for the S3G asbestos workers were annotated to show that this requirement was met for most workers by viewing a "videotape". This training record entry could not be verified by the Board.

   Only one of the Navy Asbestos workers interviewed remembered viewing a videotape and he could not positively state whether or not it was during the asbestos training or a different training session on the Hazard Communication Standard.

8. The Kesselring Site asbestos control instruction requires that asbestos workers pass a written examination. Several of the Navy asbestos workers interviewed stated that the test they were given was very simple. One worker stated that the test was "a joke" because workers were permitted to refer to their notes while taking the test.

9. The Kesselring Site asbestos control instruction requires that asbestos monitors receive instructions and demonstrate the ability to obtain personnel and environmental air samples.

Several of the Navy asbestos workers interviewed indicated that they had received instructions on use of asbestos samplers. None of the Navy asbestos workers stated that they had demonstrated the ability to use the samplers as required by the Kesselring Site asbestos control instruction.

10. The Kesselring Site asbestos control training program did not receive technical or administrative overview.

The performance of the Kesselring Site asbestos control program was not overchecked by Kesselring Site safety management or S3G management. The training was performed by the Kesselring Site Lead Industrial Hygienist at his own technical direction.

11. The lesson plan for the training program consisted of several handwritten 5x7 cards and a few overhead transparencies. The Kesselring Site Manager, Safety and Health stated that the lesson plan was a long-established plan which had been reviewed in the past by Kesselring Site safety management. However, the Kesselring Site Lead Industrial Hygienist stated that the lesson plan was a "generic" plan which was used as a guide and which was varied by the instructor based on the instructor's judgment of the needs of the students.

The specific content of the training program given to the S3G asbestos workers could not be clearly established.

12. The training program was geared to minor asbestos jobs. It was not upgraded to cover the type and complexity of work performed by the S3G crew. The Industrial Hygienist did not have detailed knowledge of the specific work to be done.

13. The training records for the S3G asbestos workers were deficient. The following are examples of deficiencies in the records:

a. Nearly all of the medical qualifications for the S3G Navy asbestos workers were signed by the Kesselring Site Lead Industrial Hygienist rather than the KAPL Physician/Navy Dispensary as required by the record form. In most cases the Kesselring Site Lead Industrial Hygienist's signature indicated that a telephone authorization had been received from appropriate medical personnel. However, in the records of four of the Navy asbestos workers, no notation of a telephone authorization was included.

b. The records of one of the S3G Navy asbestos workers indicated that the worker was not authorized to use asbestos sampling equipment and that his qualification to perform asbestos work had lapsed due to his failure to requalify since 1985. When the worker was interviewed, he stated that he had been retrained by the Industrial Hygienist in 1986.

14. The Kesselring Site Instructions for asbestos work does not require any training of asbestos worker supervisors. Such training is specifically required by the controlling standard for all KSO asbestos work, OPNAVINST 6260.1B. The Board determined that no S3G supervisors (GE or Navy) have received any training in asbestos controls.

15. On 5 August 1986 S3G Senior Chief Petty Officer submitted a Deficiency Report which stated "Asbestos school does not adequately fulfill the needs of the Navy. It stresses safety only and does not teach the mechanics of drawing air samples, performing air samples, or erecting tents/containments. This will undoubtedly cause injury or at minimum an incident in future."

    The Deficiency Report was routed through the S3G Operations Manager and Materials Officer to the KSO Industrial Hygienist.

    No action has ever been taken on the Deficiency Report.

C. <u>PERFORMANCE OF ASBESTOS WORK</u>

In accordance with a Naval Reactors directive, asbestos work at the prototype sites is to be conducted in accordance with OPNAVINST 6260.1B. This instruction establishes the permissible exposure levels (PEL's) to asbestos fibres and the basic work controls to be followed to meet these limits. The instruction also requires compliance with ANSI standard Z88.2-1980, American National Standard Practices for Respiratory Protection for the use of respirators when they are required for protection against asbestos exposures.

The Kesselring Site Safety Instruction contains a chapter 7.0 on asbestos controls which establishes training and work control requirements for such work at the site. The instruction does not address engineered work controls as a method for reducing asbestos exposures.

1. <u>Work Controls</u>

    a. Half-face respirators were specified and provided by KAPL for use by Navy personnel for the S3G asbestos work. OPNAVINST 6260.1B requires the use of Type "C" continuous-flow or pressure cleaned air respirators during asbestos removal unless previous data from similar jobs indicates that their use is not required.

Type "C" continuous-flow or pressure demand supplied air respirators were not used during the asbestos removal even though previous data for similar jobs in S3G was not available. The asbestos material in S3G contains a significant amount of AMOSITE, a form resistant to water absorption. This resistance increases the amount of asbestos dust generated during a removal as compared to other types of asbestos encountered at Kesselring Site. KAPL had no data available from prior S3G asbestos jobs which would have indicated the type and degree of asbestos control problems associated with AMOSITE.

b. No engineered ventilation was utilized to reduce airborne asbestos levels at any of the job sites.

c. The vacuum cleaners used to reduce the levels of asbestos dust were reported to be frequently ineffective by the S3G crew members interviewed by the Board. Their use and proper maintenance to prevent performance degradation is required by OPNAVINST 6260.1B.

d. Personnel were inconsistent in the manner in which they wore masks and Tyvek coveralls. Some individuals wore two sets of coveralls vice one; and some individuals wore their masks over the attached coverall hood while others wore the masks under the hood.

e. Sample cassettes were handled with asbestos contaminated gloves, potentially causing pieces of asbestos and fibres to fall on the filter paper.

f. No S3G Supervisor or other management personnel ever inspected S3G asbestos work in progress. No asbestos worker interviewed recalled observing the Lead Industrial Hygienist inspecting asbestos work in progress inside the S3G hull. The Industrial Hygienist did observe the cleaning of asbestos vacuum cleaners.

g. An Asbestos Work Permit is a work control document which contains specific work controls and protective equipment requirements required for each job involving asbestos. Several of the asbestos work permits were initialed by, signed for as area tenant, and signed for approval of the containment installation by the same individual. In many cases, the same individual also did the asbestos work.

h. The individual asbestos work packages (one for each job) contained a standard/generic Prototype Work Permit which consists of 2 1/2 pages of general requirements. However, the type of containment to use and the tools and methods of asbestos removal are left to the discretion of the asbestos worker.

The permit contained a caution that wetting of lagging on stainless steel piping was not allowed, but did not address alternatives for keeping the dust levels at a minimum.

i. Preshift or pre-job briefings were not conducted.

j. One containment was a small tent (3ft x 3ft x 3ft) which was entered through a slit in the bottom. There were no provisions to insure an adequate level of oxygen was maintained in the enclosure during the work.

k. Some of the asbestos jobs were not performed inside containments. Instead plastic sheets were used as drop cloths, in lieu of containments, to prevent asbestos from falling into bilges. These provided no personnel protection or isolation of the asbestos.

l. Personnel were assigned to empty and clean asbestos vacuum cleaners (a job likely to raise particularly high levels of asbestos dust) in an off-hull facility. No specific instructions or guidance were given on how to perform this work. Visible asbestos dust clouds were reported to have occurred as workers tried to wet the asbestos and make asbestos "mud" for disposal.

m. A specific designated color is not used for identification of asbestos tools or waste containers as required by OPNAVINST 6260.1B.

n. No apparent attempt was made to estimate the total amount of asbestos to be removed so that a report could be made to the U.S. Environmental Protection Agency (EPA) if required in accordance with 40 CFR 61.

o. The Puget Sound Naval Shipyard (PSNS) "lagging expert" was assigned to S3G for about 2 1/2 weeks at the beginning of the S3G asbestos removal work. About half of the S3G asbestos workers did not know him or had never heard about him. Some were aware of his presence but did not understand his role. Others crew members (day shift) reported he was very helpful during their work.

p. The Lead Industrial Hygienist stated that he authorized the PSNS representative to be an Asbestos Monitor so that he could approve Asbestos Work Permits. When contacted by the Board, the PSNS representative reported that he did not attend a KAPL training course for S3G asbestos work or controls. (The PSNS representative stated that he had attended an earlier training course at the Kesselring Site related to D1G work.)

q. The asbestos removal were not performed, to the maximum extent feasible, on second or third shifts or on weekends and holidays as required by OPNAVINST 6260.1B.

r. The Lead Industrial Hygienist stated that he believed KAPL was living to the intent of OPNAVINST 6260.1B, but not the absolute requirements.

s. The Lead Industrial Hygienist stated that the Site's asbestos instruction has been intentionally written to not contain many details. It was his expectation that workers who needed guidance would ask for advice or assistance and that the instruction would help the workers obtain proper assistance.

D. RESPIRATORY PROTECTION PROGRAM

OPNAVINST 6260.1B states that a respirator program shall be established as described in the ANSI publication American National Standard. Practices for Respiratory Protection, ANSI Z88.2-1980.

1. A respiratory protection program meeting the requirements of ANSI Z88.2-1980 was not established as required by OPNAVINST 6260.1B.

2. S3G crew members were not trained by KAPL in the use of the half-face respirators that were used on the job sites.

3. Crew members were not trained to recognize and select the proper choice of cartridges to be used with the respirators.

4. Some individuals cleaned their own masks using improper cleaning methods, e.g., damp cloth, dry cloth and a commercial disinfectant.

5. Some crew members stated that they did, or could have worn another individual's mask without the mask being cleaned or disinfected.

6. Respirators and cartridges were not returned to Incident Prevention after use as required by the Site's respiratory protection standard.

7. Personnel obtained their half-face respirator from an "asbestos locker" in the S3G Prototype building. The Site respiratory protection instruction requires all respirators be issued by Incident Prevention or the warehouse.

8. The Respirator Permits (Appendix 8) are required, by the Site respiratory protection instruction, to stipulate the filter cartridge replacement frequency. This was not done for the respirator permits associated with the S3G asbestos work.

Several individuals stated that their respirators smelled like ammonia after sweating heavily. The Site instruction requires immediate exit and changeout of the filter cartridge whenever an abnormal odor is detected.

9. Asbestos Work Permits issued by Incident Prevention were inconsistent in the method of designating the filter cartridge to be used with air purifying half-face respirators. The permits associated with the S3G asbestos work contained one of three designations:

1. Organic vapor Stock #16-540-140
or 2. Organic vapor
or 3. 16-540-140

This inconsistency could have caused the use of a cartridge (organic vapor) which provides no protection against asbestos fibers.

a. Two workers stated that they believed "organic, vapor" cartridges were the proper type to use for asbestos removal.

b. One worker stated that he used an organic vapor cartridge on a job because the asbestos cartridges were unavailable.

c. Some crew members did not recall what type of cartridges they used. S3G crew members obtained filter cartridges from an "asbestos locker" in the S3G prototype building or the warehouse. This asbestos locker is an unattended, uncontrolled personnel clothing locker which when inspected by the Board was found to be in disarray with loose and unprotected cartridges and half-face respirators.

d. On one occasion a Navy asbestos worker entered the warehouse during non-working hours and withdrew cartridges himself.

E. <u>ASBESTOS MONITORING</u>

1. Asbestos exposure monitoring at Kesselring Site was accomplished in three phases as required by OPNAVINST 6260.1B. The three phases consist of environmental, personnel, and clearance sampling. All monitoring was accomplished using either a 37 mm diameter or 25 mm diameter filter cassettes. However, samples obtained were not read in a timely manner, so were of no use.

a. An environmental sample is to be obtained in the general work area and is intended to characterize the airborne asbestos levels generated by the work. An Environmental sample was collected for each job. The environmental sampler was run whenever a worker was working in the asbestos work area.

b. A Personnel sample was collected in the breathing zone of the primary asbestos worker, who actually performed the work, for the entire duration of each job. Exposure data recorded for the primary worker has historically been also recorded for the helper or "asbestos monitor" also assigned to the job. This practice results in conservative (higher than actual) exposure data being assigned to the helper.

c. A Clearance sample was collected and counted by the Kesselring Site Chemistry Laboratory for each asbestos work site after work was completed to verify an airborne concentration of less than 0.1 fibers/cc prior to removal of the work area boundary and thus allow personnel access to the area without protective equipment.

2. Environment and Personnel samples from completed jobs were sent to an outside laboratory (Galson Technical Services, Inc.) for counting.

3. Both the Site Chemistry Laboratory and Galson Technical Services, Inc (Galson) participate in the Proficiency Analytical Testing (PAT) program administered by the NIOSH.

4. Personnel and Environmental monitoring samples were collected and accumulated from July to September for batch shipping to an analytical laboratory, Galson Technical Serivces, for asbestos determination. This practice caused a delay in identification of the potential asbestos exposure problem. Up to two months could have elapsed between the time a job was performed and the time asbestos exposure data was available to the Kesselring Site Industrial Hygienist for analysis (Table 1).

Table 1

ASBESTOS WORK STATISTICS
(S3G-D1G-AO)*

| Dates | No. of Jobs | No. of** Samples | Samples Mailed | Oral Results | Written Results | Results |
|---|---|---|---|---|---|---|
| 7/30-9/2 | 21 | 49 | 9/9 | 10/1 | 10/7 | Problems |
| 9/7-9/15 | 3 | 6 | 9/22 | 10/1 | 10/7 | Problems |
| 9/24-9/29 | 2 | 7 | 10/1 | 10/9 | 10/13 | Problems |

**Personnel and Environmental

The Lead Industrial Hygienist stated he believed there was little urgency associated with the process except at the end of a calendar quarter when all the data must be up to date for exposure reporting. The Industrial Hygienist felt this accumulation practice was acceptable because of a history of low exposures associated with asbestos work at Kesselring Site.

Concerning the use of an outside laboratory versus the Kesselring Site Laboratory for personnel and environmental counting, the Lead Industrial Hygienist stated it is desirable to have an outside laboratory do this work even if it takes longer, to reduce KAPL's liability associated with the accuracy of the exposure data for entry on worker's medical records. This clearly represents the wrong focus regarding the primary use of monitoring.

5. Asbestos fiber counts could not be provided by Galson for several personnel and environmental samples.

* S3G - S3G Prototype
D1G - D1G Prototype
AO - Auxiliary Operations

Seventeen sample cassettes were reported by Galson to be unreadable (Table 2).

Table 2

SUMMARY OF JOBS INVOLVING UNREADABLE MONITORS

| | No. of Jobs | No. of Jobs with Unreadable Monitors | No. of Unreadable Monitors Personnel | Envr | No. of Personnel Involved in Jobs |
|---|---|---|---|---|---|
| S3G | 24 | 10 | 9 | 6 | 16 |
| D1G | 1 | 1 | 1 | - | 1 |
| AO | 1 | 1 | - | 1 | 2 |
| Total | 26 | 12 | 10 | 7 | 19 |

6. Terminology such as "Bulk" and "Void" were used by Galson to characterize sample results. Subsequent discussions between the Lead Industrial Hygienist and Galson have attempted to define and mutually understand terms used in the Galson reports. To date these definitions have not been clarified. Galson has agreed to send KAPL a letter which will clarify their terminology in describing unreadable samples. To date this letter has not been received by KAPL. However it is clear that an accurate count of Bulk or Void samples cannot be made. No action has been taken to have the samples returned from Galson and count them at KAPL or some other laboratory.

Work requirements and practices by asbestos workers resulted in invalid monitoring data. Asbestos monitoring samplers are susceptible to becoming contaminated with dust and debris if worn or handled improperly. Measurement of actual airborne concentrations of asbestos fibers is not then possible.

Several jobs were reviewed by the Board in which worker body position associated with job access could have resulted in contaminated samples. For example, working prone and crawling to gain access could have resulted in contaminated or overexposed samples. In such cases the sampler (which operates like a mini-vacuum cleaner) is likely to catch falling material or pick up material off horizontal surfaces which is of a type and size not likely to be airborne.

7. The workplace monitoring plan was inadequate to ensure the airborne asbestos levels are below the Short Term Exposure Limit of 10 fibers/cc.

   Both the personnel and environmental samples were taken for the entire time an individual was engaged in asbestos work during a given 8 hour shift. In some cases, the environmental sample duration was extended to cover several shifts involving several asbestos workers on a particular job.

8. The nature of asbestos work performed was likely to produce short term "spikes" in airborne asbestos levels. Examples include short term running of a cast cutter on inadequately wetted lagging materials or puffs of dust involved in emptying asbestos vacuum cleaners. No short duration samples were taken on such spike producing operations to adequately characterize them.

9. The Kesselring Site Chemistry Laboratory counted clearance samples taken on completion of work to verify that cleanup operations were effective and that the area is safe for personnel to enter without protective equipment. Observation of several samples by the Board revealed various degrees of contamination of the samples by materials visibly of a non-fibrous nature. Such contamination impares the technicians ability to count the sample since it may obscure visibility of the fibers. KAPL technicians interviewed indicated that some contaminated samples are very difficult to count but they do the best they can.

10. Placement of the environmental monitors was inconsistent. Interviews with crew members disclosed that some monitors were placed inside containment tents near the work areas, some were placed at the exit from the containment tent and some were placed between the containment tent and the work boundary.

11. On 7 May 1986 Naval Reactors approved the purchase of a real-time fibrous aerial monitor. This device is to be used at Kesselring Site during maintenance periods to monitor the in-hull environment for the presence of asbestos on a continuous real-time basis so that airborne asbestos conditions can be promptly corrected if necessary.

    KAPL received this equipment on 4 November 1986. It is not yet in use.

F. AUDITS/INSPECTIONS

1. NR letter F-6#80-11 dated September 8, 1980 requires an annual review of compliance with the asbestos safety requirements of OPNAVINST 6260.1B at the Kesselring Site.

The Kesselring Site has performed the annual compliance audit of the site asbestos safety control program as required by the Naval Reactors directive. The most recent KAPL review dated 3 December 1985 reports that "the Kesselring Site asbestos program is satisfactory. However, the administrative records contain some errors, omissions and inconsistencies which threaten program credibility". The KAPL audit also highlights that "the lack of an audit plan is a repeat finding". The annual audit did not review the KAPL training program, prototype asbestos work procedures or supervision of asbestos work. It was primarily involved with a field audit of site facilities, warehouse accountability of asbestos items, equipment procurement and work practices at two lagging removal jobs unrelated to this S3G work.

2. Kesselring Site Safety and Health instruction No. 7.0 "Removal, Handling and Control of Asbestos Insulating Material" establishes the requirements, assigns responsibility and describes an audit plan for asbestos work related activities at the Kesselring Site.

   This instruction states that as a minimum requirement the Kesselring Site Industrial Hygienist will conduct an audit of the following items:

   a. Perform an annual review of Safety & Health Instruction No. 7.0 (currently Revision 5, 4/86).

   b. Perform a quarterly audit of issued Asbestos Work Permits, Asbestos Data and Analysis Sheets, Worker Qualification lists, and Laboratory Analysis reports.

   c. Conduct an annual field audit to include as a minimum requirement the following items:

      1. Inspect for the integrity of asbestos-containing lagging and component systems; make recommendations to responsible subsection(s) and track open items.

      2. With Auxiliary Operations, evaluate emergent work items to expedite removal of asbestos-containing material at the Kesselring Site.

      3. Ensure that on-site temporarily stored asbestos waste is properly secured and labeled in accordance with KAPL-A-EP-1, Procedure A.12, Chemical Waste Disposal.

      4. Inventory Warehouse supplies of materials used for asbestos work and ensure that stocked asbestos-containing items are stored and distributed as controlled material.

5. Evaluate asbestos work practices performed by Qualified Asbestos Workers.

KAPL has not performed a quarterly audit of issued asbestos work permits, asbestos data and analysis sheets, worker qualification lists and laboratory analysis reports or actual observation of work practices. The Board was informed by the Subsection Manager - Safety, Environment/Special Projects that the Lead Industrial Hygienist reviewed these documents continuously as work was performed and data was developed. The quarterly audit requirement was considered by the Subsection Manager to be satisfied by the daily work of the Industrial Hygienist. No formal reports were issued and there was no independent assessment of the Industrial Hygienists work.

There is no documented annual field audit as required in Site Instruction No. 7.0.

3. The audit plan does not provide guidance nor requirements to be examined during an asbestos audit.

4. There were no KAPL audits or inspections of the S3G asbestos work by Kesselring Site safety managment supervisor or by S3G Plant supervision.

The Board was informed by several crew members that a Puget Sound Naval Shipyard (PSNS) lagging supervisor on occasion checked the adequacy of containment and on occasion provided general guidance for lagging removal. However, this guidance appears to have been available only during day shift work. Most Navy asbestos workers did not know about the PSNS lagging supervisor.

5. American National Standard Z88.2-1980 "Practices for Respiratory Protection" states that an evaluation of respirator program effectiveness shall be performed at least annually and corrective action should be taken to correct defects in the program. The basic elements of this evaluation are: wearer acceptance, inspection of respirator program operation, and appraisal of protection afforded. The findings of the respirator program evaluation shall be documented and this documentation shall list plans to correct faults and target dates for implementation of the plans.

KAPL has not performed an evaluation of the respirator program as required by ANSI Z88.2-1980.

G. QUALIFICATIONS AND TRAINING - KAPL

1. Manager, Safety, Environment/Special Projects - appointed to present position in January 1985. No prior safety experience. No asbestos training.

2. Manager, Safety and Health - appointed to present position 6/85; formerly assigned as Plant Manager, MARF. No asbestos training.

3. Lead Industrial Hygienist - MS Biology - assigned as Site IH 9/84. Attended NIOSH Asbestos Counting Course - Temple University 12/85. No other outside training in asbestos controls. Not certified as an Industrial Hygienist.

   The Kesselring Site Lead Industrial Hygienist is assigned "the principal representative for asbestos-related work activities at the Kesselring Site". He was appointed as Site Industrial Hygienist about two years ago and had been responsible for oversight of asbestos activities most of that time. However, the Lead Industrial Hygienist had no experience and has not received training which would qualify him to train workers in asbestos removal techniques.

4. Industrial Hygienist - former Medical Technologist, US Army; worked for General Electric since about 1971 primarily in chemical hazards. At Kesselring Site since 11/85. Primary duties related to HazCom. No asbestos training.

5. Incident Prevention Captains - are required to maintain proficiency as asbestos monitors. They issue asbestos samplers and complete the Respiratory Permit associated with the Asbestos Work Permit. They also maintain the log of all permits issued.

   The Incident Prevention Supervisor stated that Incident Prevention Captains were not receiving the semiannual asbestos control training required for an asbestos monitor by the Kesselring Site asbestos control requirements. The IP Supervisor stated that he realized his personnel were not knowledgeable enough to complete asbestos work permits. Therefore,the IP Supervisor had required that the Industrial Hygienist complete Section II Controls Section of the asbestos permits prior to his personnel issuing them.

6. S3G Plant Management and Supervision - None received asbestos training. None were qualified asbestos workers. None were authorized to enter asbestos work areas to observe and supervise operations.

H. Personnel Exposure

KAPL review of asbestos monitoring data and working conditions to establish actual personnel exposure has been underway since 1 October 1986. As of 12 November this review has not been concluded.

## VI. ANALYSIS

### A. Training

The asbestos controls training given to Navy asbestos workers was of poor quality and inadequate scope. The training did not prepare the Navy asbestos workers to select and wear respirators even though the asbestos work permits required the wearing of respirators. Navy asbestos workers were not prepared to don and remove protective clothing even though the asbestos work permits required crew members to wear protective clothing. The training did not include the practical skills which were required by the asbestos work permits and by the Kesselring Site qualification standard (i.e., perform actual asbestos work and demonstrate how to take asbestos samples). These weaknesses resulted in Navy asbestos workers not being adequately trained to perform their assigned duties safely.

In addition to the content of the training program, the asbestos control training given to the crew members was not commensurate with their training needs. The crew members had no experience in asbestos removal. Their training, which consisted of only four hours of classroom instruction, was given two months before work was started and was largely forgotten by the time the work took place. The instruction was intended to prepare the Navy asbestos workers for small work tasks. However, several Navy asbestos workers were assigned to perform major asbestos work tasks. A significant training deficiency, and one that eventually resulted in invalid monitoring data, was that the training did not recognize nor provide for the unique features and complexity of the S3G asbestos removal tasks that were encountered by the Navy asbestos workers (i.e., crowded and uncomfortable working conditions and physical interferences from pipes and equipment).

The Board also found that no personnel, other than the crew members performing the work, were trained in asbestos control. This resulted in a situation whereby no supervisor was authorized to enter asbestos work areas to supervise the crew members and oversee asbestos control practices and monitoring.

The Board notes that Kesselring Site asbestos control requirements do not require that supervisors be qualified asbestos workers. In fact, this safety procedure indicates that management's primary responsibility was to ensure that an adequate number of qualified personnel are available to perform the work.

### B. Performance of Asbestos Work

In assessing the performance of asbestos work, it is essential to recognize the principle - Engineering control measures shall be employed to control and contain airborne asbestos fibers to the lowest feasible level. Compliance with PEL's shall not be achieved by the use of respirators except under three specific

conditions (OPNAVINST 6260.1B). There is no credible evidence of any serious attempt by KAPL to apply this principle.

The S3G asbestos removal was conducted using individual job work packages prepared by S3G Navy personnel. Each work package consisted of a generic work permit that did not contain any details about the type of containments, engineering controls to be used or methods of asbestos removal to be employed. No work package contained job specific information. In many instances, asbestos and respirator permits were obtained, containment designed, erected, and certified, and work performed by the same individual.

This completely negates the purpose of the Permit which is to require independent, knowledgeable review prior to start of asbestos work. Asbestos worker protection consisted of one or two pair of Tyvek coveralls and a half-face respirator. The respiratory protection was depended upon to minimize worker asbestos exposure.

The containments used for the asbestos work consisted of drapes below the work area or facilon tents. The containments were installed to limit the spread of asbestos, not for worker protection. Engineering controls to keep asbestos dust levels at a minimum were not specified.

The available standard for asbestos control at Kesselring Site, OPNAVINST 6260.1B was not followed. There was no Navy or KAPL supervision of the work. In fact, there was no Navy or KAPL supervisors trained or qualified to overcheck asbestos work.

C. <u>Respiratory Protection Program</u>

None of the asbestos workers had received any practical training in the selection of cartridges and use of the type of respirators that were specified for the S3G asbestos work. Some crew members entered the warehouse and obtained filter cartridges without any supervision - in violation of the specified respiratory protection standard.

Used respirators were handled improperly. Some individuals used respirators previously used by others without having them cleaned and disinfected. There was no established policy or instructions on when respirator cartridges should be discarded or where used respirators were to be placed.

The half-face respirator was designated for use on all S3G asbestos jobs by the KAPL Lead Industrial Hygienist. This decision was based on previous asbestos sample data from similar jobs at the Site, however, there was no asbestos sample data available from the S3G plant. In the absence of sample data, Type C full flow air supplied respirators should have been specified for use, as required by OPNAVINST 6260.1B. These provide a greater protection factor than the half-face respirators.

Based on the inconsistent designation of cartridge type on the respirator permits, statements from some interviewees, and lack of respiratory training, it is possible that some crew members used respirator cartridges that were unsatisfactory for use in asbestos dust atmospheres.

D. Asbestos Monitoring

The monitoring of airborne asbestos exposure to workers should have provided timely feedback to the Site Safety organization and management on the adequacy of work practices and exposure controls. The fact that the Lead Industrial Hygienist considered a two month accumulation period was satisfactory was an unacceptable lack of perspective for the person entrusted with responsibility for the health and safety of workers on the Site. Had samples been counted on-site with results available in one day, the asbestos exposure problems could have been recognized sooner (within 2 days), management attention could have been directed to corrective action and the exposure of individuals would have been greatly reduced.

The sensitivity of the monitoring cassettes to contamination by non-airborne materials was not adequately considered in job planning. Engineered controls, ventilation or glovebag type containments were not required which could have precluded overwhelming of the asbestos monitoring equipment. This deficiency was compounded by the lack of training of crew members in the proper handling and wearing of the sampling equipment. Establishment of downhanded or arms length work vice overhead, would have further reduced the potential for contaminating samples.

The fact that in-hull asbestos work required contorted worker body positions to gain access to restricted work areas should have been recognized in job planning and required a case-basis review and determination of proper monitoring procedures and techniques to insure that viable samples were obtained. This was not done.

The lack of valid monitoring data for those individuals associated with the unreadable samples reinforces the possibility that the Navy asbestos workers may have been exposed to airborne asbestos fiber concentrations above the Permissible Exposure Limits.

E. Audits/Inspections

Evaluation of the Kesselring Site Audit/Inspection Program for asbestos work clearly shows that it was inadequate and virtually nonexistent. KAPL failure to perform this management function was a contributing factor to the poor performance of asbestos work. The only audit that had been performed was the annual compliance audit required by the NR Directive F#6-80-11.

However, a detailed review of the KAPL audit report indicates it did not get to the core of the asbestos control program at Kesselring Site, i.e., training and work performance requirements of OPNAVINST 6260.1B.

The audit also identified deficiencies in the asbestos recordkeeping program which "threatened program credibility". However, follow-up corrective action addressed the specific findings without management assessment of the findings to get at the real concern - program credibility.

It was also noted that audit findings and responses were handled between the leader of the audit team and the Kesselring Site Manager SE&SP. There is no evidence that KAPL higher level management was involved or informed.

Other required audits were not performed.

The fact that Safety Office management and Plant management performed no inspections of the work areas, and in fact were not qualified to do so because they were not asbestos trained, clearly indicates a lack of recognition of their responsibility for safe performance of asbestos work. This was manifest at all levels of Kesselring Site Management. Although expressed in different ways by different people interviewed, the prevailing attitude was that control of asbestos work is the responsibility of the worker and the Industrial Hygienist and that an outside expert was following the work.

KAPL's failure to perform asbestos work audits and inspections carried over into the respirator protection program. No audit was performed of the program as required by ANSI Z88.2-1980, a mandatory standard for work at KSO.

F. <u>Qualification and Training - Site Safety Office</u>

Evaluation of the qualification of training of KAPL Safety Office personnel responsible for asbestos controls at the Kesselring Site indicates that they had little experience or training to effectively manage such a program and to monitor and control extensive asbestos work. This includes both Management and operating personnel. Only the Lead Industrial Hygienist has any direct asbestos training and this was a NIOSH asbestos counting course. He has no applied engineering expertise (similar to a Radiological Engineer) even though safety regulations, and good safety practice, specifically require the use of engineered controls as the primary means of protection against asbestos exposure. This failure to apply engineered controls resulted in reliance on the use of respirators as the primary means of protection.

The lack of KAPL management overview and Site Safety Office inexperience led to failure to recognize the inexperience and lack of asbestos training of crew members and the need for KAPL to tailor their training program to meet crew needs. KAPL failed to recognize that the complexity and scope of individual asbestos jobs in S3G needed knowledgeable engineering to specify containments, work practices and monitoring techniques. Management attention to asbestos work requirements simply did not exist.

The lack of KAPL capability to manage and control asbestos work by S3G Plant Management did not go unnoticed. The fact that KAPL-SRA management considered it necessary to hire a lagging expert from Puget Sound Naval Shipyard (PSNS) indicates that SRA management was concerned about Site capability to control S3G asbestos work. This SRA action should have triggered higher KAPL management to the problem potential that was present and the need for corrective action to upgrade the Site's asbestos control capabilities. Prior asbestos experience with other on-site work and the hiring of the outside expert for S3G work were clear signals that the Kesselring Site Asbestos Control Program demanded management attention.

## G. Responsibility

Operating management responsibilities for prototype staff is promulgated and assigned in the Kesselring Site Plant Operations Manual. Safety responsibility is primarily addressed for safe and proper operation of the prototype. Management responsibility for safe performance of asbestos work in-hull is not specifically stated in the Operations Manual nor in the Kesselring Site Safety Instructions.

KAPL plant managers acknowledge their responsibilities for the asbestos work, but they could not clearly explain what their responsibilities entailed. No one recognized that they were responsible to check the work to insure that it was done properly and safely, nor that they should be asbestos trained and qualified to do so. The asbestos work was considered the job of the individual crew members who had been "trained" by the Safety Office and the lagging "expert" who had been hired to take care of the asbestos problem. Operating management assumed that training was adequate, workers were qualified, work was satisfactory and crew members were protected. There was no procedure or design review. Nobody checked the training or the work.

Safety Office responsibility for training of asbestos workers is clearly assigned and understood. However, the Board found no evidence of Safety Management overview, evaluation or even reasonable knowledge of details of the asbestos controls/respiratory protection program. There was a lack of management control over a vital function and responsibility of the Safety Office.

The Board notes that a Quality Deficiency Report which reported concern about the inadequacy of training was submitted through Plant management to the KSO Industrial Hygienist. No one took responsibility to follow up on the complaint.

H. Personnel Exposure

KAPL review of available data and information obtained through record reviews and interviews with KAPL and Navy personnel indicates the possibility of 13 personnel with potential overexposure to asbestos - 10 Navy S3G; 1 Navy D1G; 2 KAPL Laggers AO. (Table 3)

Table 3

WORKER/JOB/POTENTIAL OVEREXPOSURE

| Location | Worker | Total No. of Jobs Performed | No. of Jobs with Potential Overexposure |
|---|---|---|---|
| S3G | A | 5 | 4 |
| | B | 2 | 1 |
| | C | 2 | 1 |
| | D | 6 | 1 |
| | E | 2 | 0 |
| | F | 6 | 1 |
| | G | 8 | 3 |
| | H | 1 | 1 |
| | I | 5 | 2 |
| | J | 3 | 0 |
| | K | 1 | 0 |
| | L | 3 | 1 |
| | M | 5 | 0 |
| | N | 4 | 0 |
| | O | 5 | 1 |
| | P | 2 | 0 |
| | T | 1 | 0 |
| | U | 1 | 0 |
| D1G | Q | 1 | 1 |
| AO | R | 1 | 1 |
| | S | 1 | 1 |

Board assessment of the KAPL review procedures and our followup interviews with the Navy and KAPL asbestos workers indicate that the KAPL review to determine individual exposure has been constrained by the lack of verifiable information on monitoring and specific work practices. This has made reconstruction of individual jobs for exposure estimates very difficult and tenuous.

## VII. CONCLUSIONS

### A. Training

1. The asbestos control training given to the crew members was inadequate. The probable causes for this are:

   a. The Kesselring Site Lead Industrial Hygienist was not qualified through education and experience to train inexperienced crew members in asbestos work controls.

   b. The Kesselring Site Lead Industrial Hygienist used poor judgement in relying on prior radiological controls training of crew members and not including essential practical training in the scope of the training given to the Navy asbestos workers.

   c. The management of the Kesselring Site safety program did not provide any technical direction or oversight to the Kesselring Site Lead Industrial Hygienist and his training program.

2. The cursory asbestos control training given to the crew members did not recognize their inexperience nor satisfy their training needs. The Board identified three probable causes:

   a. The management of the Kesselring Site safety program did not provide adequate review and oversight of the scope and content of the asbestos control training and did not correlate this with the work to be done for the S3G selected restricted availability (SRA) and the inexperience of the crew members.

   b. The KAPL plant managers responsible for the S3G asbsestos removal did not provide input to the Kesselring Site Industrial Hygienist on the scope of the anticipated asbestos removal. The Safety Office was not aware of the complex nature of the work and plant management was not aware of the limited scope of the training.

   c. Notwithstanding (a) and (b) above, the Kesselring Site Lead Industrial Hygienist used poor judgement in developing the scope and content of the asbestos control training for inexperienced personnel.

3. Plant operations management was not trained to adequately plan, engineer, or supervise the asbestos work.

   The Board found two probable causes for the fact that the individuals who were responsible for supervising the work were not qualified to do so.

a. The Kesselring Site asbestos control instruction is inadequate. The instruction indicates that line management's prime responsibility is to ensure that an adequate number of workers are trained as asbestos workers by the Kesselring Site Industrial Hygienist to complete the assigned work. The implication that no one else needed to be trained in asbestos safety controls and that line mangement responsibility is limited to insuring training for others, is unacceptable.

b. Both Plant Management and the SRA shutdown manager failed to prepare themselves to fulfill their inherent line management responsibility of supervising the work of their subordinates.

B. Performance of Asbestos Work

1. Asbestos work was performed by inexperienced personnel who had been indequately trained.

2. Engineering Control measures were not employed as the primary means to control and contain airborne asbestos fibers to the lowest feasible level.

3. The work documents for performance of asbestos work on S3G were inadequate in that they contained no specific guidance or instruction on types of containments to be used and engineering controls to be exercised to minimize the amount of asbestos dust generated during the work.

4. There was no supervision of the asbestos work.

5. Containments were used to limit the spread of asbestos dust to large in-hull areas. Little use was made of containments to protect individual asbestos workers in the immediate work area.

C. Respiratory Protection

1. Respiratory protection equipment was depended upon to protect the individual asbestos workers from exceeding established exposure limits without ensuring the personnel were adequately trained in its use or were issued the correct equipment.

2. Half-face respirators for work protection were chosen based on previous work history at the site, however, there was no history of similar work on the S3G prototype plant. The more protective full flow air-supplied respirators should have been designated.

D. Asbestos Monitoring

1. Personnel and environmental monitoring performed by crew members resulted in invalid data.

2. The monitoring program for asbestos work was not thorough. The program did not recognize the complexity of the work and the need for a case basis determination of monitoring needs and requirements.

3. Definitive asbestos exposure for individual crew members has not yet been determined by KAPL. This may not be possible.

E. Audits/Inspections

KAPL audit program did not comply with requirements of NR and DOE directives.

The failure of KAPL management to inspect and audit asbestos work was a major contributing factor to the poor performance of asbestos work at the Kesselring Site and contributed to the potential overexposure of S3G crew members to asbestos.

F. Qualification and Training

The Kesselring Site Safety Office lacked experience and was insufficiently qualified to conduct a training program for S3G crew members and qualify them for safe performance of asbestos work.

KAPL mangement attention was not applied to correcting Safety office inexperience. Temporary outside expert assistance was hired instead. This outside assistance was primarily directed to facilitate production. The fundamental training and safety deficiencies were unaffected.

G. Responsibility

KAPL operating management failed to meet their responsibility to provide adequate planning and control of asbestos work to insure safe performance of asbestos work by Navy asbestos workers.

Kesselring Site Safety Office management failed their responsibility to provide adequate and reasonable asbestos controls training to plant crew members.

H. Personnel Exposure

The Board concludes that there is credible possibility that personnel who worked on asbestos removal in S3G and D1G from July - September 1986 may have been exposed to asbestos in excess of the Permissible Exposure Limit. The Board is unable to determine the specific individual exposure from the information available.

## VIII. JUDGEMENT OF NEEDS

KAPL needs to develop and implement an asbestos controls/respiratory protection program which fully complies with DOE and Naval Reactors directives. Some specific needs are as follows:

### A. Responsibilities

1. KAPL needs to clearly establish and promulgate the responsibilities of line management and the Safety Office for the asbestos controls/respiratory protection program. KAPL managers and supervisors must clearly understand their responsibilities and prepare themselves to carry them out.

### B. Work Controls

1. KAPL needs to establish an asbestos work control program which requires and insures that engineered controls are the primary means used to achieve asbestos work safety.

2. Each asbestos work request needs to be specifically evaluated for engineering controls. Full containments, i.e, glovebags, need to be used wherever feasible. The evaluation should be performed by someone trained and knowledgeable in asbestos work.

3. Asbestos work in progress needs to be reviewed/observed periodically by trained supervision and Safety Office personnel.

4. Asbestos containments need to be certified in a manner similar to radiological controls containment.

5. A trained individual not involved in the actual work needs to be present whenever a containment tent is required for asbestos work to assist the asbestos workers when they are exiting. The individual should be an Asbestos Monitor.

6. The proper tools for asbestos work need to be used. Powered tools should have an integral exhaust system to remove the asbestos dust.

7. Asbestos work should be done on backshifts or weekends whenever feasible.

### C. Training

1. The asbestos worker training program requires a thorough evaluation and substantial upgrading. Practical training needs to be stressed. Specifically wearing and handling of

asbestos monitoring equipment, the donning and removal of protective clothing and equipment, and use of mockups to simulate actual asbestos work conditions need to be included in training.

2. A training program needs to be developed and administered to all supervisors of asbestos workers and to other cognizant personnel such as engineers who prepare work packages, work planners and safety specialists.

3. The training program needs to be reviewed and approved by management. Periodic management surveillance should be made of training sessions.

4. The individual who provide asbestos control training need to receive further training in asbestos removal procedures and engineered controls.

5. The asbestos control training program needs to include proper exposure to emergency conditions, e.g., damaged containments, damaged or mishandled monitoring equipment, defective or deficient respiratory equipment, and emergency exit from tent containments.

6. The training and fit-test requirements of ANSI Z88.2-1980 for the type of respirator to be used needs to be included in the training program.

7. All personnel that complete any portion of asbestos work control documents need to be trained in asbestos controls.

8. The training program needs to be sufficiently flexible to facilitate different groups of varying experience.

D. <u>Respiratory Protection Program</u>

1. Powered air or supplied forced air respirators need to be specified for the infrequent occasions when engineering controls are not technically feasible. The use of half-face respirators for asbestos work should be discontinued.

2. Issuance of respirator cartridges, respirators and their use need to be controlled in accordance with the requirements of ANSI Z88.2-1980.

3. The respiratory protection program needs to be in full compliance with ANSI Z88.2-1980 and an annual audit should be conducted to insure such compliance.

E. Asbestos Monitoring

1. More timely analysis of personnel and environmental monitoring data is necessary. Accumulation of samples for analysis should not exceed 24 hours.

2. The on-site capability to analyze monitoring samples needs to be improved and used to effectively support on-going asbestos work.

3. Develop procedures and specific requirements for placement and wearing of monitoring equipment by asbestos workers.

4. Expedite the NR approved program to develop the capability for on-line monitoring of asbestos.

F. Audits/Inspections

1. KAPL needs to develop a viable audit/inspection program for asbestos controls and respiratory protection to be used at all three sites.

2. The KAPL audit/inspection program must evaluate and determine full compliance with Naval Reactors and DOE directives on asbestos controls and respiratory protection.

3. KAPL needs participation by higher management, Safety Office, and Incident Prevention personnel in the audit/inspection program.

4. Independent, in-depth audits of the asbestos controls program need to be conducted at least annually by qualified personnel from other KAPL sites.

5. Detailed audit plans for asbestos controls and respiratory protection programs need to be prepared. Consideration should be given to the guidance contained in DOE document "Internal Audit Criteria for Industrial Hygiene Programs", August 1986, previously furnished to KAPL by SNR.

G. Qualification and Training - Safety Office

1. KAPL needs to upgrade the qualifications and capabilities of Safety Office personnel so that an effective asbestos controls/respiratory protection program is implemented.

2. Qualification of Safety Office personnel needs to be periodically assessed and continually upgraded.

H. **Personnel Exposure**

1. KAPL needs to promptly complete their review of each individual case of asbestos work by crew members and determine the exposure of each individual.

2. KAPL needs to issue a letter to each individual crew member who may have exceeded the PEL and inform him of KAPL's determination regarding his exposure. This is required by OPNAVINST 620.1B.

D. J. Hamilla, Chairman

E. D. Shollenberger, Member

J. M. Cochran, Member

D. E. Kruschke, Member

APPENDIX 1

Department of Energy
Schenectady Naval Reactors Office
Post Office Box 1069
Schenectady, New York 12301-1069

REC&SD:DJH#2923
OCT 10 1986

MEMORANDUM FOR: D. J. Hamilla, SNR
E. D. Shollenberger, PNR
J. M. Cochran, SNR
D. E. Kruschke, WMFO

APPOINTMENT TO BOARD OF INVESTIGATION - CLASS B

In accordance with DOE Order 5484.1, I have determined that a formal Board of Investigation should be appointed to investigate and report on the possible overexposure of personnel to asbestos at KAPL.

The Board will be constituted as follows:

D. J. Hamilla, Chairman
E. D. Shollenberger, Member
J. M. Cochran, Member
D. E. Kruschke, Member

John Huckle, Chief Counsel, SNR will also serve as legal advisor to the Board. The Board is to convene immediately to commence the investigation. The Board will be guided by the Standards of Investigation set forth in DOE Order 5484.1, Chapter II.

The Chairman of the Board is to keep me fully and currently informed of the progress of the investigation, and is requested to complete the draft report of this investigation by 31 October 1986.

B. M. Erickson
Manager

cc: C. H. Schmitt, NR
J. J. Mangeno, NR
R. L. Kingsbury, WMFO
C. K. Gaddis, PNR

## PERSONNEL INTERVIEWED

| | | |
|---|---|---|
| P. Hancock | | Kesselring Site Manager |
| E. Bergin | - | Project Manager, Selected Restricted Availability |
| M. Hughes | - | S3G Plant Manager |
| D. Collum | - | S3G Operations Manager |
| R. Hayes | - | S3G Materials Manager |
| Lt. Booth (USN) | - | S3G Maintenance Officer |
| C. Bartoletti | - | S3G/SRA Project Control Manager |
| R. Barrington | - | Shipyard Production Coordinator |
| R. Harvey | - | Puget Sound Naval Shipyard Lagging Supervisor (Telecon) |
| N. Luedtke | - | Lead Chemist - Kesselring Site |
| E. Durrant | - | Chemist |
| K. Schmocher | - | Chemist |
| J. Bast | - | Manager, Safety, Environment/Special Projects |
| G. Winters | - | Manager, KSO Safety and Health |
| P. Domagala | - | Lead Industrial Hygienist |
| G. Vitullo | - | Supervisor, Incident Prevention and Safety, Kesselring Site |
| R. Winters | - | KAPL - Knolls Site Industrial Hygienist |

## PERSONNEL INTERVIEWED

| | |
|---|---|
| S3G Plant | Smith, USN<br>McGowan, USN<br>Chicoine, USN<br>Haslem, USN<br>Toms, USN<br>Heath, USN<br>Eledge, USN<br>Weiser, USN<br>Witherington, USN<br>Cronin, USN<br>Mock, USN<br>Ancona, USN<br>Lowden, USN<br>Haskins, USN<br>Flaker, USN<br>Embury, USN |
| D1G Plant | Williams, USN |
| Auxiliary Operations | Crandall * |

* Accompanied by A. Martin and D. Allen, Union representatives.

JUN 20 REC'D

Department of Energy
Washington, D.C. 20585

June 16, 1983

NR:NT:DHRushworth R#43
F-6 83-7

Manager, Pittsburgh Naval Reactors Office, USDOE
Manager, Schenectady Naval Reactors Office, USDOE

ALL PROTOTYPE PROJECTS--IMPLEMENTATION OF OPNAVINST 6260.1B WITH CHANGE 1, "CONTROL OF ASBESTOS EXPOSURE TO NAVAL PERSONNEL AND ENVIRONS"; REQUEST FOR

NR letter R#18 dated January 30, 1979 requested implementation of OPNAVINST 6260.1A, "Control of Asbestos Exposure to Naval Personnel and Environs" at all Naval Reactors program prototypes. The instruction has been revised and reissued twice since then, once on 12 February 1982 as OPNAVINST 6260.1B and again on 29 April 1983 as Change 1 to OPNAVINST 6260.1B.

Revision B of the subject instruction includes numerous editoral changes for clarification. The significant technical changes in Revision B are as follows:

a. The Medical Surveillance Action Level has been changed to apply to personnel who work in areas "which could potentially contain" airborne asbestos above limits rather than personnel working in areas "containing" airborne asbestos above limits.

b. A requirement has been added permitting individuals or a representative designated by an individual to receive access to asbestos monitoring records referring to them.

c. Instructions concerning the frequency at which periodic medical examinations are performed have been clarified and changed to reflect the greater risk to older workers from prolonged asbestos exposure.

d. Data in medical records must now be forwarded to BUMED's (now NAVMED) Occupational Exposure Data Bank.

As did Revision A, Revision B requires medical examinatins of any individual exposed for any length of time to more than 0.5 fibers of asbestos per centimeter cubed of air (f/cc) on more than 15 days per quarter or 45 days per year. Change 1 to Revision B adds a new criteria requiring in addition, periodic medical examinations of any individual exposed to a time weighted average of 0.1 f/cc or more routinely during an eight hour work-day. This change was issued to comply with Occupational Safety and Health Administration (OSHA) Instruction CPL 2-2.21A, "Minimum Airborne Fiber Concentration for Initiating and Continuing Asbestos Medical Examinations."

For the purpose of implementation, the phrase "potentially exposed" should be considered as work in areas where actual asbestos measurements demonstrate airborne dust levels at or above the medical surveillance action level. Work done in areas containing asbestos products should not itself be considered as potential exposure. Furthermore, the method of analysis for asbestos dust specified in enclosure (1) has a minimum sensitivity of 0.1 f/cc and is therefore not useful for controlling to the new level. Bettis and KAPL should implement suitable analysis methods that will provide the needed sensitivity and should advise NR of the specific procedure(s) used. The subject instruction is forwarded as enclosure (1).

Bettis and KAPL should implement enclosure (1) at all prototypes. The new medical monitoring requirement should be applied to personnel exposed to the new criteria levels on or after the date of implementation. The medical history and examination requirements should be implemented for Naval personnel assigned to Manager, PNR and Manager, SNR. Although Navy instructions do not apply to Bettis, KAPL or Department of Energy personnel, it should be noted that the new 0.1 f/cc criteria is in accordance with OSHA rules applicable to DOE contractor and DOE personnel under appropriate DOE orders.

If implementation of enclosure (1) will substantially increase the number of personnel who must receive medical examinations, or substantially increase the extent and cost of current asbestos control and monitoring programs, Naval Reactors should be informed prior to implementation.

This letter is assigned the number F-6 83-7 in accordance with the numbering system established by Procedure F-6, "Procedures for Implementation of General Letters and Instructions Applicable to Naval Reactors Prototypes." F-6 letter 79-3 (R#18 dated January 30, 1979) is hereby cancelled.

The action taken by this letter is considered by the Government to be within the contractual scope of existing contracts and does not authorize any additional cost to the Government, either direct or indirect.

C.H. Schmitt

C. H. Schmitt
Naval Reactors

Copy to:
Mgr., PNRO (2)
Gen. Mgr., Bettis
Mgr., NRF
Mgr. NRF Project, Bettis

Copy to: (Cont'd.)

Mgr., IBO
Gen. Mgr., KAPL
Mgr., Windsor Site
Mgr., Kesselring Site
Mgr., PSO, KAPL
Chief, WMFO
Chief, WSO

Enclosure (1): OPNAVINST 6260. 1B dated 12 February 1982 with change 1 dated 29 April 1983; "Control of Asbestos Exposure to Naval Personnel and Envirous"

DEPARTMENT OF THE NAVY
Office of the Chief of Naval Operations
Washington, DC 20350

OPNAVINST 6260.1B
OP-45
12 February 1982

OPNAV INSTRUCTION 6260.1B

From: Chief of Naval Operations
To: All Ships and Stations (less Marine Corps field addressees not having Navy personnel attached)

Subj: Control of Asbestos Exposure to Naval Personnel and Environs

R) Ref: (a) Code of Federal Regulations, Title 29, Chapter XVII, Part 1910, Sub Part Z, Section 1910.1001 (29 CFR 1910.1001) (NOTAL)
A) (b) OPNAVINST 5100.23A
R) (c) Clean Air Act, as amended, 42 U.S.C. § 7401 *et seq.* (1971) (NOTAL)
(d) 40 CFR Part 61 (1977) (NOTAL)
(e) OPNAVINST 5100.8E

R) Encl: (1) NAVOSH Exposure Standards, Control, and Medical Surveillance Requirements for Asbestos
(2) National Emission Standard for Asbestos
(3) Industrial Hygiene Technical Assistance Directory

1. Purpose

a. Occupational Health - To comply with the national safety and health standards on asbestos, promulgated in reference (a), by issuance of a Navy Occupational Safety and Health (NAVOSH) Standard, in accordance with reference (b).

b. Environmental Protection - To comply with the National Emission Standard for asbestos, promulgated by reference (c) and implemented by reference (d).

2. Cancellation. OPNAVINST 6260.1A.

3. Background

a. Asbestos is a general term used to describe several fibrous mineral silicates. Although there are many asbestos minerals, only six are of commercial importance: chrysotile, amosite, crocidolite, tremolite, anthophyllite, and actinolite. Major uses of asbestos are: asbestos cement products, floor tiles, fireproofing, high temperature insulation, asbestos cloth, friction materials (such as brake linings and clutch facings), various gasket materials, and miscellaneous other products.

b. Inhalation of asbestos fibers has been demonstrated to cause at least two distinct disease states. (R

(1) Asbestosis is a form of fibrosis of the lung which may become disabling or even fatal. The use of the term "asbestosis" in a generic sense for all asbestos-associated disorders (including pleural plaques) is imprecise and confusing.

(2) Asbestos has also been found to be a causal factor in the development of lung cancer, malignant mesothelioma, and cancer of the gastro-intestinal tract. A latency period of 20-40 years between first exposure to asbestos and the appearance of a malignancy has been observed.

c. Some examples of tasks which can generate concentrations of airborne asbestos which exceed permissible limits are: the fabrication, installation, repair or removal ("rip-out") of asbestos insulation materials; power sawing of asbestos-containing fire retardant building materials; and brake relining and repair work.

d. Although asbestos-free substitute materials are being developed, asbestos materials continue to be used in the Navy in selected applications. In addition, ships presently (R in commission and shore installations both have asbestos boiler and pipe insulation that will eventually require rip-outs. The potential for personnel exposure will there- (R fore exist for another 20 or more years.

e. Recognizing the serious health implications of asbestos exposure, the government has imposed stringent (R occupational health and environmental protection standards (references (a) and (d) respectively) for the control of asbestos. These standards and controls, specified in enclosures (1) and (2), must be strictly enforced and followed by all Navy civilian employees, both appropriated and nonappropriated fund, and by all military personnel, both afloat and at all shore activities.

4. Action

a. The Chief, Bureau of Medicine and Surgery (BUMED), shall centrally manage the Asbestos Medical Surveillance Program ashore and afloat. BUMED shall also provide professional, technical, and health educational assistance (R to commands for the purpose of evaluating the potential for asbestos exposure in accordance with reference (e), and as prescribed in reference (b). Enclosure (3) provides

a list of activities where industrial hygiene assistance is available.

b. The Chief of Naval Material shall, in coordination with BUMED, provide advice and technical assistance to define appropriate engineering and work practice con- (1) trols, and to identify acceptable asbestos-free substitute materials within the meaning of subparagraph 2c of enclosure (1).

c. Major claimants shall insure program support by budgeting the resources required to meet the regulatory standards for the control of asbestos as prescribed by this instruction.

d. Commanding officers for shore activities shall insure that:

(1) Appropriate occupational health/industrial hygiene control measures and monitoring procedures in enclosure (1), or headquarters-approved alternatives that provide substantially equivalent protection, are applied to processes and procedures using asbestos or asbestos-containing materials.

(2) The National Emmission Standard for Asbestos is complied with as prescribed in enclosure (2).

e. Commanding officers of afloat commands shall comply with the provisions of enclosure (1) to the maximum extent feasible, and shall obtain the necessary protective clothing and equipment to protect ships' force (R personnel during shipboard removal of thermal asbestos insulation material. The Allowance Equipage List (AEL) (A 2-330024045 of 30 March 1980 has been provided to all afloat units, less those ships with minimal or no asbestos material aboard. Procedures for ship requisitioning of subject items and funding of item requirements resulting from COSAL changes are set forth in NAVSEAINST 7323.1 of 8 June 1977 (NOTAL).

A. M. SINCLAIR
Deputy Chief of Naval
Operations (Logistics)
(Acting)

Distribution:
SNDL Parts 1 and 2

Chief of Naval Operations
OP-09B15C
Washington, DC 20350 (200)

Stocked:
CO, NAVPUBFORMCEN
5801 Tabor Ave.
Philadelphia, PA 19120 (500 copies)

NAVOSH EXPOSURE STANDARDS, CONTROL, AND MEDICAL SURVEILLANCE REQUIREMENTS FOR ASBESTOS

1. Definitions

a. Fiber. A rod-shaped particle whose length-to-diameter, or aspect ratio, is equal to or greater than 3:1, and whose length is greater than 5 micrometers. Airborne asbestos concentrations will be expressed as "counts," i.e., the number of fibers per cubic centimeter of air (f/cc). Sampling and counting methodologies are prescribed in paragraphs 4 and 5 below. (A

b. Asbestos Medical Surveillance Program (AMSP). This program consists of a periodic medical screening examination, which may include special purpose histories, physical examinations and laboratory tests, directed at detecting early changes in specific organ systems which have been identified with asbestos disease. Those individuals who, because of the nature of their job must work with, or be in the vicinity of, operations which generate airborne asbestos shall be included in the medical surveillance program and inclusion is not based solely on the determination that an individual has been overexposed. (A

c. Medical Surveillance Action Level (MSAL). Medical Surveillance Action Level for asbestos shall be defined to include any individual who, because of employment, is required to enter or work on a regular basis in areas which could potentially contain an airborne concentration of asbestos at or above 0.5 fibers/cubic centimeter greater than 5 micrometers in length as determined by phase contrast microscopy. "On a regular basis" is defined as 15 separate days in any quarter during a calendar year or 45 days per year. Additionally, those personnel exposed at any time, for any length of time, to airborne concentrations in excess of the "ceiling limit" shall be included under the "Medical Surveillance Action Level." The aforementioned term "Medical Surveillance Action Level" is defined and used only for the purpose spelled out specifically in this instruction and to identify those individuals who will be included in the Asbestos Medical Surveillance Program. The MSAL criteria are summarized as follows: (R

| Concentration (f/cc) | Duration | Frequency |
|---|---|---|
| $\geq$ 0.5 | for any length of time per day | 15 days/quarter or 45 days/year |
| or $\geq$10.0 | for any length of time | on any occasion |

(A

d. Permissible Exposure Limits (PELs)

(1) "Time-Weighted Average (TWA)" - The 8-hour TWA airborne
R) concentration of asbestos fibers to which personnel may be exposed shall not exceed two fibers per cubic centimeter of air (2 f/cc).

(2) "Ceiling Limit" - Personnel shall not be exposed at any
R) time to airborne concentrations of asbestos in excess of ten fibers per cubic centimeter of air (10 f/cc).

2. Engineering and Work Practice Control Measures

a. Local exhaust ventilation is frequently required to ensure that atmospheric levels of asbestos do not exceed the PELs. General requirements for the design and use of ventilation to reduce exposures can be found in attachment (1). Specific guidance in adapting attachment (1) to each asbestos operation may be obtained from the cognizant industrial hygienist - see enclosure (3).

b. As practicable, asbestos shall be handled, applied, removed, cut, scored, or otherwise worked in a wet state sufficient to prevent the emission of airborne fibers in excess of the PELs.

c. Asbestos-free substitute materials shall be tested under the technical management of cognizant headquarters activity and, if acceptable, shall be used in place of asbestos-containing materials.

d. All external surfaces in the work area where asbestos is handled shall be maintained free of visible accumulations of loose asbestos fibers which could result in airborne concentrations in excess of the PELs set forth in paragraph 1d.

e. Disposal of asbestos, asbestos-containing materials, and asbestos-contaminated waste shall be in accordance with the procedures listed in attachment (2).

f. To minimize exposure potential, shipboard or shore facility asbestos removal operations shall, to the maximum extent feasible, be performed during the second or third shifts or on weekends and holidays.

3. Personal Protective Equipment

a. Compliance with the PELs shall not be achieved by the use of respirators except as indicated in attachment (3). Assistance in the specific application of attachment (3) may be obtained from the cognizant industrial hygienist - see enclosure (3).

b. Special clothing such as coveralls, disposable whole body clothing, hoods, gloves and foot coverings shall be supplied

to and worn by personnel whose jobs require them to be in areas where the airborne asbestos concentration exceeds or is likely to exceed the PELs. See attachment (4) for details. (R

c. Change rooms shall be provided as close as practical to the asbestos work area when the airborne concentration of asbestos fibers exceeds the PELs. Details are provided in attachment (4). (R

4. <u>Method of Measurement</u>. All determinations of airborne concentrations of asbestos fibers shall be made by the membrane filter method at 400-450 magnification, using phase contrast illumination, with sample mounted in a high viscosity solution of membrane filter material. If the material which is suspected of being the source of the airborne fibers is known to contain asbestos, then all airborne fibers (having an aspect ratio of 3:1 and longer than 5 micrometers) are to be counted as asbestos. (R

5. <u>Air Sampling Requirements</u>

a. Environmental Sampling - A workplace monitoring plan shall be established to characterize the airborne asbestos levels generated by all operations. Within a class or category of similar operations, sampling shall be of such frequency and pattern as to accurately and reproducibly represent the airborne levels produced by a typical operation within the class or category. Sampling of all areas where repetitious asbestos work is performed shall be at intervals of six (6) months or less, to verify that the work site or operation has remained in the same class or category. Each non-repetitious asbestos removal operation will be sampled at least once to determine the maximum exposure potential of that operation. Each asbestos removal operation aboard ship will require at least one air sample to be taken upon completion of the operation to verify that clean-up operations were effective and that the area is safe for personnel to enter without protective equipment. (R

b. Personnel Sampling - Samples shall be collected from within the breathing zone of personnel, on membrane filters of 0.8 micrometer porosity mounted in an open-face filter holder. Samples shall be taken to determine both the TWA asbestos concentratiion and the peak concentration. Filters should be precounted to determine the average background count. Persons counting filters shall be judged proficient by successful participation in the Proficiency Analytical Testing (PAT) program administered by the National Institute for Occupational Safety and Health (NIOSH). Only phase contrast microscopes especially set up for asbestos counting should be utilized. Persons performing dispersion staining to differentiate asbestos from non-asbestos fibers shall be specifically trained in this technique. Their proficiency shall be verified with standard laboratory quality control techniques approved by the Navy Environmental Health Center (NAVENVIRHLTHCEN) - see paragraph 3 of enclosure (3). (R

c. Sampling Validity/Reliability - Measurement and monitoring shall be conducted under the technical direction of the cognizant industrial hygienist in accordance with the provisions of reference (b). Sources of industrial hygiene assistance are provided in enclosure (3).

d. All environmental and personnel air sampling records shall be retained for a period of 50 years following termination of service of employment of the individual to whom the records refer. Each individual, currently or previously employed by the Department of the Navy, or any other person he or she may designate shall have access to all such records within 15 days of the request.

6. Caution Signs and Labels

a. Caution signs shall be provided and displayed at each location where airborne concentrations of asbestos fibers may exceed the PELs. Signs shall be posted at a distance such that personnel may read the signs and take necessary precautions before entering the area marked by the signs. Signs may be sized to suit the particular situation. A listing of required protective equipment may be attached to or be part of the sign. The following criteria represent the minimum requirements: caution signs shall conform to the general requirements of 20" by 14" vertical format signs. The signs shall display the following legend in the lower panel, with letter sizes and styles of a visibility at least equal to that specified in this subdivision:

| LEGEND | NOTATION |
|---|---|
| Asbestos--------------------- | 1" Sans Serif, Gothic or Block |
| Dust Hazard------------------ | 3/4" Sans Serif, Gothic or Block |
| Avoid Breathing Dust--------- | 1/4" Gothic |
| Wear Assigned Protective Equipment------------------ | 1/4" Gothic |
| Do Not Remain in Area Unless Your Work Requires It------ | 1/4" Gothic |
| Breathing Asbestos Dust May be Hazardous to Your Health--- | 14 point Gothic |

Spacing between lines shall be at least equal to the height of the upper of any two lines.

b. Caution labels shall be affixed to containers of raw materials, mixtures, scrap, waste, debris, and other products containing asbestos fibers if, in the foreseeable use, handling, storage, disposal, processing or transportation of these items, levels of airborne asbestos could be produced which might constitute a threat to health. The caution labels shall be printed in letters of sufficient size and contrast as to be readily visible and legible. The label shall state:

CAUTION

Contains Asbestos Fibers

Avoid Creating Dust

Breathing Asbestos Dust May Cause
Serious Bodily Harm

7. Criteria for Inclusion of Personnel in the AMSP

a. Inclusion of any individual in the AMSP is determined by his or her degree of exposure to asbestos during the course of their Navy employment. Inclusion of a particular individual in the AMSP is required if the criteria in section 1c are reached or exceeded. (A

b. For past exposures to asbestos, medical personnel attempting to determine whether to place an individual in the AMSP must be guided by the exposure history in the absence of more definitive exposure records. A history of participation in any operation where visible asbestos dust was present, including but not limited to rip-outs, shall be considered to have been an exposure in excess of the ceiling value. Histories are to be obtained utilizing attachment 5 (suggested format). (A

8. Medical Surveillance Examinations

a. Preplacement. All naval personnel, both military and civilian, upon assignment to a position involving work in areas where the airborne concentration of asbestos will equal or exceed the MSAL, shall have a health evaluation. This evaluation shall be performed prior to assignment and shall include the following: (R

(1) A comprehensive occupational history, attachment (5), detailing prior potential exposure to harmful chemical or physical respiratory hazards, particularly asbestos. Any adverse effects related to these exposures must also be recorded. (R

(2) A physical examination with special emphasis on the chest, particularly the presence of persistent "dry rales" or "crackles" at the lung base.

(3) A 14" x 17" posterior-anterior chest roentgenogram. These films shall be interpreted locally in accordance with current radiological practices. In addition, these films shall
R) also be interpreted in accordance with the ILO International Classification of Radiographs of Pneumoconioses - 1980. To obtain ILO interpretations for their films, local medical facilities shall contact the NAVENVIRHLTHCEN - see paragraph 3 of enclosure (3).

(4) Pulmonary function tests, including forced expiratory volume in one second ($FEV_1$) and forced vital capacity (FVC). Such tests should be performed, calculated, and interpreted in accordance with the NAVENVIRHLTHCEN Technical Manual 77-1, May 1977 (NOTAL).

R) (5) A judgment of the individual's ability to use respiratory protective equipment.

(6) The findings of severe respiratory impairment from any cause, e.g., $FEV_1$/FVC less than 45% or FVC less than 70% of predicted or the presence of documented actual or probable pulmonary asbestosis, should be considered disqualifying for initial assignment. Any other abnormalities discovered in the course of the preplacement evaluation should be investigated to determine if they could substantially increase the risk of asbestos-induced disease.

b. Periodic and Termination-of-Employment. Medical evaluation identical to the preplacement evaluation shall be conducted
R) in accordance with the medical surveillance examination schedule below. In addition, individuals working in areas where the asbestos concentration did not equal or exceed the MSAL during the past year, but who believe they have been exposed to undetermined levels of asbestos fibers at some time during the course of their Navy employment, shall complete, at least one time, a medical surveillance questionnaire (suggested format, attachment 5). Based on the review of this questionnaire, individuals shall be placed in the ASMP if it can be reasonably concluded that their potential exposures could have been at or above the MSAL. The
R) placement of personnel in the AMSP is based on a history of exposure or potential exposure at or above the MSAL as judged by competent medical personnel. Placement of any individual in the AMSP is a permanent action. Once placed in the AMSP, regardless of the original placement criteria, that individual shall remain in the AMSP for the duration of his or her Navy employment. The frequency of re-examination will vary, according to age, work history, and medical findings. NOTE: If records indicate that the individual has received an annual asbestos examination within the past twelve months, a termination examination is not required.

c. Frequency. Asbestos medical examinations shall be conducted in accordance with the following schedule: (A

| Category | Criteria | Schedule for (Re)examination |
|---|---|---|
| 1 | Preplacement: Upon assignment to a position which involves working in areas where asbestos concentrations will be at or above the MSAL. | Prior to assignment (A |
| 2 | Periodic: Personnel working in areas where the asbestos concentration was at or above the MSAL in the past year. | Annually (A |
| 3 | Periodic: Personnel not working in areas where the asbestos concentration was at or above the MSAL in the past year, but with a history of such work experience (see paragraph 7): | (A |
| | a. 45 years of age or younger AND less than 15 years history of working in areas where the asbestos concentration was at or above the MSAL. | At 5-year intervals |
| | b. Over 45 years of age OR 15 or more years history of working in areas where the asbestos concentration was at or above the MSAL. | Annually |

d. Personnel shall be counselled regarding any abnormalities detected during any screening test, and the medical records so noted and signed by both the counselling physician and the patient. (R

9. Diagnosis of Asbestosis and Related Disorders

a. The diagnosis of "asbestosis" is presumptive with known past exposure to asbestos (the presence of pleural changes or asbestos bodies in the sputum may support or suggest past exposure) and two or more of the following criteria:

(1) Dyspnea (shortness of breath) on exertion,

(2) Persistent basal inspiratory "crackles" or "dry rales,"

(3) Diffuse interstitial changes on the chest roentgenogram

R) (4) Reduction in vital capacity and/or diffusion capacity,

(5) Digital clubbing.

b. In early stages of the disease, dyspnea and roentgenographic changes may not be present and the only screening abnormalities may consist of a slight reduction in the vital capacity, and end-inspiratory rales. A history of exposure to asbestos is critical to the diagnosis. It is unusual for pulmonary asbestosis to develop with less than 10 years of exposure. Individuals with medical findings suggestive of asbestosis, but not supported by an adequate history of exposure, should undergo further evaluation by a pulmonary disease specialist to rule out other diagnoses.

c. Personnel who have been exposed to asbestos in the past and show abnormal lung changes, e.g., pleural plaques and/or pleural thickening, shall be considered as having an asbestos-related disorder and be placed in the AMSP.

10. Medical Records

a. All personnel who are included in the AMSP shall have the exterior of their Health Records prominently marked "ASBESTOS."

b. Each individual record must include the following identifying information:

(1) Name,

(2) Social Security No.,

(3) Date of birth,

(4) Dates of examinations, and

(5) Job titles, job codes, and/or primary and secondary Navy Enlisted Classification Code (NEC).

c. All records of examinations, possible asbestos-related conditions, related x-ray interpretations and all forms and correspondence related to the individual's medical history shall become a permanent part of the Health Record and be retained for a period of 50 years following termination of service or employment. X-ray films shall be retained for a period of five (5) years.

d. The judgment of the occupational health physician concerning the adequacy of the diagnostic information to support the impression of asbestos-related disease shall be entered in the medical record. Lacking definitive information, the evaluating physician must exercise his best medical judgment in each individual case.

e. Each individual currently or previously employed by the Department of the Navy or any other person he or she may designate shall have access to all the records, as defined in paragraph c above, within 15 days of the request. (A

f. Copies of any examinations, x-ray reports, or special studies in an individual's Health Record or compensation folder shall be made available to a physician of the individual's choice after execution of a proper release-of-information form. (R

g. Medical records as defined in paragraphs b and c above shall be maintained locally and data reported to BUMED's Occupational Exposure Data Bank. (A

11. Personnel Notification. Any individual found to have been exposed at any time during the course of their Navy employment to airborne concentrations of asbestos fibers in excess of either PEL shall be notified in writing of the exposure as soon as practicable but not later than 5 days after the finding. The individual shall also be notified in a timely manner of the corrective action being taken. (A

12. Education

a. All personnel currently working in areas where the MSAL is exceeded, as defined in paragraph 1c, and their supervisors, shall receive a detailed indoctrination, and periodic refresher instruction at least semi-annually. (R

b. The initial indoctrination shall include all of the following:

(1) Hazards of asbestos,

(2) Safe handling and disposal procedures,

(3) Proper use of protective equipment,

(4) Association of cigarette smoking and asbestos-related disease, and

(5) Procedures for reporting actual or suspected exposure to asbestos. (R

c. All personnel, including supervisors, who are not in the Asbestos Medical Surveillance Program, as defined in paragraph 1b,
R) but who could incidentally come in contact with asbestos or asbestos-containing materials, shall be informed of the potential risk and proper precautionary procedures.

13. Outside Contractor

a. Each contract for work to be performed by an independent contractor within the United States, which may involve the release of asbestos fibers, shall incorporate the appropriate references or specific contract clause or clauses necessary to assure that:

(1) the contractor is aware of the potential hazard to his/her employees and others,

(2) the contractor shall take such special precautions
R) (i.e., references (a) and (d)) as are necessary and appropriate to protect his/her employees, as well as others, from any physical harm.

b. The Chief of Naval Material shall issue appropriate guidance to all activities which contract for services involving a possible asbestos exposure hazard, including a standard contract clause or clauses and instructions for their use. The contract
A) clause must require the contractor to measure and control asbestos fibers outside his asbestos boundary to less than 0.5 fibers/cc at all times. Appropriate monitoring and enforcement of the contract provisions is required.

Engineering and Work Practice Control Measures

1. Local exhaust ventilation and dust collection systems shall be designed, constructed, installed and maintained in accordance with: (R

a. Industrial Ventilation - A Manual of Recommended Practice. Committee on Industrial Ventilation, American Conference of Governmental Industrial Hygienists, Inc. (R

b. American National Standard: Fundamentals Governing the Design and Operation of Local Exhaust Systems, ANSI Z9.2 1971. American National Standards Institute. (R

2. All hand-operated and power-operated tools which may produce or release asbestos fibers in excess of the PELs shall be provided with a local exhaust ventilation system.

3. It must be noted that ventilation systems used to control the generation of asbestos fiber exposures or emissions cannot be directly exhausted to the workroom or atmosphere. The use of High Efficiency Particulate Air (HEPA) filters with prefilters, or other collection systems approved by the cognizant industrial hygienist, is required to prevent the inadvertent production of an exposure hazard (see enclosure (2)).

4. Exhaust filtration systems must be meticulously maintained to prevent performance degradation of the ventilation system as a whole. Such maintenance work must be done in accordance with the provisions of the basic instruction.

5. To the extent feasible, local exhaust ventilation connected to HEPA or other approved filters should be provided at the point of airborne fiber generation. Capture velocities must be high enough to entrain generated fibers under the specific environmental conditions. Duct transport velocities must be high enough to prevent accumulation of fibers in the duct, and clean-out ports should be provided where necessary. Specific equipment design parameters (e.g., requirements for static pressure monitors), as well as protective clothing/respiratory protection and system servicing procedures for each operation must be provided/approved by the cognizant industrial hygienist.

6. Procedures shall be established that minimize the accumulation of waste dust or scrap materials. Specific procedures for containment of dust and handling of contained materials shall be instituted so that the possibility of secondary air contamination is minimized. Cleanup procedures based on wetting the material and use of approved vacuum cleaning systems for removal of debris shall be employed whenever possible.

7. Personnel engaged in the removal ("rip-out"), or demolition of pipes, structures, or equipment covered or insulated with asbestos, and in the removal or demolition of asbestos insulation or coverings shall be provided with a type "C" continuous flow or pressure demand, supplied air respirator and protective clothing in accordance with attachments (3) and (4). Care shall be taken to minimize the effects of meteorologic conditions, such as wind, to control the spread/increase of airborne concentrations of asbestos. Enclosures or temporary curtains shall be used to control the amount and velocity of air moving through the workplace, whenever possible.

8. Asbestos waste, scrap, debris, bags, containers, equipment, and asbestos-contaminated clothing, consigned for disposal, which may produce in any reasonably foreseeable use, handling, storage, processing, disposal, or transportation of airborne concentrations of asbestos fibers in excess of the PELs shall be collected and disposed of in sealed impermeable bags, or other closed, impermeable containers and labeled in accordance with paragraph 6c of enclosure (1). Transportation of asbestos waste including piping or other debris resulting from demolition shall be conducted in a manner that does not release airborne asbestos fibers.

## Disposal Procedures

1. Asbestos materials, properly contained and disposed of in an approved sanitary landfill that is operated in accordance with 40 CFR 241 guidelines, should not pose a hazard to human health or the environment.* The landfill operator must maintain daily compacted soil cover. Specific locations within landfills used for the disposal of asbestos materials should be recorded by the landfill operators with a copy retained by the cognizant naval facility for future reference. This practice should reduce the possibility of future unearthing and rupturing of disposal containers.

2. In preparation for disposal, asbestos wastes must be adequately wetted, when appropriate, prior to bagging in heavy-duty plastic bags or other suitable impermeable containers. All bags or containers must be provided with standard asbestos caution labels. Asbestos waste containers such as bags, trash cans, dumpsters, etc., shall be distinctively color-coded to assure easy recognition. Dumpsters shall be labeled "ASBESTOS WASTE ONLY" or otherwise marked in accordance with paragraph 6b of enclosure (1). Care must be exercised in order to prevent bags and other containers from rupturing when being moved to a dumpster or other suitable vehicle for transport to a proper disposal site.

3. For guidance concerning specific health-related precautions to be used for specific operations, consult the cognizant industrial hygienist - see enclosure (3). For guidance concerning specific environmental questions, or applicable local regulations, consult the <u>Hazardous Waste Disposal Guide</u>, NESO 20.2-011 of December 1976, Part IV; Directory of Contacts for Disposal Assistance (NOTAL).

*NOTE: Some states may require large quantities of asbestos materials to be disposed of in specially designated landfills. Consult appropriate state regulations prior to disposal.

Respiratory Protection

1. Engineering control measures shall be enployed to control and contain airborne asbestos fibers to the lowest feasible level. Compliance with PELs shall not be achieved by the use of respirators except under the following conditions:

a. during the time period necessary to implement engineering control measures,

b. in work situations for which the control methods prescribed are not technically feasible, or are feasible to an extent insufficient to reduce the airborne concentration of asbestos fibers below the PELs, and

c. during emergencies.

2. A respirator program shall be established as described in the American National Standards Institute (ANSI) publication American National Standard, Practices for Respiratory Protection, ANSI Z88.2-1980 as embodied in 29 CFR 1910.134 (NOTAL). (R

3. Where a respirator is required, it shall be selected from those approved for protection against exposure to asbestos by the National Institute for Occupational Safety and Health (NIOSH)or by the Mine Safety and Health Administration (MSHA). (R

4. Reusable or disposable single-use air purifying respirators should be NIOSH or MSHA approved for protection against pneumoconiosis and fibrosis producing dusts, including asbestos. They shall be used to reduce the concentrations of airborne asbestos fibers in the respirator below the PELs when the ceiling or the 8-hour TWA concentration of asbestos fibers is reasonably expected to exceed no more than 10 times the limit, based on data obtained in accordance with paragraph 5 of enclosure (1). (R

5. A full facepiece powered air purifying respirator, or a powered air purifying respirator shall be used to reduce the concentration of airborne asbestos fibers in the respirator below the PELs when the ceiling or the 8-hour TWA concentration of asbestos fibers is reasonably expected to exceed 10 times, but not 100 times, the limit, based on data obtained in accordance with paragraph 5 of enclosure (1).

6. A type "C" continuous flow or pressure-demand supplied-air respirator shall be used to reduce the concentration of airborne asbestos fibers in the respirator below the PELs when the ceiling or 8-hour TWA airborne concentration of asbestos fibers is reasonably expected to exceed 100 times those limits, based on data obtained in accordance with paragraph 5 of enclosure (1).

7. Breathing air or sources of breathing air for self-contained breathing apparatus and supplied-air respirators must conform to the requirements found in the following documents: 29 CFR 1910.134(d) (NOTAL); Federal Specification BB-A-1034a of 21 June 1968 (NOTAL), with Amendment 1 of 15 December 1970; and NAVFACINST 11300.24B of 2 August 1972 (NOTAL).

8. A person shall not be assigned to tasks requiring the use of respirators if, based upon his or her most recent medical examination, the examining physician determines that the person will be unable to function normally wearing a respirator; or that the safety or health of the person or other personnel will be impaired by his or her use of a respirator.

9. When data obtained in accordance with paragraph 5 of enclosure (1) is not available or is not relevant to a specific operation,
A) a type "C" continuous-flow or pressure-demand supplied air respirator shall be used to assure adequate personnel protection.

## Personal Protective Clothing/Change Room/ Shower Facility Requirements

1. Personnel engaged in the handling of asbestos-containing materials where emission of airborne fibers is likely to be in excess of the PELs, such as during insulation rip-out operations, shall wear the protective clothing listed below. The cognizant industrial hygienist (see enclosure (3)) shall be consulted regarding the adequacy of and requirements for protective clothing. (R

a. Full-body, one-piece, disposable coveralls (preferably constructed of Tyvek material, or material comparable in weight, strength, and resistance to penetration by asbestos) over cloth coveralls supplied and laundered by the Navy (see Note 1).

b. Hoods (head covering), which shall extend beyond the collar of the coverall to completely protect the neck area (see Note 2). The hood should be Tyvek material, or a comparable substitute. Use of a Tyvek coverall with attached hood is highly desirable.

c. Medium weight rubber gloves, or thin latex or rubber gloves with cotton "over glove" (see Note 1).

d. Slip-resistant plastic shoe covers, or heavy polyethylene shoe covers with slip-resistant soles, or light-weight rubber boots (see Note 1).

e. Safety glasses with side shields, goggles, or a full-length face shield when full-face respirators are not in use (see Note 1).

2. Change rooms shall be provided as close as practical to the asbestos work areas. Protective clothing removal procedures shall be promulgated, to include vacuuming of clothing (before removal) using a vacuum approved by the cognizant industrial hygienist (and while still wearing a respirator if one was required for the task). (R

3. Shower facilities shall be located between the "clean" and "dirty" change rooms and each room shall have separate clothing lockers or containers to prevent contamination.

4. Laundering of asbestos-contaminated clothing shall be done so as to prevent release of airborne asbestos fibers in excess of the PELs. Contracts governing the laundering of asbestos-contaminated clothing shall specifically require that contractors comply with the precautions specified in Section (d)(4)(iii) of reference (a). Bags of asbestos-contaminated clothing should be transported

in sealed impermeable bags or containers to which is affixed the standard caution label.

Note 1: The proper use of protective clothing requires that all openings be closed and that garments fit snugly about the neck, wrists, and ankles. Accordingly, the wrist and ankle junctions, and the collar opening on the disposable coveralls shall be taped as necessary to prevent contamination of skin and under-clothing without restricting physical movement.

OPNAVINST 6260.1B
12 FEB 1982

**MEDICAL SURVEILLANCE QUESTIONNAIRE**

Sample Format

**PRIVACY ACT STATEMENT**

"The authority for collecting this information is Section 19 of the Occupational Safety and Health Act and the Code of Federal Regulations (29 CFR 1960). This information will be used by the Occupational Health Physician, and/or such clinical staff as he may designate, to help identify the causes of adverse health effects and for future epidemiology studies. Providing this information is voluntary, however, failure to provide the information could unnecessarily hamper the identification of potential health problems and preclude any redress of problems identified in the future".

DATE OF SUBMISSION:

| NAME | RANK/RATE | HOME ADDRESS/MILITARY UNIT | SEX (M/F) | DATE OF BIRTH | CURRENT JOB DESIGNATION |
|---|---|---|---|---|---|
| | | | | | |

**PART I - OCCUPATIONAL HISTORY**

INSTRUCTIONS. Please complete the following work history; begin with your present job or military assignment, and list all jobs you have held. Be as specific as possible; if you held more than one job with the same employer, list each job title and activity. Use additional sheets as needed.

| COMPANY OR MILITARY UNIT *County and state where worked* | DATES WORKED | | FULL/PART TIME JOB CHECK | | JOB TITLE AND WORK ACTIVITIES | POTENTIAL HAZARDS EXPOSED TO | | PROTECTIVE EQUIPMENT WORN *Respirator, ear plugs, etc.* |
|---|---|---|---|---|---|---|---|---|
| | FROM MO/YR | TO MO/YR | FULL | PART | | PHYSICAL *Noise, vibration, etc.* | CHEMICAL *Heavy metals, Freon, solvents, etc.* | |
| | | | | | | | | |

Attachment (5)
to Enclosure (1)

OPNAVINST 6260.1B 12 FEB 1982

| SECONDARY (MOONLIGHTING) JOBS YOU HAVE HELD *(Firefighter, farmer, etc.)* | DATES (MO/YR) | |
|---|---|---|
| JOB TITLE | FROM | TO |
| | | |

| HOBBIES & ACTIVE SPORTS *(Past and present, such as painting, woodworking, scuba diving, etc.)* | | |
|---|---|---|
| | | |

WORK-RELATED EXPERIENCES, COMMENT ON *(Those you feel may have been harmful to your health)*

PART II - RESPIRATORY SYMPTOMS

Based on a review of this completed medical surveillance questionnaire, placement in AMSP:

☐ IS RECOMMENDED

☐ IS NOT RECOMMENDED

REVIEWING MEDICAL DEPARTMENT OFFICIAL

Attachment (5)
to Enclosure (1)

National Emission Standard for Asbestos

1. General

a. Section 112 of reference (c) requires the administrator of the Environmental Protection Agency (EPA) to publish a list of hazardous air pollutants for which national emission standards will be promulgated. Reference (d) promulgated emission standards for four hazardous air pollutants: asbestos, beryllium, mercury and vinyl chloride. (R

b. Technical assistance for air pollution control is available upon request from the Engineering Field Divisions of the Naval Facilities Engineering Command.

c. Care must be taken to assure that measures to meet the emission standards are compatible with NAVOSH standards contained in enclosure (1) of this instruction, particularly with regard to collection devices and disposal procedures involved in asbestos fabrication (as in shipyard pipe or lagging shops), installation or removal operations. For additional information contact the industrial hygiene activities listed in enclosure (3). (R

2. Application of National Emission Standards for Asbestos

a. The National Emission Standards for Asbestos are contained in reference (d).

b. This standard became effective immediately upon publication and applies to asbestos mills, manufacture of asbestos products, demolition and renovation, spraying of asbestos, and the fabrication, insulation, and disposal of waste asbestos. It does not include fabrication or repair operations if the operation does not involve the production of asbestos cloth, cord, wicks, tubing, tape, twine, rope, thread, yarn, roving lap, or other textile material. (A

c. Demolition or modification of institutional, commercial or industrial buildings (including residential buildings containing 5 or more dwelling units) containing friable asbestos requires at least 20 days prior notice by prescribed format to the Administrator of EPA. The work must be accomplished in compliance with specific procedures for the removal and handling of friable asbestos-coated or -covered pipe, duct, boiler, tank, turbine, furnace or structural member.

d. Spray applications of materials containing more than 1% asbestos on a dry weight basis requires at least 20 days notice by prescribed format to the Administrator of EPA, and compliance

with emission limitations. Spray application of materials containing 1% or more asbestos is prohibited for buildings, structural members, pipes and conduits.

e. Rip-out of asbestos from commissioned ships is not included in the National Emission Standard; however, Navy ships are subject to state and local standards concerning asbestos rip-out from ships in state waters if such standards are applicable to ships, and are uniformly applied to all ships. Further, Navy ships must comply with NAVOSH Standards in enclosure (1) of this instruction.

f. Procedures for the handling, transporting and disposing of waste asbestos are prescribed in the Standards. Waste asbestos or asbestos-contaminated material must be wetted down and placed in impermeable containers prior to transporting for disposal. The containers must be labelled as prescribed in this instruction. The most commonly available disposal method is in a sanitary landfill operated in accordance with the requirements in Chapter 12 of OPNAVINST 6240.3E (NOTAL) and state and local permit requirements for sanitary landfills.

## Industrial Hygiene Technical Assistance Directory

1. General. Industrial hygiene personnel at BUMED activities are available to (a) provide consultation on occupational health matters; (b) provide specific assistance in monitoring personnel exposures to toxic contaminants and other hazardous agents; and (c) evaluate the need for, and recommend as appropriate, the administrative and/or engineering controls and/or personal protective equipment required to control personnel exposures in any potentially hazardous situation.

2. Activities Located in non-BUMED Commands. Request industrial hygiene services from the cognizant regional medical center which will provide, or arrange for, the required services. Industrial hygiene services are available in the following centers.

### Industrial Hygiene Services

| NAVREGMEDCEN | Autovon | Commercial | |
|---|---|---|---|
| Bremerton, WA | 439-9550 | (206)478-9550 | (R |
| Camp LeJeune, NC | 484-5707 | (919)451-5707 | (R |
| Camp Pendleton, CA | 993-4260 | (714)725-4260 | (R |
| Charleston, SC | 794-6600 | (803)743-6600 | (R |
| Corpus Christi, TX | 861-3465 | (512)939-3465 | |
| Great Lakes, IL | 792-2492 | (312)688-2492 | (A |
| Guam, Mariana Islands | 322-1110 | 339-2189 | (A |
| Jacksonville, FL | 942-2841 | (904)772-2841 | |
| Long Beach, CA | 873-6615 | (213)547-6615 | (R |
| Newport, RI/Portsmouth, NH | 684-2302 | (207)439-1000 | (R |
| Oakland, CA | 253-2458 | (707)646-2458 | |
| Pearl Harbor, HI | 430-0111 | (808)474-1137 | (R |
| Philadelphia, PA | 443-3734 | (215)755-3734 | (R |
| Portsmouth, VA | 954-7377 | (804)444-7377 | (R |

| NAVREGMEDCEN | Autovon | Commercial |
|---|---|---|
| San Diego, CA | 727-3850/2442 | (714)233-2442 |
| Subic Bay, RP | 844-6995 | |
| Yokosuka JA | 234-7521 | |
| NAVSUBMEDCEN Groton CT | 241-4613 | (203)449-4613 |
| NATNAVMEDCEN Bethesda MD | 295-5722 | (301)295-5722 |
| NAVAEROSPREGMEDCEN Pensacola FL | 922-3639 | (904)452-3639 |
| NAVHOSP Roosevelt Roads PR | 894-3920, Ext: 71-226 | 863-2000, Ext: 71-226 |

3. All Other Shore Activities. Request industrial hygiene assistance from the nearest Navy Environmental and Preventive Medicine Unit (NAVENPVNTMEDU), as listed below, or from:

Navy Environmental Health Center
Naval Station
Norfolk, Virginia 23511
AV: 690-4657
COM: (804)444-4657

4. Forces Afloat. Forces afloat which are located in a port supported by one of the NAVREGMEDCENs above and which require the services of an industrial hygienist, shall request assistance from the cognizant NAVREGMEDCEN. Others should request assistance from the nearest NAVENPVNTMEDU as follows:

| Unit No. | Location | Autovon | Commercial |
|---|---|---|---|
| 2 | Norfolk, VA | 690-7671 | (804)444-7671 |
| 5 | San Diego, CA | 958-1261 | (714)235-1261 |
| 6 | Pearl Harbor, HI | 430-0111 | (808)471-9505 |
| 7 | Naples, Italy | 625-1110 Ext: 724-4468 | |

DEPARTMENT OF THE NAVY
OFFICE OF THE CHIEF OF NAVAL OPERATIONS
WASHINGTON, DC 20350

IN REPLY REFER TO
OPNAVINST 6260.1B CH-1
OP-45
29 April 1983

OPNAV INSTRUCTION 6260.1B CHANGE TRANSMITTAL 1

From: Chief of Naval Operations
To: All Ships and Stations (less Marine Corps field addresses not having Navy personnel attached)

Subj: Control of Asbestos Exposure to Naval Personnel and Environs

Encl: (1) Revised page 1, new page 1a and reprinted page 2, of enclosure (1)

1. Purpose. To incorporate the provisions of OSHA Instruction CPL 2-2.21A which establishes a triggering level of 0.1 fibers per cubic centimeter of air (f/cc) time-weighted average asbestos concentration for medical surveillance. The incorporation of this level complements the existing 0.5 f/cc medical surveillance action level (MSAL) provided in subject instruction.

2. Action. Remove pages 1 and 2 of enclosure (1) and replace with enclosure (1) of this change transmittal.

D. S. CRUDEN
Assistant Deputy Cheif of
Naval Operations (Logistics)

Distribution:
SNDL Parts 1 and 2

Chief of Naval Operations
OP-09B15C
Wash., D.C. 20350 (200 copies)

Stocked:
CO, NAVPUBFORMCEN
5801 Tabor Ave.
Phil., PA 19120 (500 copies)

NAVOSH EXPOSURE STANDARDS, CONTROL, AND MEDICA, SURVEILLANCE REQUIREMENTS FOR ASBESTOS

1. Definitions

a. Fiber. A rod-shaped particle whose length-to-diameter ratio, or aspect ratio, is equal to or greater than 3:1, and whose length is greater than 5 micrometers. Airborne asbestos concentrations will be expressed as "counts," i.e., the number of fibers per cubic centimeter of air (f/cc). Sampling and counting methodologies are prescribed in paragraphs 4 and 5 below.

b. Asbestos Medical Surveillance Program (AMSP). This program consists of a periodic medical screening examination, which may include special purpose histories, physical examinations and laboratory tests, directed at detecting early changes in specific organ systems which have been identified with asbestos disease. Those individuals who, because of the nature of their job, must work with, or be in the vicinity of, operations which generate airborne asbestos shall be included in the medical surveillance program; and inclusion is not based solely on the determination that an individual has been overexposed.

c. Medical Surveillance Action Level (MSAL). The MSAL is the airborne concentration of asbestos fibers used to qualify an employee for placement in the AMSP. This MSAL has three separate and distinct criteria designed to assure that all individuals, currently or previously exposed, will be included in the AMSP. The MSAL is defined to include any individual, who because of Navy employment is: (R

(1) Required to enter or work in areas which could potentially contain an 8-hour time-weighted average (TWA) concentration of asbestos at or above 0.1 fibers/cubic centimeter (f/cc), or

(2) Required to enter or work on a regular basis in areas which could potentially contain concentrations of asbestos at or above 0.5 f/cc for any length of time ("on a regular basis" is defined as 15 separate days in any quarter during a calendar year or 45 days per year), or

(3) Exposed at any time, for any length of time, to airborne concentrations of asbestos at or above the "ceiling limit" of 10.0 f/cc.

The aforementioned term "Medical Surveillance Action Level" is defined and used only for the purpose spelled out specifically in this instruction and to identify those individuals who will be included in the Asbestos Medical Surveillance Program. The MSAL criteria are summarized as follows:

| CONCENTRATION (F/CC) | DURATION | FREQUENCY |
|---|---|---|
| Equal to or greater than 0.1 | 8-hour TWA | On any occasion |
| or | | |
| Equal to or greater than 0.5 | For any length of time per day | 15 days/quarter or 45 days/year |
| or | | |
| Equal to or greater than 10.0 | For any length of time | On any occasion |

Enclosure (1)

d. Permissible Exposure Limits (PELs)

R) (1) "Time-Weighted-Average (TWA)" - The 8-hour TWA airborne concentration of asbestos fibers to which personnel may be exposed shall not exceed two fibers per cubic centimeter of air (2 f/cc).

R) (2) "Ceiling Limit" - Personnel shall not be exposed at any time to airborne concentrations of asbestos in excess of ten fibers per cubic centimeter of air (10 f/cc).

2. Engineering and Work Practice Control Measures

a. Local exhaust ventilation is frequently required to ensure that atmospheric levels of asbestos do not exceed the PELs. General requirements for the design and use of ventiliation to reduce exposures can be found in attachment (1). Specific guidance in adapting attachment (1) to each asbestos operation may be obtained from the cognizant industrial hygienist - see enclosure (3).

b. As practicable, asbestos shall be handled, applied, removed, cut, scored, or otherwise worked in a wet state sufficient to prevent the emission of airborne fibers in excess of the PELs.

c. Asbestos-free substitute materials shall be tested under the technical management of cognizant headquarters activity and, if acceptable, shall be used in place of asbestos-containing materials.

d. All external surfaces in the work area where asbestos is handled shall be maintained free of visible accumulations of loose asbestos fibers which could result in airborne concentrations in excess of the PELs set forth in paragraph 1d.

e. Disposal of asbestos, asbestos-containing materials, and asbestos-contaminated waste shall be in accordance with the procedures listed in attachment (2).

f. To minimize exposure potential, shipboard or shore facility asbestos removal operations shall, to the maximum extent feasible, be performed during the second or third shifts or on weekends and holidays.

3. Personal Protective Equipment

a. Compliance with the PELs shall not be achieved by the use of respirators except as indicated in attachment (3). Assistance in the specific application of attachment (3) may be obtained from the cognizant industrial hygienist - see enclosure (3).

b. Special clothing such as coveralls, disposable whole body clothing, hoods, gloves and foot coverings shall be supplied

APPENDIX 4

GENERAL ELECTRIC COMPANY
KNOLLS ATOMIC POWER LABORATORY

STRUCTURAL ORGANIZATIONAL ROSTER — -716-KSO SAFETY/ENVIRONMENT/SPEC PROJS — DATA AS OF 08-24-86

| ORGANIZATION LEVEL / TITLE | POSITION INCUMBENT | EMP NO | COMP | CA | AI | RD |
|---|---|---|---|---|---|---|
| 5TH MGR-SAFETY ENV/SPEC PROJ | BAST, JOHN A | 1407 | 71610 | 10 | AR | 00 |
| 6--7--8 | -6--7--8 | | | | | |
| | WEMPLE, JOAN J | 8698 | 71610 | 81 | IR | 00 |
| MGR-KSO SAFETY + HEALTH | WINTERS JR, GLENN C | 8870 | 71620 | 10 | AR | 00 |
| | BENNICE, PAUL J | 1546 | 71620 | 11 | AR | 00 |
| | DOMAGALA, PETER W | 2869 | 71620 | 11 | AR | 00 |
| | KANIA, CHARLES J | 4509 | 71620 | 11 | AR | 00 |
| | REYNOLDS, WILLIAM J | 7042 | 71620 | 12 | IR | 00 |
| | VERRIGNI, S R | 8487 | 71620 | 12 | IR | 00 |
| | SMITH, MARGARET L | 7829 | 71620 | 80 | IR | 00 |
| SUPV-INCIDENT PREV + SAFETY | VITULLO, GENE J | 8503 | 71620 | 20 | IR | 10 |
| | FLANIGAN, MICHAEL E | 3295 | 71620 | 80 | IN | 10 |
| | FRASIER, CHRISTOPHER M | 3387 | 71620 | 80 | IN | 10 |
| | HAMMOND, MARK E | 3886 | 71620 | 80 | IN | 10 |
| | TAPPAN, DAVID M | 8161 | 71620 | 80 | IN | 10 |
| | AUFIERO, MICHAEL J | 1236 | 71620 | 93 | IN | 10 |
| | GATZENDORFER, JOSEPH P | 3518 | 71620 | 93 | IN | 10 |
| | GILDEA, CAROL L | 3621 | 71620 | 93 | IN | 10 |
| | LOEBER, CHARLES W | 5218 | 71620 | 93 | IN | 10 |
| | PALCOVIC, RALPH J | 6469 | 71620 | 93 | IN | 10 |
| | ROSS JR, FREDERIC D | 7201 | 71620 | 93 | IN | 10 |
| | ROSS, RICHARD P | 7202 | 71620 | 93 | IN | 10 |
| | SLADE, DAVID L | 7726 | 71620 | 93 | IN | 10 |
| | THOMAS, TIMOTHY R | 8238 | 71620 | 93 | IN | 10 |
| | VACCARA, MICHAEL L | 8385 | 71620 | 93 | IN | 10 |
| | WACHTEL, KENNETH C | 8523 | 71620 | 93 | IN | 10 |
| | WILSON, JACK A | 8848 | 71620 | 93 | IN | 10 |
| KSO ENVIRONMENTAL ENGR | DESROCHERS, PETER B | 2754 | 71630 | 11 | AR | 00 |
| | SMITH, CAROL N | 7752 | 71630 | 11 | AR | 00 |

APPENDIX 5 (Page 1)

S3G SRA MANAGEMENT STRUCTURE



APPENDIX 5 (Page 2)



APPENDIX 8

**SECTION I**

Work Request No.__________ Permit No.__________

Description of Job __________

Permit Initiator __________ Date ______ Time ______

Location of Job: Building __________ Room/Area __________

Names of Personnel Doing Work: __________

**SECTION II**

| Controls | Required | Not Required | Special Instructions |
|---|---|---|---|
| Ventilation secured or redirected ............... | | | |
| Asbestos Waste Containers available ............ | | | |
| Work area isolated and posted ................ | | | |
| Approved Asbestos vacuum ................. | | | |
| Glove Bag ........................... | | | |
| Large Containment ..................... | | | |
| Drop Cloth plus side partitions ............. | | | |
| Drop Cloth or poly bag below work area ......... | | | |
| Special Tools (Specify) ________ | | | |
| Disposable (Tyvek) Coveralls over Cloth Coveralls (or equivalent) .......... | | | |
| Disposable Hood ...................... | | | |
| Disposable Foot Coverings ................ | | | |
| Gloves (Specify type) ________ | | | |
| Type C Respirator (Respirator Permit Req.) ........ | | | |
| Full Face Respirator w/MSA Ultra Filter (Respirator Permit Req.) .................. | | | |
| Sampling (at least one required for each asbestos operation) ................ | | | |
| 1) Personnel ...................... | | | |
| 2) Environmental .................... | | | |
| Other (Specify) ________ | | | |

**SECTION III**

REQUIRED SIGNATURES: Requester __________
Signature Date Time

Area Tenant __________
Signature Date Time

APPROVAL TO START WORK: Kesselring Site Safety Office/ Qualified Plant Personnel

__________
Signature Date Time

Renewal Initials __________
Signature Date Time

__________
Signature Date Time

PERMIT TERMINATED BY: __________
Signature—Qualified Asbestos Monitor Date Time

KAP-3055 (10-80)

FIRE HOUSE

KESSELRING SITE SAFETY AND HEALTH INSTRUCTION NO. 7.0

SUBJECT: REMOVAL, HANDLING, & CONTROL OF ASBESTOS INSULATING MATERIAL

I. PURPOSE

The purpose of this Instruction is to establish the requirements, assign responsibilities and describe an audit plan to monitor the performance of asbestos work-related activities at the Kesselring Site.

II. SCOPE

This Instruction describes the administrative requirements to be followed for the removal, handling and disposal of asbestos-containing materials at the Kesselring Site.

III. REFERENCES

A. OSHA 29 CFR 1910.1001.
B. OPNAV Instruction 6260.1B with Change 1.
C. NR letter, F-6, 78-22; 08R4934, dated 12/5/78, with Enclosure.
D. KAPL Safety Manual (KAPL-A-S-1), Chapter 15, Instruction No. 2.0.
E. S-12, "Health, Environment and Safety Requirements for Work on Knolls Atomic Power Laboratory Sites," Rev. 11.
F. KSO Radiological Controls Manual, Vol. II, Procedure A.4.

IV. ENCLOSURES

1. Asbestos Worker/Monitor Qualification Standard.
2. Asbestos Work Permit.
3. Asbestos Air Sampling Field Data and Analysis Report.
4. EPA Reporting Requirements for Renovation/Demolition Involving Asbestos Material.

V. GENERAL CONSIDERATIONS

A. All thermal insulation used for lagging/relagging shall consist of non-asbestos material. Specific approval from Schenectady Naval Reactors (SNR) is required to deviate from the above.

B. All work contracts involving use of thermal insulation shall stipulate asbestos-free materials. All work contracts shall adhere to the requirements of Reference E (S-12 Rev. 11). If large scale demolition/renovation of buildings or components containing asbestos materials is anticipated, the prime contract administrator shall contact KSO Environmental Engineering to determine any EPA Reporting Requirements (see Enclosure 4).

C. The prime work or contract administrator shall make all efforts to utilize asbestos-free [illegible], gaskets, fire retardant wall board. If an asbestos-free substitute cannot be found, the Industrial Hyg[illegible]

D. All work packages involving removal of asbestos-containing thermal insulation or where release of airborne-asbestos dust is a consideration shall be reviewed by the Site Industrial Hygienist. If the Industrial Hygienist is not available, the Captain of Incident Prevention and Safety will serve as the qualified representative.

E. An Asbestos Work Permit (Form KAP-3055) is required for any work project which involves the potential for asbestos dust generation. Asbestos Work Permits are available from Incident Prevention and Safety, ext. 219.

F. All asbestos airborne monitoring data will be documented on the Asbestos Air Sampling Data and Analysis Sheet (see Enclosure 3).

VI. REQUIREMENTS FOR PERFORMANCE OF ASBESTOS WORK

A. Identification

1. Where non-asbestos thermal insulation materials are being used to replace pre-existing asbestos material, the section(s) replaced will be identified as non-asbestos material by use of either a red dye impregnated lagging cloth or by use of a red adhesive coating (in compliance with Class 1, Grade B requirements of MIL-I-2424). For all newly installed lagging (non-asbestos), the words "Non-Asbestos" will be stenciled in red over the final paint coat.

2. Whenever the composition of pre-existing lagging is in question, the Industrial Hygienist shall be consulted. Through use of lagging core samples, several analytical testing methods are available for determining the presence of asbestos fibers.

Note: Turnaround time varies depending on the specific analytical method employed.

3. The following major systems have been verified to be non-asbestos areas and do not require labeling:

a. MARF Plant, including PSB and Engine Room, except

(1) Reactor vessel nozzles and connecting piping covered by the Primary Shield Tank.

(2) Bottom and foundation of the Main Coolant Pump rod plates.

(3) Asbestos tape has [illegible] between [illegible] clamps and the pipes which they support.

b. S8G Prototype, including Buildings 81, 82 and 83.

B. Specific Practices When Asbestos Work is Required

This procedure sets forth the mechanisms and requirements for work with asbestos-containing material. All asbestos rip-out jobs must be reviewed prior to approval of an Asbestos Work Permit.

1. The Asbestos Work Permit (AWP) must be initiated in advance (minimum of 48 hours except in cases of emergency) to allow for proper review of the asbestos work task by the performing components supervisor, Site Industrial Hygienist, and applicable asbestos qualified personnel. For all asbestos ripouts, the requirement for an Asbestos Work Permit should be part of the work document.

2. Initiation of the Asbestos Work Permit is the responsibility of the component performing the work. The requirements for processing the Permit are as follows:

   a. Obtain the Asbestos Work Permit from Incident Prevention and Safety and complete Section I. Review the work task with the Industrial Hygienist to determine proper work procedures, personal protective measures (see Reference D for obtaining Respiratory Permit) and Airborne Asbestos Monitoring Requirements and complete Section II in order to select proper job controls. Obtain the Requester's and Area Tenant's signatures in Section III.

   b. Upon installation of the AWP specified controls, the performing Subsection's qualified Asbestos Monitor shall inspect the work area to ensure all controls have been established. The Asbestos Work Permit shall then be signed by the cognizant Asbestos Monitor.

   c. The Asbestos Work Permit shall then be returned to the Captain, Incident prevention and Safety who will review the Permit for completeness and will issue a Work Permit number. The Permit contains four (4) copies; the white (Firehouse) copy is placed in the Asbestos Work Permit "Active" file until permit is terminated. The yellow ([illegible]) copy, the pink (Work Package) copy and the blue (Area Tenant) copy shall be distributed or posted accordingly.

   d. The Asbestos Work Permit is valid for the duration of the work task. Any deviation from the initially specified requirements must be documented by the responsible Asbestos Monitor in Section III.

   e. Once work commences access to all asbestos work areas shall be restricted [illegible]

f. Upon completion of the work task, personnel approving the Permit are responsible for terminating the Asbestos Work permit by signing the posted (yellow) copy of the Permit and submitting it to the Captain, Incident Prevention and Safety for final termination.

g. Any deviation from the initially specified requirements indicated on the AWP must be approved and documented.

h. The asbestos work area will not be released for normal access until the Asbestos Work Permit is terminated by a Qualified Asbestos Monitor, and the job site copy (yellow) has been returned to the Captain, Incident Prevention and Safety.

C. Asbestos Waste Disposal

1. Obtain an open top 55-gallon drum by contacting the Foreman, Buildings and Grounds, ext. 310. Label the drum on the top and side with asbestos labels. A Chemical Waste Identification Label (KAP 3321) should also be affixed to the side. These labels are available in the Warehouse (Stock No. 16-031-105). Obtain a supply of green poly bags and visually check them for rips or tears. All waste material shall be immediately double bagged and wetted down. The bags shall be sealed, tagged, and placed in an asbestos-labeled 55-gallon drum.

Partially filled drums must be covered and may be maintained in the work area. When the drum is full, contact the area tenant's Waste Chemical Representative. The drums shall then be transferred to the Site Chemical Waste Storage Area in accordance with KAPL-A-EP-1, Procedure A.12. Chemical Waste Disposal. It is the requester's responsibility to ensure that this is accomplished.

VII. QUALIFICATION OF PERSONNEL

A. Navy Personnel

1. The KSO Industrial Hygienist will conduct courses on a semi-annual basis to qualify Navy personnel as Asbestos Workers/Monitors. See Enclosure 1. Navy personnel are trained as both Asbestos Workers and Monitors. Mandatory requalification seminars will also be held on a semi-annual basis.

2. The Prototype Plant Manager is responsible for ensuring that a sufficient number of qualified Navy personnel are available to support both ongoing and emergent asbestos work. It is the Prototype Plant's [illegible] comprehensive and annual followup medical examination requirements are being [illegible]

B. Civilian Personnel

1. The KSO Industrial Hygienist will conduct courses annually to qualify/requalify selected individuals as Asbestos Workers and as workers entitled "Trained in Asbestos Controls" (TACs). Asbestos workers qualified as KSO Laggers are the only group permitted to perform asbestos-related delagging operations. TAC individuals are trained to enter asbestos work areas to perform tasks specific to their job description. Selected supervisory personnel will receive additional annual training to serve as TAC monitors. In conjunction with the Industrial Hygienist, these personnel are responsible for Environmental and Personal Airborne Asbestos sampling and selected administrative items of an Asbestos Work Permit.

2. The KSO Industrial Hygienist will initiate medical screening and will obtain approval from the KAPL Medical Director for the initial TAC and Asbestos Worker Qualification. Annual medical reviews of TACs are not required unless airborne exposure levels equal or exceed the Medical Surveillance Action Level (MSAL) of Reference B. The Manager, Auxiliary Operations is responsible for the KSO Laggers' annual medical review.

VIII. ASBESTOS AUDIT PLAN

A. As a minimum requirement, the KSO Industrial Hygienist will conduct an audit of the following items:

1. Perform an annual review of Safety & Health Instruction No. 7.0 (currently Revision 5, 4/86).

2. Perform a quarterly audit of issued Asbestos Work Permits, Asbestos Data and Analysis sheets (Enclosure 3), Worker Qualification lists, and Laboratory Analysis reports.

3. Quarterly, submit to Schenectady Naval Reactors (SNR) a review of Navy Asbestos Worker Airborne Asbestos Monitoring results.

4. Submit an annual report to KAPL Medical Director on the results of Monitored Airborne Asbestos Exposure levels for Asbestos Workers (KSO Laggers) and TAC that equal or exceed the MSAL described in Reference B.

5. Conduct an annual field audit to include as a minimum requirement the following items:

   a. Inspect for the integrity of asbestos-containing lagging and component systems; make recommendations to responsible subsection(s) and track open items.

   b. With Auxiliary Operations, evaluate emergent area items to expedite removal of asbestos-containing material at the Kesselring Site.

c. Ensure that on-site temporarily stored asbestos waste is properly secured and labeled in accordance with KAPL-A-EP-1, Procedure A.12, Chemical Waste Disposal.

d. Inventory Warehouse supplies of materials used for asbestos work and ensure that stocked asbestos-containing items are stored and distributed as controlled material.

e. Evaluate asbestos work practices performed by Qualified Asbestos Workers.

## IX. CASUALTIES

### A. Cleanup of Loose Debris (non-airborne)

1. Inform supervisor; e.g., Shift Supervisor.

2. Restrict access of area as an Asbestos Exclusion Area. Qualified Asbestos Workers/TACs only are allowed to enter.

3. Prepare and obtain approval for an Asbestos Work Permit for recovery work (obtain at Incident Prevention & Safety, ext. 219).

   a. Qualified Asbestos Worker
   b. Half-face respirator and protective clothing
   c. Approved HEPA vacuum cleaner/damp kimwipes.

4. Instructions

   a. Clean up until there is no more visible debris.

   b. Area can be released from asbestos control when actions described in VI.B.2.h. have been completed.

### B. Cleanup of Personnel Who Come In Contact With Lagging Dust

On skin and clothing - Utilize damp kimwipe to remove dust until can conveniently go to lavoratory to wash with soap and water

Suspected in mouth/ nose - Blow nose in kimwipe
Spit out into kimwipe
Contact Supervision

### C. Immediate Actions for Release of Airborne Debris from a Lagging Associated Component

In the event that personnel encounter an airborne release of dust from a lagging associated component, immediately:

1. Have all personnel [illegible]

2. Restrict access of area as an Asbestos Exclusion Area. Qualified Asbestos Workers/TACs only are allowed to enter.

3. Prepare and obtain approval for an Asbestos Work Permit for recovery work (Incident Prevention and Safety, ext. 219). Approved protective equipment:

   a. Qualified Asbestos Worker.

   b. Half-face respirator and protective clothing.

   c. Approved HEPA vacuum cleaner/damp kimwipes.

   d. Equipment for personal monitoring for asbestos.

4. A qualified Asbestos Worker will enter area and immediately cover dust/debris with damp kimwipes; draw a one-hour large volume "pre-cleanup" environmental air sample and deliver to Captain, Incident Prevention and Safety.

5. After completion of environmental sample (do not wait for analysis), assemble a team of Qualified Asbestos Workers (document on same AWP) and complete the following:

   a. Appropriately secure lagging to prevent future release (e.g., tape/facelon/relag).

   b. Clean up all areas of loose debris with damp kimwipes and/or approved asbestos vacuum cleaner.

   c. Draw a one-hour asbestos clearance sample.

   d. Area will be released for unrestricted access when asbestos clearance sample is <.1f/cc. Reclean area if necessary and repeat clearance sample until obtain <.1f/cc.

X. RESPONSIBILITIES

A. <u>Kesselring Site Industrial Hygienist</u>

   1. Serve as the primary representative for asbestos-related work activities at the Kesselring Site.

   2. Maintain accountability for the requirements contained within the Asbestos Audit Plan Section VIII.

   3. Maintain and conduct the Asbestos Controls Training Programs for Navy and civilian personnel.

B. <u>Manager, Kesselring Site Safety and Health</u>

C. Manager, Prototype Programs

1. Ensure that an adequate number of qualified personnel are available to support both ongoing and emergent asbestos work activities in the Prototype Plants.

2. Instruct Plant supervision on the intent of this Instruction and ensure that compliance is met.

D. Manager, Auxiliary Operations

1. Ensure that an adequate number of qualified personnel are available to support both ongoing and emergent asbestos work activities.

2. Provide assistance from Radiological Services to perform DOP testing of asbestos vacuum cleaners (see Reference F).

E. Manager, Warehousing

1. Maintain an adequate supply of materials used for asbestos work and related activities.

2. Ensure that asbestos containing materials are stored and distributed as a controlled material.

F. Subsection Managers

1. Instruct supervision on the intent of this Instruction and ensure that compliance is met.

G. KSO Chem Lab Supervisor

1. Maintain proficiency in the PAT Analytical Testing Program for counting asbestos fibers.

H. Captain, Incident Prevention and Safety

1. Maintain proficiency as a qualified Asbestos Monitor.

2. Maintain a log entry system and perform reviews on incoming Asbestos Work Permits and Data and Analysis Sheets.

3. By calculation, determine clearance sample values for the purpose of terminating active Asbestos Work Permits.

I. Asbestos Workers/Asbestos Monitors/TACs

1. Maintain proficiency in their respective qualification(s).

G. C. Winters, Manager
Kesselring Site Safety & Health

J. A. Bast, Manager
Safety, Environment, & Special Projects
Kesselring Site Operation

ASBESTOS WORKER/MONITOR QUALIFICATION STANDARD

Rate ______
Organization/Plant ______
Section ______ Badge No. ______
Soc. Sec. No. ______

I. General Requirements

A. This qualification standard includes the specific requirements necessary to become an asbestos worker and/or asbestos monitor.

B. Individuals pursuing this qualification must be designated by their supervisor.

II. References - Reading Assignments

A. KAPL Safety Manual (KAPL-A-S-1):

1. Chapter 15, Instruction No. 7.0, "Removal, Handling, and Control of Asbestos Insulating Material."
2. Chapter 15, Instruction No. 2.0, "Respiratory Protection Program."

B. Related Incidents provided by KSO Safety Office (optional).

III. Discussion Requirements

| Requirement | Date | KSO Safety Office |
|---|---|---|
| A. Demonstrate an understanding of Safety and Industrial Hygiene Requirements associated with asbestos ripout including air sampling (Reference A.1.) | | |

IV. Performance Requirements

| Requirement | Date | KSO Safety Office |
|---|---|---|
| A. Attend a lecture on asbestos control conducted by the KSO Safety Office. | | |
| B. Complete an asbestos ripout operation under instruction (a non-asbestos mockup may be utilized). | | |
| C. Receive instructions and demonstrate ability to obtain personnel and environmental air samples (asbestos monitors only). | | |

| Requirement | Date | Grade | KSO Safety Office |
|---|---|---|---|
| D. Successfully pass a written examination (≥ 3.20). | | | |

V. Watchstanding Requirement - None

VI. Medical Examination Requirements (Asbestos Worker Only)

| Requirement | Date | KAPL Physician/Navy Disp. |
|---|---|---|
| A. Initial Medical Examination Approved (Date Performed: ______) | | |
| B. Medical records properly marked | | |

Date KAPL Physician/Navy ...

VII. Certification

A. Asbestos Worker Qualified

| Date | Mgr., KSO Safety & Heal |
|---|---|
| | |

B. Asbestos Monitor Qualified

| Date | Mgr., KSO Safety & Health |
|---|---|
| | |

C. Record of Attendance at Semi-Annual Requalification Seminar (failure to attend a semi-annual requalification seminar will result in automatic disqualification).

| Date | KSO Safety Office Rep. |
|---|---|
| | |
| | |
| | |
| | |
| | |
| | |

NOTE: This qualification standard shall be kept on file at the KSO Safety Offic

COMMENTS:

KESSELRING SITE SAFETY AND HEALTH INSTRUCTION NO. 7.0

KNOLLS ATOMIC POWER LABORATORY

ENCLOSURE (2)

# ASBESTOS WORK PERMIT

SECTION I

Work Request No. ______________________ Permit No. ______________________

Description of Job ______________________________________________

Permit Initiator ______________________ Date __________ Time __________

Location of Job: Building ______________________ Room/Area ______________________

Names of Personnel Doing Work: ______________________ ______________________

______________________ ______________________

______________________ ______________________

SECTION II

| Controls | Required | Not Required | Special Instructions |
|---|---|---|---|
| Ventilation secured or redirected ................ | | | |
| Asbestos Waste Containers available ............ | | | |
| Work area isolated and posted .................... | | | |
| Approved Asbestos vacuum ................ | | | |
| Glove Bag .............................. | | | |
| Large Containment ........................ | | | |
| Drop Cloth plus side partitions ................ | | | |
| Drop Cloth or poly bag below work area .......... | | | |
| Special Tools (Specify) ______________ | | | |
| Disposable (Tyvek) Coveralls over Cloth Coveralls (or equivalent) ............... | | | |
| Disposable Hood ........................... | | | |
| Disposable Foot Coverings ................. | | | |
| Gloves (Specify type) ______________ | | | |
| Type C Respirator (Respirator Permit Req.) ........ | | | |
| Full Face Respirator w/MSA Ultra Filter (Respirator Permit Req.) ................... | | | |
| Sampling (at least one required for each asbestos operation) ..................... | | | |
| 1) Personnel ........................... | | | |
| 2) Environmental ........................ | | | |
| Other (Specify) ______________ | | | |

SECTION III

REQUIRED SIGNATURES: Requester ______________________________________
Signature Date Time

Area Tenant ______________________________________
Signature Date Time

APPROVAL TO START WORK: Kesselring Site Safety Office/ Qualified Plant Personnel

______________________________________
Signature Date Time

Renewal Initials ______________________________________
Signature Date Time

KAPL - KESSELRING SITE OPERATION ASBESTOS AIR SAMPLING DATA & ANALYSIS REPORT SHEET

Plant: ________ Date: ________ Work Permit No.(s): ________

...tion of Work (be specific): ________

## EMPLOYEES MONITORED

| ...of Employees Monitored | Badge No. | Section | Occupation | Supervisor | Protective Equipment Worn: (circle) |
|---|---|---|---|---|---|
| | | | | | 1. Supplied-air respirator<br>2. Air-purifying respirator<br>3. Gloves<br>4. Coveralls<br>5. Hood, shoe covers |
| | | | | | |
| | | | | | |

## SAMPLE INFORMATION

| No. | Type of Sample: Personnel | Type of Sample: Environmental | Identification (Name of wearer or location) | Pump ID | Calib. Date | Flow Rate: On | Flow Rate: Off | Time On | Time Off |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |

Clearance Sample Results

Sample No. ____ Date/Time ________

Lab Performing Analysis ______ fibers/filter reported / pump volume drawn = ______ = ____ f/cc

Data recorded by: ________________ ________________

(Signature) (Print)

KNOLLS ATOMIC POWER LABORATORY

ENCLOSURE (3)

ASBESTOS/FIBERGLASS AIR SAMPLE ANALYSIS REPORT

SAMPLE ANALYSIS RESULTS

| Sample No. | Sample Volume ($cm^3$) | Sample Time (min) | Fibers/Filter | Fibers/$cm^3$ |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

PERSONAL MONITORING RESULTS

| Name (Last, First, MI) | Represented by Samples Numbered: | Ceiling Conc.* (fibers/$cm^3$) | 8-hour TWA** (fibers/$cm^3$) |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

*Concentrations calculated after correcting sample fibers/$cm^3$ for background fibers/$cm^3$ when background sample was taken.

**8-hour TWA is calculated from one or more sample times (minutes) and concentrations (fibers/$cm^3$) as follows:

$$8\text{-hour TWA} = \frac{\sum (C_i \times T_i)}{480} = \frac{(C_1 \times T_1) + (C_2 \times T_2) + \cdots + (C_n \times T_n)}{480}$$

REMARKS:

The person signing this form certifies by his signature that the indicated actions were actually performed and that the recorded data are correct to the best of his knowledge.

| Calculations performed by (signature): | Date: |
|---|---|
| | |

## EPA REPORTING REQUIREMENTS FOR RENOVATION/DEMOLITION INVOLVING ASBESTOS MATERIAL

1. DEFINITIONS

   a. Demolition - The demolition of any industrial building, structure, facility, installation or portion thereof which contains any pipe, duct boiler, reactor or structural member that is covered or coated with friable asbestos materials.

   b. Renovation - The removal of asbestos material used to cover any pipe, duct, boiler, tank, reactor, furnace or structural member for purposes of repiar or replacement.

2. The following chart indicates the specific EPA reporting requirements for renovation or demolition of operations involving asbestos material.

| Notification Required | Demolition of >260 linear ft. of pipe or >160 sq. ft. of Asbestos Mat'l. | Demolition of <260 linear ft. of pipe or <160 sq. ft. of Asbestos Mat'l. | Renovation of >260 ft. of Pipe or >160 sq. ft. of Asbestos Mat'l. | Renovation of <260 ft. of Pipe or <160 sq. ft. of Asbestos Mat'l. |
|---|---|---|---|---|
| None | | | | X |
| Format A | | X | | |
| Format B | X | | X | |

3. NOTIFICATION FORMATS

   A. 1. Name of owner or operator.

      2. Address of owner or operator.

      3. Address or location of the building, structure, facility, or installation.

      4. Scheduled starting and completion dates of demolition or renovation.

      5. The following notification is required to be delivered to the EPA 20 days prior to commencement of demolition or renovation.

      6. The measured or estimated amount of friable asbestos material.

      7. An explanation of the techniques to be used to remove the asbestos material.

3. NOTIFICATION FORMATS (Continued)

B. 1. Name of owner or operator.

2. Address of owner or operator.

3. Description of the building, structure, facility, or installation to be demolished or renovated, including the size, age, and prior use of the structure, and the approximate amount of friable asbestos materials present.

4. Address or location of the building, structure, facility, or installation.

5. Scheduled starting and completion dates of demolition or renovation.

6. Nature of planned demolition or renovation and method(s) to be employed.

7. Procedures to be employed to ensure there will be no viable emissions to the outside air.

8. The name and address or location of the waste disposal site where the friable asbestos waste will be deposited.

9. Name, title, and authority of the State or local governmental representative who has ordered a demolition.

SINGLE USE RESPIRATORY PERMIT

REQUESTER ______
JOB LOCATION ______
JOB DESCRIPTION ______

| HAZARD | Yes | No |
|---|---|---|
| *Airborne Radioactivity | | |
| Oxygen Deficiency | | |
| Fumes, Smoke, Dust, etc. | | |
| Gas or Vapors | | |

| PERSONS USING EQUIPMENT | PROPERLY INSTRUCTED Yes | PROPERLY INSTRUCTED No | MEDICALLY CLEARED Yes | MEDICALLY CLEARED No | MEDICALLY CLEARED Reference | RESPIRATOR # |
|---|---|---|---|---|---|---|
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

**EQUIPMENT TO BE USED**

| SUPPLIED AIR RESPIRATOR | Required | Not Required | N/A |
|---|---|---|---|
| Air Line Respirator | | | |
| Air Supplied Hood | | | |
| Air Fed Suit | | | |
| Clearvue Mask & Breathing Tube | | | |
| Air Hose____ft. | | | |
| Cartridge Filter | | | |
| Flow Valve | | | |
| Compressor | | | |
| Breathing Air Cylinder | | | |
| Air Quality Analyses | | | |
| $CO/O_2$ Monitor | | | |

**SELF CONTAINED BREATHING APPARATUS**

| | | | |
|---|---|---|---|
| MSA Air Pak | | | |
| Scott Air Pak | | | |
| Spare Air Tanks | | | |
| Other:______ | | | |

**AIR PURIFYING RESPIRATORS**

| | | | |
|---|---|---|---|
| Half Face Respirator<br>Qty. ______<br>(Stock # ) | | | |
| Full Face Respirator;<br>Qty. ______<br>(Stock # ) | | | |
| Cartridge;<br>Qty. ______<br>Type ______<br>(Stock # ) | | | |
| Canister;<br>Qty. ______<br>Type ______<br>(Stock # ) | | | |

*Only if Radioactivity Involved.

| SPECIAL PRECAUTIONS | Required | Not Required |
|---|---|---|
| Harness and Life Lines | | |
| Compressor/Cylinder Watch | | |
| Tank Entry Permit | | |
| Atmospheric Tests | | |
| Forced Ventilation | | |
| Freq. for Replacing Cartridge/Canister | | |
| Flame Permit | | |
| Asbestos Work Permit | | |
| Low Voltage Lights | | |

**AIR QUALITY/ATMOSPHERIC TEST RESULTS**

| | | Date | Time | Insp. | N/A |
|---|---|---|---|---|---|
| $CO_2$ | % | | | | |
| Oxygen | % | | | | |
| Explosive | % LEL | | | | |
| Hydrocarbons | $mg/m^3$ | | | | |
| CO | ppm | | | | |
| Other: ______ | | | | | |

**REMARKS:**

______

**SIGNATURES**

Requester: ______
*Rad Con ______
IP&S ______
Permit No. ______
Date Issued: ______ Date Expired: ______
Close Out Sign: ______ Date: ______

| Respirator # | Returned | Disposed |
|---|---|---|
| | | |
| | | |
| | | |

KAP 3329A (8-81) NEW

FIREHOUSE

517–959